**Page 14**

1    A.  Yes.
2    Q.  By whom?
3    A.  Roy Eckert.
4    Q.  And when did Mr. Eckert authorize that?
5    A.  Umm, do you expect me to give you an exact
6  date?
7    Q.  Best you can.
8    A.  I can't give an exact date. It was -- I
9  left Ketchikan June 6. It was over a month prior to
10 that.
11   Q.  Okay. So April or early May?
12   A.  Yes.
13   Q.  Can you -- well, first of all, was it in
14 writing?
15   A.  No.
16   Q.  Can you give me some context that would
17 help us put that conversation in time?
18   A.  Well, it made -- it made a huge difference,
19 because for one thing we did not have to find an H.R.
20 manager prior to my departure. It made a big
21 difference in how I closed out -- for lack of a better
22 term -- my office and the work that was in progress.
23         So I remembered the conversation well. And
24 Roy said 2006, you know, this is -- or 2005, excuse me.
25 I'm really confused on years. And it was 2005.

**Page 15**

1    Q.  Got it.
2    A.  If you have a computer, a fax machine, and
3  a phone you can perform -- I think what he said was,
4  you can be anyone but a surgeon and do it remotely.
5    Q.  Are you describing one conversation or more
6  than one conversation?
7    A.  We had several conversations about it.
8    Q.  Okay. How did the idea come up?
9    A.  We were -- I was in his office. We were
10 talking about things that were not yet complete. For
11 instance, we had four union contracts that were not yet
12 signed.
13        And we were talking about some personnel
14 issues that were in progress and were moving along
15 positively and -- we were just talking about open
16 issues in H.R. probably is what we were doing. I mean,
17 I think that's the best way to describe it.
18        And I told him that I would really like to
19 stay with the union contracts until they were signed,
20 because one of those unions had been negotiating for a
21 long long time and had changed negotiating teams more
22 than once and I wanted to stay with them.
23        And he said -- this is not a direct quote.
24 He said something to the effect that I wish you would
25 just do -- stay with your whole job. And I said, but I

**Page 16**

1  really need to be in Oregon. And he said I know.
2         And we discussed doing it remotely and what
3  would work and what would not work. And we talked
4  about it two or three or four times, and then it was
5  determined that that was what I would do. We talked --
6  discussed it with supervisors. It was --
7    Q.  Okay. Let me take that in smaller bites if
8  I may.
9         Were there other people present at the
10 discussion you just described for me?
11   A.  Initial one, absolutely not.
12   Q.  So it's just you and Mr. Eckert?
13   A.  Yes.
14   Q.  Okay. And during that discussion
15 Mr. Eckert must have already known that you were
16 planning to go to Oregon?
17   A.  He knew in February. I told him in
18 February.
19   Q.  So actually, at the risk of confusing
20 myself even more, let me ask you to go back to February
21 then.
22        In February did you tell Mr. Eckert that
23 you had family problems that might require you to move?
24   A.  Yes.
25   Q.  Okay.

**Page 17**

1    A.  He was aware of the situation prior to my
2  saying okay, this is coming to a head, I'm going to
3  have to go.
4    Q.  How long do you believe Mr. Eckert was
5  aware of these family issues roughly?
6    A.  Probably within a couple of months of my
7  employment.
8    Q.  Oh, okay. And then in February of 2005,
9  you told Mr. Eckert what?
10   A.  That I was going to have to go to Oregon.
11   Q.  Okay. And did you tell Mr. Eckert when you
12 were going to have to go to Oregon?
13   A.  Yes, in June.
14   Q.  And in February then was it your
15 expectation that you would be leaving your employment
16 with the Ketchikan Gateway Borough come June?
17   A.  Yes.
18   Q.  Did the issue of remotely working come up
19 in February?
20   A.  No.
21   Q.  In February, to your knowledge, was there
22 anything written down on paper by either you or
23 Mr. Eckert about your leaching?
24   A.  No.
25   Q.  And going --

Exhibit A
Page 5 of 43                        5 (Pages 14 to 17)

