Thomas v. Ketchikan Gateway Borough   6/20/06                           Carolyn Thomas

## Page 26

1  those and sometimes I did not.
2         When the legislature was in session I
3  followed bills that would be advantageous to the
4  Borough.
5         I worked with Scott -- the Borough attorney
6  Scott Brandt-Ericksen on some lawsuits, some issues. I
7  spoke with, you know, representatives sometimes on a
8  daily basis. Other times there would be many days
9  before there was an issue that prompted them to call.
10        I negotiated for union contracts while I
11 was there. I read job evaluations. Each department
12 had -- does job evaluations on all employees around a
13 schedule. And there are written and then they come to
14 me and I sign them or initial them. Any pay change
15 came to me. Crying employees came to me. There's a
16 lot of variety.
17        Have I answered your question adequately?
18    Q. Well, that's quite a list. If you think of
19 some more as we go along don't hesitate to tell me.
20 But let's go through those things now and maybe you can
21 explain to me how you were contemplating these
22 functions would be handled after June the 6 --
23    A. Okay.
24    Q. -- once you were living in Oregon.
25        E-mails, you said you began your day with

## Page 27

1  e-mails typically, correct?
2     A. Yes.
3     Q. And certainly a person can read e-mails
4  wherever they happen to be, right?
5     A. Yeah.
6     Q. And the next thing you said was -- or at
7  least I took down, related to dealing with issues. And
8  I'm not sure what you meant by that.
9     A. Umm, if a supervisor had -- or an employee
10 had a question about something and we hadn't resolved
11 that, then that's what I was talking about.
12    Q. How did you picture that was going to work
13 when you were working remotely?
14    A. We did it on the phone when I was in
15 Ketchikan.
16    Q. So this wasn't a face-to-face function
17 either?
18    A. It could be, but more often than not it was
19 not a face to face function.
20    Q. So you were thinking that when you were
21 working remotely that this was something you could
22 handle on the phone?
23    A. Yes.
24    Q. Okay. Then the next thing I took down was
25 talked to employees. Was that a face-to-face function

## Page 28

1  typically?
2     A. Sometimes, sometimes not.
3     Q. And how were you contemplating that was
4  going to work once you were --
5     A. By phone or e-mail.
6     Q. Then the next thing I took down was
7  visiting facilities. That certainly is something you
8  could only do in person, correct?
9     A. Yes.
10    Q. How were you thinking that was going to
11 work once you were in Oregon?
12    A. I would not visit those facilities if I was
13 in Ketchikan.
14    Q. Then you said attending meetings. What
15 kind of meetings are we talking about?
16    A. Well, there were a lot of different kinds
17 of meetings. There were not -- all of which related to
18 human resources by the way.
19    Q. So they might be more generalized staff
20 meetings of some kind?
21    A. No. Staff meetings were staff meetings and
22 they were every Tuesday.
23    Q. Oh, okay. What kind of meetings then are
24 we talking about?
25    A. If we met with insurance companies when we

## Page 29

1  did those.
2     Q. I've got that.
3     A. If we met with the workers' comp adjusters.
4         Sometimes we had -- or sometimes we
5  discussed purchasing new software, for instance, that
6  would perform a lot of personnel functions, then I
7  would have gone to that.
8     Q. Before June 6 were these meetings something
9  that people got together and talked face to face?
10    A. And would continue to be so, yes.
11    Q. Okay. So how were you picturing that this
12 part of your job would happen or work after you went to
13 Oregon?
14    A. These were always scheduled ahead of time
15 because it required coordination of several different
16 departments. And so, I would have flown to Ketchikan.
17    Q. So you were thinking that these meetings
18 would be scheduled for a time when you'd be there?
19    A. Or I would be there when they were
20 scheduled. Yes.
21    Q. Okay.
22    A. Yes. The schedule -- I had a reason for
23 making that and I did not mean to sound flippant. I
24 did not expect everyone to schedule everything around
25 me, if that was your question.

