Thomas v. Ketchikan Gateway Borough    6/20/06                                    Carolyn Thomas

Page 38

1  concerned about how it would be handled.
2      I know that I shredded confidential
3  documents that when I don't have physical possession of
4  the file which is the situation that was going to be
5  there. And yes, I have a shredder.
6      Q. Prior to your departure in early June of
7  2005 had you talked this issue over with Scott?
8      A. Confidentiality issues yes, I had, uh-huh.
9      Q. So prior to June 6 of 2005, you worked out
10 with Scott some kind of arrangement for transferring
11 personnel records to Oregon either via mail, fax or
12 electronically?
13     A. No, because they wouldn't originate from
14 Scott.
15     Q. No, I understand but the procedure would,
16 right?
17     A. No.
18     Q. Okay. Then I'm confused again. I'm sorry.
19 I thought --
20     A. It's an H.R. procedure. I wanted to -- I
21 talked to Scott because I wanted to to be sure that he
22 didn't have an issue with confidentiality.
23     Q. Okay. Then let me ask the question I
24 should have asked in the beginning.
25        When did you talk to Scott?

Page 39

1      A. I have no idea. Before I left Ketchikan.
2      Q. Okay. Are we discussing one conversation
3  or multiple conversations?
4      A. Probably more than one.
5      Q. Was anyone present at those besides Scott
6  and yourself?
7      A. No. No.
8      Q. What was discussed regarding maintaining
9  confidentiality?
10     A. Well, I went in to Scott and said anything
11 I receive will be -- after I leave here will be by fax
12 or computer. Do you have an issue with
13 confidentiality, I said, because the original will stay
14 here with Holly.
15        And Scott said no, he did not as long as I
16 did not keep them. Things that were e-mailed to me, I
17 read and deleted.
18     Q. To the best of your recollection did you
19 and Scott exchange any e-mails on this subject?
20     A. No.
21     Q. To the best of your recollection did you
22 and Scott exchange any writings on this subject?
23     A. No.
24     Q. So what we're discussing is one or more
25 conversations with Scott regarding how would

Page 40

1  confidentiality work once you relocated to Oregon?
2      A. Yes.
3      Q. Okay. Okay. Did Scott voice any concerns?
4      A. In regard to confidentiality no.
5      Q. That's right.
6      A. No.
7      Q. Did you discuss other issues with Scott
8  other than confidentiality regarding how working
9  remotely -- strike that. I got myself tongue-tied.
10        Regarding working remotely, in other words,
11 did you have other conversations with Scott before you
12 left Ketchikan that we haven't talked about regarding
13 how all this was going to work?
14     A. Umm, probably. But I do not -- I can't
15 give you specific details on our conversations because
16 Scott and I discussed my departure more than once but I
17 can't recall any specific details.
18     Q. Did Scott ever raise any issues, to your
19 recollection, regarding how working remotely was going
20 to happen?
21     A. Yes, but it wasn't working remotely that
22 concerned him.
23     Q. What did concern him?
24     A. You know, something? We need a break a
25 minute please.

Page 41

1      Q. That's fine. Do you want me to leave? You
2  two can stay. If you want us to come, tell me.
3          (Off the record.)
4      Q. (By Mr. Sandberg) Are you able to answer
5  that question now?
6      A. Can you please repeat it.
7      Q. I'd ask you before we went off record
8  whether Scott had expressed concerns. And I just like
9  to hear about whatever concerns Scott may have
10 expressed to you prior to your departure, whatever you
11 got.
12     A. Umm, we had -- "we" meaning Scott and I --
13 had a mutual concern about the bargaining units because
14 there was only one contract that was actually signed.
15 However, we were in agreement. But Roy did not want
16 them to go to the Borough simply for approval until
17 September.
18        And we were both concerned that something
19 could -- he could change his mind or something and then
20 we basically -- you know, we weren't going to have
21 agreements after all. And one of the unions had been
22 working without an agreement for quite some time, and
23 we both felt it was really important to get signed
24 agreements and to keep our word to the unions.
25        We -- you know, that's the only specific

Exhibit A
Page 11 of 43

11 (Pages 38 to 41)

Thomas v. Ketchikan Gateway Borough   6/20/06                                   Carolyn Thomas

