Thomas v. Ketchikan Gateway Borough    6/20/06    Carolyn Thomas

Page 50

1  They begin I think at sixty.
2      A.  And it's right here.
3      Q.  Okay.  Where?  I'm sorry.
4      A.  Sorry.  Page 61.
5      Q.  Okay.  Page 61.
6      A.  One, two, three, four, fifth line down.
7      Q.  It says: Monitors workers' compensation
8  and workplace safety.  I see a four.
9      A.  Uh-hmm.
10     Q.  Which I would take it meant you'd done an
11 outstanding job of doing those things?
12     A.  You don't have -- okay.  That's the one,
13 your evaluation.  Here is -- what did you find?
14         69.
15     Q.  69?  Okay.
16     A.  See.
17     Q.  At 69 I'm looking at -- well, let's see.
18 It appears to be the third page of -- well, actually it
19 says it's page 1.  What am I looking at?
20     A.  You are looking at the handwritten --
21 basically the work sheet.  And I can tell you but you
22 can't confirm that this is Roy's handwriting.  I mean,
23 I can give you my word on it.
24     Q.  Now, on 69, would 69 relate to the
25 performance appraisal -- is that 67 dated November

Page 51

1  12th, '04?
2      A.  That's what I'm trying to figure out.  67
3  is 11, 12.  69, are the numbers the same?
4      Q.  Gosh, I hope so.
5      A.  No.  No, they're not.
6      Q.  Well, let's go back to 69, whenever it was
7  generated.  I still see: monitors workers'
8  compensation and workplace safety receiving score.
9      A.  Uh-hmm.
10     Q.  So is there something on here that tells me
11 monitoring workplace safety was not part of your job?
12     A.  No.  There's just Carolyn telling me that.
13     Q.  I'm sorry, there's just what?
14     A.  Just Carolyn telling you that.
15     Q.  Oh, okay.
16     A.  It's marked out but he -- it's marked out
17 on page 69.
18     Q.  Where?
19     A.  Right here (indicating).
20     Q.  The words that say: Assist department in
21 developing relevant employee and supervisor training
22 needs or provides safety training being the next one?
23 See what I'm looking at on 69, the fifth item down?  It
24 says: Monitors workers' compensation and workplace
25 safety.  And you got a 3.9.

Page 52

1      A.  Yes.
2      Q.  Which is once again pretty outstanding.
3      A.  Yes.
4      Q.  And so --
5      A.  Well, I'm here to tell you I did not write
6  any safety training programs while I was there.
7      Q.  Okay.  Well, how about monitoring workplace
8  safety?
9      A.  Yes, I did that because incident reports
10 came to my desk.
11     Q.  Did you inspect Borough facilities for
12 workplace safety?
13     A.  No.
14     Q.  Did monitoring workplace safety involve
15 going to the field?
16     A.  No.
17         I need to volunteer again.
18         MR. VENNEBERG:  Well, if you need to
19 expand on an answer you should feel free to do that.
20         THE WITNESS:  I do.
21     Q.  (By Mr. Sandberg) Okay.
22     A.  I was never expected to be the hard hat
23 on-site safety person.
24     Q.  Who was?
25     A.  It depended on which area of the Borough it

Page 53

1  was in.
2      Q.  Okay.
3      A.  Umm, the risk manager and I worked together
4  on some safety things.  In each building there was
5  someone who was officially or unofficially responsible
6  for any safety issues at that facility.  Like at the
7  airport, it's the airport manager.  In the parks and
8  rec building it's Wendy Mackie.  Or Eric Taylor out at
9  the mill site.
10     Q.  Did those people report to you?
11     A.  If we had an issue absolutely.  If there
12 was a safety issue and depending on the nature of the
13 issue we'd send someone from maintenance.
14         If it was a minor thing like -- we had a
15 minor thing in the Reed building that became a big
16 thing because the lights kept going out over the
17 stairway.  And I called in the electrician to come and
18 take care of it.
19         I mean, this is the -- in the Reed building
20 it was the assistant manager who usually handled any
21 kind of safety issue within the building.  I would say
22 something if I saw someone standing on a chair that was
23 on casters.  But that's the way it was handled.
24         Major safety issues -- and, you know, I
25 don't even remember one coming up while I was there,

