Thomas v. Ketchikan Gateway Borough  6/20/06                                    Carolyn Thomas

Page 74

1  attorney waiving my right to legal action against you
2  and the Borough."
3      First of all, are we together, you have
4  those words in front of you?
5      A. Yes.
6      Q. Had you hired an attorney by this point?
7      A. No.
8      Q. Whose idea was it to tender your
9  resignation?
10     A. It was mine.
11         MR. VENNEBERG: Wait till he finishes
12 the question.
13     Q. (By Mr. Sandberg) I was simply going to
14 say subject to the conditions?
15     A. My idea.
16     Q. Okay.
17         Well, let's continue with the words on the
18 page. It says: I will sign a legal document to be
19 prepared by the Borough attorney waiving my right to
20 legal action against you and the Borough.
21         On August the 5th, 2005, why did you think
22 you had a right to legal action against Mr. Eckert and
23 the Borough?
24     A. Because in my opinion -- I'm sorry you have
25 to represent me.

Page 75

1      Q. I understand you're not a lawyer, but you
2  wrote the letter.
3      A. In my opinion I had a verbal contract with
4  him. He had promised me basically that I could
5  continue my employment.
6         And I took my job duties very seriously and
7  I did my job well. I know I did my job well. I wasn't
8  even -- literally my flight had not even left Ketchikan
9  when he started telling things about me that were not
10 true.
11        I was very concerned that our employees
12 were not being properly represented by human resources.
13 And I mean, those services that whatever was not being
14 provided and I felt he could not do that. He couldn't
15 say one thing and then do another.
16        He had helped make all the arrangements for
17 me to move my office to Ketchikan. He was the one who
18 told the IT person to order me a laptop and get me a
19 printer and get it all programmed. If I was resigning
20 or if I resigned before I left, why did the Borough buy
21 me a laptop? I didn't buy that laptop; the Borough
22 did.
23     Q. Okay.
24     A. I'm not supposed to ask a question. Sorry.
25     Q. That's okay.

Page 76

1      A. But that was my -- he lied to me, pure and
2  simple. That is why I had the -- that's why I wrote
3  what I wrote.
4      Q. Before you moved to Oregon you understood
5  Mr. Eckert to be authorized to make an oral contract
6  with you?
7      A. I still believe that.
8      Q. Okay. Before you moved to Oregon did you
9  understand Mr. Eckert to be authorized to change his
10 mind?
11         MR. VENNEBERG: Object to the extent
12 the question is vague.
13         If you can answer it; if you can't you can
14 say so.
15         THE WITNESS: I believe -- I don't
16 think he could just change his mind because he wanted
17 to change mind, no.
18     Q. (By Mr. Sandberg) Suppose he decided this
19 wasn't working out, was he just stuck with four years
20 of this arrangement?
21         MR. VENNEBERG: Form, foundation.
22         THE WITNESS: No. You have to -- but
23 you can't just say objection, you're not stuck, quotes,
24 unquote with any employee who is not performing his or
25 her duty. But you have an obligation to have a sound

Page 77

1  reason for wanting -- or for discharging the person.
2         MR. VENNEBERG: This a good time to
3  take a quick break?
4         MR. SANDBERG: Yeah, that will be
5  fine.
6         (Off the record.)
7      Q. (By Mr. Sandberg) When we went off record
8  I was asking you about page 18 of Plaintiff's 18.
9         Essentially in this letter you tell
10 Mr. Eckert if he pays you $326,000 you won't sue him or
11 the Borough, right?
12     A. Yes.
13     Q. So as of August the 5th, 2005 was it your
14 expectation that you would sue Mr. Eckert and the
15 Borough if they declined to pay you $326,000?
16     A. It was my intention to seek legal counsel.
17     Q. When did you hire a lawyer?
18     A. January or February, I think. March. I
19 don't know.
20     Q. Of 2006?
21     A. Yes.
22     Q. Would it have been around the time of the
23 ad hoc hearing?
24     A. Yes.
25     Q. Okay. Turn to 19 then if you would. At 19

Exhibit  A
Page 20 of 43

20 (Pages 74 to 77)

Thomas v. Ketchikan Gateway Borough   6/20/06                                    Carolyn Thomas

