Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

COPY

CAROLYN L. THOMAS,

   Plaintiff,

   v.              Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
   Defendants.
_____/

DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

      Terry Venneberg
      1126 Highland Avenue, Suite 101
      Bremerton, Washington 98337

FOR THE DEFENDANTS:

      Mark A. Sandberg
      Sandberg, Wuestenfeld & Corey
      701 West 8th Avenue, Suite 1100
      Anchorage, Alaska 99501

Exhibit B
Page 1 of 41

Page 2

PROCEEDINGS

MR. COSSMAN: Okay, we're on the record at 9:38. This is the video deposition of Roy Eckert, taken by the plaintiff in the matter of Thomas v. Ketchikan Gateway Borough, et al., Case No. 5:06-cv-00001-JWS, in the United States District Court for the District of Alaska at Ketchikan. This deposition is being held in the offices of the Ketchikan Gateway Borough, located at 344 Front Street, Ketchikan, Alaska, on July 19, 2006.

My name is Eric Cossman from Alaska Legal Video, mailing address 645 G Street, No. 892, Anchorage, Alaska 99501, and I will be serving as both the videographer and the court reporter for this deposition.

Will counsel please identify themselves for the record?

MR. VENNEBERG: Terry Venneberg, representing the plaintiff.

MR. SANDBERG: And Mark Sandberg, representing all defendants.

MR. COSSMAN: Thank you. Would the witness please raise your right hand and be sworn? Do you solemnly swear or affirm that the testimony you are about to give in this matter will be the truth, the whole truth, and nothing but the truth?

MR. ECKERT: I do.

Page 3

MR. COSSMAN: Thank you.

ROY ECKERT
testified as follows on:
DIRECT EXAMINATION
BY MR. VANNEBERG:

Q Thank you. Can you state your full name?
A Yes, it's Roy Eckert, middle name Allen.
Q All right. Now, what position of employment do you have?
A I'm the Borough Manager.
Q The Borough Manager for the Ketchikan Gateway Borough?
A Yes, sir.
Q How long have you been in that position?
A It will be four years come October 1st.
Q Okay. So, you started October 1st, 2002, is that right?
A Correct.
Q Okay. And during your time as Borough Manager, have you had occasion to supervise the employment of Carolyn Thomas?
A I have.
Q Okay. And what position did she have?
A She was our HR Director.
Q Okay. And did you terminate the employment, or

Page 4

decide to terminate the employment of Ms. Thomas in October 2005?
A 2005 -- I'm trying to remember the timeline, here. The -- October 2005 would have been about the time that -- yes, I believe that was when the ordinances changed, yes.
Q Okay. Why did you decide to terminate Ms. Thomas' employment?
A Originally she had stated she was going to resign and move to Oregon, and then there was some disagreement as to what her status was. But in the end we had offered her several chances to, you know, come back to the community. She chose not to do that, stated she would not come back, so we had no choice but to -- you know, but to terminate the employment.
Q Okay. So, the reason for termination, then, was what?
A Just a refusal to come back.
Q Okay. And was that pursuant to any law or policy of the Borough?
A Yes. Yes. The Borough had an ordinance to that effect, that employees had to live inside the city -- I'm sorry, inside the Borough.
Q All right. And was that Ordinance 1369?
A I believe that's right. If I saw it, I could -- I could know the number, but --

Page 5

Q Okay. And that was an ordinance that was enacted by the Borough in September 2005, is that right?
A I believe that's right, yes, sir.
Q Okay. So, was her termination the result of her failure to adhere to that ordinance?
A Yes.
Q Was there any other reason for her termination?
A No. To the best of my knowledge, she had stated she had resigned earlier. And then after the discrepancy between our understandings -- you know, we gave her two opportunities to come back, several opportunities, and she chose not to.
Q Okay. When had Ms. Thomas stated that she was going to be resigning?
A It was in late February or early March of -- I believe it was 2005 -- she had come to my office and stated that her mother was going blind and that she was going to have to move to Oregon and take care of her full time and she wanted to give me a chance to find a replacement.
Q Okay. Did Ms. Thomas indicate the effective date of her resignation?
A She said it would be around the 1st of June.
Q Did Ms. Thomas ever give you a letter of resignation?
A We had talked about one, and I had asked her to put

