Page 14

1  Q  Okay. And it says, prepared by Cindy. Who would
2  Cindy be?
3  A  Okay, Cindy would be the Attorney for our Borough
4  Attorney's Office.
5  Q  Okay, is she an attorney?
6  A  No, she is not.
7  Q  Oh, she -- is she an assistant to the Attorney?
8  A  She's a secretary, yes.
9  Q  Okay. And do you know whether she was the one that
10 prepared this document?
11 A  I do not know.
12 Q  Have you ever seen this document before today?
13 A  It doesn't -- no, I have not. I haven't seen this
14 one.
15 Q  Okay. Did you give any instruction to -- to Cindy
16 consistent with the request that is in KB315?
17 A  No. Cindy works for the Attorney and there are three
18 employees that work for the Assembly: the Clerk, the
19 Attorney and myself. We don't give direction to each
20 other's office staff, so.....
21 Q  Okay.
22 A  .....so, no.
23 Q  Now, this is a request for legal services, right?
24 A  Right.
25 Q  And so, this would be a request to the Borough

Page 15

1  Attorney?
2  A  I am assuming so. That or a -- see, there's an
3  attachment on the next page. Again, I don't recognize the
4  handwriting. I do know it's not mine. But it's -- I
5  don't know whose that is.
6  Q  Okay. And the request for legal services is, do an
7  ordinance for September 5th, 2005 introduction to require
8  employees to live in the Borough?
9  A  That's what it says.
10 Q  Okay. Were you involved at all in making that
11 request of the Borough Attorney, or his office?
12 A  I don't know if this was -- well, it says for
13 September 5th. I don't know if this was before or after
14 the request by some Assembly members, but I know there had
15 been some discussion ahead of it. And I don't -- I don't
16 recall that one. I'd have to.....
17 Q  Okay.
18 A  .....try and find some note, or minutes, or whatever,
19 if I can find something.
20 Q  But you don't have any knowledge about how this
21 particular request came about?
22 A  No.
23 Q  Okay. And then you referred before to the
24 handwritten note that is on KB316 and you said that that's
25 not your.....

Page 16

1  A  That's not mine, no.
2  Q  .....handwriting. Do you recognize the handwriting?
3  A  I don't.
4  Q  Okay. And that says, do an ordinance for 9/5
5  introduction to require employees to live in the Borough.
6  Again, did you have any involvement in putting together
7  that request?
8  A  No.
9  Q  Okay. I'd like you to turn to KB288. Okay. 288
10 through 291 is, again, Ordinance 1369, is that right?
11 A  That's correct.
12 Q  And this was as introduced to the Borough Assembly on
13 September 19, 2005?
14 A  Yes, sir.
15 Q  Okay. Now, in 289, on KB289, there is a section on
16 residency that's 30.20.016. Do you see that?
17 A  Yes, sir.
18 Q  Okay. And this paragraph reflects both the language
19 that is -- that the ordinance seeks to add to the code and
20 the language that was in the code, is that right?
21 A  That's correct.
22 Q  Okay. And the language that was in the code at the
23 time of the proposed ordinance is the language that is in
24 capital letters there, is that right?
25 A  I -- I forget how Scott does that. Sometimes he -- if

Page 17

1  it's underlined, it was what's added, or -- or -- or if
2  the capitals is what's added, but I -- I'd have to look at
3  the former code to tell you.
4  Q  Okay.
5  A  But, yeah, this shows both the -- what's to be added
6  and what was current.
7  Q  Okay. And if you could take an opportunity to read
8  through that paragraph.
9  A  Okay.
10 Q  Okay. Does reading through the paragraph help
11 refresh your recollection as to the sections -- the
12 section that the ordinance sought to add, as opposed to
13 the -- the language that was previously in the code?
14 A  Again, I -- I would have to look at it, because it's
15 -- it's -- just to see -- I would have to see the original
16 one written to tell you which is which, because it's --
17 Q  Okay. I'd like you to turn to P -- near the end of
18 the binder -- P190.
19 A  Okay. Okay.
20 Q  And do you see section 30.20.016, Residency?
21 A  Yes, I do.
22 Q  Okay. And if you could just take an opportunity to
23 read that.
24 A  Okay.
25 Q  Was -- was that paragraph -- that provision, the

5 (Pages 14 to 17)

