Page 38

1  A  Correct.
2  Q  And KB33. And again, this is a timesheet for pay
3  period ending November 15, 2005 and this reflects time
4  recorded by Ms. Thomas, right?
5  A  Right.
6  Q  And this was a timesheet that you signed off on?
7  A  Right.
8  Q  And you had also signed off on KB35, is that right?
9  A  I did, yes.
10 Q  And this reflects time that Ms. Thomas worked as
11 Human Resources Manager?
12 A  It's time she was paid for. I'm not going to say she
13 worked for it.
14 Q  Okay. Were there any entries that you disagree with,
15 as you look at it today?
16 A  No. No.
17 Q  Okay. You signed off on a number of the timesheets
18 after -- for pay period after September 1, 2005.
19 A  Yes.
20 Q  What inquiry did you make to verify that Ms. Thomas
21 had worked those hours before signing the timesheets?
22 A  The only inquiry we could do would be just
23 discussions, you know, through Holly, or someone else with
24 her, and just, you know, she put down the hours worked.
25 We had no way to prove or disprove it, and we were just

Page 39

1  trying to bring this to a head, to a conclusion, and we
2  thought it was better to pay.
3  Q  Okay. When you signed the timesheets, you had no
4  reason to think that Ms. Thomas had not spent this time on
5  Borough matters, right?
6  A  Personal conclusion, I don't think -- I don't think
7  the work was there to justify it. Again, with what's
8  going on in-house. But we had no way -- no way to prove
9  it.
10 Q  Did you have that view when you signed the
11 timesheets?
12 A  I did.
13 Q  Okay.
14    MR. SANDBERG: Terry, we've been at it for an hour.
15 Might we take our -- would this be a convenient spot?
16    MR. VENNEBERG: Absolutely.
17    MR. SANDBERG: I'm sort of over-caffeinated, over
18 here.
19    MR. VENNEBERG: Sure. Sure. No, that's fine.
20    MR. COSSMAN: We're going off record. The time is
21 10:32.
22    Okay, we're back on the record. The time is 10:40.
23 Q  Okay. Mr. Eckert, Carolyn Thomas became employed as
24 HR Manager for the Ketchikan Gateway Borough in 2004, is
25 that right?

Page 40

1  A  I believe that's correct, yes.
2  Q  Okay. Now, when was it that you became her
3  supervisor?
4  A  When she became employed.
5  Q  Okay. Were you involved in the hiring process?
6  A  I was.
7  Q  Okay. Were you involved in conducting interviews?
8  A  There were interviews -- I don't remember exactly how
9  many people interviewed, probably two or three. It was
10 not a big pool to choose from.
11 Q  Was there any discussion with Ms. Thomas during the
12 interview process about how long she intended to stay as
13 HR Manager, if she got the job?
14 A  I don't believe there was.
15 Q  Was she hired as a temporary person for that
16 position?
17 A  No, it was full-time.
18 Q  Okay. Now, if Ms. Thomas resigned from her position
19 as Human Resources Manager on June 6, 2005, how was it
20 that she was terminated pursuant to an ordinance that
21 didn't go into effect until almost four months later?
22 A  Again, it goes back to the -- to the issue of being
23 able to, number one, verify employment. If we had people,
24 you know, telecommuting, or whatever. There was no
25 control, there was no way to, you know, verify employment.

Page 41

1  The hours, as we discussed previously, the -- you know, I
2  had the questions on whether or not she actually did work,
3  you know, from her home in Oregon. So, it was a matter of
4  not being at work, you know, under Borough control, you
5  know, and Borough property, to do Borough business.
6  Q  Did you ever express any concern to Ms. Thomas about
7  those issues, about control over her position and
8  verification and things that you've just talked about?
9  A  The -- I maintained and still maintain, even with
10 her, that upon her direct statement to me that she was
11 resigning effective June 1 because her mother was going
12 blind, she could not work full-time, she would -- it would
13 be full-time taking care of her mother. And later on when
14 she said all she wanted to do was finish up the union
15 contracts and she'd probably be able to do that from her
16 house while she took care of her mother, because there was
17 not a whole lot of work left to do, that, you know, there
18 was not even a need for that, you know. Then once the
19 dispute came, you know, later that summer, it was just
20 down to total disagreement on, you know, what to do, so it
21 was -- just trying to pay her out, to give her a chance to
22 come back, or be paid out, you know. That's all there is.
23 Q  Okay. Did you ever tell the Borough Attorney that
24 Ms. Thomas had submitted a letter of resignation?
25    MR. SANDBERG: Objection to conversations with the

