Page 50

1  how Ms. Thomas was occupying her time, time that she was
2  recording, after September 1? Any discussion with any
3  Borough employee about that?
4  A   If I would have, it would have been, probably the
5  only other person, probably would have been the Assistant
6  Manager, Steve Corporon.
7  Q   Okay. And do you recall any of those discussions?
8  A   I don't recall the discussions. Again, if it was, it
9  would have been, you know, not very detailed. Just, you
10 know, questions, concerned -- especially when the
11 timesheets would come in.
12 Q   Okay. Do you remember having discussions with Mr.
13 Corporon or any Borough employee when the timesheets came
14 in, before signing the timesheets, about how this time was
15 being spent?
16 A   I remember probably either Polly and/or Mr. Corporon,
17 Holly Rosendin and Mr. Corporon saying, you know, I don't
18 know what she's doing, you know -- you know -- I just
19 don't know. So, they were very brief conversations.
20 Q   Okay. Well, if Ms. Thomas was submitting timesheets
21 reflecting work that she hadn't performed, wouldn't that
22 have been cause to terminate her employment, in your view?
23 A   In my view it would. Again, there was some, you
24 know, attorney issues that we were discussing at that
25 time, regarding that very issue.

Page 51

1  Q   But you were the decision maker?
2  A   I was the decision maker. But again, I've learned a
3  long time ago to -- to get good legal advice and follow
4  it.
5  Q   Okay.
6  A   But it's still my contention, how do you fire
7  somebody that's already been -- resigned?
8  Q   Okay. But you -- in fact, you did that in October
9  2005, right? In your view, you fired somebody that had
10 already resigned?
11 A   I agree with that. And again, procedure is something
12 I don't always have control over.
13 Q   Did you believe you had cause to fire Ms. Thomas as
14 of August 1, 2005?
15 A   As of August 1, 2005, I don't think there was any
16 reason to fire her, because she had resigned and knew --
17 you know, knew the timing, you know, of the contracts.
18 And that was our understanding.
19 Q   But she still occupied the position, right?
20 A   She still had the title, but again, if I give notice
21 to the Assembly that, okay, I'm going to resign effective
22 60 days from now, I may still have that title, and if I
23 stay an extra 30 days because of, you know, whatever,
24 something that they want me to stay, I'm no longer
25 technically the Manager, although I still have the title,

Page 52

1  I'm still getting paid under that -- under that title.
2  So, I didn't see that was any different.
3  Q   Will you turn to KB363?
4      MR. SANDBERG: 263?
5      MR. VENNEBERG: 363.
6      MR. SANDBERG: 363, I'm sorry.
7  Q   Do you recognize what is marked as KB363?
8  A   Yes, I do.
9  Q   Okay. What is KB363?
10 A   It's a purchase order, and it is a purchase order for
11 a notebook computer.
12 Q   Okay. And this notebook computer was going to be
13 used by Ms. Thomas in her work in Oregon, is that right?
14 A   It's -- I'm not going to say specifically for Ms.
15 Thomas. We do -- we purchase, from time to time, notebook
16 computers, as we're trying to replace our -- the big --
17 bigger-- for lack of a better term, the big desktops with
18 notebooks, which are more efficient for office staff. And
19 we were rotating some out. We did purchase some
20 notebooks. Carolyn stated, you know, that she could use
21 one. We let her have this one -- not have it to keep, but
22 to use in her -- finishing up the contracts and -- the
23 union contracts. So, that's -- I'm not going to say it
24 was done specifically for her, but, you know, it was one
25 that we were probably rotating through. So, we probably

Page 53

1  purchased several in that timeframe.....
2  Q   Okay.
3  A   .....probably that summer.
4  Q   All right. Well, you understand, this -- this
5  invoice was included in the disclosures provided.....
6  A   Right.
7  Q   .....in this case?
8  A   Right.
9  Q   All right. But you don't have any understanding as
10 to whether this notebook was purchased specifically for
11 Ms. Thomas for use in her work in Oregon?
12 A   No, because under normal circumstances we wouldn't do
13 that with somebody that was -- that was, you know, had
14 already told us that they were resigning, but I had no
15 problem letting her use, you know, use one. And -- I
16 mean, it's -- it had the Borough files and everything else
17 on it, you know, that we could preload and that she could
18 use.
19     In fact, we tried to make arrangements to get this
20 computer back, and it's my understanding from our IT guy,
21 Mr. Bjork, Greg Bjork, that signed off on this, that he's
22 tried four or five times to make arrangements for pick-up
23 through either UPS or FedEx, and has been unsuccessful in
24 getting that returned.
25 Q   Do you recall the date that Ms. Thomas told you that

