Page 62

1  A   This is standard language, so just to go into
2  executive session for the purpose of discussing Human
3  Resources functions pursuant to KGB Code.  This is -- we
4  have a kind of blanket statement that we just cut and
5  paste in there and -- in this -- potential claims, in the
6  event that the Borough were to take adverse employment
7  action regarding Ms. Thomas -- that would have been,
8  again, pretty much standard cut and paste language.  So,
9  while that's -- I think recommended motion is -- is maybe
10 a misnomer, that's our standard form that has it on there,
11 but I think that it's a cut and paste type of situation
12 that we use.
13 Q   Okay.  So, this motion that is under recommended
14 motion, that wasn't a motion that you were recommending to
15 the Borough Assembly?
16 A   No, it was -- the only motion that I would recommend
17 that we go into executive session for the purpose of
18 discussing Human Resource functions pursuant to the Code.
19 And then, you know, the rest would be, I think, again,
20 probably boilerplate that we take out of -- out of, you
21 know, former things that, you know, we're dealing with,
22 whether it would be former managers, or department heads
23 or whatever, and just -- so it's a cut and paste.  But my
24 only -- my only recommendation would be to go into
25 executive session to discuss what they wanted to discuss.

Page 63

1  Q   To discuss what you wanted them to discuss, right?
2  A   Well, up here, what they had asked to discuss,
3  providing functions and questions regarding Ms. Thomas'
4  employment status.  So, that's pretty much protective.
5  Q   Could you read the recommended motion that is in the
6  agenda?
7  A   Sure.  I move to recess into executive session for
8  the purpose of discussing Human Resources function,
9  pursuant to KGB Code section 5.31.080, matters the
10 immediately knowledge of which may adversely affect the
11 finances of the Borough and potential claims in the event
12 the Borough were to take adverse employment action
13 regarding Ms. Thomas.
14 Q   Okay.  Now, as of the time of this -- the drafting of
15 this recommended motion, were you contemplating taking an
16 adverse employment action against Ms. Thomas?
17 A   At that time, I had not.  I certainly had not, not on
18 August 1, because, again, the contracts weren't fulfilled.
19 And I would have to refer to probably a letter you may
20 have in here, a letter or an email where Ms. Thomas has
21 recommended -- not recommended, but requested that she be
22 paid three hundred and some thousand dollars -- I don't
23 have the exact figure, but it's in excess of three hundred
24 thousand dollars to go away quietly.  And that may have
25 had a bearing on this, I don't know.  I would have to see

Page 64

1  the date of that letter.
2  Q   Okay.  What adverse employment action is being
3  referred to in the recommended motion?
4  A   Again, that could only be as a result if that -- if
5  that letter was there.  Because I don't know what adverse
6  employment action if -- if push came to shove, if she had
7  already made her request and I'd stated, look, you know,
8  you resigned, you know, you're not still the -- she was
9  going to file suit, which she, at one point in time
10 threatened, then that would be the only -- only reason I
11 would think it would be there.
12 Q   Okay.  KB336.
13 A   Okay.
14 Q   Okay.  Is that the first page of the letter you're
15 referring to?  And take an opportunity to look at that.
16 A   Okay.  I'm trying to find the -- okay, there's --
17 there's her -- that's $326,108.  I think there was a phone
18 call or something prior to this, where she had stated
19 that, and I think this was where she put it in -- in
20 writing.  So --
21 Q   Okay.  Because this letter is dated.....
22 A   August 5.
23 Q   .....August 5.
24 A   And this is for the meeting of August 1.  But I think
25 that she had already alluded to that fact in a phone

Page 65

1  conversation and -- which is -- which is the -- that's the
2  only reason I could understand that we would have some
3  adversity affecting the finances because we knew it was
4  coming.
5  Q   Okay.  Well, you said earlier that the only reason
6  could have been the letter.
7  A   Well, the letter or the knowledge of the thing
8  coming.  Letter is probably maybe too strong a word.  But
9  -- I did say that, but, you know, but there was -- there
10 was a phone conversation prior to the letter.  I just
11 don't know the date of that letter -- or that phone
12 conversation.
13 Q   Okay.  Do you recall anything about the phone
14 conversation?
15 A   It was pretty caustic.  It was basically Carolyn
16 reiterating some of the things in the letter, which a lot
17 of things that are in here -- in her letter I certainly
18 disagree with, because there are a lot of things there
19 that are not, in my opinion, correct.  But it was very
20 caustic, and I think, you know, she said for the sum of
21 three hundred plus thousand dollars that, you know, she
22 would walk away and she wanted an answer and I just didn't
23 even respond to that.  And as a result we get the letter.
24 so, it's -- it's probably what prompted this -- this --
25 after the discussion with our Attorney.

