**Page 74**

1  head, because she needed to be here if she wanted to
2  continue work. And we had had discussions back and forth
3  on the phone, and -- about, you know, had she resigned,
4  had she not resigned. She had already started asserting
5  that she was still performing other HR functions, you know
6  -- you know, that's not our understanding. I had already
7  told her that to continue employment with the Borough she
8  would have to work here in Ketchikan. You know, whether
9  she lived here or not, she had to work here and so that's
10 what prompted it.
11 Q  Okay. Now, when you refer to continuation of
12 employment, what are you referring to, there?
13 A  Okay, if she wanted to continue to be the HR Manager
14 and to perform those duties, then she would have to work
15 in the office, here, where our personnel records are kept,
16 where the, you know, HR files are. You have to have
17 direct access to those files to perform that job. That's
18 just all there is to it.
19 Q  Okay. So, as of this memorandum, August 5, 2005, Ms.
20 Thomas was still the Borough Human Resources Manager?
21 A  She had the title. But again, she had resigned
22 effective June 1 and we had not filled the position, she
23 could still come back and take it. I would have been
24 happy to have her.
25 Q  Okay. In the second paragraph, about seven lines

**Page 75**

1  down.....
2  A  Um-hmm.
3  Q  .....you say, as we discussed on Tuesday, I told you
4  that the policy is going to stand that all Borough
5  employees will live in, reside in, and work in the Borough
6  and will work in and on Borough property. You discussed
7  that with Ms. Thomas, in person?
8  A  On the phone, I believe. I'm not sure if it was in
9  person or on the phone. I think it was on the phone.
10 Q  Okay. Now, this policy that you were referring to,
11 at that point, was that in written form?
12 A  I believe it was.
13 Q  And where was that contained?
14 A  I would have to find that. We have a policy book
15 that we, you know, keep Borough policies and directions in
16 and, you know, it should be in there. If you don't have
17 it in here, we'll certainly have to find that. But I do
18 know that we have a policy and procedures manual.
19 Q  What's -- what's the name of the -- is it called a
20 policies and procedures manual?
21 A  Right.
22 Q  Okay. And this policies and procedures manual has
23 some reference to the residency of Borough employees?
24 A  I'm not sure about residency, but it talks about, you
25 know, working inside the Borough. So, it's -- it's there.

**Page 76**

1  And from time to time there are verbal policies made that
2  may or may not be reduced to writing, I don't know. But
3  it's -- it should be in there.
4  Q  Well, what I'm asking about is this particular.....
5  A  Right.
6  Q  .....policy that you refer to, that all Borough
7  employees will live in, reside in and work in the
8  Borough.....
9  A  Um-hmm.
10 Q  .....and work in and on Borough property.
11 A  Right.
12 Q  Is it your testimony that that policy, at the time of
13 this memorandum, was in writing?
14 A  I'll have to go back and look in the policy. If not,
15 I know it had been discussed, you know, and certainly
16 there were issues that even had come up and I think we had
17 referred to it earlier in this about the -- or maybe it's
18 later, about the former City Planner, that had offices
19 offsite, just down here on Creek Street, about three or
20 four blocks away. And we caught a lot of heat about him
21 working out of his office and that was one reason that he
22 now just does consulting. He's no longer a Borough
23 employee, you know, because he would have had to work
24 here. He chose not to do that.
25 Q  Okay.

**Page 77**

1  A  So, I believe it's in writing, but if it's not, it
2  certainly was an understood policy.
3  Q  Okay. Well, the only written policy on residency at
4  this point, that has been produced, was the policy
5  contained in the previous version of 30.20.016, that we
6  talked about earlier, that says residency within the
7  Borough shall not be a condition of initial appointment or
8  continued employment, except as otherwise provided by
9  state law, the Borough Code of Ordinances or resolution.
10 Provided, however, that an employee's residence location
11 shall not interfere with the daily performance of an
12 employee's duties and responsibilities. Is it your
13 testimony that there was a policy in place inconsistent
14 with that.....
15 A  No.
16 Q  .....provision of the Borough Code?
17 A  No. I think the policy that had been always used was
18 that you had to be able to perform your duties, you know,
19 in a Borough location, Borough office, you know, within
20 the Borough. You know, I mean, that's where the Borough
21 is. Our offices aren't outside the Borough. So, I don't
22 believe it's a matter of residency as it is of work
23 location and being able to perform the duties in Borough
24 facilities where people have access to you.
25 Q  Okay. But you don't know whether that policy was in

20 (Pages 74 to 77)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit B
Page 20 of 41

