THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 86

1  they're terminated for cause?
2  A  Usually they do.
3  Q  Is there a particular policy or provision that you
4  know of that deals with severance pay and when that is
5  allowed?
6  A  It would be in our personnel policy -- subject under
7  severance pay.  I know there is-- there is something
8  there.  But I know standard policy is that we, under most
9  every circumstance, we do two weeks' severance and that's
10 it.
11 Q  Okay.
12 A  Unless there are contract arrangements where they get
13 more.
14 Q  Okay.  Do employees get two weeks' severance pay on
15 resignation?
16 A  I'll have to look on that.  I just -- I know they get
17 all of their time off, all of their personal acquired
18 leave, and I'm not sure about the severance pay.
19 Q  Do you know whether Ms. Thomas was given any payment
20 for accrued leave, or anything along those lines when, as
21 you say, she resigned?
22 A  It wouldn't have been at that time, I don't believe.
23 I'll have to check.  I know that she was paid for all of
24 her time off.
25 Q  Do you know whether that happened in June, or July?

Page 87

1  A  I don't know, but I could find out very easily.
2  Q  Now, you referred earlier to a policies and
3  procedures manual?
4  A  Right.
5  Q  Is that -- is that at the Borough Office, here?
6  A  It's at the Borough Office, yes.
7  Q  Okay.  Maybe at our next break, could you get that?
8  A  I'll see if I can find it, sure.
9  Q  I'd like to point you to KB64.  And KB64 is a letter
10 that you wrote to Ms. Thomas dated February 1, 2006?
11 A  Right.
12 Q  In the third paragraph you say, in the time which has
13 passed since you were given your notice of termination of
14 employment, we have discovered additional information
15 which was not known at the time of your termination,
16 which, if it had been known, would have provided a
17 separate and independent basis for your termination.  What
18 information are you referring to there?
19 A  There were employees that had been given raises, you
20 know, above the authorized step increases by personnel
21 policy.  That was -- and apparently quite a few -- some
22 with -- what I think we would consider in excess.  And not
23 all those were routed through me.  A lot of them were
24 just, you know, sent through.
25 Q  Okay.  Anything else?

Page 88

1  A  That was pretty much it.
2  Q  Okay.  And the employees that were given step
3  increases, do you know who those employees were?
4  A  I'd have to look through the list.  There were, oh,
5  maybe half a dozen or more.
6  Q  Do you know how the knowledge of these step increases
7  came about?
8  A  Steven Corporon had been going through the job
9  descriptions in the effort of rewriting some things, and
10 also there was a -- in our audit, our annual audit that we
11 have, there was, oh, I think one of the auditors brought
12 one to our attention that, you know, just kind of leaped
13 out at them.  And that kind of triggered something, so
14 then Mr. Corporon starting going through and looking at
15 others to see what was there and that's when we started
16 finding these.
17 Q  Do you know how it was that the step increases were
18 inappropriate?
19 A  Normally you get a two-step increase maximum after
20 evaluations and everybody has to sign off on it.  I have
21 to sign off on it, the department head, the HR Director,
22 and Finance.  The maximum you can get on an evaluation is
23 a two-step increase.  In some of these cases, there were
24 up to six, seven, eight steps.
25 Q  Okay.

Page 89

1  A  And did not have all the required signatures.
2  Q  Do you know when the step increases were discovered?
3  The inappropriate nature of the step increases?
4  A  I think it was during -- during -- when our auditors
5  were here, you know, this past year, doing the audits.
6  And, you know, that's when they were first found.
7  Q  Okay.  And there was a particular policy or policies
8  that were violated?
9  A  Oh, it's in the Code.  It's, you know, how many step
10 increases are allowed after evaluations and the maximum is
11 two.
12    MR. SANDBERG:  You certainly have the right to ask
13 Roy whatever you want, but I can tell you, Scott knows
14 more about this.
15    MR. VENNEBERG:  And I'll certainly be asking him.....
16    MR. SANDBERG:  Okay.
17    MR. VENNEBERG:  .....about it.  But Mr. Eckert has
18 referred to this additional information, so.....
19    MR. SANDBERG:  Yeah.
20    MR. VENNEBERG:  .....I'm asking him.
21    MR. SANDBERG:  I'm not trying to stop you.
22    MR. VENNEBERG:  No -- no, that's fine.
23    MR. SANDBERG:  I'm trying to help you.
24    MR. VENNEBERG:  No, that's fine.  I appreciate any
25 help at any point.

