THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

SCOTT BRANDT-ERICHSEN
7/19/2006

**Page 10**

1  A  My understanding is that it was a narrowing.
2  Q  And how was it a narrowing, to your understanding?
3  A  Again, I'd want to look at the job descriptions and
4  compare them to be certain. The primary function as it
5  related to me, that I recall as being different, whether
6  it's reflected in the job descriptions or it's just the
7  way things were done, was that the Human Resources
8  Director had been handling grievances and -- including
9  arbitrations during the period that we had a Human
10  Resources Director, and that reverted to me handling the
11  grievances and arbitrations.
12  Q  Okay. You said that they -- that the Human Resources
13  Manager position involved a higher level -- I take it a
14  higher level of pay, right?
15  A  Actually, it's the reverse.
16  Q  Oh, okay. Oh, I see.
17  A  It was a lower level.....
18  Q  Oh, I see.
19  A  .....than the Human Resources Director.
20  Q  Okay. So, the function that was eliminated from the
21  Human Resources Director to get to Human Resources Manager
22  was the handling of grievances, essentially, on behalf of
23  the Borough?
24  A  I would defer to whatever the job description says.
25  Q  Yeah, I'm just asking for your best understanding.

**Page 11**

1  A  The best way that I can state it and maybe I can
2  short-cut a couple of your questions, during my employment
3  here, there was no Human Resources person, whether you
4  call it a director, manager, what have you, until
5  approximately 2001, 2002 timeframe. An individual was
6  hired as Human Resources Director. They then took over
7  all the Human Resources functions, including grievances
8  and arbitrations. They stayed a couple of years, they
9  left. When they left, the position was reclassified to be
10  a Human Resources Manager. My recollection is it was a
11  lower paying position and at least the grievance and
12  arbitration functions, I ended up taking those back.
13  Q  Okay. Ms. Thomas was hired as the Human Resources
14  Manager, you said, in February or March of 2004?
15  A  That's my recollection.
16  Q  Okay. And can you describe the nature of your
17  working relationship with her, what sort of issues did you
18  work on, what sort of functions? Provide a general
19  description of that?
20  A  If she had questions, she would come and sit in my
21  office and ask me questions. Sometimes they related to
22  disciplinary procedures. Sometimes they related to
23  contract interpretation issues. I worked with her
24  developing -- obtaining documents for use in conjunction
25  with any grievances or arbitrations, any Labor Relations

**Page 12**

1  Board actions.
2  Q  Okay. Would you interact with her on a daily basis?
3  A  Probably pretty close.
4  Q  Okay.
5  A  Not every day, but in a given week, two, three days a
6  week I'd end up having a conversation with her.
7  Q  When she worked here at the Borough Offices, was your
8  office pretty close to hers?
9  A  It was. In order to access my office, you would need
10  to walk past her office.
11  Q  Okay. You're aware from your dealings on this case
12  that Ms. Thomas moved to Oregon in June of 2005?
13  A  Correct.
14  Q  Okay. I'd like to ask you about the period from when
15  she started, to the time that she moved to Oregon.
16  A  Okay.
17  Q  What was your view of the quality of her job
18  performance during that time?
19  A  In what aspects of her job?
20  Q  Well, from your standpoint, how did she perform her
21  job? Was she good at it?
22  A  Well, the HR function, based upon the information
23  that I had as of the time she left, she was doing a
24  reasonably good job of resolving a number of outstanding
25  issues that had been left by the prior HR person.

**Page 13**

1  Q  Okay. Did you ever have any concerns during that
2  period about the way that she was performing her job?
3  A  Yes.
4  Q  Okay. What were your concerns?
5  A  The HR issues that had been around when she came on
6  board, she managed to get a handle on within a couple of
7  months and seemed to develop pretty good working
8  relationship with the union representatives and
9  interactions with the employees. It seemed to me that
10  once she had accomplished that, she had a lot of extra
11  time. And -- and I didn't think she made the most
12  productive use of that time.
13  Q  Okay. Did you ever raise that as a concern with the
14  Borough Manager?
15  A  No.
16  Q  Why was that?
17  A  I don't supervise her. You know, I may have at one
18  time, made a comment to the Borough Manager, suggesting
19  that he might identify some special projects for her to
20  work on. But apart from that, I don't believe I mentioned
21  anything.
22  Q  Okay. How was it that you came to understand that
23  she had extra time? How did you gather that?
24  A  Well, I use the restroom a couple times a day.
25  Anytime I went anywhere, I walked in and out of my office,

4 (Pages 10 to 13)

