THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

SCOTT BRANDT-ERICHSEN
7/19/2006

Page 22

1  supervisor saying, well, do I have to pay them or not, or
2  what am I supposed to do?
3  Q    Would you have involvement in some of those
4  communications?
5  A    Sometimes.  If it was a likely grievance, or if there
6  was a question of contract interpretation, then I might.
7  I believe that either she or the supervisors sent me
8  copies of probably half a dozen such communications from
9  the time period of June 1st through mid-August.
10  Q    Okay.  You talked about this first gradient, this
11  first period, and that went from about June 6th forward
12  until about a month?
13  A    I'm estimating a month.  A better indicator of the
14  time would be an email exchange where Ms. Thomas sent an
15  email to all the department heads, saying I'm doing this,
16  this and this.  And the -- and I don't recall when that
17  was.
18  Q    Okay.  Were there any duties of the Human Resources
19  Manager position, to your understanding, that Ms. Thomas
20  was not doing during this first period that you've talked
21  about?
22  A    There are duties in the job description she wasn't
23  doing.  There are things that --things that I had to do
24  because she wasn't here, or I had to have somebody else do
25  because she wasn't here, that if she were here, she would

Page 23

1  have done.  As to the things in the job description, I'd
2  want to look at a copy of the job description.  As to the
3  things that I had to do, the most specific things were
4  involving communication regarding preparation, regarding
5  litigation on personnel issues we had pending.
6  Q    How was the performance of her duties
7  different, from your standpoint, in the period right after
8  she left, as opposed to right before she left?
9  A    Well, the pending personnel case I had where I had
10  some discovery to respond to, when she's here, I give her
11  the list, I say, get me these documents.....
12  Q    Um-hmm.
13  A    .....and she can take care of it.  If she's not here,
14  I have to get them, or Cindy has to get them, or somebody
15  else has to get them.
16  Q    Okay.  Anything else?
17  A    That's the most significant one that impacts my time
18  that comes to mind.  But I don't know that that's the only
19  thing.  It's not a topic that I researched in preparation
20  for this deposition.
21  Q    Sure.  Did you express a concern about that to Mr.
22  Eckert?
23  A    No, not that I recall.
24  Q    Okay.  Now, you talk about this first period.  Was
25  there a second gradient, a second period involving the

Page 24

1  scope of her duties -- duties that she was performing?
2  A    What I'm referring to by the second gradient, there
3  appeared to be a conflict or difference in description of
4  just what it was she was doing, as between the email she
5  sent and the information that Mr. Eckert had provided.
6  And, as a result, my observation was that the degree to
7  which she was involved in advising supervisors was
8  reduced.
9  Q    Okay.  And how did you come to that conclusion?
10  A    I got fewer courtesy copies of emails.
11  Q    Okay.  Did you talk with any supervisors about, you
12  know, a difference between when she was in Ketchikan....
13  A    No.
14  Q    .....and when she was in Oregon?
15  A    Not that I recall.
16  Q    Did you receive any input, criticisms, complaints
17  from the supervisors about her level of interaction with
18  them?
19  A    I received an inquiry, but not a complaint.
20  Q    Okay.  What was the nature of the inquiry?
21  A    Supervisor saying, what am I supposed to do?  Am I
22  supposed to work with her, am I supposed to work with you?
23  What am I supposed to do?
24  Q    Did you have an understanding as to whether Ms.
25  Thomas was continuing to communication with supervisors

Page 25

1  from her office in Oregon?
2  A    I did have an understanding.
3  Q    What was that understanding?
4  A    She would communicate with supervisors whenever she
5  deemed it appropriate.
6  Q    And that's the same she would do if her office were
7  here, right, in Ketchikan?
8  A    Well, I think when she was here, there was probably a
9  larger amount of communication, but she would communicate
10  with supervisors when she was here and when she had left.
11  Q    So, she communicated with supervisors when she worked
12  in Ketchikan, and she communicated with supervisors when
13  she worked in Oregon, to your understanding?
14  A    Yeah.  The amount of communication going on would be
15  different when she was gone versus when she was here, but
16  the fact of there being communication was the same.
17  Q    Okay.  And this second period you talked about, about
18  how long did that last?
19  A    Oh, she made a couple of trips up here.  And when she
20  was up here, she communicated the same as when she had
21  been here before, or appeared to.
22  Q    Um-hmm.
23  A    And her trips up here, I believe, were after her
24  email that I referred to earlier.  But the -- sort of the
25  reduced effort on her part probably lasted from then

7 (Pages 22 to 25)

Exhibit _C_
Page _7_ of _29_

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

**Page 26**

1  until, oh, October.

