Page 46

1 handled properly and if they're failing in that basic
2 duty, that's a problem.
3 Q  Is it the position of the Borough that Ms. Thomas
4 would have been terminated concerning the placement of her
5 signatures on KB112 and KB113?
6 A  The Borough took a position in the ad hoc grievance
7 hearing that KB112, KB113 and the other exhibits, taken
8 together, showed a --showed a level of negligent discharge
9 of her duties in the position which would justify
10 termination, yes.
11 Q  Okay. And the reason for that termination would be
12 what?
13 A  You hire somebody to make sure that you're following
14 the right personnel rules and they aren't doing it, they
15 aren't doing the job right, that's defective performance,
16 justifying termination.
17 Q  Okay. How about Mr. Hull? What did Ms. Thomas do
18 that was negligent or inappropriate with respect to Mr.
19 Hull?
20 A  Well, Mr. Hull, at the time of hire -- well, let me
21 double check. He also was in a PERS retiree status, and
22 so his position suffered the same defect that Mr. -- Mr.
23 Gutzman's did in that regard. Her signature appears on
24 the KB118 and KB119 and KB120. And I'm trying to remember
25 -- let's see -- I believe -- okay, yeah, those would be

Page 47

1 the documents.
2 Q  Okay. And Ms. Thomas' inappropriate or negligent
3 conduct was the placement of her signatures on forms 118,
4 119 and 120?
5 A  Because that signature represents that this action is
6 consistent with the requirements of the Borough Code when
7 it actually was not.
8 Q  Okay. And how was it not consistent with the
9 requirements of the Borough Code?
10 A  As I explained with respect to Mr. Gutzman, Mr. Hull
11 is a PERS retiree status employee. Loading his additional
12 compensation from what the Borough's contribution for his
13 would have been into his pay grade pyramids the
14 compensation. And then when the law was changed and he
15 was no longer entitled to that additional pay, it -- it
16 was not a discretely identified component of his
17 compensation to be eliminated.
18 Q  When was the law changed?
19 A  My recollection was the end of June 2006. I'm sorry,
20 this is 2006. End of June 2005. I think previously I
21 testified 2006, and I should have said 2005. The bill
22 passed earlier that year, but that was the effective date
23 of the change.
24 Q  Okay. So, is it the Borough's position that Ms.
25 Thomas should have taken some action with respect to these

Page 48

1 -- the levels of pay upon enactment of the changed law?
2 A  Well, there are two parts. One is prior to the
3 change, instead of, for example, being 90G, or 90M, he
4 should have been 90A, or 90 whatever, and as additional
5 compensation, gotten X dollars, which is the equivalent of
6 what the Borough would have had to contribute to PERS
7 otherwise. Come June 30, 2005, the problem became more
8 difficult, because in addition to this, the Borough then
9 had to start contributing two and a quarter or two and a
10 half percent to PERS for this guy and we didn't get a
11 break. So, the compensation, then, should have been taken
12 away. And that was not done.
13 Q  And when should that have been done?
14 A  Well, the first thing should have been done when they
15 were hired. And each time that this change occurred, it
16 was done the wrong way. And then there should have been
17 another change in, you know, June, July, August of 2005.
18 Q  Okay. And it's the Borough's position that failure
19 to do that was a terminable offense?
20 A  There are several here and the combination of all of
21 them, the consistent point is that a lot of public money
22 was spent that was spent in violation of provisions of the
23 Code. And the negligence that led to that would justify
24 disciplinary action, up to and including termination, yes.
25 Q  So, the answer is yes?

Page 49

1 A  With the explanation that I provided, yes. I think
2 it's important to realize that any individual one,
3 standing on its own, would not necessarily justify
4 termination. When taken as a whole, there is a more
5 persistent problem.
6 Q  Okay. And who was it that came to this conclusion
7 that Ms. Thomas would have been terminated for these, as
8 you've described them, negligent acts?
9 A  I think the response to that would probably be
10 covered by the attorney/client privilege.
11 Q  I don't know that it would be. You know, it's who --
12 who -- who made that determination. It's not -- it
13 doesn't call for disclosure of communication.
14 A  I made that argument in the grievance hearing.
15 Q  Okay. But who made the decision that those would be
16 actions for which Ms. Thomas could be terminated?
17 A  She was terminated for a different reason.
18 Q  Right.
19 A  She was not terminated for these acts.
20 Q  But as I understand the position of the Borough, Ms.
21 Thomas would have been terminated for these actions that
22 are discussed in the -- or that are allegedly shown in
23 these exhibits. She would have been terminated for that,
24 right? That's the position of the Borough?
25 A  Ye -- a termination could have been justified, yes.

