Page 58

1  Q  Okay.
2  A  .....that would probably be more accurate than the
3     assignment sheet.
4  Q  Okay. So, it looks like on August 1 that instruction
5     may have been given?
6  A  Correct.
7  Q  Okay. I'd like you to turn to P94.
8  A  Okay.
9  Q  And there's a -- those are part of the August 1, 2005
10    minutes, and there's a section, request for executive
11    session to discuss the employment status of the Ketchikan
12    Gateway Borough Human Resources Manager, do you see that?
13 A  I do. I'm looking -- yes.
14 Q  Okay. And right below that, it says Mayor Salazar
15    said he did not believe an executive session was necessary
16    because the discussion was going to center around the
17    location of the job and it would be setting policy.
18    Attorney Brandt-Erichsen said he tried to communicate the
19    concerns that he had at the last meeting in a confidential
20    memorandum to the Assembly. He said if the memorandum
21    provided the information that would have required an
22    executive session, then one was not necessary. And then
23    it goes on to have a discussion and the motion to have an
24    executive session was rejected. Do you see that?
25 A  Yes.

Page 59

1  Q  Okay. Now, there wasn't any request to draft an
2     ordinance reflected in this part of the minutes, is that
3     right?
4  A  I -- can I take -- ?
5  Q  Sure, absolutely.
6  A  Let's see -- okay, I don't see anything else
7     reflected in those minutes, no.
8  Q  Okay. And there are copies of several other Assembly
9     meeting minutes. I won't have you go through it. But was
10    it your understanding that there was a request made by an
11    Assembly member, and perhaps the Mayor at the August 1,
12    2005 meeting to draft an ordinance on the residency of
13    employees?
14 A  I don't have an independent recollection of who the
15    request came from. The assignment sheet indicates the
16    Mayor. I know it was a topic that came up in discussion
17    with the Assembly. I don't have a recollection of whether
18    it was in open session, or a separate conversation. I do
19    have a recollection that it was something the Assembly
20    wanted done.
21 Q  Okay. Was it also something Mr. Eckert wanted done?
22 A  I don't think he had any objection to it.
23 Q  Did you discuss it with him?
24 A  I probably did, but I don't have a specific
25    recollection.

Page 60

1  Q  Did Mr. Eckert review the proposed Ordinance 1369
2     prior to its submission to the Assembly?
3  A  He would have the opportunity to and I believe he
4     did. To the extent -- the extent to which he read and
5     thought about it, I couldn't say.
6  Q  Did Mr. Eckert instruct you to draft that ordinance?
7  A  I don't believe so.
8  Q  And the agenda statement that is on P108, the summary
9     statement there says, at the Assembly meeting of August 1,
10    2005, some Assembly members expressed interest in
11    considering an ordinance to set out a clear statement of
12    policy regarding residency of Borough employees. Was that
13    something you drafted?
14 A  I drafted this agenda statement, yes.
15 Q  Okay. Now, in fact, at that point, there was a clear
16    statement of policy in the Borough Code concerning the
17    residency of Borough employees, isn't that right?
18 A  I don't know. I'm not sure what you're referring to.
19    There's the -- the ordinance addressed a couple of things.
20    One of them is where people would work and that was a
21    matter that had been of concern for some time by the Mayor
22    and some members of the Assembly.
23 Q  Okay. Turning to P111 -- and again, this is --
24    starting on P110 -- this is a document that you drafted,
25    is that right?

Page 61

1  A  Correct.
2  Q  Okay. And on P111, there is the citation or the
3     section 30.20.016 on residency. And there's a section
4     that starts to be underlined and then there's a
5     capitalized section below that, see that?
6  A  Correct.
7  Q  Now, the capitalized section was the state of the
8     Borough Code prior to the enactment of Ordinance 1369,
9     isn't that right?
10 A  And the underlying text did not appear there,
11    correct?
12 Q  Right. Right. So, and under -- under that law,
13    under the law before 1369, residency within the Borough
14    was not a condition of initial appointment or continued
15    employment at the Borough, unless an employee's residence
16    location was interfering with the daily performance of
17    their duties and responsibilities, isn't that right?
18 A  Well, and except as otherwise required by state law
19    and the Borough Code of Ordinances or resolution.
20 Q  Right. But there were no provisions of state law or
21    Borough Code of Ordinances that.....
22 A  I don't know.
23 Q  .....that dealt with that. Okay. You didn't know
24    whether that was the case when you drafted this?
25 A  No, I don't know whether there were other provisions

