EXHIBIT 1

**Carolyn L. Thomas**
**P. O. Box 798**
**Ward Cove, AK 99928**
**907-247-2697**

I am interested in securing employment with Ketchikan Gateway Borough. I am a long time resident of Ketchikan and have always been very interested in our community. I am well aware that we are experiencing some "tough" times as a community, and feel I have experience and background that would make me an asset to our borough staff. I believe in accountability for all employees. I believe in teamwork and a concerted effort toward goals and timetables. I do not believe in personal agendas. I believe each and every position is just as important as any other and that all positions are equally responsible for the effectiveness of the team. I believe in treating all employees respectfully and considerately and as people, not positions. I believe respect (for and from other employees) is important, and is earned, not demanded. Finally, I believe a happy staff that works together is far more productive than an unhappy staff in which employees work against each other.

I worked thirteen years at Ketchikan Pulp Company/Louisiana Pacific as Personnel Administrator. During those years we had a pulp mill, two sawmills, and eleven logging camps. We employed approximately 2,000 people. My duties included:

1. Adjusting and supervising adjustment of worker's compensation claims (KPC was self-insured) and setting reserves for claims. I was also responsible for representing KPC at hearings before the Worker's Compensation Board.
2. Contract negotiations with four separate bargaining units.
3. Representing management on joint pension trust committees for three bargaining units.
4. Disciplinary meetings with employees (both hourly and salaried).
5. Supervisor training and evaluation of supervisors.
6. Affirmative action compliance and preparation of affirmative action plans for each of our 14 locations.
7. Hiring and firing of hourly and salaried employees.
8. Representing management at grievance hearings.

EXHIBIT 1
Page 1 of 8

P00050

9.  Supervision of safety managers, plant nurse, guards, cafeteria staff and other Industrial Relations staff.
10. Representing management at OSHA hearings at the state and federal levels.
11. Representing management when negotiating the cost of company provided health and welfare benefits.
12. Supervision of personnel files maintenance.
13. Preparing departmental budget.
14. Supervision of contractors hired for asbestos removal, relining of digesters, various building projects, roof removal and replacement. It was also my responsibility to resolve any personnel problems that arose when contractors were on site, either from our employees or contractor's employees.
15. Coordination with Immigration when cargo ships were coming in to or tied up at our docks.
16. Resolution of disputes between insurance company and employees regarding heath and welfare benefits.
17. Preparation and completion of paperwork for retirees and/or survivors of deceased employees who were entitled to death benefits.

For three years, I was employed as Office Manager for ITT Rayonier. During that time, Rayonier was logging and marketing timber owned by native corporations. My duties included:

1.  Negotiating logging contracts and processing progress payments to the contractor. This involved verifying that work invoiced had been completed.
2.  Processing log and bundle tickets and forwarding information to and from scaling bureau to Seattle office.
3.  Accountability for logs watered.
4.  Preparation of manifest for logs shipped.
5.  Negotiating towing contract and supervision of same. This included verifying towing invoices before processing for payment.
6.  Liaison with native corporation officers regarding hiring of members.
7.  Writing letters for manager and engineers.
8.  Handling issues that arose when all engineers were on site rather than in the office.
9.  Daily office matters.

EXHIBIT 1
Page 2 of 8

P00051

I also spent three years working for my husband's wireless communications company. My duties included:

1. Ordering from vendors.
2. Invoicing customers.
3. Programming pagers and cell phones.
4. Customer care.
5. Scheduling flights for high site work and fueling.
6. Scheduling fuel trucks for high site fueling operations.
7. Processing invoices for payment.
8. Recording payments from customers and maintaining customer files.
9. Other duties as assigned.

I have spent the last three years as Chief of Staff for Senator Robin Taylor. My duties included:

1. Supervision of other staff.
2. Prioritization of the senator's daily schedule.
3. Working with Legal on preparation of bills to be presented by the senator. (Amendments to other senator's bills required the same process.)
4. Preparation of packets for committee meetings.
5. Processing constituent problems to resolution.
6. Working closely with departments involved in issues that were on the senator's priority list.
7. Taking the senator's appointments for him when the senator's schedule changed unexpectedly.
8. Meeting with the press.
9. Working on campaigns.
10. Talking with communities within the senator's district regarding funding needs and assuring necessary backup was available for submission to Senate Finance Committee.

As a staffer for a senator, I was responsible for whatever "came up" during the course of a day. This requires the ability to change focus several times a day, and still complete the projects that you were already working on. During the legislative sessions, the duties are varied by the very fact that the legislature is in session. Out of session, I attended meetings, met with constituents and took the steps necessary to resolve their problems, researched and prepared drafts of legislation to be submitted during next session and worked on special projects for the senator. I enjoyed the variety and the pressure of the job immensely.

EXHIBIT 1
Page 3 of 8

P00052

I have lived in Ketchikan for 31 years and intend to stay in Ketchikan. All four of our children went to school in Ketchikan and graduated from Kayhi. They are now grown and have children of their own. I have a vested interest in our community and feel I would be an asset.

I can furnish references upon request.