Page 18

1      MR. VENNEBERG: Make sure to allow him
2   to finish his question before you answer.
3      THE WITNESS: Oh, I'm sorry.
4      Q. (By Mr. Sandberg) When did the issue of
5   working remotely first come up then?
6      A. I can't give you an exact date. It was
7   more than a month before I left, so I would say it was
8   in April.
9      Q. Okay. And who raised the issue of working
10  remotely? Was it you or was it Mr. Eckert?
11     A. I'm sorry, I thought I'd already answered
12  that. I believe we both got there together in the
13  conversation. I know that I never went to him and
14  said, Can I just do this from Oregon. So I think we
15  just arrived at working remotely when we were
16  discussing how we were going to handle H.R. things.
17         Does that answer the question?
18     Q. Maybe but I probably won't stop.
19     A. That's fine.
20     Q. Are we talking about one discussion or
21  multiple discussions in April?
22     A. We talked -- I spent time with Roy every
23  day.
24     Q. Okay. So does that mean this was an issue
25  that over time you and Mr. Eckert discussed?

Page 19

1      A. I don't believe so. I believe we reached
2   this decision that I would work from Oregon in two
3   conversations at the most.
4      Q. And you told me that there was no one
5   besides you and Mr. Eckert at at least one of these but
6   was there to your recollection anyone other than you
7   and Mr. Eckert present at either of the two
8   conversations?
9      A. No.
10     Q. Okay.
11     A. No.
12     Q. Then you said -- I believe you talked it
13  over with some supervisors?
14     A. We discussed with -- I discussed it with
15  supervisors to find out if they had a problem with that
16  because it had to work for the supervisors.
17     Q. Who did you talk to?
18     A. We have a lot of supervisors. I spoke with
19  every one of them.
20     Q. Oh, okay. So the answer is, all of them?
21     A. Yes.
22     Q. And generally what did they have to say?
23     A. They didn't see a problem with it. They
24  wanted to know if I would have e-mail. They wanted to
25  know if I would always be accessible by phone, and they

Page 20

1   wanted to know if I would be coming back to Ketchikan
2   if I needed to be there.
3      Q. And you told them what?
4      A. Yes, yes, I would have e-mail. I would
5   have a phone. I would go back to Ketchikan as
6   necessary.
7      Q. How often were you contemplating returning
8   to Ketchikan?
9      A. That would be totally dependent on what was
10  going on in Ketchikan. But at least quarterly and
11  maybe more.
12     Q. Who would be paying for your travel to
13  Ketchikan?
14     A. I would be.
15     Q. Okay. It wasn't your expectation that the
16  Borough would be paying for your travel from Oregon for
17  these quarterly returns?
18     A. No. The -- there couldn't be an added cost
19  involved to the Borough --
20     Q. Okay.
21     A. -- for me, for having me gone.
22     Q. Prior to your departure on June the 6th was
23  it?
24     A. Yes.
25     Q. Prior to your departure on June the 6th are

Page 21

1   you aware of any writing authorizing you to work
2   remotely?
3      A. No.
4      Q. Prior to June the 6th did you have
5   authorization to work remotely from any individual
6   other than Mr. Eckert?
7      A. No.
8      Q. For example, to the best of your knowledge
9   has the assembly of the Ketchikan Gateway Borough ever
10  authorized you to work remotely?
11     A. No.
12     Q. To this date has any person other than Roy
13  Eckert ever authorized you to work remotely?
14     A. I didn't -- I wasn't accountable to anyone
15  but Roy.
16     Q. No. I'm just trying to make sure I
17  understand the world of possibilities.
18         And so, to this date the only person who
19  has ever authorized you to work remotely is Mr. Eckert,
20  correct?
21     A. Yes.
22     Q. Let's go through the job description then
23  at page 54. And maybe you can tell me how you were
24  picturing some of these things were going to work. If
25  we may, if we look under the job summary, about four

Exhibit A
Page 6 of 43

6 (Pages 18 to 21)