Exhibit __A__
Page __8__ of __43__                        8 (Pages 26 to 29)

MOBURG & ASSOCIATES   1601 Fifth Avenue, Suite 860   Seattle, WA 98101
Court Reporters        206-622-3110              Fax 206-343-2272

85e52045-9de4-4003-8f0a-6dd5572f9b70

Thomas v. Ketchikan Gateway Borough   6/20/06                                Carolyn Thomas

Page 30

1  Q. No.
2  A. I expected to be the one inconvenienced by
3  a scheduling problem.
4  Q. I wasn't trying to be a smart aleck. I was
5  simply trying to understand.
6      What you were picturing was that the
7  meetings would take place when you were physically in
8  Ketchikan?
9  A. Yes.
10 Q. Okay.
11 A. Yes.
12 Q. And then you said other government people
13 visited. They would be government people from some
14 other entity besides the KGB?
15 A. Yes. The mayor of Saxman, the city mayor,
16 although they don't visit very often. Our state
17 representative. Our state senator or representatives
18 of -- you know, probably state employees who came down
19 to visit with the Borough.
20 Q. And once again are we discussing
21 face-to-face meetings with these government people?
22 A. Uh-hmm.
23 Q. How did you picture that was going to work
24 after June the 6th?
25 A. They weren't there to see me.

Page 31

1  Q. Okay.
2  A. The reason -- go ahead.
3  Q. No. Finish up. The reason...
4  A. The reason I was so involved in that
5  portion is because I was chief staff for a state
6  senator for three years prior to going to the Borough.
7  So I knew these people. But they didn't come to visit
8  me.
9  Q. I am once again then a little confused.
10 When they showed up what did you do?
11 A. I was just the one who was the Borough
12 contact for them. And I visited with them, took them
13 in the conference room, got them something to drink,
14 let them use my computer to check their e-mails.
15 Q. I see.
16 A. But it was not part of my job.
17 Q. Okay. And then let's see. The next thing
18 I took down was that you followed legislation.
19 Certainly I suppose a person can follow legislation --
20 A. On line.
21 Q. -- anywhere.
22     Then you worked with Scott regarding
23 lawsuits and other issues.
24     Typically would that involve going into
25 Scott's office and working with him physically face to

Page 32

1  face?
2  A. Scott -- sometimes yes. Scott prefers
3  e-mail because then there is always a paper trail.
4  Q. Okay.
5  A. So working with Scott was not going to be a
6  problem.
7  Q. So after June you pictured that working
8  with Scott would be done by e-mail or on the phone?
9  A. Yes.
10 Q. Then you spoke with union representatives
11 daily sometimes.
12     What unions are we discussing?
13 A. APEA, Alaska Public Employees Association;
14 IBU, Inland Boatmen's Union; MM and P, Masters, Mates
15 and Pilots; and IBW, International Brotherhood of
16 Electrical Workers. But that was always on the phone.
17 Q. Okay. That's what I was about to ask next
18 is, did you meet with these people face to face or on
19 the phone?
20     I mean, we need a question in front of an
21 answer. I'm sorry.
22 A. That's all right. Almost always on the
23 phone. There was one union representative that I
24 negotiated a contract with and I never met him.
25 Q. Then it says you negotiated for union

Page 33

1  contracts. Having never negotiated a union contract
2  what's that look like? What do you do?
3  A. You just meet with the union. Usually
4  management selects a negotiating team and the
5  bargaining unit selects a negotiating team. And
6  someone is head of each team. And you meet -- there
7  are all kinds of different negotiating styles. My
8  preference is for each side to present a list of their
9  needs or wants.
10     Negotiating union contracts is a process of
11 give and take. And please understand that this is my
12 negotiating style; this is not anyone else's
13 negotiating style. It isn't all done this way. But in
14 my opinion, as a negotiator, it's a process of give and
15 take. You have your bottom line just like the union
16 has their bottom line. And hopefully you can work to a
17 resolution that's acceptable to both sides.
18 Q. Does that process involve a face to face
19 interaction as well as being on the telephone?
20 A. When you get to the nitty gritty yes, it's
21 face to face.
22 Q. And when you left for Oregon in June there
23 were several negotiations still in the works, correct?
24 A. They were not signed.
25 Q. Okay. Which unions are we talking about

Exhibit A
Page 9 of 43                                                9 (Pages 30 to 33)

MOBURG & ASSOCIATES   1601 Fifth Avenue,  Suite 860    Seattle, WA 98101
Court Reporters         206-622-3110                    Fax 206-343-2272
85e52045-9de4-4003-8f0a-6dd5572f9b70