Page 42

1  thing that I can recall.
2      Q.  You have no recollection then of Scott
3  expressing any concerns about how the nuts and bolts of
4  performing your job from Oregon were going to work out?
5      A.  No, I don't think we had a conversation.  I
6  don't think Scott had concerns about it.
7      Q.  The next thing on my list here then, it
8  says pay changes came to you.
9      A.  PAF.
10     Q.  That would be a Personnel Action Form?
11     A.  Yes.
12     Q.  How often would you receive a PAF?
13     A.  PAFs were the same as evaluations.  You
14 could get several in one week and then not have any for
15 a while.  A PAF is generated anytime there is a change
16 affecting personnel.  And it's not just used for pay
17 changes.
18     Q.  Are PAFs ordinarily confidential forms?
19     A.  There's truly a difference of opinion on
20 that.  I think every employee is entitled to have their
21 pay information confidential.
22         There is the argument that we're a
23 government entity, therefore it's all public record.
24 So while I was there they were treated -- they were
25 supposed to be treated as confidential documents.

Page 43

1      Q.  So your expectation after you went to
2  Oregon was that -- or your expectation of how this
3  would work after you went to Oregon was the same as for
4  job evaluations, that they would come to you either via
5  fax, e-mail or in the mail.  You would act upon them
6  and destroy them?
7      A.  I would tell Holly Rosenden.  She had my
8  signature stamp.  And I would let her know I would not
9  keep a copy of anything like that in Oregon, no.
10     Q.  So your expectation was that you would
11 receive a PAF and if it appeared satisfactory you would
12 tell Holly to use your signature stamp?
13     A.  That's true.  If it was strictly routine,
14 it wouldn't even come to me.  Holly would sign for me.
15 She would tell me about it and it wouldn't even come to
16 me.
17     Q.  Then the last thing on our list here is
18 that crying employees came to you.  How often did that
19 happen?
20     A.  That was a facetious thing.  I think I had
21 one.
22     Q.  All right.  But how about complaining
23 employees.  I bet you had more than one of those?
24     A.  You know, interestingly, complaints usually
25 came to me like at lunch or if we had some kind of

Page 44

1  Borough potluck or birthday party, or they came on the
2  phone or via e-mail.
3          And I think the e-mail was first
4  preferenced -- and I don't blame them because then they
5  had a written record.  There was not a lot of trust
6  when I went to work there.  Our employees really felt
7  the need to protect themselves with a written record.
8      Q.  Were there parts of your job that you had
9  doubts you could do from Oregon?
10     A.  No.
11     Q.  Do you know other H.R. people who worked
12 remotely?
13     A.  Personally?
14     Q.  Yes.
15     A.  I know -- I knew people who did.  I don't
16 know if they still do.
17     Q.  Well, this is what we're here for.  Tell me
18 about it.  What companies or government entities?
19     A.  Well, we had people come for training who
20 were working remotely.
21     Q.  What's that mean?  I don't know.  I'm not
22 tracking.
23     A.  When I was -- when I worked for Louisiana
24 Pacific, the Ketchikan Pulp Company we had people come
25 and give training classes.  They were working remotely.

Page 45

1  They were H.R. managers who did not reside where the
2  employees that -- they were overworked.
3      Q.  So some of the training people -- some of
4  the people who provided training at Louisiana Pacific
5  were H.R. people who were working remotely?
6      A.  Yes.
7          Boise Cascade in Oregon now has remote H.R.
8  managers.
9      Q.  Okay.  Just out of curiosity, where are
10 they?
11     A.  And, you know, I probably can't give you a
12 good answer on that.  And interestingly the only reason
13 I knew that immediately is because I have a
14 brother-in-law who is part of a team for Boise Cascade
15 who is teaching all their employees about the company,
16 and they have an H.R. manager who does not even reside
17 in the state of Oregon but shows up every once in a
18 while.
19         There is a lumber mill in Wallowa that is
20 owned by someone, and their H.R. manager lives in
21 Idaho.
22     Q.  Is that perhaps where the corporate
23 headquarters are or is that where the person resides?
24     A.  I don't know.
25     Q.  Do you know people who did their job from