Exhibit  A    14 (Pages 50 to 53)
Page 14 of 43

MOBURG & ASSOCIATES    1601 Fifth Avenue, Suite 860    Seattle, WA 98101
Court Reporters             206-622-3110                Fax 206-343-2272

85e52045-9de4-4003-8f0a-6dd5572f9b70

Page 54

1  but it would have been initially dealt with by the
2  department head.
3       Q.  How were you expecting to handle monitoring
4  workplace safety from Oregon?
5       A.  There it wouldn't have been any different
6  than it was when I was in Ketchikan.  For the most part
7  the issues came to me after the fact.  The incident
8  reports, sometimes they'd call me on the phone and tell
9  me we've had a problem but we're doing an incident
10 report.  Those aren't confidential.
11          Frequently notification was made via e-mail
12 anyway so I didn't anticipate any kind of problem with
13 that particular issue.
14      Q.  On page 55, the fourth bullet point says:
15 Investigation and resolution of claims of harassment,
16 discrimination, and threats of violence.
17      A.  I would have gone to Ketchikan.
18      Q.  I was going to say.  Tell me, first of all,
19 what's that look like?  In other words, were there --
20 during your tenure when you were in Ketchikan were
21 there claims of harassment, discrimination or threats
22 of violence?
23      A.  Yes.
24      Q.  Okay.  And what did you do?  I mean, I
25 don't need to know the specifics of an individual, just

Page 55

1  what's the process look like?
2       A.  I understand the question.  The first thing
3  you do is, talk to the complainant.  And a claim is not
4  always -- the information is not always going to come
5  to you from the complainant or from the victim or
6  whatever term you want to use.
7           And you need to talk to them.  Sometimes
8  ideally you talk to them, ask them if they want someone
9  else in the room when you talk to them.  I mean, I
10 always make that offer.  If they do, fine.  If they
11 don't, then you deal just one on one.
12          If they are not comfortable talking to you,
13 ask them if there's someone they are comfortable
14 speaking with.  And then, you know, the important thing
15 is to get the information as quickly as possible.  And
16 it needs to be with someone they trust.
17      Q.  How did you picture this function was going
18 to work after you left for Oregon?
19      A.  I would come to Ketchikan.
20      Q.  So this would be one of the things that
21 would have required some face to face interaction in
22 Ketchikan?
23      A.  Yeah.  I believe so, yes.
24      Q.  Okay.  The next bullet point down on 55
25 says -- in the middle of it says:  respond to

Page 56

1  emergencies.
2           While you were in Ketchikan, were there
3  emergencies that came up within the H.R. functions?
4       A.  No.
5       Q.  I mean, how about -- I don't know --
6  accidents, employees threatening somebody, whatever?
7       A.  No.
8       Q.  Nobody had an accident?
9       A.  No idea what that language means.
10      Q.  Okay.  Then we'll move on.
11          How about investigates grievances and human
12 resources complaints.  What's that mean?
13      A.  Yes.  That means if there's a grievance
14 filed you investigate it.
15      Q.  And what's that process look like?
16      A.  You talk to the employee.
17      Q.  Is that something that's typically done
18 face to face or on the phone?
19      A.  In Ketchikan it's usually done on the phone
20 because the union reps are not necessarily in
21 Ketchikan.
22          There's a procedure provided in the union
23 contract for grievances.
24      Q.  Is there anything in that fifth bullet
25 point that you expected would require you to return to

Page 57

1  Ketchikan to perform this function?
2       A.  Face to face negotiations, absolutely.
3       Q.  Okay.  Now, we've already talked about
4  that.
5       A.  Uh-hmm.
6       Q.  Okay.  The next one said:  Conducts
7  in-house training programs.
8           Prior to your departure -- we may have
9  already talked about this too.  I can't remember.  But
10 had you conducted in-house training programs?
11      A.  No.
12      Q.  We talked about that because we talked
13 about sensitivity training.
14      A.  Uh-hmm.
15      Q.  Okay.  And your expectation was that you'd
16 have to return to Ketchikan sometime to conduct that
17 sort of training?
18      A.  Yes.
19      Q.  A lot of these other things we've already
20 talked about.
21          Flip over to 56 if you would.  The second
22 item says, develops, maintains, conducts new employee
23 orientation for both union and nonunion employees,
24 period.  Performs exit interviews for employees leaving
25 the Borough.