Page 78

1  we're looking at a letter from Mr. Eckert to you dated
2  August the 5th, 2005, correct?
3      A.  Yes.
4      Q.  In the last paragraph here, Mr. Eckert
5  says: If you decide to continue your employment with
6  the Borough I need to have you available for work at
7  the Borough offices on or before September 1st.
8          First of all, have I read that correctly?
9      A.  I'm sure you have but I can't find it.
10     Q.  It's in the bottom paragraph.
11     A.  Right. Okay. Yes.
12     Q.  So here we have Mr. Eckert telling you to
13 report to the Borough offices for work by September the
14 first, correct?
15     A.  Yes.
16     Q.  Did you understand as of August the 5th,
17 2005, that he somehow lacked the authority to tell you
18 where you were going to be working?
19     A.  Did I understand he lacked the authority?
20     Q.  If we look, it's an organizational chart,
21 we would have seen you report to Mr. Eckert, correct?
22     A.  Yes, yes.
23     Q.  In the parlance of the workplace was he
24 your boss?
25     A.  Yes.

Page 79

1      Q.  And certainly before June of 2005, if he
2  had told you, "You will work in the office down the
3  hall," he had the authority to tell that you, right?
4      A.  Yes.
5      Q.  Okay. In August the 5th, 2005 did you
6  understand on August the 5th, 2005 did you understand
7  that he no longer had the authority to tell you where
8  to work?
9      A.  No.
10     Q.  Okay. At 32, P32 we're looking at a letter
11 from you to Mr. Eckert dated August 12th, 2005 that
12 begins by saying it's in response to his of August 5th.
13 Correct?
14     A.  Yes.
15     Q.  And at 19, the last paragraph -- I'm sorry,
16 19, at 33 at P-33, the last paragraph of that letter
17 says: I am not moving back to Ketchikan.
18         Is that in response to what he told you in
19 the prior letter, that he needs you working in
20 Ketchikan by September 1st?
21     A.  This entire letter from me is in response
22 to his memo of August 5th.
23     Q.  Okay. So by August the 12th he has told
24 you that you will be working or that he needs to know
25 if you intend to continue and if so, you'll be working

Page 80

1  in Ketchikan by September the first? Correct?
2      A.  Yes.
3      Q.  And by August the 12th you have told him
4  I'm not going to do that, correct?
5      A.  Yes.
6      Q.  Okay. At 34 we're looking at a letter
7  dated September the 26th from Mr. Eckert to you,
8  correct?
9      A.  Yes.
10     Q.  He is forwarding a copy of new ordinance
11 1369. And then it goes to say: The last time you were
12 in Ketchikan we discussed your situation. And at that
13 time I told you that I needed a decision about your
14 returning to work at the Borough within two weeks.
15         First of all, have I read that sentence
16 correctly?
17     A.  I think so.
18     Q.  Is this one of the conversations that we
19 talked about earlier?
20     A.  This is probably the last conversation I
21 had with him in person.
22     Q.  Okay. Can you -- well, let me ask a
23 foundational question.
24         Was there -- prior to this letter did you
25 talk to Mr. Eckert, quote, the last time you were in

Page 81

1  Ketchikan?
2      A.  Yes.
3      Q.  Did he tell you he needed a decision about
4  your returning to work at the Borough within two weeks?
5      A.  Umm, not unless it was in this memo.
6      Q.  Well, I'm thinking in terms of verbal
7  communication. Did he tell you anything different than
8  the words on the paper we have been looking at?
9      A.  Oh, no.
10     Q.  And then here at the end he says: I need
11 to have your final decision as to your intent to return
12 to work here in Ketchikan no later than Friday, October
13 the 7th. Please advise me in writing.
14         The response I believe we find at 39. Is
15 that correct?
16     A.  Yes.
17     Q.  And that ends with a sentence that reads:
18 As for any final decision on my intent to return to
19 Ketchikan, I gave you my final decision in August.
20     A.  Yes.
21     Q.  And that was the letter we looked at just a
22 few moments ago?
23     A.  Yes.
24     Q.  By October of 2005 you're doing H.R. work
25 for Ketchikan?