Exhibit B
Page 2 of 41

2 (Pages 2 to 5)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

7fbeafc4-3271-4468-9d4c-83a4023dbe10

**Page 6**

1  one in her personnel file. As with most small towns, you
2  know, people have a way of stating things that aren't
3  correct, and I just did not want her to have the
4  perception that she had been fired, and she thought that
5  was a good idea.
6  Q  Okay. Did you ever see a written letter of
7  resignation from Ms. Thomas?
8  A  I -- I -- I could not definitely say that I have seen
9  one, but I know we did talk about it and I told her to put
10 it in her personnel file.
11 Q  Okay. Okay. Now, I had agreed with counsel here
12 prior to the deposition today, that we would be referring
13 to documents in the initial disclosures that we had
14 previously exchanged. So, I would ask you to refer to the
15 binder that is in front of you that has the disclosures
16 from both the plaintiff and the defendants. And I would
17 like you to turn to what is marked as KB062. There are
18 numbers in the lower right hand corner.
19 A  I see them (word indiscernible). Okay.
20 Q  Okay. And do you recognize that letter?
21 A  I do.
22 Q  Okay. And was this the -- the letter of termination
23 that you sent to Ms. Thomas?
24 A  Yes, I believe that -- yes it was.
25 Q  Okay. And this letter is dated October 21, 2005?

**Page 7**

1  A  Yes, it is.
2  Q  Was that the date that you decided to terminate Ms.
3  Thomas' employment.?
4  A  This was the final date after giving her all the
5  chances to return.
6  Q  Okay. Do you recall whether you actually made the
7  decision to terminate her employment on October 1, 2005?
8  A  Did you mean October 21?
9  Q  Yes, October, 21, yes.
10 A  I believe it is, because we had -- we had waited until
11 hearing from her and receiving, you know, her -- her final
12 answer. And so, we -- I signed the letter -- wrote it
13 after -- after receiving hers. So, that was probably --
14 probably the 21st or maybe the day before. I'm not too
15 sure, but within a day, probably.
16 Q  Okay. And this letter states that the reason for her
17 termination was her failure to adhere to Ordinance 1369?
18 A  Yes, sir.
19    MR. SANDBERG: What was Ordinance No. 1369? Is there
20 a copy of it in here? I'd like to refer to it.
21    MR. SANDBERG: Yes. I believe it is -- it starts at
22 KB66. You can feel free to use that to.....
23    MR. SANDBERG: Okay.
24    MR. VENNEBERG: .....refresh your recollection.
25 A  Okay, this -- this ordinance was as a result of the

**Page 8**

1  Assembly wanting to clarify, you know, residence
2  requirements for employees with the Borough, especially
3  given the fact that we're an island community, requiring
4  people to work, you know, in Borough facilities and on
5  Borough property, and within the Borough. So, it was --
6  it was a long time coming, but the Assembly had directed
7  that we have something like this in place.
8  Q  Okay. And the ordinance goes from page KB66 to KB69,
9  is that right?
10 A  Yes, sir. Technically 68, but 69 is a signature
11 page.
12 Q  Okay. And this was adopted by the Borough Assembly
13 on September 19, 2005?
14 A  Yes, sir.
15 Q  And went into effect October 4, 2005?
16 A  I believe that's correct.
17 Q  Okay. I know you touched on this earlier, but how
18 was it that Ordinance 1369 came about?
19 A  1369 came about as a result of a lot of discussion as
20 far as not just Ms. Thomas' employment, but whether or not
21 people would be allowed to work from home, or work from --
22 from other areas, even remote areas. And it was decided
23 that we needed to tighten up our personnel policy and --
24 in working area requirements. We do have several places
25 in the Borough that -- our offices are -- are, you know,

**Page 9**

1  spread out and we don't have the best working conditions,
2  as far as office -- you know, all centrally located. So,
3  they wanted to tightened that up and they decided this was
4  a good time to do that. And so, it was for multiple
5  reasons, but basically to make sure people came to work,
6  showed up to work on Borough-owned property. For
7  insurance and other reasons, but primarily just -- just to
8  have some control over -- over individuals.
9  Q  Did Ordinance 1369 come about as a result of Ms.
10 Thomas' employment situation?
11 A  It had a factor in it. I'm not sure if it was -- it
12 was the overriding factor, but it was -- I'm sure it had a
13 factor in it.
14 Q  Okay. I'd like you to turn to KG286, if you would.
15 A  286?
16 Q  Yes.
17 A  Okay.
18 Q  Okay. And do you recognize that document that makes
19 up 286 and 287?
20 A  It's a standard agenda statement for the -- you know,
21 for what we were going to submit to the Assembly. So, it
22 says consideration of Ordinance 1369, so.....
23 Q  And.....
24 A  .....so, right.
25 Q  .....that -- that states, submitted by Borough