Exhibit B
Page 5 of 41

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

7fbeafc4-3271-4468-9d4c-83a4023dbe10

Page 18

1  state of the law prior to October 4, 2005?
2  A  Yes, yes it was.
3  E  Okay. And could you read that?
4  A  Okay. Residency within the Borough shall not be a
5  condition of initial employment -- or appointment, sorry -
6  - or continued employment, except as otherwise required by
7  state law, the Borough Code of Ordinances, or resolution.
8  Provided, however, that an employee's residence location
9  shall not interfere with the daily performance of an
10 employee's duties and responsibilities.
11 Q  Okay. And Ordinance 1369 served to amend that
12 paragraph.....
13 A  Yes, it did.
14 Q  .....to add the language that is underlined.....
15 A  Yes.
16 Q  .....on page KB289?
17 A  Absolutely correct.
18    MR. SANDBERG: Among other things.
19    MR. VENNEBERG: Right, among other things. But as to
20 that particular paragraph, that's --that's what it did to
21 that paragraph?
22 A  Yes, sir.
23 Q  So, the code, prior to the amendment that was in
24 Ordinance 1369, provided that residence within the Borough
25 was not a condition of employment for Borough employees.

Page 19

1  Would that be fair to say?
2  A  I believe it says initial employment, if I read that
3  right. Of initial employment......
4  Q  Initial employment or continued employment.
5  A  .....or continued employment. Right.
6  Q  Okay. So, I'll ask the question again, then. Would
7  it be fair to say that the Code, prior to the amendment
8  that was Ordinance 1369, provided that residency within
9  the Borough was not a condition of employment for Borough
10 employees?
11 A  Of initial employment, no. But -- and I understand
12 the continued employment.
13 Q  Or continued employment, right. Okay. And it also
14 provided that residence location shall not interfere with
15 the daily performance of an employee's duties and
16 responsibilities, right?
17 A  (No audible response.)
18 Q  Okay. Would it be fair to say, then, that under the
19 Code prior to amendment that an employee could not be
20 disciplined for residency location, unless the residency
21 location interfered with the daily performance of their
22 duties?
23    MR. SANDBERG: I object to calling for a legal
24 conclusion, but if he has an understanding, I'll let him
25 answer it.

Page 20

1     MR. VENNEBERG: Right.
2  Q  I'm just asking for your understanding.
3  A  Okay. My understanding is that within the Borough,
4  absolutely correct. But again, out of state, I don't
5  think was ever contemplated.
6  Q  Okay. But the -- the Code prior to 1369 didn't refer
7  to out-of-state or in state?
8  A  Right.
9  Q  It says, basically, that residency location is not a
10 condition of employment, unless it interferes with an
11 employee's daily performance?
12 A  Right.
13 Q  Right. Okay. Was there any time during the
14 employment of Carolyn Thomas where her residency location
15 interfered with the daily performance of her duties?
16 A  Prior to her moving? Absolutely not.
17 Q  At all. At any time during her employment.
18 A  It's hard to say. When she left, the understanding
19 we had was that she was working on union contracts,
20 finishing those up alone, and that was all, and that's --
21 and she was able to do that, you know, by phone and fax
22 and emails. So, in that respect, no.
23 Q  Okay. So, the answer to the question I posed was no,
24 then?
25 A  No --

Page 21

1     MR. SANDBERG: I -- I object to that.....
2     MR. VENNEBERG: Sure.
3     MR. SANDBERG: .....because that, I believe
4  mischaracterizes his testimony.
5     MR. VENNEBERG: Okay. Well, let me ask the question
6  again, because I think it's -- I think it's a yes or no
7  question. Was there anytime during the employment of
8  Carolyn Thomas, where her residency location, in your
9  view, interfered with the daily performance of her duties?
10 A  As HR Director?
11 Q  As a -- right. That was her position, right?
12 A  Yes. Yes. And I would have to say yes to that.
13 Q  Okay. And at what point during her employment did
14 her residency location interfere with the daily
15 performance of her duties?
16 A  Okay. We would have numerous things under her job
17 description that were to be fulfilled by the HR person in
18 charge, handling safety issues, training meetings,
19 complaints, very technical personnel files and issues,
20 such as injuries, accidents, things that would come up on
21 a daily nature, garnishments, things like that, that I
22 would, quite frankly, have no business seeing, or anyone
23 else, for that matter. We take our personnel issues very,
24 very seriously. And that -- that cannot be done long
25 distance. It's just impossible.