Page 42

1  Borough Attorney. We've not waived privilege; we're not
2  asserting a --an advice of counsel defense. I -- I -- you
3  can ask, I suppose, what people did, but what he told the
4  Borough Attorney, I have problems with and I would
5  instruct him not to answer those.
6      MR. VENNEBERG: Okay.
7  Q   Did you ever tell anyone that Ms. Thomas had
8  submitted a written letter of resignation?
9  A   I'm sure -- I'm sure I told somebody. I know there
10 had been discussion about it -- about it, you know, even
11 the recommendation --my recommendation to her to put a
12 letter in her file, you know, to protect herself from, you
13 know, again, the rumors that get around. You know, people
14 say, hey, you know, they were fired. No. And Carolyn, at
15 the time, thought that it was a very good idea and she
16 appreciated it. So -- and I'm sure that -- I'm sure I had
17 discussed that with others.
18 Q   Okay. You testified earlier you've never seen a
19 written letter of resignation?
20 A   I'm not -- I could have thought I did, but I --I
21 can't prove I did, so I can't say that I did. So, it's
22 one of those areas that doesn't really have an answer, you
23 know?
24 Q   Okay. In any of your correspondence with Ms. Thomas,
25 the correspondence that makes up a good share of the

Page 43

1  documents in front of you, did you make any reference to a
2  written letter of resignation?
3  A   I don't know if I did in the correspondence. But I
4  do know that we had discussed it in person. Again, she
5  thought it was a very good idea, you know, because she was
6  very --very familiar with the way that rumors get around
7  in small towns.
8  Q   And it was your understanding that the written letter
9  of resignation that she was going to be preparing,
10 according to your testimony, was that she was resigning
11 effective July 1?
12 A   Yes. No, June 1.
13 Q   June 1?
14 A   June 1.
15 Q   Okay. Shortly after Ms. Thomas went to Oregon, did
16 you tell a staff meeting that Ms. Thomas would be leaving
17 effective July 1?
18 A   I don't know if it was July 1, or not, but I do
19 remember in a staff meeting that she would be finishing up
20 the union contracts and that her employment would continue
21 until that was done. And that might have been -- I think
22 at that time we were still thinking it would be around
23 July 1 when those things would be done, because people
24 were starting to say, you know, Carolyn is gone, was she
25 fired, whatever? And I wanted to set the record straight,

Page 44

1  no, she was not fired, you know, she resigned. It was
2  just, I didn't want to get into the personal issues about
3  her mother being blind, but she told me going blind, so
4  it's, quite frankly, none of the staff's business, you
5  know. So, I did want to set the record straight that she
6  would be, you know, she would be doing union contracts and
7  that was it.
8  Q   Okay. I'd like you to turn to P76. And do you
9  recognize the first page of P76?
10 A   Assembly meeting minutes, yes.
11 Q   Now, on page P87, in the second paragraph, and again,
12 these continue the minutes of the July 18, 2005 Assembly
13 meeting. It says, Mayor Salazar asks --I guess it should
14 be asked -- about the status of the personnel manager.
15 Manager Eckert explained Ms. Thomas was working strictly
16 on the union contracts. In response to Mayor Salazar,
17 Manager Eckert said she was working full-time to get those
18 items done and he was in contact with her every day. Was
19 that true, that you were in contact with her every day?
20 A   Well, when I say I was, it was my office. Because
21 she would call Holly every day, sometimes she would talk
22 to me, sometimes she would talk to Holly, sometimes Steve,
23 sometimes Scott, some -- you know, so she would talk
24 through the office, so it was generally recognized, you
25 know, when I make those statements that it was, you know,

Page 45

1  my office.
2  Q   Okay. Then Mayor Salazar asked how long Ms. Thomas
3  would be working for the Borough and Manager Eckert said
4  the plan had always been that when the contracts were
5  done, that was that. Mayor Salazar asked when they would
6  be done, and Manager Eckert responded August 1.
7  A   Right.
8  Q   Okay. When did you arrive at the conclusion that Ms.
9  Thomas would be completed with these tasks on August 1?
10 A   It was through conversations with her, as we
11 determined, you know, how they were going and different
12 things that the unions might want to have changed, or --
13 you know, wording, contract documents, that she was
14 working on. So, again, we originally thought it would be
15 July 1 and then, you know, after July 1 it stretched on a
16 little bit. And she thought by -- by August 1st.
17 Q   Okay. I think you testified earlier that your
18 expectation was that Ms. Thomas would be submitting a
19 letter to her file reflecting that she would resign July
20 1, is that right?
21 A   I don't remember if it was July 1 or June 1, but it
22 was -- it was one of those days. Our original
23 understanding was that she would be resigning effective
24 June 1. That was when we had discussed that, oh, back in
25 late February, early March, and I think sometime mid-March