14 (Pages 50 to 53)

Exhibit B
Page 14 of 41

Page 54

1  she would -- she would be resigning?
2  A  I don't remember the exact date, but it was late
3  February or the first week or so of March.
4  Q  Okay.
5  A  I do remember it was quite -- quite traumatic,
6  because she was very concerned about her mother, who she
7  said was having eye troubles, going blind, and she was
8  going to have to move down and help take over their ranch
9  and she would be working full time, you know, taking care
10 of her mother, who was going to lose her eyesight. So,
11 that was -- that was what precipitated it. And I know she
12 was very concerned and very upset at the time.
13 Q  Was it this discussion where Ms. Thomas gave you the
14 date of July 1?
15 A  June 1.
16 Q  June 1?
17 A  Right.
18 Q  All right. After that discussion, did you have any
19 other discussion with Ms. Thomas about when she would be
20 leaving Borough employment?
21 A  Obviously, we discussed it off and on for the next,
22 you know, several months. I know I'd, you know, always
23 ask how her mother was doing, you know, because it's not -
24 - not a nice thing for somebody to, you know, have to go
25 blind. But discussed it -- she did say it was one of the

Page 55

1  hardest things she had ever done, because she had never
2  been, you know, unemployed and out of full-time
3  employment, but it was going to be an adjustment for her
4  and she kept --kept talking about the June 1 timeframe.
5  And one of the reasons, I think her husband had already
6  gone down. They were trying to make arrangements to get
7  their furniture and things moved, although they still have
8  their home here. Anyway, so, they were trying to make
9  that shift and so we discussed it off and on for the next
10 several months.
11 Q  Okay. But after that discussion in late February,
12 early March, did you have any discussion with Ms. Thomas
13 where she gave you a different date for her resignation?
14 A  No. No, in late April, early May is when, you know,
15 she asked about the union contracts because we could tell
16 they weren't going to be done in time for her to go on
17 June 1st. And she said if she could do that, it would
18 help the transition from full-time employment to part-time
19 -- or to no employment easier. And I did ask her, well,
20 would that interfere with her mother's -- trying to take
21 care of her? And she said, no, she would do it in the
22 same house. It was my understanding she was going to be
23 living in the house with her mother, because, you know,
24 when somebody loses their sight, it's hard to get around
25 for a while, and so she was going to be right there. So

Page 56

1  she said, you know, there was not a lot of work left to
2  do, so she felt she could do it fine from there.
3  Q  Okay. I'd like you to turn to P10.
4  A  Okay.
5  Q  Okay. And P10- contains a reference to a newspaper
6  article in the Ketchikan Daily News.
7  A  Um-hmm.
8  Q  Were you interviewed for that article?
9  A  Oh, yes.
10 Q  Okay. What were the subjects that came up during the
11 interview?
12 A  Basically just -- just Ms. Thomas' employment.
13 Apparently someone had called the -- the newspaper, you
14 know, complaining about her working out of state and it
15 was -- it was a very interesting conversation with the
16 newspaper. As Ms. Thomas and I both know, neither one of
17 us like to -- like to work with the newspapers.
18 Q  Okay. And so, you were called by a reporter?
19 A  Yes.
20 Q  And what was the name of the reporter?
21 A  Let's see, probably Joanna Markell. Yeah, Joanna
22 Markell, I'm sure.
23 Q  Okay. What did the reporter tell you about the
24 reason for her call and the interview?
25 A  She just said that it had been reported to her that,

Page 57

1  you know, we were still paying a former HR Director, you
2  know, to do work, you know, and why was that allowed, you
3  know, to live out of state and to work away from the
4  office? And it was -- it was pretty specific, pretty
5  pointed.
6  Q  Okay.
7  A  I do have to say that this article caused me a lot of
8  grief, but that's okay.
9  Q  Why did the article cause you grief?
10 A  Oh, just -- just the concept in the community of
11 allowing somebody to work, you know, outside the area, and
12 to not -- not be at the office.
13 Q  Okay. Did the newspaper article generate some
14 political pressure on you?
15 A  I think that would be a fair assumption, yes.
16 Q  And what was the reason for the pressure, to your
17 understanding?
18 A  Well, just basically, that the public was getting,
19 you know, the heat, because the Assembly was already aware
20 that, you know, she was doing the -- doing the union
21 contracts, you know, from her -- you know, from down there
22 and finishing those up, but it had not been, you know,
23 widely publicized, you know, it was just -- it caused some
24 concern among the Assembly, you know, that we were even
25 doing that much. But I think they were all okay with it,