17 (Pages 62 to 65)

Page 66

1  Q  And you don't know the date of the conversation?
2  A  No. It probably would have been at least a week,
3  maybe a week and a half prior to the 1st.
4  Q  Okay. Did you make any notes about that
5  conversation?
6  A  If I did, I would have given them to our Attorney and
7  he would probably have a copy of them. But I do know that
8  -- that as a result of that, I did talk with our Attorney.
9  Q  Okay.
10 A  So, I don't know that I made any notes.
11 Q  So, as of the preparation of this agenda statement
12 for the meeting of August 1, 2005, you weren't
13 contemplating ending Ms. Thomas' employment with the
14 Borough. Is that your testimony?
15 A  Well, again, it goes back to -- I've always said, my
16 understanding was she was -- she was done. According to
17 her letter, you know, she says she wasn't. And so, I
18 think at that point in time it was an okay, where are we?
19 But to answer -- the short answer to your question is, no.
20 Q  Now, the summary statement goes on, on KB341, in the
21 third paragraph on the page. It says, if, on the other
22 hand, the executive session is not to discuss Ms. Thomas'
23 actions or performance, but rather is to discuss potential
24 Borough liabilities in the event that the Borough were to
25 take an improper or unjustified adverse employment action

Page 67

1  against Ms. Thomas, then the appropriate basis for the
2  executive session would be KGB Code § 531.080(b)(2)(B) to
3  discuss potential or pending from litigation claims or
4  enforcement actions in which the Borough or service area
5  has an interest, or 531.080(b)(1)(A), the immediate
6  knowledge of which would clearly have an adverse affect
7  upon the finances of the Borough. So, when the summary
8  statement refers to potential Borough liabilities, in the
9  event the Borough were to take an improper or unjustified
10 adverse employment action against Ms. Thomas, you don't
11 know what improper or unjustified adverse employment
12 action is being referred to, there?
13 A  No, I do not.
14 Q  And it's still your testimony that as of the drafting
15 of this agenda statement that you were in no way
16 contemplating terminating Ms. Thomas' services?
17 A  Right, because I was still -- still arguing with her,
18 the fact that she had resigned and she knew that when
19 those union contracts were finished, she was done, so
20 there would be no need for any termination.
21 Q  Okay. If Ms. Thomas had already resigned, what
22 adverse employment action could that be referring to, in
23 your view?
24 A  In my view, the only thing that this could possibly
25 be referring to would be if, again, with her letter that

Page 68

1  she wanted to file a wrongful termination, or something
2  like that. You know, just -- if we said, okay, we're
3  going to just fire you and, you know, just get it over
4  with, which again was not my position, because I'm -- I
5  will still say and I will always maintain, she resigned.
6  And so, should that action be taken, either by me or by,
7  you know, the Assembly, you know, saying you know, hey, do
8  this, although they don't have the authority to do it,
9  they'd have to order me to do it, that there would be some
10 -- some wrongful termination action.
11 Q  Okay.
12 A  And let me add there, whether it's justified or not.
13 Q  Okay. Now, this -- the motion to recess to executive
14 session to discuss the employment status of the Ketchikan
15 Gateway Borough Human Relations Manager.....
16 A  Um-hmm.
17 Q  .....that motion didn't pass, did it?
18 A  I would -- you know, are the minutes there? I don't-
19 Q  If you could turn to P94, and these are part of
20 the.....
21 A  Okay.
22 Q  .....minutes for August 1, 2005. Does that reflect
23 that the motion to go into executive session to discuss
24 the employment status of the Ketchikan Gateway Borough
25 Human Relations Manager was rejected?

Page 69

1  A  It was rejected. The motion failed.
2  Q  Okay. And did you have an understanding as to why it
3  was rejected?
4  A  Let's see -- no, I think the -- the Assembly a lot of
5  times -- the Assembly we currently have does not like to
6  go into executive session for very many reasons. And
7  again, I think this is one issue that they were probably
8  wanting to pretty much stay away from.
9  Q  Okay. Well, you have recommended that they go into
10 executive session to discuss this, is that right?
11 A  Right. But I think that was at the direction of --
12 what was that document number? That -- that agenda item?
13 Q  KB340.
14 A  Okay. If I remember right, I think that was -- yeah,
15 several Assembly members had asked questions regarding the
16 employment status, and they wanted to discuss that. And
17 any time a personnel issue, an HR issue comes up, we
18 always direct that to be, you know, an executive session.
19 We don't like to discuss an employee's status, their --
20 you know, where they are with their position, their
21 employment. So, that's pretty much standard. If they
22 want to discus it, we want to give the employee all the --
23 all the option of having it into an executive session.
24 Q  Okay. But, in fact, they didn't want to discuss it
25 that night?