7fbeafc4-3271-4468-9d4c-83a4023dbe10

Page 78

1  writing or not?
2  A  I would have to check. If it's not in the policies
3  and procedures manual, then it was a written thing,
4  because I know it was certainly discussed from time to
5  time, not very often, but from time to time during my
6  employment. I know that.
7  Q  Okay. If that was a policy at this point, in August
8  2005.....
9  A  Um-hmm.
10 Q  ......why was there a need to change the Borough Code
11 in the form of Ordinance 1369?
12 A  Just to tighten it up. We do that from time to time
13 with different -- different issues that come up. If
14 something is assumed, but it's not, you know, in an
15 ordinance form where it can be actually enforced, you
16 know, with disciplinary action, then we put it in the
17 Code.
18 Q  Well, in fact, Ordinance 1369 did more than tighten
19 something up. It changed the law, right?
20 A  It did.
21 Q  Let's go back to KB34. Now, this was the personnel
22 action form that we talked about earlier and this was the
23 PAF that served to terminate Ms. Thomas' employment, is
24 that right?
25 A  Right.

Page 79

1  Q  Okay. And they have a box checked for termination,
2  do you see that, for type of action?
3  A  I see that.
4  Q  And then it has a series of boxes that should be
5  filled in on termination, do you see that? There are a
6  series of numbers about that?
7  A  Okay, 1 3 5 9 10 11 12 13? Right.
8  Q  Right. And one of those is box 12, but it described
9  the employee's services.
10 A  Okay.
11 Q  But there is no box checked for Ms. Thomas on number
12 12 to reflect the employee services. Do you know why that
13 was?
14 A  No, it was probably just an oversight, because her
15 services were -- I would have to say they were
16 outstanding. They were very good.
17 Q  Okay.
18 A  They were certainly above average. So, the next one
19 is outstanding, so that's where we go.
20 Q  Okay. So that's the box that should have been
21 checked, in your view, when this was issued?
22 A  I'm sure it should have, because it would certainly
23 just have been an oversight on our part.
24 Q  Okay.
25 A  Yeah, I wouldn't have any problem giving her -- you

Page 80

1  know, even a letter stating that, because, I mean, she was
2  a good employee.
3  Q  Okay. And it's your testimony that that box should
4  have been checked.....
5  A  Yes.
6  Q  .....for this form?
7  A  Yes.
8  Q  All right.
9     MR. VENNEBERG: Okay. I'd like to go off the record
10 for a little bit. I think I'm close to being done.
11    MR. COSSMAN: Okay. I'm going off record. The time
12 is 11:39.
13    Okay, we're back on the record. The time is 11:47.
14 Q  Okay. Mr. Eckert, I'd like to point you to KB268,
15 which is part of a letter that was referred to earlier
16 from Ms. Thomas to you, dated August 1, 2005.
17 A  Okay.
18 Q  Do you see that?
19 A  I do.
20 Q  Okay. And on KB268, Ms. Thomas refers in the third
21 paragraph to a meeting that she had with you on August 2
22 at -- or here at the Borough offices. Do you recall that
23 meeting?
24 A  I do.
25 Q  What do you recall about that meeting?

Page 81

1  A  It was probably -- I don't believe it was two and a
2  half hours, but --
3  Q  Well, it said an hour and a half.
4  A  Oh, I'm sorry. I'm always -- I'm sorry --
5  transposing the numbers.
6  Q  Sure.
7  A  Let's see. She came in. She had been back for, I
8  believe some union negotiation things. She had, you know,
9  discussed, you know, basically, just small talk. And
10 then, finally, she says -- she says she brought up the
11 job, but I mentioned that it was becoming a big deal, so
12 we have a difference here. And I did bring it up, not
13 her. And I did tell her to think about coming back, you
14 know. I told her I wished she would come back, quite
15 frankly. And she said, I totally disagree with the
16 statement. I reminded you that I had moved with your
17 permission and had I not had your permission to keep my
18 job while living in Oregon, I would not have moved. And
19 that is an absolutely untrue statement, because she was
20 going down -- we've already -- she resigned to go take
21 care of her mother, she didn't ask my permission. She
22 said she was having to quit employment to do it and she
23 would have gone anyway. So, I mean, that's -- I totally
24 disagree with her on that. And I don't know about the
25 statement, you heard the Assembly is going to make you

21 (Pages 78 to 81)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit B
Page 21 of 41