23 (Pages 86 to 89)

Exhibit B
Page 23 of 41

Page 90

1  Q  Okay, do you -- you don't know what policy is being
2  referred to there, do you, by -- where that policy is
3  located?
4  A  It's in our personnel code. It's in the Borough Code
5  of Ordinances, so it's -- it's in there.
6  Q  Okay. And is there some provision in the personnel
7  code for dismissing employees concerning matters involving
8  step increases?
9  A  I don't think it specifies, you know, to that degree
10 of things, but it's certainly outside the realm of
11 authority to do that -- to give more than two steps
12 without -- usually more than two steps requires Assembly
13 approval.
14 Q  Okay. We can go off record.
15    MR. COSSMAN: Going off record. The time is 12:01.
16    Okay, we're back on the record. The time is 12:13.
17 Q  Okay. Mr. Eckert, during our break, you went and
18 retrieved a policy manual. Can you describe what you went
19 to -- what you went to get?
20 A  Yes. This is the standard operating procedure for
21 the Manager's Office. It contains a lot of the policies
22 and procedures that we have. Again, some of them have not
23 been reduced to writing, some have. This is a (word
24 indiscernible) of the ones that I know that we currently
25 have. And we keep this documented in the Borough

Page 91

1  Manager's Office at -- with Holly Rosendin, the Borough
2  secretary.
3  Q  Okay. Are there any policies and procedures in this
4  manual that have to do with location of work or residency
5  of employees?
6  A  I briefly looked at those when I went out to get it.
7  I did not see any. Of course, it was a cursory glance,
8  there are quite a few documents here. We'll make you a
9  full copy to where you can look through there.
10 Q  All right. But to your understanding, having
11 undertaken a cursory review today, you weren't able to
12 locate any written policies or procedures having to do
13 with that?
14 A  Not in a couple minute cursory look, but, you know,
15 again, some of them may not have been reduced to writing,
16 but this is what we have on file.
17 Q  Would there be any other manual that contain policies
18 or procedures that could have to do with residency?
19 A  The only thing would probably be the personnel
20 section of the Code and we'd be happy to supply a copy.
21 Q  And we talked about that. We talked about the change
22 that was accomplished by Ordinance 1369.
23 A  Right.
24 Q  I wanted to ask you a few questions about your
25 employment history. You had alluded to some of it during

Page 92

1  the break. Where did you -- or where were you employed
2  before you went to work as the Borough Manager here in
3  Ketchikan?
4  A  I was employed with the University of Tennessee as a
5  management consultant. There is a division of the
6  University, it's called the Municipal Technical Advisory
7  Service, it's MTAS, M as in Mary, T-A-S. And we provided,
8  basically, city management services for all 400 cities in
9  the state of Tennessee. And I was responsible for 40
10 cities at the same time in west Tennessee and it was an
11 excellent position.
12 Q  Okay. Were you an employee in that position, then?
13 A  Yes, I was.
14 Q  Okay. And who was your employer?
15 A  The employer was the University of Tennessee. Let's
16 see, my direct supervisor was Mike -- I can see his face,
17 I'll have to get you his -- I'll be happy to provide his
18 name.
19 Q  Okay. What years did you have that position?
20 A  Let's see, I was there for three years prior to
21 coming here. I came here in 2002, so it would have been
22 1999, 2000 to 2002.
23 Q  Okay. What position did you have before that?
24 A  Before that I was the City Manager in Orange Beach,
25 Alabama.

Page 93

1  Q  Okay. All right. How long did you have that
2  position?
3  A  Approximately six years.
4  Q  So, roughly 1993?
5  A  Right.
6  Q  Okay. How about before that?
7  A  Before that I was with the City of Lake Ozark,
8  Missouri.
9  Q  Okay. Now, when were you in that position?
10 A  Let's see, that would have been before I went to
11 Alabama, so I think I was there three or four years.
12 Prior to that I had taken a year off and gone to
13 University of Missouri and gotten my Master's Degree in
14 1986. And prior to that I had started my career in
15 municipal management in 19 -- December of 1979 at the City
16 of O'Sage Beach, Missouri.
17 Q  Okay. What position did you have for the City of
18 Lake Ozark?
19 A  Lake Ozark, I was the City Administrator. They
20 didn't call it manager back there. It was City
21 Administrator.
22 Q  Okay. And that would have ended right around 1993.
23 When did that begin?
24 A  Let's see. That would have been -- I don't remember
25 if I was there three or four years. I'd have to get my