Exhibit ___C___
Page 4 of 29

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

SCOTT BRANDT-ERICHSEN
7/19/2006

Page 14

1  I would see her standing and just chatting with co-workers
2  a great deal of time.  And I would see her just chatting
3  with other people, or working on things that were not
4  Borough HR stuff.  Things that may have interested her, but
5  weren't really part of what her job was.
6  Q   What sort of matters?
7  A   She was -- in her history, she's been a very
8  politically active sort of person.  She worked for one of
9  the state senators for about three years.  And she had a
10 lot of friends and contacts who followed state politics or
11 follow timber issues.  She would chat with her friend
12 Jackie Direct (phonetic) from time to time.  She would
13 spend her energy and time following issues that were not
14 relating to Borough Human Relations stuff.
15 Q   Okay.  Did you ever raise that as a concern with the
16 Borough Manager?
17 A   I don't believe so.
18 Q   Do you know whether the Borough Manager ever had that
19 concern about her job performance?
20 A   I don't know.
21 Q   Do you know whether the Borough Manager had any
22 concern about her performance prior to June 6, 2005?
23 A   I don't know if he had any concerns or not.
24 Q   Okay.  Now, when Ms. Thomas moved to her residence to
25 Oregon in June 2005, had you been apprised that that was

Page 15

1  going to happen, that she was going to move her residence?
2  A   She told me that she was moving to Oregon.
3  Q   When did she tell you that?
4  A   I don't recall a specific date, but I believe it
5  would have been at least a week or two before she left.
6  Q   Okay.  And do you remember how she described what she
7  was going to be doing?
8  A   No, I don't.
9  Q   Did she indicate whether she was going to be
10 continuing to perform work for the Borough while she was
11 in Oregon?
12 A   Yes.
13 Q   What did she say about that?
14 A   I don't recall specific words.  My recollection was
15 that she indicated she was going to be continuing to do
16 her job from there.
17 Q   Okay.  Did she say how that arrangement came about?
18 A   Not that I recall.
19 Q   Do you have any understanding from -- from her or
20 anybody else how that arrangement came about?
21     MR. SANDBERG:  Does he presently, or did he at the
22 time?
23     Q   Well, let me ask right now -- presently.
24     MR. SANDBERG:  I was going to say.  Because presently
25 I would object to any attorney/client confidences.  At the

Page 16

1  time before the dispute came out, you can -- I'd have no
2  problem with him telling you what he understood
3  contemporaneously.  But, in his role as attorney, I would
4  request that he not answer those.  In fact, I'd instruct
5  him not to answer that portion of the question, because
6  essentially that implicates what he has been told now, in
7  his role as Borough Attorney, after the dispute arose.
8      MR. VENNEBERG:  Okay.
9  Q   Well, let me ask as of the time -- let me ask as of
10 the date that she left -- that she went to Oregon.
11 A   As of when she left --
12 Q   Had -- let --
13 A   She was the only one who told me that she was going
14 to be going to Oregon and still doing her job.  There -- I
15 may have had conversations with other Borough employees,
16 and I'm thinking Cindy or Steve Corporon, not about what
17 she would be doing or how she would be doing it, but more
18 in the nature of, so, Carolyn is going to be doing her job
19 from Oregon?  Sharing the substance of what Carolyn had
20 said, not as an independent source of information.
21 Q   Okay.  Prior to June 6, 2005, had you discussed Ms.
22 Thomas' work in Oregon with Mr. Eckert?
23 A   Not that I recall.  I don't believe I did.
24 Q   Okay.  You said that you had some discussions with
25 your secretary, Cindy Montgomery, and Steve Corporon about

Page 17

1  the arrangement.  Do you remember the nature of those
2  discussions?
3  A   The -- I don't recall any specific discussions.
4  However, the arrangement of offices -- my office is kind
5  of at the end of a dead end.  And there's Cindy's, then
6  Roy's, then Steve's, then Carolyn's.  And so, those of us
7  in that area, see each other many times a day on a daily
8  basis.  And when Carolyn told me she was going to be
9  moving to Oregon and doing her job, I believe that I
10 mentioned it to Cindy and to Steve, but the substance of
11 the conversation would have only been the fact that
12 Carolyn said she was going to go to Oregon and do her job
13 from there.
14 Q   Okay.  When you had this conversation with Ms. Thomas
15 about her move to Oregon, did she give any indication
16 about how long that work would be -- would be lasting in
17 that arrangement?
18 A   Not that I recall.
19 Q   Now, after Ms. Thomas had moved to Oregon, did you
20 attend a staff meeting when Mr. Eckert talked about the
21 move to Oregon and her work in Oregon?
22 A   I did.
23 Q   And was that about two days after she went to Oregon?
24 A   I think it was around June 7th.  It would have been
25 the Tuesday.  I think she left on a Monday, and it would

5 (Pages 14 to 17)