2  Q   Okay.  In your view, from this -- during this second

3  period that you talked about, was Ms. Thomas continuing to

4  perform the primary duties of her position?

5  A   What are the primary duties that you're --

6  Q   Well, as you understood them.

7  A   Not really.

8  Q   And which of the -- her primary duties wasn't she

9  performing?

10  A   Well, why don't you give me a list of the primary

11  duties and I'll tell you what she wasn't --

12  Q   Well, to your understanding.  I mean, you have some

13  understanding of what the primary duties of her position.

14  A   Well, she was not assisting with preparation of

15  grievances and litigation involving HR issues.  She was

16  not looking for opportunities to educate our workforce to

17  avoid problems.  She was not there as a counselor to

18  communicate with employees who had complaints and resolve

19  them without them rising to the level of being a

20  grievance, or have -- be an intermediary between employees

21  and their supervisors.  Those were functions that she was

22  not doing.

23  Q   Okay.  Did you express any concerns about that to Mr.

24  Eckert?

25  A   I don't believe so.

**Page 27**

1  Q   Did Mr. Eckert express any concerns to you about the

2  quality of her performance during this second period?

3  A   I don't believe so.

4  Q   Did Mr. Eckert express any concerns to you about the

5  quality of her performance at any time after June 6, 2005?

6  A   Not per se, no.

7  Q   Well, what do you mean by that?

8  A   Well, I don't recall any statements about -- to the

9  effect of her performance was poor or her performance was

10  bad.  He did make other statements to me which -- from

11  which one could infer that her performance had been

12  substandard.

13  Q   And what were those statements?

14  A   I'm not sure if it would be covered by

15  attorney/client privilege or not, and I'd like the

16  opportunity to consult with Mr. Sandberg prior to

17  responding.

18  Q   Absolutely.  Feel free to do that.  You need to take

19  a break?

20  A   Sure.

21       MR. SANDBERG:  Let's go off record.

22       MR. COSSMAN:  Going off record.  The time is 2:28.

23       Back on the record and the time is 2:31.

24  A   (Words indiscernible -- speaking low), can I have you

25  repeat the question?

**Page 28**

1  Q   Yeah.  And I -- I will try.  Do you remember

2  expressing concerns about Ms. Thomas' performance --

3  strike that.  Do you remember Mr. Eckert expressing

4  concerns to you about Ms. Thomas' performance after she

5  moved her residence to Oregon in June 2005?

6  A   And I believe my response was no, he didn't make any

7  statements about her performance being poor.  And then you

8  had asked me a follow-up question about the -- the nature

9  of the statements, and that's why I asked for a break to

10  think about whether those would be covered by

11  attorney/client privilege.

12  Q   Okay.

13  A   And I believe they would.

14  Q   Okay.  You've got a better recollection of my

15  questions than I do, so, all right.  After Ms. Thomas

16  moved her residence to Oregon in 2005, did you have

17  discussions with Ms. Thomas about her employment

18  situation?

19  A   I believe I did.

20  Q   Okay.  On how many occasions?

21  A   Well, if you include the grievance hearings, probably

22  at least four.

23  Q   Okay.  Well, excluding hearings and official

24  proceedings, how many times did you discuss --

25  A   I believe at least two.

**Page 29**

1  Q   Okay.  And were those in person, or on the telephone?

2  A   I believe they were in person.  I believe she was up

3  here.

4  Q   Okay.  Do you remember when the first one was?

5  A   I think it was sometime in July, but I -- I don't

6  recall specifically.

7  Q   Okay.  Do you recall how that discussion came about?

8  A   I don't recall how it started.  She was sitting in my

9  office, talking about various things and I believe I said

10  to her that it would be nice if she would come back and

11  work here.

12  Q   Okay.  You said you were discussing various things.

13  Various things related to her duties as Human Resources

14  Manager?

15  A   Some -- in the course of the conversation, some would

16  be related to her -- to HR functions, but some were

17  unrelated things.  From time to time, she would talk to me

18  about how her nieces or nephews were doing sporting

19  events, how her brother's football team is doing, things

20  of that sort.

21  Q   All right.  Was the purpose of your meeting with her

22  in July to discuss human resources issues?