13 (Pages 46 to 49)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit C
Page 13 of 29

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

Page 50

1  If Ms. Thomas had returned, continued to work for the
2  Borough, and then subsequently it was discovered that she
3  had conducted her job in a negligent manner that cost the
4  Borough thousands of dollars, if the Manager wanted to, as
5  a result of that discovery, terminate her, I believe the
6  termination would be justified.
7  Q   And who was it that made that decision?
8  A   What decision?
9  Q   The decision that her termination would have been
10 justified by these actions, by this conduct that you've
11 talked about with respect to these personnel action forms
12 and pay levels. Who was it that made the determination
13 that her termination would have been justified? Somebody
14 made the decision, right?
15 A   I'm not sure if you're being coy, or what.
16 Q   I don't think I'm being coy at all.
17 A   The -- based upon these, in my handling of personnel
18 cases, if a supervisor came to me and said, look, this is
19 what this employee has done and said, do you think we
20 could terminate them for this activity, could we defend a
21 termination for this? Based upon this, I offer the
22 opinion that yes, this would justify termination if you
23 wanted to terminate.
24 Q   Okay. That's not only your opinion, that's the
25 position of the Borough in this case. You understand that

Page 51

1  there's been an affirmative defense posed that after-
2  acquired evidence would have justified Ms. Thomas'
3  termination. Do you understand that?
4  A   I draw a distinction, though, between what would
5  justify termination and what was a decision to terminate.
6  She was not terminated based upon this.
7  Q   Right, I understand that. What I'm asking is, who
8  made the determination that she could have been just --
9  she could have been terminated for these actions, for this
10 conduct?
11 A   Okay. And I believe my response is that I believe I
12 could defend a termination based upon this conduct.
13 Q   Well, I understand what you believe. What I'm asking
14 is, first, whether anyone at the Borough has decided or
15 determined that Ms. Thomas could have been terminated for
16 these actions, and if so, whom?
17 A   I may be misunderstanding you, because in my
18 response, I think I'm saying I determined that she could
19 have been terminated for these actions if the Manager
20 wanted to terminate her for these actions.
21 Q   So it was your decision? It was your determination?
22 A   We decided to terminate her, but I decided that this
23 evidence would support a termination.
24 Q   Okay. And that was a determination that you made on
25 behalf of the Borough?

Page 52

1  A   Yeah, in an argument that I made in the arbitration,
2  as well.
3  Q   Right. Has Mr. Eckert, to your knowledge, made any
4  determination as to whether these actions would have
5  justified Ms. Thomas' termination?
6  A   I can't say definitively that he has or has not.
7  Q   All right. Now, at the grievance hearing, you also
8  made a presentation about Ms. Thomas' timesheets. Do you
9  remember -- do you recall doing that?
10 A   I don't, but I wouldn't be surprised.
11 Q   Okay.
12 A   Because that was among the things that were of
13 concern.
14 Q   Okay. Do you recall saying at the hearing,
15 management does not believe that she was actually
16 performing eight hours of Borough work on each of the days
17 on which she submitted a timesheet indicating eight hours
18 of Borough work?
19 A   That's page --
20 Q   And that is page 8.
21 A   I believe I said that, yes.
22 Q   Okay. On what basis did management come to that
23 conclusion, to your understanding?
24 A   You're asking the basis for my statements at that
25 time?

Page 53

1  Q   Yes.
2  A   The basis for my statements at that time were prior
3  to her departure, you could see her, she was doing work,
4  there was a certain volume of work she would produce. In
5  an average day, she'd have, you know, maybe a couple dozen
6  emails, she'd have meetings with folks. When she was in
7  Oregon, I might see one email every two or three days.
8  And she -- she would be doing other things, taking her
9  mother to the doctor, doing family things. The empirical
10 evidence didn't support the conclusion that she actually
11 was sitting doing Borough work for eight hours every day,
12 as reflected on the timesheets.
13 Q   Okay. Who, if anybody at the Borough made that
14 conclusion? Or made that determination?
15 A   I made the conclusion and made the argument. Whether
16 there are other folks at the Borough who have also drawn
17 that conclusion or not, I cannot say.
18 Q   Do you know whether Mr. Eckert arrived at that
19 conclusion?
20 A   I cannot say.
21 Q   You cannot say because you don't know?
22 A   I don't recall if I talked to him about it, and if I
23 had talked to him about it, it would be protected by the
24 attorney/client privilege.
25 Q   At the grievance hearing, you said additionally,

14 (Pages 50 to 53)