16 (Pages 58 to 61)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit  C
Page 16 of 29
f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

Page 62

1  in state law or resolutions that addressed it.
2  Q  okay.
3  A  I wasn't aware of any, but I can't tell you that
4  there were not.
5  Q  In the absence of such provisions, it was the state
6  of the law that residency within the Borough was not a
7  condition of initial appointment or continued employment,
8  unless the residence location interfered with daily
9  performance of duties and responsibilities.
10 A  The ordinance at the time read as if it did not have
11 the underlying text here and the capitalized text was
12 there.
13 Q  Right. So, there was a statement of policy on
14 residency of Borough employees in the Borough Code prior
15 to Ordinance 1369, right?
16 A  Yeah, this was the section dealing with residency.
17 Q  Okay. And the enactment of Ordinance 1369
18 represented a change in that policy, isn't that right?
19 A  A change -- well, in that section and in 036 and
20 adding 038.
21 Q  There was more than that clarification of the policy.
22 It was a change, right? On residency?
23 A  There is a change there, yeah.
24 Q  Because residency outside the Borough was allowed
25 under the previous version of 30.20.016, and then it was

Page 63

1  disallowed upon Ordinance 1369, isn't that right?
2  A  Well, it could be allowed in some circumstances.
3  Q  It was allowed unless it interfered with the daily
4  performance of duties and responsibilities, right?
5  A  Well, and even following adoption of Ordinance 1369,
6  it could be allowed if the -- the Assembly concurred, in
7  theory -- yeah, if there's some reason that it makes
8  sense, they would concur.
9  Q  Right. But under the law before 1369, it was allowed
10 unless, again, it interfered with the daily performance of
11 an employee's duties, right?
12 A  Yes. And that's what this -- you know, we talked
13 about what the section said at the time and it said what
14 it said.
15 Q  Okay. If we could go off record for a bit, I think
16 I'm just about done.
17    MR. SANDBERG: Okay.
18    MR. COSSMAN: Going off record. The time is 3:34.
19    Back on the record. The time is 3:34.
20 Q  Did Ms. Thomas ever express to you concerns that Mr.
21 Eckert would somehow find a way to be able to terminate
22 her employment?
23 A  I don't know. She talked to me a fair amount. She
24 did not say anything that was couched quite that way.
25 Q  Okay. Did she say anything similar to that? Did she

Page 64

1  express a concern about being terminated as a result of
2  her move to Oregon?
3  A  I don't think so, except in the grievance hearing, or
4  when the, you know, when she was -- when she got a letter
5  saying if she didn't come back, she -- you know, she
6  needed to come back to work.
7  Q  Right.
8  A  But her concern seemed to be more focused on the
9  difference in their stories, as to what the circumstances
10 were.
11 Q  So, she never expressed to you a concern that somehow
12 she would end up -- she would end up terminated over all
13 of this?
14 A  Well, when you say, all of this, it's a -- it's a
15 pretty broad --
16 Q  Sure. Yeah.
17 A  She said that she wanted to continue to do the job
18 from Oregon. And to a certain extent, I suppose that
19 expresses an opinion that she was to continue the work.
20 But concern and when you say, all this, whether it's the
21 difference in interpretation or something else, you know,
22 if you can be more specific, I might be able to be
23 more.....
24 Q  Sure.
25 A  .....helpful.