Although I do not have a degree, I feel my experience qualifies me for positions that would usually require a degree.

I am currently in Indiana with our youngest daughter and her new baby. On September 2, I will be returning to Oregon, and will be back in Ketchikan by October 1. My cell phone number is 509-386-0586.

Thank you for accepting my resume. I hope you will consider me for any positions you have for which I am qualified.

EXHIBIT 1
Page 4 of 8

P00053

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT KETCHIKAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CAROLYN L. THOMAS,

        Plaintiff,

    vs.                        No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH

and ROY ECKERT, an individual

and official capacity,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION UPON ORAL EXAMINATION OF

CAROLYN THOMAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


9:05 a.m.

June 20, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


Zel D. Gonce, CCR              1601 Fifth Avenue, Suite 860

(CCR No. 2458)                Seattle, WA  98101


Moburg & Associates - Seattle, WA (206) 622-3110

Page 10

```
 1        A.    No.
 2        Q.    Do you have any plans to sell your home in
 3   Ketchikan?
 4        A.    Not at this time.
 5        Q.    Okay.  Well, that's enough about houses
 6   then.
 7              Let's talk about your work experience.  I
 8   have a copy of your resume which is Plaintiff's 50,
 9   P50.
10              And I should put on the record how we are
11   handling documents.  This morning we're only going to
12   be looking at documents that one side or the other has
13   produced in their initial disclosures and therefore
14   they all have Bates numbers on them.  Rather than mark
15   them individually as exhibits, I'm simply going to
16   refer to them by the Bates number.
17              And so, for example, the first thing we
18   should be looking at is Plaintiff's -- or P50 which
19   appears to be the first page of a resume or job
20   application with the Ketchikan Gateway Borough,
21   correct?
22        A.    Yes.
23        Q.    Okay.  Prior to coming to work for the
24   Ketchikan Gateway Borough can you sort of summarize for
25   me what your H.R. experience would have been?  In other
```

Page 11

 1   words --

 2          A.    I worked for Louisiana Pacific.

 3          Q.    And I know that -- I know it's in here but

 4   generally how long did you work for Louisiana Pacific?

 5          A.    About 13 years.

 6          Q.    During that entire thirteen years were you

 7   the head of the H.R. Department?

 8          A.    No.  I was assistant.

 9          Q.    Did you ever become the head of the H.R.

10   Department?

11          A.    Umm, we didn't have H.R. then.  It was

12   called Industrial Relations.  I was the head of the

13   personnel portion.

14          Q.    Okay.

15          A.    But I had an immediate supervisor who was

16   head of the department.

17          Q.    And that person was who?

18          A.    Clyde Johnson.

19          Q.    Do you have formal training of any kind in

20   H.R. functions or personnel functions?

21          A.    Yes.  You want to know what it is?

22          Q.    Please.

23          A.    Sorry.

24          Q.    That's okay.

25          A.    I attend a number of -- are you talking

Page 12

1    about college?

2          Q.    Well, any kind of normal training.

3          A.    Because that answer is no.

4          Q.    I'll take whatever you got.

5          A.    I attended a number of workshops, intensive

6    workshops where -- or work sessions, I don't remember

7    what they were called -- duration of several days, the

8    whole week.  There were trainers who were brought on

9    site.  That's the kind of training I've had.

10         Q.    Okay.  And I know we have a personnel

11   business form for you somewhere in here, but generally

12   when did you start with the Ketchikan Gateway Borough?

13         A.    March 29th, 2004.

14         Q.    And what was your job at the time you

15   started with the Ketchikan Gateway Borough?

16         A.    Human Resources Manager.

17         Q.    Did you ever have any other job during your

18   tenure with the Ketchikan Gateway Borough?

19         A.    No.

20         Q.    To whom did you report --

21         A.    Roy Eckert.

22         Q.    -- in your job?

23               And Mr. Eckert is the --

24         A.    Borough manager.

25         Q.    And he's the individual whom you've sued in

EXHIBIT 2

KETCHIKAN GATEWAY BOROUGH
PERSONNEL ACTION FORM

ACCOUNT CHARGED

| EMPLOYEE NAME | EMPLOYEE NUMBER | EFFECTIVE DATE |
|---|---|---|
| Thomas, Carolyn | 664000 | 3/29/05 |

## TYPE OF ACTION
### FILL IN APPROPRIATE COLUMNS, AS INDICATED, BY EACH TYPE OF ACTION

☐ APPOINTMENT (2,4,6,8,10)    ☐ PROMOTION OR TRANSFER (1,2,3,4,5,6,7,8,10)    ☐ SALARY CHANGE (1,2,3,4,5,6,10,12)