Page 22

1  lines down, we come to the word training that the human
2  resources manager, slash, safety officer will have
3  responsibility for training.
4         As a practical matter, prior to working
5  remotely, what kind of training did you actually do and
6  for whom?
7     A. It's interesting that you picked that out
8  because if you will look at my evaluations, training
9  was a portion of this job that Roy wanted delayed and
10 so there hadn't been any training started.
11    Q. Oh, okay. So prior to June 6, 2005, you
12 had not in fact been training anybody?
13    A. Formal training, no. I mean, no.
14    Q. Okay.
15    A. There was training going on but I was not
16 doing it.
17    Q. Who was?
18    A. The supervisors were.
19    Q. So prior to your departure on June the 6,
20 2005, you weren't providing training to any employees
21 of the Ketchikan Gateway Borough?
22    A. Not formal class, no.
23    Q. Okay. If you had stayed -- in other words,
24 if the issue with your mother simply had never come up
25 and you had stayed after June 6 was it contemplated?

Page 23

1  Was it your expectation that you were going to have to
2  provide training?
3     A. Yes, we would have, yes. Sorry I
4  interrupted again.
5     Q. That's okay. I mean, she probably likes it
6  better when we only talk one at a time. But I don't
7  mind.
8         What was your expectation of what would
9  have happened if you stayed? In other words, who were
10 you going to be training and what would it have looked
11 like?
12    A. We would have done supervisory. We would
13 have started with supervisors. This was my
14 expectation. We needed sexual harassment training,
15 which is now called sensitivity training. We needed --
16 in my opinion, we needed to spend time with our
17 supervisors and be certain that they understood the
18 union contracts they were bound by.
19        There was some confusion there. I felt if
20 we just spent time with them and went through the
21 contracts and explained to them so they understood it,
22 it would make their jobs much simpler.
23        We also had union members who didn't
24 understand the contracts, but we had not started any of
25 those.

Page 24

1  Those are the two areas that I felt were
2  most important.
3     Q. After your departure -- so let me strike
4  that question and ask it differently.
5         Was training a function that you thought
6  you could do remotely?
7     A. I would have gone back to Ketchikan to do
8  it.
9     Q. So these are things that you would have
10 done, say, during your quarterly visit that is we were
11 talking about?
12    A. Or whenever I went. We were never bound
13 to -- I was never bound to quarterly visits.
14    Q. Okay. And let me explain. None of my
15 questions were intended to carry an answer. I'm just
16 trying to understand at this point what you had in your
17 mind for how that arrangement was supposed to work.
18    A. I understand.
19    Q. The next line on this has to do with
20 responsible for organization, coordination,
21 administration of the day-to-day functions of the
22 Borough's personnel management system.
23        What are the day-to-day functions of the
24 Borough's personnel management system?
25    A. Depends on who's interpreting that.

Page 25

1     Q. Well, it goes on to list some of them.
2     A. I know. I know. You want to know what I
3  do every day?
4     Q. Yeah. What's a day look like?
5     A. Okay. Routinely my day started reading
6  e-mails. Because I always had a lot of e-mails. I
7  then went through any issues or projects or questions
8  that had not been completed prior to going home the day
9  before.
10        I talked to supervisors. I talked to
11 employees. I visited offices or job sites or -- are
12 you familiar with Ketchikan Gateway Borough offices'
13 layout?
14    Q. I've been to it.
15    A. Have you been only to downtown?
16    Q. Yes.
17    A. Because we're kind of scattered all over,
18 and so, it just depended what was going on where I
19 spent my time.
20        There were meetings, of course, that were
21 attended as scheduled. There was preparations
22 sometimes for Borough assembly meetings.
23        We met with insurance representatives
24 regarding Worker's Comp, and we had other government
25 people who visited the offices and sometimes I attended

Exhibit A
Page 7 of 43
7 (Pages 22 to 25)

MOBURG & ASSOCIATES   1601 Fifth Avenue Suite 860   Seattle, WA 98101
Court Reporters            206-622-3110            Fax 206-343-2272

85e52045-9de4-4003-8f0a-6dd5572f9b70