Thomas v. Ketchikan Gateway Borough   6/20/06                                  Carolyn Thomas

Page 34

1  not being -- that you were still working on, in other
2  words?
3      A.  All but IBW.
4      Q.  Was there anything that you expected about
5  the union -- negotiating the union contracts that was
6  going to require your return to Ketchikan after June?
7      A.  Yes.
8      Q.  Okay.  And what would that be?
9      A.  Presenting them to the Borough assembly.
10     Q.  Anything else?
11     A.  No.
12         Can I have a short break please?
13     Q.  Oh, sure.  Yeah, anytime.  We've been going
14 on for better part of an hour.  That's fine.
15         (Off the record.)
16     Q.  (By Mr. Sandberg)  Before our break I was
17 going through the list of things that on ordinary day
18 might involve.
19         And the next one on my list here would be:
20 Read job evaluations.  First of all, we're talking
21 about a piece of paper, correct?
22     A.  Yes.
23     Q.  Okay.  I mean, these aren't something
24 that's on line, for example?
25     A.  No.

Page 35

1      Q.  So how often would you have to read job
2  evaluations in the course of performing your functions
3  as the human resources manager, slash, safety officer?
4      A.  Umm, I think I can best answer that by
5  saying that any -- every employee was evaluated
6  annually, except the new employee who was evaluated at
7  six months and then twelve months.  So I would see 120
8  a year.  That's a generalization.
9      Q.  Okay.  Was it then one every three days or
10 were they batched?
11     A.  It depended on how they were -- I'm not
12 trying to be evasive.  You might get three or four in
13 one month or five or six or ten and not have any for
14 two or three months.
15     Q.  Okay.  And reading job evaluations, who did
16 they come from?
17     A.  They came from the supervisor.
18     Q.  And the supervisor would fill out a form
19 and submit it to you?
20     A.  Yes.
21     Q.  And what would you do with the form?
22     A.  Read it and initial it.
23     Q.  Anything else?  I mean, I'm trying to
24 understand.  Why was it routed to you?
25     A.  Because I was the human resources manager.

Page 36

1      Q.  Okay.  And so, were you expected to -- I
2  mean, were you expected to do something with the forms
3  other than read and initial it?
4      A.  They went in the personnel file once they
5  came to us.
6      Q.  Okay.  How were you picturing that this
7  function was going to happen after you moved to Oregon?
8      A.  Holly either faxed them to me or scanned
9  them and e-mailed them to me.
10     Q.  In Oregon?
11     A.  Yes.
12     Q.  So after you went to Oregon in June, the
13 job evaluations physically -- did some job evaluations
14 physically come to you in Oregon?
15     A.  No.
16     Q.  So I'm once again confusing us both I
17 think.  Because the first thing I asked you was, how
18 did you expect this to work, and then what I'm trying
19 to understand now is after you left how did it work.
20 So after you left did you in Oregon receive any job
21 evaluations for any employee of the KGB?
22     A.  Not to my knowledge.
23     Q.  As we sit here today do you have any
24 personnel records regarding any employee of the KGB,
25 other than yourself, in Oregon?

Page 37

1      A.  Absolutely not.
2      Q.  The records we're discussing are
3  confidential records, correct?
4      A.  Yes.
5      Q.  And maintaining confidentiality would
6  certainly be important, correct?
7      A.  Yes.
8      Q.  So how were you picturing that this
9  function was going to work once you were in Oregon?  I
10 mean, you expected somebody to be faxing them to you?
11     A.  Or scanning them and e-mailing them, yes.
12     Q.  Had you discussed that with Mr. Eckert?
13     A.  Roy Eckert had no idea what I did.  I don't
14 mean that facetiously.  He had no idea what my daily --
15 what my day consisted of.
16         Confidentiality issues I discussed with
17 Scott because it was a true concern of mine.
18     Q.  Okay.
19     A.  And as in any confidential situation, there
20 was a certain element of trust that has to come into
21 play.  So it was -- Scott did not have a trust issue
22 with me.
23         Umm, Roy has no idea what I do on a day to
24 day -- this isn't coming out right but anyway.  Because
25 there wasn't a concern on Scott's part.  I wasn't

Exhibit A
Page 10 of 43

10 (Pages 34 to 37)