Exhibit  A
Page 12 of 43                    12 (Pages 42 to 45)

MOBURG & ASSOCIATES   1601 Fifth Avenue, Suite 860      Seattle, WA 98101
Court Reporters             206-622-3110              Fax 206-343-2272

85e52045-9de4-4003-8f0a-6dd5572f9b70

Page 46

1   their home as opposed to from some kind of an office
2   setting?
3       A.  Specifically H.R.?
4       Q.  Right.
5       A.  No.
6       Q.  Whether for government or industry, either
7   way.
8       A.  No.
9           Can I volunteer something?
10      Q.  I won't stop you.
11          MR. VENNEBERG: Can you volunteer
12  something?
13          THE WITNESS: Well, I don't like "from
14  your home."
15          MR. SANDBERG: Okay.
16      Q.  (By Mr. Sandberg) Why not?
17      A.  Is that okay?
18      Q.  I just asked a question. Now there's a
19  question on the floor. Why not?
20      A.  I had an office. I still have that office.
21  It was not in my home. It was never in my home; it was
22  in a separate building.
23      Q.  Okay. Well, let me ask you a different
24  question. Do you know any H.R. people who perform
25  their job from an office that is not provided by their

Page 47

1   employer?
2       A.  Not H.R..
3       Q.  Okay. Let's go through some more of the
4   things here then.
5           On page 54. And the extent we've already
6   talked about them we can pass over some of them
7   quickly. But going under the heading "essential job
8   functions" the first thing I see is, administers major
9   personnel functions, including recruiting and hiring,
10  performance appraisal systems, et cetera.
11          The performance appraisal system is the job
12  evaluations that we were talking about earlier?
13      A.  Yes.
14      Q.  Okay. Then the third item, third bullet
15  point says "develops and maintains employee
16  assistance." What's that mean?
17      A.  You help employees if they have an
18  insurance question or they have insurance coverage
19  question, or they have a workers' comp claim question,
20  or they have any kind of question.
21      Q.  How did you anticipate that was going to
22  work after June of 2005?
23      A.  The same way it did when I lived in
24  Ketchikan.
25      Q.  And that is?

Page 48

1       A.  In fact, I dealt with one very complicated
2   one after I left. You do it by phone.
3       Q.  So develop and maintain employee assistance
4   is a function that is performed telephonically?
5       A.  It can be very effective.
6       Q.  Well, let me ask a different question then.
7           Does developing and maintaining employee
8   assistance require face time?
9       A.  No, no. Frequently these issues are taken
10  to the supervisor by the employee and then the
11  supervisor talks to me.
12      Q.  In the spring of 2005 how many people
13  worked in H.R. for the Ketchikan Gateway Borough?
14      A.  One.
15      Q.  And that was you?
16      A.  Uh-hmm.
17      Q.  So you were a one-person department at that
18  point?
19      A.  Holly Rosenden -- I don't know where Roy
20  budgeted her. She was full-time H.R.
21          And there was another position that was
22  Roy's assigned to the manager's office, and I think
23  that the manager's office and H.R. is under the
24  management office, but I think we split Holly in the
25  budget. I'm not certain.

Page 49

1       Q.  Now, was H.R. called -- I don't know a
2   department or was it called something else?
3       A.  Well, they called it a department but it
4   was under the manager's office.
5       Q.  In the spring of 2005 to your knowledge did
6   KGB have any kind of a organization chart where we
7   could have located the H.R. Department?
8       A.  Yes.
9       Q.  And who would maintain such a chart? Would
10  that be Roy?
11      A.  No, finance department.
12      Q.  Okay. Turn to 55, if you would.
13      A.  Okay.
14      Q.  P55. The second bullet point says:
15  Monitor workers' compensation and workplace safety.
16          What were your responsibilities regarding
17  monitoring workplace safety?
18      A.  Workplace safety had been removed from my
19  responsibilities.
20      Q.  When and by whom?
21      A.  By Roy Eckert when he did my first
22  evaluation.
23      Q.  We have your evaluation in here somewhere.
24      A.  I might be able to locate them --
25      Q.  Well, I made myself a little -- let's see.

Exhibit __A__
Page _13_ of _43_          13 (Pages 46 to 49)