Exhibit  A
Page 15 of 43

15 (Pages 54 to 57)

MOBURG & ASSOCIATES   1601 Fifth Avenue, Suite 860        Seattle, WA 98101
Court Reporters           206-622-3110                    Fax 206-343-2272

85e52045-9de4-4003-8f0a-6dd5572f9b70

Thomas v. Ketchikan Gateway Borough   6/20/06                                       Carolyn Thomas

Page 58

1   Let's take the first sentence. What's that
2   mean, develop, maintain and conduct orientations?
3       A. There is a process, an orientation process
4   for new employees but new employees are not orientated.
5   Their orientation is not done by me. It is done by the
6   supervisor on the work site.
7       Q. So what, if any, role did you have in
8   orienting new employees?
9       A. I did not.
10      Q. Not even as to contracts or benefits or --
11      A. Those -- there was a new hire packet that
12  was done. We went through the new hire packet with
13  them. Either I did or Holly did, explained -- and that
14  was they filled out their paperwork in the Reed
15  building. If they filled it out at a different site,
16  then the packet was explained to them by the
17  supervisor.
18      Q. Okay. And for the people who filled it out
19  at the Reed building how were you picturing the new
20  hire packet was going to be handled after you left for
21  Oregon?
22      A. Holly was the one who did it.
23      Q. Okay.
24      A. Holly is still there.
25      Q. Last bullet point above additional job

Page 59

1   says: Administer the operations of the human resources
2   department.
3       Does that mean anything we haven't talked
4   about so far?
5       A. I have no idea.
6       Q. Okay. Fair enough.
7       A. There was a grand plan to have the human
8   resources department this big powerful thing at the --
9   this is a job description.
10      Q. I understand.
11      Let me ask then. In June of 2005, when you
12  left for Oregon, did you have any kind of understanding
13  with Mr. Eckert regarding how long you would be working
14  remotely?
15      A. Did I have any --
16      Q. I mean, of course --
17      A. Was there an end?
18      Q. Yeah. Let me backup.
19      A little earlier this morning I asked you
20  who authorized you to work remotely. You told me Roy
21  Eckert, correct?
22      A. Yes.
23      Q. Okay. And Mr. Eckert certainly knew that
24  you were going to start working remotely in June of
25  2005, correct?

Page 60

1       A. Yes.
2       Q. Did you and Mr. Eckert have an
3   understanding as to how long you would be working
4   remotely?
5       A. No.
6       Q. Did you and Mr. Eckert have any
7   understanding regarding probationary period or try-out
8   for this new arrangement?
9       A. No.
10      Q. Had either of those things been discussed
11  with Mr. Eckert before you left?
12      A. No.
13      Q. Suppose Mr. Eckert had decided having you
14  working remotely just wasn't working out. What was
15  your expectation of what happened?
16          MR. VENNEBERG: Calls for speculation.
17  You can go ahead if you can.
18          THE WITNESS: Umm, if -- no, I'm not
19  going to say "if." What would happen?
20      Q. (By Mr. Sandberg) Right.
21      A. He would discuss it with me, and we'd come
22  to some conclusion.
23      That's not a good answer but I can't give
24  you a good answer.
25      Q. When you left Ketchikan in June of 2005,

Page 61

1   had Mr. Eckert promised that under no circumstances he
2   would require you to come back and do your job in
3   Ketchikan?
4       A. I hadn't -- no.
5       Q. Let's go through your documents here if we
6   may.
7       By the way, it's about -- let's go off the
8   record.
9           (Off the record.)
10      Q. (By Mr. Sandberg) Look at page 1,
11  Plaintiff's 1, if you would. What are we looking at?
12      A. I had received numerous phone calls from
13  employees telling me that Roy said I had quit and that
14  I left town and Roy didn't even know why or how long I
15  was going to be gone. And I made numerous attempts to
16  contact Roy and he didn't respond and so, I sent this
17  e-mail.
18      Q. And generally who are all these people?
19      A. They're supervisors.
20      Q. Looking at the third item number three, it
21  says I had Roy Eckert's permission and agreement to
22  continue my employment in my current capacity while
23  living here. Otherwise, I would not have left until at
24  least December.
25      A. Yes.

Exhibit _A_
Page 16 of 43                          16 (Pages 58 to 61)