Exhibit __A__
Page 21 of 43                       21 (Pages 78 to 81)

Thomas v. Ketchikan Gateway Borough   6/20/06                                     Carolyn Thomas

Page 82

1    A. Yes.
2    Q. And generally what kinds of things were you
3 doing at that point?
4    A. The same things I went through with you
5 earlier.
6    Q. So you were doing those functions that we
7 talked about earlier this morning from your residence
8 or from the office in your residence?
9    A. Yes.
10   Q. And then at 40 we have a letter from
11 Mr. Eckert to you telling you you're about to be
12 terminated.
13       And then it says: I want to offer you the
14 opportunity to present any and all information you wish
15 to explain why you should not be terminated for cause.
16 Please meet with me in October 19th at 1:00 p.m..
17       Is that the telephonic meeting we talked
18 about earlier?
19   A. Yes.
20   Q. What actually was discussed at that
21 telephonic meeting, to your recollection?
22   A. There was no discussion. I told him why I
23 thought I should retain my job, I should continue doing
24 that job.
25   Q. And he responded by saying what?

Page 83

1    A. He didn't respond.
2    Q. Okay. Then at 42 we see you exercising
3 your right to a step three grievance procedure?
4    A. Yes.
5    Q. We're a little out of sequence at this
6 point but go to 162 if you would, P-162.
7    A. Okay.
8    Q. What is this?
9    A. This is a memo to Roy that I felt I needed
10 to send before I was no longer authorized to do any
11 Borough work, because these were issues that someone
12 needed to deal with.
13       MR. SANDBERG: Let's go off the record
14 for a second.
15       (Off the record.)
16   Q. (By Mr. Sandberg) While we were off record
17 I provided a copy of a transcript of the ad hoc
18 committee hearing, and I only have a couple questions
19 about that.
20       Did you go to Ketchikan for that hearing?
21   A. No.
22   Q. You participated telephonically?
23   A. Yes.
24   Q. Did you offer any witnesses at that
25 hearing?

Page 84

1    A. No.
2    Q. Did you offer any evidence at that hearing?
3    A. No.
4    Q. Before we shift gears entirely, in your
5 mind has Mr. Eckert or the Ketchikan Gateway Borough
6 done something wrong that we haven't talked about so
7 far? I'm not asking for legal conclusions. I just
8 want to know --
9       MR. VENNEBERG: I'll object to the
10 extent it calls for a legal conclusion.
11   Q. (By Mr. Sandberg) I just want to know, in
12 the universe of grievances against those two
13 individuals, have we talked about them or are there
14 more out there? In your mind have they done other
15 things wrong that we haven't talked about this morning?
16   A. That involve me?
17   Q. Yeah, just you. I'm sorry, I should have
18 been more specific. I don't care about other stuff.
19   A. Actually, I don't think so. I think it's
20 been pretty well covered.
21   Q. Okay. Let's do shift gears then.
22       During the ad hoc hearing were you on the
23 phone the entire time?
24   A. Yes.
25   Q. At that hearing Scott made a presentation

Page 85

1 on behalf of the Borough, correct?
2    A. Yes.
3    Q. And he offered a number of exhibits into
4 the record at that time?
5    A. Yes.
6    Q. Did you have a copy of the exhibits before
7 the hearing?
8    A. Yes.
9    Q. Did they furnish you with a copy?
10   A. Yes.
11   Q. So the items that we're looking at now
12 between KB55 and KB131 were things you would have had
13 when the hearing was held?
14   A. Yes.
15   Q. Now, generally -- before we go into
16 specifics, you understand that generally Scott was
17 saying that you had either authorized new employees to
18 start at an inappropriate step or had authorized jumps
19 in pay grade that were larger than your authority.
20 Correct?
21       MR. VENNEBERG: You're asking for her
22 understanding of what he was saying?
23       MR. SANDBERG: That's right.
24   Q. (By Mr. Sandberg) That generally he was
25 contending those two things, aside from the stuff we

Exhibit  A
Page 22 of 43                22 (Pages 82 to 85)

MOBURG & ASSOCIATES   1601 Fifth Avenue, Suite 860   Seattle, WA 98101
Court Reporters           206-622-3110              Fax 206-343-2272

85e52045-9de4-4003-8f0a-6dd5572f9b70