### Page 10

1  Manger. And that was yourself?
2  A  Right. It's submitted by myself, okay, reviewed or
3  submitted, so that's -- you know, when we're asked to do
4  something, you know, we have to make that. You know,
5  sometimes it will be the Attorney, sometimes myself or
6  department heads.
7  Q  Okay. Did you draft this agenda statement?
8  A  I know there was a lot of discussion on this. I
9  don't recall if I was the sole author of it, but -- but I
10  may have been. But it's -- may have been, may have been
11  just in, you know, relation with our Assistant Manager,
12  or, you know, some of the other employees that -- when
13  we're required to draft something and to give a good
14  background on what happens, we -- you know, several of us
15  work on it together. But it's got my signature on it.
16  Q  Okay. So, it's fair to say you reviewed and signed
17  this.....
18  A  Absolutely.
19  Q  .....before it -- And this is submitted to the
20  Borough Assembly, then?
21  A  Yes, it is. It goes to the Clerk and then she puts
22  it on the agenda, and then it goes to the Assembly.
23  Q  Okay. Now, the section entitled summary statement,
24  that starts by saying, at the Assembly meeting of August
25  1, 2005, some Assembly members expressed interest in

### Page 11

1  considering an ordinance to set out a clear statement of
2  policy regarding residency of Borough employees. Do you
3  recall which Assembly member spoke to that issue on August
4  1, 2005?
5  A  I don't, but I could refer to the minutes, and I'm
6  sure that would have that in there.
7  Q  Okay.
8  A  Our Clerk keeps real good minutes.
9  Q  Okay. You might turn to page P91, which is in,
10  actually, the back section.
11  A  Okay. Okay.
12  Q  Okay. And P91 is the first page of the Assembly
13  meeting minutes of August 1, 2005, is that right?
14  A  Right.
15  Q  Okay. And if you turn to P94, there is a section
16  entitled request for executive session to discuss the
17  employment status of the Ketchikan Gateway Borough Human
18  Resource Human Relations Manager. Do you see that?
19  A  I do.
20  Q  And -- and that was Carolyn Thomas, at the time?
21  A  Yes, it was.
22  Q  Okay. So, would it be fair to say that it was --
23  this discussion that's noted in the minutes of August 1st,
24  2005, that led to the agenda statement that we referred to
25  earlier and the proposed Ordinance 1369?

### Page 12

1  A  Again, like I said, it would have a factor in it.
2  There are some other items, I think, that were also
3  discussed later by Assembly members and even staff. But
4  it would have -- it would certainly have a factor, yes.
5  Q  Okay. So, it's -- it's your testimony that Ms.
6  Thomas' employment situation was a factor in the enactment
7  of Ordinance 1369?
8  A  Yes.
9  Q  What other factors went into the enactment of that
10  ordinance?
11  A  We had had some situations with the Borough Office,
12  for example, where we're at right now, with some
13  environmental concerns in the past and employees
14  requesting to work from their home, or in offices that are
15  not Borough-owned. You know, just a lot of people refer
16  to it as telecommuting, or whatever. And there was
17  concern about that with documents, with files, with
18  availability of employees and being able to make sure, to
19  monitor that they actually put in the time that they do.
20  So, that has been a -- it's kind of below the radar, but
21  it's been a continuing factor. And so that -- that was
22  considered when this was done, so -- but it was all part
23  of that.
24  Q  What other employees of the Borough were requesting
25  to perform their duties outside of the Borough offices,

### Page 13

1  around the time of this Assembly meeting?
2  A  At this time I don't know that there were any.
3  Q  Okay. So, as of August 1, 2005, was it the case that
4  Ms. Thomas was the only Borough employee to be performing
5  her duties outside of the Borough offices?
6  A  At that time it was, yes.
7  Q  Okay. And would it be fair to say that the enactment
8  of Ordinance 1369 only had an impact on Ms. Thomas'
9  employment?
10  A  At that -- at that time it would. The -- again, the
11  situations had arisen before, and they did not want to
12  have, you know, situations arise again, where, you know,
13  people would be outside of the Borough control.
14  Q  It's fair to say that Ms. Thomas was the only one to
15  be disciplined as a result of the enactment of Ordinance
16  1369?
17  A  At that time, yes.
18  Q  Since that time, has anyone -- has any Borough
19  employee been disciplined as a result of failure to adhere
20  to Ordinance 1369?
21  A  No, because we don't allow it.
22  Q  Okay. We've got to turn to KB315. Do you recognize
23  KB315?
24  A  It's a request for legal services. I don't recognize
25  the handwriting on it.

Exhibit B    4 (Pages 10 to 13)

Page 4 of 41