**Page 22**

1  Q  Okay. Was there any point prior to October 4, 2005,
2  where Ms. Thomas' residency location interfered with the
3  daily performance of her duties?
4  A  Again, after her leaving June 1st, other than the --
5  other than the union issues, union contract issues, which
6  were almost done, you know, there was no way to perform
7  other HR functions, you know, on a daily basis, you know,
8  via long distance.
9  Q  Okay. So, the answer to the question was yes, then,
10 that at some point before October 4, 2005, that her
11 residency location interfered with the daily performance
12 of.....
13 A  Yes.
14 Q  .....her duties?
15 A  Yes.
16 Q  Okay. And at what point did that come?
17 A  Well, it would have been any time after she left,
18 which was somewhere around the first of June, 1st or 5th,
19 I can't remember exactly what dates she was gone, but --
20 Q  Okay. And I believe the testimony was June 6th.
21 Does that sound right?
22 A  Yes, it sounds right.
23 Q  Okay. So, as of June 6, 2005, it's your view that
24 her residency location interfered with the daily
25 performance of her duties?

**Page 23**

1  A  Yes.
2  Q  Okay. Did you ever discipline Ms. Thomas under the
3  previous ordinance that provided that -- that residency
4  was not a condition of employment unless it interfered
5  with the daily performance of her duties? Did you ever
6  discipline her under that ordinance?
7  A  You're talking prior to -- I mean, after June 6th?
8  Q  Yes, after -- yes.
9  Q  No. Because it was our understanding that she had --
10 had resigned and she was strictly working on HR -- or
11 union contract functions, period. There was no need for
12 this.
13 Q  Okay. So, the answer is no?
14 A  No.
15 Q  As of June 6, 2005, when did you expect that Ms.
16 Thomas would be leaving her position?
17 A  We had discussed that the union contracts would
18 probably be finished -- we were shooting for early to mid-
19 June, but August 1st, at the latest, was what we had
20 contemplated.
21 Q  Okay. So, was there a date in there, then? Was that
22 -- was it July 1?
23    MR. SANDBERG: Terry, may I have a continuing
24 objection? I don't want to keep interrupting you, but,
25 simply, my objection is to form. And only because I

**Page 24**

1  believe that he testified she left her position on June
2  6th, when she got on an airplane and that they had an
3  understanding that she would be doing some continuing
4  work, but would not be doing the -- the entire HR job
5  remotely. And therefore, when you -- each of your
6  questions assumes that he thinks she's still the HR
7  Director in Oregon, and that's my objection.....
8     MR. VENNEBERG: Okay.
9     MR. SANDBERG: .....to the form.
10    MR. VENNEBERG: Well, I'll accept that as a daily
11 objection, but it does -- it does open up a line of
12 questioning, then.
13 Q  So, is it your view that Ms. Thomas left her position
14 as HR Manager, effective June 6th, 2005?
15 A  Yes.
16 Q  Okay.
17    MR. SANDBERG: And that was the basis of my
18 objection.
19    MR. VENNEBERG: Okay.
20 Q  And did -- did Ms. Thomas -- so, it's your view that
21 Ms. Thomas resigned, effective June 6, 2005?
22 A  Yes, sir.
23 Q  Was there a written letter or notice that reflected
24 that?
25 A  I know we had discussed it at length. She had been

**Page 25**

1  to my office in late February, early March, stating that
2  she would be resigning effective and maintained that all
3  the way down through June -- or through May, rather. I
4  had asked her to put something in her personnel file,
5  stating she had resigned, because I didn't want people in
6  town saying that she had been fired, because that was not
7  the case. And I had reported to the Assembly that she
8  would be leaving, effective, you know, June 1, or shortly
9  thereafter. But as far as anything else, I'm not aware of
10 it.
11 Q  I'd like you to turn to KB34. Okay. What -- do you
12 have that in front of you?
13 A  I do.
14 Q  What is KB34?
15 A  KB34 is a personnel action file, PAF they call them.
16 It's a -- we do this for every employee that has a change
17 in status of employment, whether it be a, you know, raise
18 or, you know, being -- resigning, being terminated,
19 whatever. So.....
20 Q  Okay.
21 A  .....it's just a record of what was done.
22 Q  Okay. And KB34 was a personnel action that concerned
23 Carolyn Thomas, is that right?
24 A  Yes, sir.
25 Q  Okay. And this reflects her dismissal from

Exhibit B
Page 7 of 41
7 (Pages 22 to 25)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

7fbeafc4-3271-4468-9d4c-83a4023dbe10