Page 46

1  or late-March that I required her -- not required, asked
2  her to go ahead and put a letter in her file, stating that
3  she was resigning and not being terminated.
4  Q   Did you have any discussion with Ms. Thomas about
5  submitting any sort of written letter or notice reflecting
6  that she would be resigning August 1?
7  A   No, because it was -- again, we had our understanding
8  that she would continue the -- the union contracts until
9  they were done, and that was -- that was the end of the
10 employment.
11 Q   Okay.  Now, you testified earlier that it was your
12 understanding that Ms. Thomas completed the work on the
13 union contracts on or about September 1?
14 A   Right.  It was when they were -- well, I don't know
15 when she finished her work, but I think the -- the
16 Assembly ratified those, or adopted the contracts
17 somewhere around September 1st, so yeah.  And that was the
18 official end of when things were done.  In case the
19 Assembly wanted to go back and do other -- other
20 negotiations.
21 Q   That was the official end of her work, in your view?
22 A   Right.
23 Q   Okay.  But then, we went over the timesheets that
24 reflected that Ms. Thomas was paid for work through around
25 October 19th, right?

Page 47

1  A   Right.
2  Q   When -- when you signed off on the timesheets for
3  most of that period, did you have an understanding as to
4  what Ms. Thomas was doing?
5  A   Not really.  She was -- that's where we had a major
6  disagreement, because she had started sometime during the
7  summer, apparently telling employees that she had been
8  promised to fulfill HR functions, you know, from long
9  distance.  I do know that when she came back and talked to
10 me sometime in June -- late June, early July, she came to
11 the Borough office and I asked her point blank about that,
12 and she sat in my office and I told her, looked her square
13 in the face, right in front of my desk, and she said, you
14 know, I'm still doing my duties.  And I said, well, you
15 never told me.  And she said, well, I had permission from
16 all the Assembly members, I talked to every one of them.
17 And I said, well, it's funny you never talked to me about
18 it.  And her exact words were, well, you were always too
19 busy, I never had a chance to talk to you about it.  And I
20 said, well, you know that's not true and you know that you
21 resigned.  And I said you know that that's the only
22 understanding we had.  And to that she responded with
23 nothing.  She said nothing, just looked at me.  And she
24 knows, I know, God knows, that she resigned, that we never
25 had an understanding for her to continue that employment.

Page 48

1  However, in the fall when we continued paying her, you
2  know, we were trying to be -- be nice.  We still had that
3  position open, we gave her every opportunity to come back,
4  you know to -- to fulfill those duties if she wanted to,
5  fine.  She chose not to come back, said she would not move
6  back to Ketchikan.  They still have a home here and she
7  said she would not come back to work at the Borough,
8  period.
9  Q   So, it's your testimony that Ms. Thomas was paid for
10 the period after September 1 to around October 19 because
11 you were being nice?
12 A   We were being nice and that's pure and simple.
13 Because we wanted to -- to go the extra mile, we wanted to
14 see if she wanted to come back.  There is no question that
15 she did very good HR work.  She was very good at what she
16 did.  And I would have welcomed her back, if she wanted to
17 come back.
18 Q   When -- when you signed off on the timesheets, was
19 that the reason that you signed off on the timesheets, was
20 to be nice?
21 A   We had some -- we had some discussion in-house and --
22 I may get into some privileged things.  I'm not sure --
23     MR. SANDBERG:  I would instruct you not to relate
24 conversations with the Borough Attorney.....
25     MR. ECKERT:  All right.

Page 49

1      MR. SANDBERG:  .....in-house, regarding a dispute
2  that was pending.
3  Q   And I'm not asking you about communications.  What
4  I'm asking about is why you signed off on the timesheets.
5  And was the reason you signed off on the timesheets after
6  September 1, was that to be nice to Ms. Thomas?
7  A   Again, that gets into some privileged communication
8  between myself and the Attorney.  But --
9  Q   Well, I'm asking for the reason, I'm not asking for
10 any communication.
11 A   I understand.  I'm trying to think how to put this
12 where it won't get into some privileged communication.  In
13 the Borough's best interest, at that time, we felt it
14 would be better to pay her, try and resolve the issue and
15 terminate as quickly as possible, either through her
16 resignation, or, you know, action that would, you know,
17 would bring it to a head.
18 Q   So, as Ms. Thomas' supervisor, you had no
19 understanding about how she was occupying her time in the
20 period after September 1.....
21 A   Exactly right.
22 Q   .....when you continued to sign her timesheets?
23 A   Exactly.
24 Q   Have you ever had any discussion with any other
25 Borough employee, except for the Borough Attorney, as to

13 (Pages 46 to 49)

Exhibit B
Page 13 of 41

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

7fbeafc4-3271-4468-9d4c-83a4023dbe10