Page 58

1  as long as they knew that, you know, everything was going
2  to stop when the union contracts were ratified.
3  Q   Okay. The article says in the second paragraph, she
4  -- referring to Ms. Thomas -- is working full-time for the
5  Borough and is responsible for finishing union contract
6  negotiations and updating Borough job descriptions. Was
7  that something that you told the newspaper?
8  A   I don't (word indiscernible) telling them about
9  updating the Borough job descriptions. I know that we had
10 been talking about what we were doing here, doing --
11 updating Borough job descriptions. And again, I don't
12 believe everything I read in the papers, I learned that a
13 long time ago. But there may have been some
14 misunderstanding on, you know, on how they interpreted the
15 conversation, you know, with their notes. But I don't --
16 I don't believe that that was stated in the way they had
17 this stuff.
18 Q   Okay. So, is it the case that you recall that you
19 didn't tell the -- the reporter that she was updating
20 Borough job descriptions, or that you just don't recall
21 whether you did?
22 A   I don't think I did. I don't think I would have done
23 that, because that was not my understanding at the time.
24 Because we were doing that in-house, Mr. Corporon and
25 myself and several others had been in the process of

Page 59

1  updating job descriptions and -- and, you know, looking at
2  various ones that needed updating. So, that's why I think
3  that they might have had something --something a little
4  wrong here, because I just don't believe I would have said
5  -- you know, made that statement.
6  Q   Okay. And then it goes on, I think, in the fourth
7  paragraph to say, Eckert said the Borough is, quote, still
8  evaluating where we want to go with the Human Resources
9  position, but things are working well.
10 A   Right.
11 Q   Did you tell the reporter that?
12 A   Absolutely.
13 Q   Okay.
14 A   Absolutely. Because we were still evaluating whether
15 or not we wanted to do -- you know, hire someone, you
16 know, back, you know, to fill that position. But with
17 Steve working on the majority of things and Holly still
18 doing what she did daily, things were working well.
19 Q   Okay. So, when the article says that you -- you told
20 the reporter things were working well, that was an
21 accurate.....
22 A   Yes.
23 Q   .....statement?
24 A   Yes.
25 Q   We're going to turn to KB340. Okay. And do you

Page 60

1  recognize KB340 and then 341?
2  A   Let's see, this would be -- okay, yeah, agenda
3  statement, motion to recess to executive session to
4  discuss Carolyn's -- basically, I won't say Carolyn's,
5  Human Relations Manager position, yeah.
6  Q   Okay. And was this a document that you drafted?
7  A   Let's see, I know I did the summary statement, but on
8  the first page, let's see -- I got -- on the second page,
9  I think a lot of this is pretty much standard language.
10 Obviously, change the names for discussing executive --
11 you know, personnel matters. So, yeah, for the most part
12 I did it.
13 Q   Okay. And this agenda statement was a staff
14 recommendation to the Borough Assembly as to a motion they
15 should consider, is that right?
16 A   I think at the time -- I would have to go back and
17 see if I could find anything on this -- I think the
18 Assembly had asked for discussion on it, and most
19 personnel issues we really want to move into executive
20 session, because you never know what's going to happen
21 and, you know, what could be said. So, I don't believe
22 this was put forward by the staff. I -- it would probably
23 have been a request like -- my recollection would be it
24 would be a request either from the Mayor or an Assembly
25 member or two.

Page 61

1  Q   Okay. And you said you drafted the summary
2  statement?
3  A   Pretty much. The language -- most of the language on
4  the second page is kind of standard language we probably
5  used from other HR or personnel sessions that we would go
6  into executive session. And there might have been some
7  fine-tuning with myself and/or the Attorney, or someone,
8  but yeah, it was probably mostly me.
9  Q   Okay. And the summary statement starts at the
10 Assembly meeting of July 18, 2005, several Assembly
11 members asked questions regarding the employment status of
12 the Borough's Human Relations Manager, Carolyn Thomas, and
13 the Borough's plans for providing for Human Relations
14 functions in the future.
15 A   Right.
16 Q   Now, this reflects that as of August 1, 2005, Ms.
17 Thomas continued to hold the Human Relations Manager
18 position, is that right?
19 A   She had the title. And then she was -- this would
20 have been August 1 -- just about the time we were -- well,
21 we hadn't totally completed, I believe, the negotiations.
22 Hadn't ratified them, at that point.
23 Q   Okay. And the -- the recommended action -- I want to
24 go down to the recommended motion. Was this -- the
25 recommended motion, was that one that you recommended?