18 (Pages 66 to 69)

Exhibit B
Page 18 of 41

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

7fbeafc4-3271-4468-9d4c-83a4023dbe10

**Page 70**

1  A  They didn't want to. No, they did not.
2  Q  And did you have an understanding as to why they
3  didn't want to discuss it?
4  A  No, because they said they wanted to discuss it, and
5  then they turned around and said they did not want to
6  discuss it. So, it's -- in 28 years I have yet to figure
7  out the minds of elected officials.
8  Q  After the motion was declared failed, it says
9  Assembly Member Tipton asked if the Manager would like to
10 receive direction on policy from the Assembly. Manager
11 Eckert responded, Assembly Member Lybrand said it very
12 well. Do you know what's being referred to, there?
13 A  I think it's the second paragraph under this request
14 for executive -- where it says, Assembly Member Lybrand
15 stated the issue of an employee of the Borough working out
16 of state should not be a question for the Assembly. He
17 said if there was no rule to the contrary, then the
18 Manager should make the decision. He added he did not
19 believe it was appropriate for an employee to be allowed
20 to work outside the Borough.
21 Q  Okay.
22 A  So, that's -- that's -- that's what that's referring
23 to.
24 Q  Did you have any discussion at any time with the
25 Assembly, either at an Assembly meeting or with individual

**Page 71**

1  Assembly members about the state of the Code prior to
2  Ordinance 1369 that allowed -- that said that residency
3  was not a condition of employment, unless it interfered
4  with an employee's performance?
5  A  I don't know that there was specific discussion along
6  that specific line, but I know there were numerous
7  discussions with several Assembly members regarding her
8  being out of state and more importantly, that she was not
9  working in a Borough office, okay? That's -- I think -- I
10 think even if somebody was to live in Prince Wales or over
11 at Metlakatla, or Gravina, that would not make a big
12 difference. It was the fact that they weren't showing up,
13 you know, at the office where they can be accounted for.
14 And I think that's the issue.
15 Q  All right. Did you have any discussions with any
16 Assembly members about political pressure that they were
17 feeling as a result of Ms. Thomas' employment situation?
18 A  I wouldn't call it political pressure, but the short
19 answer is yes, the -- the Assembly was getting a lot of
20 phone calls and a lot of people talking and saying, you
21 know, why were we allowing this, you know, how can
22 somebody do that? You know, gee, they would like to have
23 a job where they could, you know, live in California or
24 Mexico and, you know, perform their job and get paid for
25 it. So, there was a lot of discussion in the community

**Page 72**

1  about this.
2  Q  Okay. Do you believe that that discussion led to the
3  passage of Ordinance 1369?
4  A  I think it had a bearing on it.
5  Q  As of the drafting of this summary statement, you
6  testified you drafted KB340.....
7  A  Um-hmm.
8  Q  .....did you have a view as to whether Ms. Thomas'
9  residence location was interfering with the performance of
10 her duties?
11 A  Well, at the time, again, in my opinion, she was only
12 working on union contracts. And it had no bearing on
13 that. Now, if she was to maintain that she was doing
14 other work, yes, I would say it had a bearing on the
15 performance of her duties. It just -- it just doesn't
16 work.
17 Q  Okay. Well, you knew what duties she was performing
18 as of August 1, 2005, right?
19 A  The union contracts.
20 Q  Because you were her supervisor?
21 A  Right.
22 Q  So you knew that?
23 A  I knew the union contracts, period.
24 Q  Okay.
25 A  So, yes.

**Page 73**

1  Q  Okay. And was her residence location having any
2  impact on her ability to perform those duties?
3  A  Not the union contracts. In fact, she did a very
4  good job and cleaned up those contracts quite well.
5  Q  Okay. I'd like you to turn to KB330.
6  A  Okay.
7  Q  Okay, and do you recognize KB330?
8  A  I do.
9  Q  Okay. And what is KB330 and then 331?
10 A  Okay. KB330 and 331 is a memorandum or a, for lack
11 of better terms, letter from myself to Carolyn Thomas
12 regarding her work location.
13 Q  Okay. Now, this -- this memorandum doesn't refer to
14 any difficulties that Ms. Thomas was having performing her
15 duties, isn't that right?
16 A  Right.
17 Q  Okay. In the fourth paragraph you say, I am not
18 asking for your resignation and that is not the intention
19 of this memo, but I need to know your decision as soon as
20 possible, in any case, by no later than Friday, August 12,
21 2005. If you decide to continue your employment with the
22 Borough, I need to have you available for work at the
23 Borough offices on or before September 1. Why did you
24 make that request?
25 A  Well, it was -- we just had to bring things to a