7fbeafc4-3271-4468-9d4c-83a4023dbe10

Page 82

1  come back.  Well, the Assembly is not going to make
2  anybody come back to employment unless they want to; they
3  left that up to me.  You know, she just -- you know, the
4  basis of our conversation was, Carolyn, if you want your
5  job, come back, please.  You know, it's here if you want
6  it.  You can have it, but you're going to have to, you
7  know, have to work here.  You're going to have to be in
8  the office.  And, you know, she said no.
9  Q   Okay.  So, when you talked about her coming back,
10  what would she be coming back to?
11  A   To the job that she had had before she resigned.
12  Q   Okay.  All right.  Would she have had to reapply for
13  the job?
14  A   No.  No.  No, it was -- again, we had not filled it.
15  You know, technically, she was still doing part of the
16  job, you know, with union contracts, so we would not have
17  -- quite frankly, I don't think we could have found
18  anybody.  You know, HR directors are few and far between
19  in this community and she was good.
20  Q   All right.
21  A   She was very good.
22  Q   And at this point, she still had the job title,
23  right?
24  A   She still had the job title.
25  Q   Still Human Resources Manager?

Page 83

1  A   Right.
2  Q   She's still being paid as the Human Resources
3  Manager, right?
4  A   Technically, yes.
5  Q   Okay.  Well, not just technically.  She was being
6  paid as the Human Resources Manager, right?
7  A   We could fine tune that one, but yes.
8  Q   Okay.  So, in coming back she is not reassuming the
9  job, she is continuing the job.  Would that be a fair
10  statement?
11  A   No, she would be reassuming, because she had -- she
12  had, effective June 1, June 6, whatever, she was not doing
13  the normal day-to-day HR functions, she was doing union
14  negotiations, period, so she would have been reassuming
15  all those things that Steve and Holly had taken over.
16  Q   You said that Ms. Thomas had resigned.
17  A   Right.
18  Q   Was there a personnel action form issued concerning
19  her resignation?
20  A   Not at the time.  We were going to do that later, you
21  know, and finish that out upon the ending of the union
22  contracts.
23  Q   Was there ever a personnel action form issued that
24  reflected a resignation by Ms. Thomas?
25  A   No.

Page 84

1  Q   You know the personnel action form has a category for
2  resignations, right?
3  A   Right.
4  Q   Okay.  And in order to -- to have resigned from the
5  Borough, a personnel action form must be filled out and
6  executed, isn't that right?
7  A   People resign all the time and normally they are.
8  But again, you know, she had -- she had not finished the
9  contracts, and then once we got in towards the end of the
10  contracts and we had this discrepancy, things moved to a
11  different level, so we did not do --you know, move to the
12  resignation, you know, PAF, you know, we just -- we were
13  hoping we could just talk her into either coming back or
14  just going ahead and resigning, which we would have filled
15  out a resignation PAF, but that didn't happen that way.
16  Q   Okay.  Is it accurate that resignations aren't
17  effective until a personnel action form is completed?
18      MR. SANDBERG:  Foundation for the legal opinion, but
19  he can tell you his understanding.
20  Q   I'm asking for your understanding.
21  A   Okay.  My understanding is -- is that anybody can
22  resign and it's effective, okay, if somebody walks out the
23  door and they don't come back, you know, just because a
24  piece of paper isn't filled out doesn't mean they still
25  have a job.  You know, once they resign, they resign.

Page 85

1  Q   Okay.  But if somebody does that and just walks
2  out.....
3  A   Um-hmm.
4  Q   .....then there's a personnel action form completed,
5  reflecting their resignation, isn't that right?
6  A   Right.
7  Q   Okay.  And that didn't happen here?
8  A   No, because she didn't just walk out.  She was
9  continuing duties, you know, getting paid for it.  So, she
10  was still -- well, once you do that PAF, you no longer get
11  a paycheck, okay?  So, that was probably one of the
12  reasons we did not fill one out at that point in time.
13  Q   Okay.  KB34 reflects that Ms. Thomas received two
14  weeks' severance pay.....
15  A   Yes.
16  Q   .....on her termination in November 2005.  Was there
17  a particular provision that she was allowed severance pay?
18  A   There may be in the Code.  My personal opinion at
19  that time was we had gone way above and beyond, you know,
20  paying the length we did and it wasn't necessary, but
21  again, there may have been something in there just to --
22  just to go with the standard procedure that we do, you
23  know, everybody gets two weeks' severance pay.  So we
24  might have already -- might have just followed procedure.
25  Q   Okay.  Do employees get two weeks' severance pay if

22 (Pages 82 to 85)


Exhibit B
Page 22 of 41