Page 94

1  resume out and look at it.
2  Q  Okay.
3  A  But, let's see, probably about 1988, I would imagine.
4  Q  All right. With regard to any of the positions that
5  you described, were you terminated from any of those
6  positions?
7  A  The one in Orange Beach, Alabama, there was a -- of
8  course, I was at will in all of them, and, you know, they
9  had a complete political change and one night decided,
10 okay, that they were going to use someone else. So, that
11 happened. There was, you know, no cause.
12 Q  Okay. And what was the appointing authority for that
13 position?
14 A  The appointing authority was the -- the appointing
15 authority was the City Council.
16 Q  So, the membership of the Council changed and that
17 resulted --
18 A  The Council, the Mayor -- in that particular -- in
19 the State of Alabama, all elected officials statewide, all
20 the way down to local, were all elected at the same time.
21 There were no overlapping terms or anything. So -- and
22 also the appointed positions, the managers, the clerks,
23 the Public Works Director, all served at the -- for the
24 term of the Mayor, is the way the law read down there.
25 So, they were all subject to being gone once every four

Page 95

1  years. So, that was interesting.
2  Q  The position with the City of Lake Ozark in
3  Missouri.....
4  A  Uh-huh?
5  Q  .....why did that position end?
6  A  That position ended, let's see, I was told, when I
7  was hired there, I asked to come there from, you know, a
8  different location and --by the Mayor, who had known me.
9  And they were in the red, budget-wise and on the verge of
10 filing bankruptcy. Asked me to come there and take that
11 position and try and help them out. I did, got them back
12 in the black. Again, they had a new group come in. They
13 were doing financially very, very well and they decided
14 that they just were going to try and do without a City
15 Administrator, so, they -- the exact words I was told, I
16 had done too good a job and so they -- they didn't need
17 me. So, that was -- that was kind of the nature of the
18 beast. Not unusual for this profession.
19 Q  Okay. Is it your testimony, then, that at no time
20 you represented to Ms. Thomas that she could continue to
21 perform the duties of her position at Human Relations
22 Manager.....
23 A  Right.
24 Q  .....while residing in Oregon?
25 A  Right.

Page 96

1  Q  Is that your testimony?
2  A  That's my testimony.
3     MR. VENNEBERG: That's all I have.
4     MR. SANDBERG: I just have a couple of questions.
5             ROY ECKERT
6  testified as follows on:
7             CROSS EXAMINATION
8  BY MR. SANDBERG:
9  Q  I wanted to go back to a couple exhibits that Mr.
10 Venneberg showed you. Let's start, if we could, with
11 KB330. Do you have that in front of you?
12 A  KB330? Yes.
13 Q  Yes, KB330. This is the memorandum from you to
14 Carolyn, dated August 5, 2005?
15 A  Yes, it is.
16 Q  Okay. And what is the subject matter identified for
17 this memorandum?
18 A  Work location. And now, by August the 5th, 2005, did
19 you understand that there was a dispute with Ms. Thomas as
20 to whether or not she was going to keep her job and work
21 full time from Oregon?
22 A  Yes.
23 Q  In this letter, did you give her a directive?
24 A  I believe I gave her a directive to, you know, come
25 back to work and -- at the Borough Office, or that was it.

Page 97

1  Q  Okay, if we go down to the fourth paragraph, can we
2  find your directive?
3  A  Let's see. Yes. I'm not asking for your resignation
4  and that is not the intention of this memo, but I need to
5  know your decision as soon as possible, in any case, by no
6  later than Friday August 12, 2005. If you decide to
7  continue your employment with the Borough, I need to have
8  you available for work at the Borough Offices on or before
9  September 1st.
10 Q  Okay. And then let's go to the termination letter
11 that you were shown, which is KB62.
12 A  Okay.
13 Q  Because there's been discussion in your deposition
14 about Ordinance 1369, correct.....
15 A  Yes.
16 Q  .....in the course of the morning. And this letter
17 says she's being terminated, based upon declining to
18 comply with Ordinance 1369, right?
19 A  Yes, sir, it is.
20 Q  Okay. And specifically, what part of Ordinance 1369
21 are we talking about, here, in your letter?
22 A  Okay. It was the part that -- it stated that they
23 have to work in the Borough, in the Borough Offices,
24 control offices. If I can find that specific part in
25 here.

25 (Pages 94 to 97)