Exhibit  C
Page  5  of  29

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

SCOTT BRANDT-ERICHSEN
7/19/2006

Page 18

1  have been the Tuesday.
2  Q   Okay.  And what did Mr. Eckert say in the staff
3  meeting about Ms. Thomas?
4  A   I don't know whether that would be subject to an
5  attorney/client privilege or not.  It probably would not.
6      MR. SANDBERG:  I -- that one is okay with me, only
7  because there was no dispute yet.  So, he would not have
8  been offering anything in confidence to you as an
9  attorney, in my understanding.  If you feel differently,
10 please tell me.
11     MR. BRANDT-ERICHSEN:  No.  And there were never
12 people in the room.  We're not there for that purpose.
13 Q   Mr. Eckert was asked by one of the -- one of the
14 folks in the staff meeting of about a dozen people or so,
15 what the story was on HR function.  And he indicated that
16 she had resigned, would be -- was moving to Oregon.  She
17 was going to be wrapping up a couple of things she had
18 pending, union contract negotiations.  There were, I
19 believe, three union contracts pending, and would be
20 finished by the end of the month.
21 Q   That she would be finished by July 1?
22 A   Yes.
23 Q   Did he use that date in his discussion?
24 A   I don't remember if he said the end of the month,
25 June 30th, July 1, but the content of the communication

Page 19

1  inferred essentially July 1.
2  Q   Okay.  After the staff meeting, did you have a
3  conversation with Mr. Eckert about Ms. Thomas' employment
4  situation?
5  A   I did.
6  Q   And what was talked about in that discussion?
7      MR. SANDBERG:  And you're going to have to help me,
8  here, Scott, because I don't know when we're going to
9  cross the line, because I wasn't a participant in these.
10 But the point where you stop, you know, where you move
11 from being a person attending staff meetings to being the
12 Borough's lawyer, is where I -- and advising management or
13 soliciting confidential information, is where I'd like us
14 to stop.
15     MR. BRANDT-ERICHSEN:  Yeah.
16     MR. SANDBERG:  I've been trying to give Mr. Venneberg
17 free reign up to that point.
18     MR. BRANDT-ERICHSEN:  I think this is that point,
19 because the purpose of my conversation with him at that
20 time was for the purpose of providing legal advice to the
21 Borough as an entity.
22     MR. SANDBERG:  Then I would instruct you not to
23 answer that.
24     MR. BRANDT-ERICHSEN:  Okay.
25 Q   Did you have any discussions with Ms. Thomas after

Page 20

1  that meeting about whether she had prepared a letter of
2  resignation?
3  A   I don't remember if I asked her that or not.  I may
4  have, but I don't recall.
5  Q   Do you remember having any conversation with Ms.
6  Thomas about that subject at any time?
7  A   Again, I may have, but I don't recall specifically.
8  I had a number of conversations with Ms. Thomas over the
9  course of the summer of 2005.  It may well be that I
10 talked with her about that.  I wouldn't be surprised if
11 she said that, but I don't have sufficient independent
12 recollection to say yes, I had this conversation.
13 Q   That she may have said what?
14 A   If Ms. Thomas told you that I asked her if she had
15 prepared a letter of resignation, I wouldn't dispute that.
16 I just don't recall well enough to say yes, I did, or no,
17 I didn't.
18 Q   Have you ever seen a written notice or letter of
19 resignation prepared by Ms. Thomas from her position?
20 A   No.
21 Q   Now, after Ms. Thomas went to Oregon, was it your
22 understanding that she was continuing to perform the
23 duties of Human Resources Manager from Oregon?
24 A   Some of them.
25 Q   Okay.  Which duties was she performing, to your

Page 21

1  understanding?
2  A   In what timeframe?
3  Q   Well, basically after she left on June 6, 2005.
4  A   Until when?
5  Q   Until the time that she was terminated, effective
6  November 1, 2005.
7  A   Okay.  There were different gradients during that
8  time period.
9  Q   Okay.  Let's talk about the first gradient, then.
10 A   Okay.
11 Q   How long would that have lasted?
12 A   Probably a month or so.
13 Q   Okay.  So, the month of June, roughly?
14 A   It was at least through June.
15 Q   Okay.
16 A   My understanding was that she was keeping in
17 communication with union representatives regarding union
18 negotiations.  And she was communicating via telephone and
19 email with supervisors and department heads, as they might
20 have a personnel issue arise that they wanted assistance
21 with.
22 Q   What sort of personnel issues would she communicate
23 about by telephone and email?
24 A   An employee saying, oh, I should have been paid
25 overtime for these days because of thus and so, and a

6 (Pages 18 to 21)

Exhibit ___C___
Page _6_ of _29_

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43