23  A   I didn't have a purpose.  Quite often, the way things

24  would work is I'll sit at my desk, people will come in

25  with whatever issue they've got and talk to me.  And they

8 (Pages 26 to 29)

Exhibit _C_
Page _8 of 29_

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

SCOTT BRANDT-ERICHSEN
7/19/2006

---

**Page 30**

1 may talk about one issue, then they talk about three
2 issues. If I want to talk to somebody, then I seek them
3 out. I had not sought her out. She came in, was talking
4 about stuff, and so, when you say purpose, I didn't have a
5 purpose in the conversation.
6 Q   Okay. So, this was an impromptu discussion, it
7 wasn't a scheduled meeting?
8 A   Correct.
9 Q   And what was said about her employment situation?
10 A   I -- I don't recall.
11 Q   Do you recall anything? What she told you, or what
12 you told her?
13 A   I don't recall any specific statements. The
14 understanding that I was left with was, I expressed the
15 sentiment that I would like to see her back and working
16 here with us. And she expressed the sentiment that she
17 didn't really want to come back and be in Ketchikan. Her
18 daughter -- she's got two daughters and at least one son.
19 I think she has four kids. Anyway, one of her daughters
20 had, in early 2005, moved back to Ketchikan and moved into
21 her house. And during several months was living there
22 with her and that was somewhat stressful for her. And
23 then, when she and her husband moved south, that daughter
24 and her family were basically living at her house here,
25 and she didn't really want to move back up here and live

---

**Page 31**

1 with them.
2 Q   Okay. Did Ms. Thomas make any statements to you about
3 how long she expected to be performing the Human Resources
4 Manager duties in Oregon?
5 A   I don't believe so.
6 Q   You didn't talk about that at all?
7 A   Not that I recall, no.
8 Q   Did you understand at that point that Ms. Thomas
9 continued to be the Human Resources Manager?
10 A   That was the job title that she was being paid for.
11 Q   Right. Did you have an understanding as to whether
12 she continued to occupy that position?
13 A   She was still being paid for that, yes.
14 Q   So the answer is yes?
15 A   She had not been -- to the best of my knowledge, she
16 had not been terminated at that time, and so she continued
17 to have the position. I'm not sure if you're getting at
18 something else or not.
19 Q   Did you have an understanding as to whether she had
20 resigned her position prior to that time?
21 A   I have multiple understandings.
22 Q   Okay. During your conversation with her, did you
23 have an understanding as to whether she continued to be
24 the Human Resources Manager?
25 A   As far as I knew, she continued to be the Human

---

**Page 32**

1 Resources Manager. It was my understanding that she
2 maintained she had not resigned, and the Manager
3 maintained that she had resigned.
4 Q   Okay.
5 A   But, she was still being paid, and so I considered
6 her to still be the Human Resources Manager.
7 Q   All right. And at that point, in July, you were
8 still dealing with her on human resources issues, right?
9 A   I continued to deal with her on at least some human
10 resources issues into September.
11 Q   Okay. And --and these issues involved employee
12 matters, right?
13 A   Well, primarily it was the -- the contracts. The --
14 as I mentioned, there were three union contracts and they
15 needed to be presented to the Assembly for approval and I
16 told her that I wanted to actually see the contracts
17 before they went, so I could offer my opinion on them, as
18 well. And we had interaction regarding the contracts and
19 the language in the contracts during that time period, up
20 until the Assembly actually approved them.
21 Q   Did you have interaction on other matters with Ms.
22 Thomas, other than the union contracts into September?
23 A   I may have, but I don't recall. I can't tell you any
24 specific matter. There was the -- there was a pending
25 litigation case that I may or may not have spoken with her

---

**Page 33**

1 about. And there was, I believe, a personnel issue at the
2 airport, which I don't recall if there was continuing
3 communication about it during that timeframe or not, but
4 there may have been.
5 Q   Okay. You represented the Borough at Ms. Thomas'
6 grievance hearing. Do you recall.....
7 A   At the ad hoc.....
8 Q   .....doing that?
9 A   .....grievance hearing?
10 Q   Yes.
11 A   Yes, I did.
12 Q   Okay. And at that hearing there was a discussion
13 about certain facts and documents, which the Borough
14 alleged would have justified Ms. Thomas' termination,
15 regardless of the residency issue. So, is that your
16 understanding?
17 A   I'm not sure what you mean by the residency issue,
18 but apart from her refusal to -- report to Borough
19 Offices to work, there were other things that were
20 discovered in November, December of 2005, which I believe
21 would have justified a termination, had they been
22 discovered earlier.
23 Q   Okay. And those were offered at the grievance
24 hearing?
25 A   Yes, they were.

---

9 (Pages 30 to 33)

Exhibit __C__
Page __9__ of __29__