Exhibit   C
Page  14  of  29

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

Page 54

1  either in the presence or absence of Ordinance 1369,
2  management maintains that it is within the Manager's
3  discretion to change his mind as to a location that an
4  employee will be assigned to work. Is it your
5  understanding that that's what happened here, that Mr.
6  Eckert changed his mind as to the location that Ms. Thomas
7  could work?
8  A  Essentially, yes.
9  Q  Okay. And describe your understanding of how that
10 change of mind took place.
11 A  She was offered the opportunity to return to the
12 Borough offices to perform her duties in August, prior to
13 the adoption of that ordinance, and she rejected that
14 opportunity. Subsequently, after adoption of the
15 ordinance, she was offered the opportunity to return to
16 the Borough offices to work and she again declined that
17 opportunity.
18 Q  Okay. Well, this refers to changing his mind. And I
19 assume that his refers to Mr. Eckert, there, right? Do
20 you see that on page 8?
21 A  Yeah. To the extent that Mr. Eckert did -- and there
22 is a dispute on this point and I don't know the truth of
23 the matter -- but to the extent that Ms. Thomas says, he
24 said she can work down there and he says no, let's say,
25 for the sake of argument, he said she could work down

Page 55

1  there. Well, if he did say that, he can change his mind
2  and say, no, you've got to come work here.
3  Q  Okay. So when you referred to changing his mind,
4  what I'm trying to find out is really what you're
5  referring to. Changing his mind as to what?
6  A  How to deploy the Borough's workforce. I mean, the
7  Borough Code gives the Manager discretion to determine
8  hours of work, locations of work, and it -- it gave him
9  that discretion before the ordinance change and after the
10 ordinance change.
11 Q  Do you know whether Mr. Eckert was contemplating
12 terminating Ms. Thomas in August 2005?
13 A  For what purpose?
14 Q  That's a good question.
15    MR. SANDBERG: And at this point, it may be veering
16 back across our line, here, only because I would instruct
17 the witness not to reveal confidential communication from
18 Mr. Eckert for the purpose of obtaining legal opinion or
19 advice on behalf of the Borough.
20 A  Yeah. I think I would have to decline to answer.
21 Q  Were you involved in the drafting of Ordinance No.
22 1369?
23 A  I was.
24 Q  And how were you involved in that?
25 A  I drafted it.

Page 56

1  Q  Okay. And on whose instruction did you draft that
2  ordinance?
3  A  The Assembly's.
4  Q  Was that instruction given at a meeting?
5  A  I believe so.
6  Q  Do you recall which meeting?
7  A  No, not specifically, not without checking. I
8  believe it was in July. It may have been early August,
9  but July or August 2005.
10 Q  Do you remember whether it was a statement made in
11 the public part of the meeting?
12 A  I thought it was, but I would defer to whatever the
13 minutes of the meetings for that timeframe provided.
14 Q  Okay. I'd like you to turn to KB315.
15 A  Okay.
16 Q  And do you recognize KB315?
17 A  I do. This looks like one of my assignment sheets.
18 Q  Okay. And this was a request for legal services.
19 And who was the request from, to your understanding?
20 A  Well, the next page, KB316, are my notes. My
21 recollection was it was from the Assembly. Here it says,
22 contact name, Mayor, which would indicate it was from an
23 Assembly meeting. Assign date, 8/15/05, gives me an
24 indication of approximately when it would have been
25 requested.

Page 57

1  Q  Okay. All right. So, from looking at the assign
2  date of August 15, 2005, can you gather from that when the
3  request was made?
4  A  I would assume it was within a couple of days of
5  then, if not that date.
6  Q  Okay. And again, you don't recall which Assembly
7  members made this request of you?
8  A  No. The indication is the Mayor. It may have been a
9  statement by the Mayor. But it may have been just the
10 Mayor making a conclusory statement based upon comments at
11 the Assembly meeting. The next page, KB316, is sort of an
12 indication of the -- I make notes for myself sometimes
13 during Assembly meetings of tasks that I have to do, and
14 this is the sort of thing that I -- how I take notes. And
15 it indicates that there is that work request.
16 Q  Okay. I'd like you to turn to P108, which is in the
17 second part of the binder.
18 A  Okay.
19 Q  And there's an agenda statement for the meeting of
20 September 6, 2005. And that was initialed by you on
21 behalf.....
22 A  Okay.
23 Q  .....of the legal department, do you see that?
24 A  Um-hmm. And it indicates an August 1st day, where
25 there was an interest, so.....

15 (Pages 54 to 57)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit C
Page 15 of 29
f9d95d7c-33a8-4ae1-90f0-86713b1f7e43