Page 65

1  Q  Well, and saying all of this, that's pretty inartful.
2  The residency issues that we've talked about, the -- her
3  move to Oregon --
4  A  Residency didn't seem to be an issue. Frankly, we
5  didn't know she wasn't a resident. We thought she was
6  still a resident.
7  Q  Okay. Well, she was residing in Oregon, you
8  understood that?
9  A  Well, she was at her mother's house, yeah. But --
10 Q  And that's --
11 A  But I thought she still had a residence here and
12 voted here and residency wasn't really the issue. It was
13 where is she going to show up in the morning and punch the
14 clock and do the job?
15 Q  All right. But the -- but Ordinance 1369 went to
16 residency, didn't it?
17 A  Well, it dealt with three issues. It dealt with
18 residency after somebody is hired. If, you know, if --
19 you know, if it's somebody that needs to be close by to do
20 their job, they're here, unless there's some reason it
21 makes more sense to have them in Juneau or DC or wherever.
22 It deals with where they work, because we've been
23 concerned about some other employees. There's a guy who
24 used to work for the Borough who owns a building on Creek
25 Street and he was working from an office in a building

17 (Pages 62 to 65)

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

Exhibit C

Page 17 of 29

f9d95d7c-33a8-4ae1-90f0-86713b1f7e43

Page 66

1  that he owned and we got a lot of questions, concerns from
2  Assembly members, how do we know he's putting in a full
3  day's work? Is he really doing work for himself on the
4  side and not really doing Borough work? And that was one
5  of the concerns addressed by this. And there was another
6  concern about people working odd schedules. You know, if
7  somebody worked ten hours four days a week and took
8  Fridays off, there was concern about accounting for that,
9  having some sort of audit trail that, well, they actually
10 are putting in an adequate amount of time. They aren't
11 just playing around and claiming credit for work they're
12 not doing. And so, each of these issues was addressed in
13 this ordinance.
14 Q  Okay. But Ordinance 1369 was primarily drafted and
15 enacted to address the issues presented by Ms. Thomas'
16 employment, isn't that right?
17 A  There was Ms. Thomas and there was Stephen Reeve.
18 And then there was a couple of employees in the Planning
19 Department. It addressed all three issues.
20 Q  Okay. Well, the agenda statement on P108 refers to
21 the Assembly meeting of August 1 and Assembly members
22 expressing an interest in considering an ordinance
23 regarding residency of Borough employees, right? Is that
24 right?
25 A  Yeah.

Page 67

1  Q  Okay.
2  A  And a lot of times some of the elected bodies may
3  want some thing that they can't have, but -- anyway, go
4  ahead.
5  Q  Okay. Well, what I'm asking is, this discussion
6  that's referred to in this agenda statement that you
7  drafted, the discussion had to do with Ms. Thomas, right?
8  Her residency was the only residency that was discussed
9  during this August 1, 2005 meeting, isn't that right?
10 A  In the minutes that's -- that's the only thing that's
11 reflected.
12 Q  Right.
13 A  The concerns expressed at various times by the Mayor
14 then -- Mayor Salazar, and by others, were, you know,
15 we've got an employee who is supposedly working for us and
16 we don't have adequate oversight of them. They're probably
17 ripping us off. Those aren't his words; I'm paraphrasing.
18 Q  Right. Were any other employees disciplined or
19 terminated concerning a failure to adhere to Ordinance
20 1369?
21 A  To date I don't believe any others have. I believe
22 that all of the existing Borough employees do have work --
23 are reporting to work locations that are Borough owned and
24 controlled. No employees have been disciplined or
25 terminated based upon residency criteria.

Page 68

1  Q  In your earlier testimony you talked about two
2  conversations that you had with Ms. Thomas about her work
3  in Oregon. You talked about a conversation in July. And
4  then we didn't get to the second conversation. When was
5  that?
6  A  I don't recall specifically. I believe she took two
7  trips up here. Each time she took a trip up here, I had
8  at least one conversation with her.
9  Q  She took a trip up in early August. Do you recall
10 that?
11 A  That may have been the one that I said was July.
12 Q  Okay.
13 A  She took one in that timeframe, but I thought she
14 came up again later, maybe September, October, I'm not
15 sure when.
16 Q  Do you recall anything about the second conversation?
17 A  Not as distinct from the other times.
18 Q  Okay. Those are all the questions I have.
19    MR. SANDBERG: I have no questions.
20    MR. COSSMAN: Okay. And this concludes the
21 deposition of Scott Brandt-Erichsen. The time is 3:42.
22 END OF RECORDING
23
24
25