☐ TERMINATION (1,3,5,9,10,11,12,13)    ☐ LEAVE WITHOUT PAY (2,4,6,9,10,14)    ☐ OTHER (Complete where appropriate and describe below)

| FROM | | | | TO | | |
|---|---|---|---|---|---|---|
| 1 | DEPARTMENT **Manager** | | | 2 | DEPARTMENT **Manager** | |
| 3 | CLASSIFICATION TITLE **Human Resources Mgr/Safety Officer** | | | 4 | CLASSIFICATION TITLE **Human Resources Manager/Safety Officer** | |
| 5 | DATE OF LAST RATE CHANGE **9/29/04** | PAY GRADE **85J** | MONTHLY SALARY (OR HOURLY) **$ 4,722/mo** | 6 | PAY GRADE **85L** | MONTHLY SALARY **$4,865/mo** |

| 7 | STATUS OF POSITION | ☐ REGULAR<br>☐ PROBATIONARY<br>☐ TEMPORARY<br>☐ TRIAL | ☐ UNION<br>☐ FULL TIME<br>☐ PART TIME | ☐ NON-UNION<br>☐ EXEMPT<br>☐ NONEXEMPT | 8 | STATUS OF POSITION | ☐ REGULAR<br>☐ PROBATIONARY<br>☐ TEMPORARY<br>☐ TRIAL | ☐ UNION<br>☐ FULL TIME<br>☐ PART TIME | ☐ NON-UNION<br>☐ EXEMPT<br>☐ NONEXEMPT |

| 9 | ☐ RESIGNATION  ☐ RETIREMENT  ☐ DECEASED<br>☐ DISMISSAL  ☐ DISABILITY RETIREMENT  ☐ LAYOFF<br>☐ LEAVE W/O PAY  ☐ OTHER  ☐ END TEMP. WORK | 10 | EMPLOYEE'S ADDRESS **Box 798 Ward Cove, AK 99818** | SOCIAL SECURITY NUMBER **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** |
|---|---|---|---|---|

| 11 | DATE OF LAST WORKING DAY | DATE OF HIRE | 12 | EMPLOYEE'S SERVICES ☐ OUTSTANDING (4)  ☐ ABOVE AVERAGE (3)  ☐ SATISFACTORY (2)<br>☐ DEVELOPMENT NEEDED (1)  ☐ UNSATISFACTORY (0) |
|---|---|---|---|---|
| 13 | EQUIPMENT CHECKED IN ☐ YES  ☐ NO | ADDRESS TO APPEAR ON W-2 FORM | 14 | LEAVE WITHOUT PAY STARTING DATE | RETURN DATE | LENGTH OF LWOP |

**REMARKS:** Two-step increase due to performance evaluation.

## APPROVAL

| DATE | IMMEDIATE SUPERVISOR | 3/29/05 DATE | ADMINISTRATIVE SERVICES DIRECTOR |
|---|---|---|---|
| 3-28-05 DATE | DEPARTMENT HEAD | DATE | Human Resources |

| FORM DISTRIBUTION | | ELIGIBLE FOR: | | YES | NO |
|---|---|---|---|---|---|
| WHITE | Personnel File | RETIREMENT | | ☐ | ☐ |
| YELLOW | Accountant's File | HEALTH INSURANCE | | ☐ | ☐ |
| PINK | Department Head | A/L ELIGIBLE (after 6-month probation) | | ☐ | ☐ |
| GOLD | Employee's Copy | S/L ELIGIBLE (after 6-month probation) | | ☐ | ☐ |

EXHIBIT 2
Page 1 of 4

P00059

G:\HR\PAF\CarolynThomasfrm.frm

## KETCHIKAN GATEWAY BOROUGH
## PERFORMANCE APPRAISAL

EMPLOYEE  Carolyn Thomas

RTMENT Manager's Office

POSITION Human Resources Manager/Safety Officer

DATE IN POSITION 3/29/04

DATE OF HIRE  3/29/04

ANNUAL REVIEW     X

PROBATIONARY REVIEW

RATED FOR PERIOD   3/29/04 - 3/29/05

SPECIAL REVIEW (Please specify)

## OVERALL PERFORMANCE RATING
### RATING CODE

| UNSATISFACTORY (a) (b) | DEVELOPMENT NEEDED (b) | SATISFACTORY | ABOVE AVERAGE (a) | OUTSTANDING (a) |
|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 |
| Falls to meet standards and/or requirements for effective performance. | Occasionally falls short of meeting expectations. Requires improvement to increase effectiveness or growth. | Meets expectations and requirements for all job phases. | Frequently exceeds expectations and requirements for job phases | Consistently exceeds expectations and requirements for all job phases. |

a. Evaluations of unsatisfactory, or those scoring 3.4 or higher, require specific written comments for each section containing that score.
b. Evaluations of unsatisfactory or development needed require specific written goals and corrective activities.

## SUMMARY EVALUATION

| KEY RESULT AREAS | RATING |
|---|---|
| CONDUCT: Professional actions and behavior | 3.8 |
| CAPACITY: Ability to fulfill all job functions and responsibilities | 4 |
| EFFICIENCY: Ability to produce the maximum work with the minimum resources | 4 |
| SKILLS: Aptitude toward the specific requirements of the position | 4 |
| RESPONSIBILITY: Assumption of professional accountability | 4 |
| INTEGRITY: Character, dependability, and trustworthiness | 4 |
| EFFECTIVENESS: Ability to achieve a desired result | 4 |
| SELF DEVELOPMENT: Progress made toward professional development | N/A |
| TOTAL (Key Result Area) | 27.80 |
| Total Key Result Area divided by 8 | 3.97 |
| TECHNICAL EXPERTISE/PERFORMANCE RATING* | 3.94 |
| Total Key Result Area and Technical Expertise Performance | 7.91 |

| OVERALL RATING (Total Points divided by 2) | 3.96 |
|---|---|

* Attach specific position performance evaluation form.

In signing this report the employee does not indicate agreement, but acknowledges s/he has received it. If s/he wishes to add a written statement concerning any part of the report, s/he may use the comment section, or attach an additional page.

_Carolyn A. Thomas_
EMPLOYEE'S SIGNATURE

_3/28/05_
DATE

_Roy Eckert_
EVALUATOR'S SIGNATURE

_3-31-05_
DATE

_Roy Eckert_
DEPARTMENT HEAD SIGNATURE

_3-31-05_
DATE

HUMAN RESOURCES MANAGER SIGNATURE

USERS\MGR\FORMS\PA.MST

FOLLOW-UP
TO BE DONE:
(TO BE COMPLETED BY EVALUATOR)

Page 1

EXHIBIT 2
Page 2 of 4
P00060

# PERFORMANCE APPRAISAL ATTACHMENT

## HUMAN RESOURCES MANAGER/SAFETY OFFICER

__4__    Administers major personnel functions, including recruiting and hiring procedures, the performance appraisal system, the position evaluation system, programs and documents required by state and federal law, and other personnel functions as assigned.

__3.5__    Remains current on new developments in public personnel administration and state and federal laws, regulations and rules relative to personnel administration; conducts personnel research as requested.

__4__    Develops and maintains employee assistance, including but not limited to, FMLA, Workers Compensation, Health Insurance and Safety Programs for the Borough.

__4__    Provides information, deadlines, and reminders to departments and divisions on personnel procedures in areas such as hiring, performance appraisals, reclassifications, training, and discipline.  Provide information to departments and divisions on labor contract requirements.

__4__    Monitors Workers compensation and workplace safety.

__4__    Administers health insurance and wellness programs.

__4__    Provides assistance and guidance to employees with matters such as interpretation of labor contracts, employee rights and obligations, investigation and resolution of claims of harassment, discrimination, and threats of violence.

__4__    In coordination with others; reviews, updates & recommends personnel policies and standard operating procedures, responds to emergencies, investigates grievances and human resource related complaints, administers grievance procedures, and prepares for and carries out collective bargaining agreement negotiations.

__4__    Responsible for the maintenance of official and confidential personnel files to include grievance and incident files.  Directs clerical functions associated with the maintenance of files, updating records, and processing personnel actions.

__4__    Develops cost control measures in connection with health insurance and other employee benefit programs as directed by Borough Manager.

__4__    Prepares responses to salary surveys, EEO reports, requests for employment information, public requests for ADA accommodation, and public or agency requests for information.

__4__    Responsible for job postings and advertising for available open positions, and special requirements.

 4    Reviews Personnel Action Forms, evaluations, and other personnel related documents prior to signature by the Borough Manager.

 4    Assists with development and maintenance of personnel policies, procedures, and forms. Conducts wage and salary surveys when needed. Gathers other information and prepares special reports on personnel issues, as requested.

 4    Responsible for development and maintenance of job descriptions and integrations of new positions with the appropriate pay scale and/or bargaining unit.

 4    Research, prepare, and submits to the Borough Manager, agenda items and statements for Assembly meetings regarding personnel issues.

 4    Administers the operations of the Human Resources Department. Develop internal work procedures to assure consistent, quality human resources services. Monitor and control Human Resource expenditures in accordance with Borough policies.


 67   TOTAL

 3.94  AVERAGE (Total Points divided by 17) Insert on Page 1 of Performance Appraisal.

EXHIBIT 3

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.                    ROY ECKERT
                                                              7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

        Plaintiff,

        v.                          Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
        Defendants.
_____/


DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                        Terry Venneberg
                        1126 Highland Avenue, Suite 101
                        Bremerton, Washington  98337

FOR THE DEFENDANTS:

                        Mark A. Sandberg
                        Sandberg, Wuestenfeld & Corey
                        701 West 8th Avenue, Suite 1100
                        Anchorage, Alaska  99501

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 78

1   writing or not?
2   A   I would have to check. If it's not in the policies
3   and procedures manual, then it was a written thing,
4   because I know it was certainly discussed from time to
5   time, not very often, but from time to time during my
6   employment. I know that.
7   Q   Okay. If that was a policy at this point, in August
8   2005.....
9   A   Um-hmm.
10  Q   ......why was there a need to change the Borough Code
11  in the form of Ordinance 1369?
12  A   Just to tighten it up. We do that from time to time
13  with different -- different issues that come up. If
14  something is assumed, but it's not, you know, in an
15  ordinance form where it can be actually enforced, you
16  know, with disciplinary action, then we put it in the
17  Code.
18  Q   Well, in fact, Ordinance 1369 did more than tighten
19  something up. It changed the law, right?
20  A   It did.
21  Q   Let's go back to KB34. Now, this was the personnel
22  action form that we talked about earlier and this was the
23  PAF that served to terminate Ms. Thomas' employment, is
24  that right?
25  A   Right.

Page 79

1   Q   Okay. And they have a box checked for termination,
2   do you see that, for type of action?
3   A   I see that.
4   Q   And then it has a series of boxes that should be
5   filled in on termination, do you see that? There are a
6   series of numbers about that?
7   A   Okay, 1 3 5 9 10 11 12 13? Right.
8   Q   Right. And one of those is box 12, but it described
9   the employee's services.
10  A   Okay.
11  Q   But there is no box checked for Ms. Thomas on number
12  12 to reflect the employee services. Do you know why that
13  was?
14  A   No, it was probably just an oversight, because her
15  services were -- I would have to say they were
16  outstanding. They were very good.
17  Q   Okay.
18  A   They were certainly above average. So, the next one
19  is outstanding, so that's where we go.
20  Q   Okay. So that's the box that should have been
21  checked, in your view, when this was issued?
22  A   I'm sure it should have, because it would certainly
23  just have been an oversight on our part.
24  Q   Okay.
25  A   Yeah, I wouldn't have any problem giving her -- you

Page 80

1   know, even a letter stating that, because, I mean, she was
2   a good employee.
3   Q   Okay. And it's your testimony that that box should
4   have been checked.....
5   A   Yes.
6   Q   .....for this form?
7   A   Yes.
8   Q   All right.
9       MR. VENNEBERG: Okay. I'd like to go off the record
10  for a little bit. I think I'm close to being done.
11      MR. COSSMAN: Okay. I'm going off record. The time
12  is 11:39.
13      Okay, we're back on the record. The time is 11:47.
14  Q   Okay. Mr. Eckert, I'd like to point you to KB268,
15  which is part of a letter that was referred to earlier
16  from Ms. Thomas to you, dated August 1, 2005.
17  A   Okay.
18  Q   Do you see that?
19  A   I do.
20  Q   Okay. And on KB268, Ms. Thomas refers in the third
21  paragraph to a meeting that she had with you on August 2
22  at -- or here at the Borough offices. Do you recall that
23  meeting?
24  A   I do.
25  Q   What do you recall about that meeting?

Page 81

1   A   It was probably -- I don't believe it was two and a
2   half hours, but --
3   Q   Well, it said an hour and a half.
4   A   Oh, I'm sorry. I'm always -- I'm sorry --
5   transposing the numbers.
6   Q   Sure.
7   A   Let's see. She came in. She had been back for, I
8   believe some union negotiation things. She had, you know,
9   discussed, you know, basically, just small talk. And
10  then, finally, she says -- she says she brought up the
11  job, but I mentioned that it was becoming a big deal, so
12  we have a difference here. And I did tell her, I point up, not
13  her. And I did tell her to think about coming back, you
14  know. I told her I wished she would come back, quite
15  frankly. And she said, I totally disagree with the
16  statement. I reminded you that I had moved with your
17  permission and had I not had your permission to keep my
18  job while living in Oregon, I would not have moved. And
19  that is an absolutely untrue statement, because she was
20  going down -- we've already -- she resigned to go take
21  care of her mother, she didn't ask my permission. She
22  said she was having to quit employment to do it and she
23  would have gone anyway. So, I mean, that's -- I totally
24  disagree with her on that. And I don't know about the
25  statement, you heard the Assembly is going to make you

21 (Pages 78 to 81)

EXHIBIT 3
Page 2 of 3

ETCHIKAN GATEWAY BOROUGH
PERSONNEL ACTION FORM

ACCOUNT CHARGED

| EMPLOYEE NAME | EMPLOYEE NUMBER | EFFECTIVE DATE |
|---|---|---|
| Thomas, Carolyn | 664000 | 11/4/05 |

## TYPE OF ACTION
### FILL IN APPROPRIATE COLUMNS, AS INDICATED, BY EACH TYPE OF ACTION

☐ APPOINTMENT (2,4,6,8,10)   ☐ PROMOTION OR TRANSFER (1,2,3,4,5,6,7,8,10)   ☐ SALARY CHANGE (1,2,3,4,5,6,10,12)

☒ TERMINATION (1,3,5,9,10,11,12,13)   ☐ LEAVE WITHOUT PAY (2,4,6,9,10,14)   ☐ OTHER (Complete where appropriate and describe below)

| FROM | TO |
|---|---|
| **1** DEPARTMENT<br>Manager | **2** DEPARTMENT |
| **3** CLASSIFICATION TITLE<br>Human Resources Mgr/Safety Officer | **4** CLASSIFICATION TITLE |
| **5** DATE OF LAST RATE CHANGE 9/29/04 — PAY GRADE 85L — MONTHLY SALARY (OR HOURLY) $4,865/mo | **6** PAY GRADE — MONTHLY SALARY |
| **7** STATUS OF POSITION: ☐ REGULAR ☐ PROBATIONARY ☐ TEMPORARY ☐ TRIAL ☐ UNION ☐ FULL TIME ☐ PART TIME ☐ NON-UNION ☐ EXEMPT ☐ NONEXEMPT | **8** STATUS OF POSITION: ☐ REGULAR ☐ PROBATIONARY ☐ TEMPORARY ☐ TRIAL ☐ UNION ☐ FULL TIME ☐ PART TIME ☐ NON-UNION ☐ EXEMPT ☐ NONEXEMPT |
| **9** ☐ RESIGNATION ☒ DISMISSAL ☐ LEAVE W/O PAY ☐ RETIREMENT ☐ DISABILITY RETIREMENT ☐ OTHER ☐ DECEASED ☐ LAYOFF ☐ END TEMP. WORK | **10** EMPLOYEE'S ADDRESS 71735 Dourgherty Loop Wallowa, OR 97885 — SOCIAL SECURITY NUMBER 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 |
| **11** DATE OF LAST WORKING DAY 10/17/05 — DATE OF HIRE 3/29/04 | **12** EMPLOYEE'S SERVICES ☐ OUTSTANDING (4) ☐ ABOVE AVERAGE (3) ☐ SATISFACTORY (2) ☐ DEVELOPMENT NEEDED (1) ☐ UNSATISFACTORY (0) |
| **13** EQUIPMENT CHECKED IN ☐ YES ☒ NO — ADDRESS TO APPEAR ON W-2 FORM 71735 Dourgherty Loop Wallowa, OR 97885 | **14** LEAVE WITHOUT PAY STARTING DATE — RETURN DATE — LENGTH OF LWOP |

REMARKS:  Terminating PAF.   *INCLUDE 2 WEEKS SEVERENCE PAY.*

APPROVAL

| 11-3-05 DATE | *[signature]* IMMEDIATE SUPERVISOR | 11/3/05 DATE | *[signature]* ADMINISTRATIVE SERVICES DIRECTOR |
|---|---|---|---|
| 11-3-05 DATE | *[signature]* DEPARTMENT HEAD | 11/3/05 DATE | *Holly Rosendin* Human Resources |

FORM DISTRIBUTION
WHITE — Personnel File
YELLOW — Accountant's File
PINK — Department Head
GOLD — Employee's Copy

*ELIGIBLE FOR*:

| | YES | NO |
|---|---|---|
| RETIREMENT | ☐ | ☐ |
| HEALTH INSURANCE | ☐ | ☐ |
| A/L ELIGIBLE (after 6-month probation) | ☐ | ☐ |
| S/L ELIGIBLE (after 6-month probation) | ☐ | ☐ |

EXHIBIT 3
Page 3 of 3

KB 034

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT KETCHIKAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CAROLYN L. THOMAS,

            Plaintiff,

     vs.                    No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH

and ROY ECKERT, an individual

and official capacity,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION UPON ORAL EXAMINATION OF

CAROLYN THOMAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


9:05 a.m.

June 20, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


Zel D. Gonce, CCR        1601 Fifth Avenue, Suite 860

(CCR No. 2458)          Seattle, WA  98101


Moburg & Associates - Seattle, WA (206) 622-3110

Thomas v. Ketchikan Gateway Borough                6/20/06                          Carolyn Thomas

Page 13

1    this lawsuit?

2         A.   Yes.

3         Q.   Okay.  Take a look at Plaintiff's 54, if

4    you would.  What are we looking at?

5         A.   We're looking at a job description for

6    human resources manager.

7         Q.   And is that the job that you had when you

8    were with the Ketchikan Gateway Borough?

9         A.   Probably.

10        Q.   Have you ever seen this piece of paper

11   before?

12        A.   Yes.

13        Q.   Okay.  Would you have seen it before you

14   had the job?

15        A.   Yes.

16        Q.   Okay.  So you understood that this was the

17   job for which you were applying and that you were

18   expected to perform?

19        A.   Yes.

20        Q.   Okay.  Now, before we go through the rest

21   of the documents, I just want to make sure I understand

22   one of your basic contentions or maybe your central

23   contention in this lawsuit, and that is that you were

24   authorized to do this job that we're seeing described

25   at page 54 remotely from Oregon?

Case 5:06-cv-00001-JWS    Document 24-4    Filed 12/12/2006    Page 22 of 31
Thomas v. Ketchikan Gateway Borough                    6/20/06                                      Carolyn Thomas

Page 14

1      A.    Yes.

2      Q.    By whom?

3      A.    Roy Eckert.

4      Q.    And when did Mr. Eckert authorize that?

5      A.    Umm, do you expect me to give you an exact

6   date?

7      Q.    Best you can.

8      A.    I can't give an exact date.  It was -- I

9   left Ketchikan June 6.  It was over a month prior to

10  that.

11     Q.    Okay.  So April or early May?

12     A.    Yes.

13     Q.    Can you -- well, first of all, was it in

14  writing?

15     A.    No.

16     Q.    Can you give me some context that would

17  help us put that conversation in time?

18     A.    Well, it made -- it made a huge difference,

19  because for one thing we did not have to find an H.R.

20  manager prior to my departure.  It made a big

21  difference in how I closed out -- for lack of a better

22  term -- my office and the work that was in progress.

23           So I remembered the conversation well.  And

24  Roy said 2006, you know, this is -- or 2005, excuse me.

25  I'm really confused on years.  And it was 2005.

Thomas v. Ketchikan Gateway Borough                6/20/06                                  Carolyn Thomas

Page 15

1        Q.    Got it.

2        A.    If you have a computer, a fax machine, and

3   a phone you can perform -- I think what he said was,

4   you can be anyone but a surgeon and do it remotely.

5        Q.    Are you describing one conversation or more

6   than one conversation?

7        A.    We had several conversations about it.

8        Q.    Okay.  How did the idea come up?

9        A.    We were -- I was in his office.  We were

10  talking about things that were not yet complete.  For

11  instance, we had four union contracts that were not yet

12  signed.

13              And we were talking about some personnel

14  issues that were in progress and were moving along

15  positively and -- we were just talking about open

16  issues in H.R. probably is what we were doing.  I mean,

17  I think that's the best way to describe it.

18              And I told him that I would really like to

19  stay with the union contracts until they were signed,

20  because one of those unions had been negotiating for a

21  long long time and had changed negotiating teams more

22  than once and I wanted to stay with them.

23              And he said -- this is not a direct quote.

24  He said something to the effect that I wish you would

25  just do -- stay with your whole job.  And I said, but I

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860      EXHIBIT 4         Seattle, WA 98101
Court Reporters                     206-622-3110              Page 4 of 6         Fax 206-343-2272

Thomas v. Ketchikan Gateway Borough                 6/20/06                        Carolyn Thomas

Page 16

```
 1   really need to be in Oregon.  And he said I know.
 2            And we discussed doing it remotely and what
 3   would work and what would not work.  And we talked
 4   about it two or three or four times, and then it was
 5   determined that that was what I would do.  We talked --
 6   discussed it with supervisors.  It was --
 7        Q.   Okay.  Let me take that in smaller bites if
 8   I may.
 9            Were there other people present at the
10   discussion you just described for me?
11        A.   Initial one, absolutely not.
12        Q.   So it's just you and Mr. Eckert?
13        A.   Yes.
14        Q.   Okay.  And during that discussion
15   Mr. Eckert must have already known that you were
16   planning to go to Oregon?
17        A.   He knew in February.  I told him in
18   February.
19        Q.   So actually, at the risk of confusing
20   myself even more, let me ask you to go back to February
21   then.
22            In February did you tell Mr. Eckert that
23   you had family problems that might require you to move?
24        A.   Yes.
25        Q.   Okay.
```

Page 17

1        A.    He was aware of the situation prior to my

2    saying okay, this is coming to a head, I'm going to

3    have to go.

4        Q.    How long do you believe Mr. Eckert was

5    aware of these family issues roughly?

6        A.    Probably within a couple of months of my

7    employment.

8        Q.    Oh, okay.  And then in February of 2005,

9    you told Mr. Eckert what?

10       A.    That I was going to have to go to Oregon.

11       Q.    Okay.  And did you tell Mr. Eckert when you

12   were going to have to go to Oregon?

13       A.    Yes, in June.

14       Q.    And in February then was it your

15   expectation that you would be leaving your employment

16   with the Ketchikan Gateway Borough come June?

17       A.    Yes.

18       Q.    Did the issue of remotely working come up

19   in February?

20       A.    No.

21       Q.    In February, to your knowledge, was there

22   anything written down on paper by either you or

23   Mr. Eckert about your leaching?

24       A.    No.

25       Q.    And going --

EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT KETCHIKAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CAROLYN L. THOMAS,

            Plaintiff,

      vs.                              No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH

and ROY ECKERT, an individual

and official capacity,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION UPON ORAL EXAMINATION OF

CAROLYN THOMAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9:05 a.m.

June 20, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington

Zel D. Gonce, CCR          1601 Fifth Avenue, Suite 860

(CCR No. 2458)             Seattle, WA  98101

Moburg & Associates - Seattle, WA (206) 622-3110

Page 20

```
 1   wanted to know if I would be coming back to Ketchikan
 2   if I needed to be there.
 3            Q.   And you told them what?
 4            A.   Yes, yes, I would have e-mail.  I would
 5   have a phone.  I would go back to Ketchikan as
 6   necessary.
 7            Q.   How often were you contemplating returning
 8   to Ketchikan?
 9            A.   That would be totally dependent on what was
10   going on in Ketchikan.  But at least quarterly and
11   maybe more.
12            Q.   Who would be paying for your travel to
13   Ketchikan?
14            A.   I would be.
15            Q.   Okay.  It wasn't your expectation that the
16   Borough would be paying for your travel from Oregon for
17   these quarterly returns?
18            A.   No.  The -- there couldn't be an added cost
19   involved to the Borough --
20            Q.   Okay.
21            A.   -- for me, for having me gone.
22            Q.   Prior to your departure on June the 6th was
23   it?
24            A.   Yes.
25            Q.   Prior to your departure on June the 6th are
```

EXHIBIT 6

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.                    HOLLY ROSENDIN
                                                                  7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

        Plaintiff,

        v.                            Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
        Defendants.
_____/


DEPOSITION OF HOLLY ROSENDIN

JULY 20, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                        Terry Venneberg
                        1126 Highland Avenue, Suite 101
                        Bremerton, Washington  98337

FOR THE DEFENDANTS:

                        Mark A. Sandberg
                        Sandberg, Wuestenfeld & Corey
                        701 West 8th Avenue, Suite 1100
                        Anchorage, Alaska  99501

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

HOLLY ROSENDIN
7/19/2006

Page 10

1 Q   No, I'm talking about after, I'm sorry.
2 A   Okay.
3 Q   What sort of issues would you work on with her, when
4 she was in Oregon?
5 A   Carolyn kept in touch with the directors.  Anybody
6 that had a problem, they would talk to her and she would
7 let me know what was going on.  If I heard of any kind of
8 problems, I would let her know.
9 Q   Did you communicate by email with her?
10 A   Both phone and email.
11 Q   Okay.  Was that on a daily basis?
12 A   Yes.
13 Q   Okay.  Did you gather that the nature of Ms. Thomas'
14 duties and responsibilities changed after her move to
15 Oregon?
16 A   No.  Except for not having personal contact, being
17 able to see her face-to-face.
18 Q   Okay.  Did Ms. Thomas make trips back up to Alaska, as
19 part of her job?
20 A   She made a few.
21 Q   And did you understand that she made those trips to
22 perform some of these face-to-face functions?
23 A   Yes.
24 Q   Did you ever have any conversation with Mr. Eckert
25 about Ms. Thomas' move to Oregon?

Page 11

1 A   No.
2 Q   Okay.  Did Mr. Eckert ever tell you that Ms. Thomas
3 had resigned?
4 A   Yes.
5 Q   When did he tell you that?
6 A   A couple days before she left.
7 Q   Okay.  And was that in a staff meeting?
8 A   No, it was in his office.
9 Q   Okay.  And that was just you and him?
10 A   It was Lisa Machado and I.
11 Q   What did Mr. Thomas say about that?
12    MR. SANDBERG: Mr. Eckert?
13 Q   I'm sorry, Mr. Eckert, yes.  Got my names mixed up.
14 A   He said that Carolyn had resigned and he was talking
15 to Lisa and I about how we were going to continue on.
16 Q   Okay.  Now, after that meeting with Mr. Eckert, you
17 continued to work with Ms. Thomas on Human Resources
18 issues, right?
19 A   Right.
20 Q   So, did you gather, after that, that Ms. Thomas had,
21 in fact, resigned?
22 A   No.
23 Q   Did you have any conversations with Mr. Eckert after
24 that discussion in his office, where he said that she had
25 resigned, about Ms. Thomas?

Page 12

1 Q   That day, or the following day?
2 A   Any following days.
3 A   Can you ask the question again?
4 Q   Sure.  You said that you had talked with Mr. Eckert
5 and that Lisa Machado had been in this.....
6 A   Right.
7 Q   .....discussion just, I think, the day after Ms.
8 Thomas had left.  What I was asking is, after that
9 meeting, did you have any other conversations with Mr.
10 Eckert about Ms. Thomas and her employment situation?
11 A   Yes, when it came time for time slips to be done.
12 Q   Okay.  And were those time slips for Ms. Thomas?
13 A   Yes.
14 Q   Okay.  And what was discussed in that conversation?
15 A   I did the time slips for her and it sort of bothered
16 Roy that she was saying that she was working 40 hour
17 weeks.  But he signed them anyway.
18 Q   Do you remember when that conversation was?
19 A   Well, I -- they don't -- every two weeks you do time
20 slips and so it came up several times.
21 Q   Okay.  Was it for a particular period?  Was it the
22 later part of Ms. Thomas' time with the Borough?
23 A   No, it was -- well, I mean, it was after she moved to
24 Oregon.  But it was from the beginning.
25 Q   Okay.  Did you prepare all of Ms. Thomas' time slips

Page 13

1 after she moved to Oregon?
2 A   Pretty much all of them.
3 Q   Did you talk with her about those time slips before
4 you prepared them?
5 A   Right.  And the reason I started preparing them for
6 her is because I know when they're due and she might maybe
7 would get it in a day late or something like that.  And
8 yes, she told me just to go ahead and put down 40 hour
9 weeks, or whatever.
10 Q   Okay.  How did you respond to the concerns that were
11 being expressed by Mr. Eckert about the time slips?
12 A   I could understand his concern.
13 Q   Do you know whether Mr. Eckert looked into the time
14 slip issue to see whether the hours were being worked?
15 Did anything?
16 A   To my knowledge he did not.
17 Q   Okay.  So, you would bring the time slips into his
18 office, he would look at them --
19 A   I do time slips for myself and for him and for
20 Assistant Manager and he signs them.
21 Q   Okay.  But on several occasions he looked at Ms.
22 Thomas' time slips, expressed a concern about whether.....
23 A   Yeah.
24 Q   .....the entries were accurate, but then went ahead
25 and signed it?

4 (Pages 10 to 13)

EXHIBIT 6
Page 2 of 2