EXHIBIT 7

**From:** Carolyn Thomas [mailto:carolynt@wallowa.us]
**Sent:** Friday, July 15, 2005 1:24 PM
**To:** 'Roy Eckert'
**Subject:** Ketchikan Daily News

Roy,

As I told you, my phone rang several times while I was talking to you (I have call waiting) and we both figured it was Joanna. Just a few minutes after you and I had concluded our conversation, the phone rang again and I let it go to the answering machine. It was Joanna. She said she had talked to you and had a couple of questions about the HR Mgr position and didn't want to go any farther until she had talked to me. The more I thought about it the more I thought it was best to talk to her rather than give them any reason to think there was anything secretive or suspicious about what I am doing, and since you had left it up to me, I called her back.

She was very friendly and apologized for asking questions about me but had been told by her editor she had to do it. (Her editor is Terry Miller) I told her I didn't mind, but wanted to ask her a question first, and my question was, "What has created the interest in me?" She said that Terry had had people ask if the position was filled, if so, by whom, and told Joanna she needed to find out. She said Terry wanted her to find out where the borough employees were. I told her that I had certainly not generated any interest in the 34 years I lived there and I was shocked by the interest my leaving had generated. I also told her that my leaving had certainly not been a secret. I reminded her that we still owned a home and property in Ketchikan. These were her questionsa;

1. Are you still employed by the borough and if so, what is your position?
    a. Yes. I am Human Resources Manager.
2. When did you leave Ketchikan?
    a. June 6, 2005
3. How long have you been an employee of the borough?
    a. Since March 2004
4. Will you be returning to Ketchikan?
    a. Any time my presence is necessary
5. Who conducts interviews in your absence?
    a. The supervisor for whom the applicant will be working and any other person of his choosing.?
6. Did you conduct all interviews when you were in Ketchikan?
    a. No. Only Directors, Supervisors and Airport Police
7. Can you be effective from there? (paraphrased)
    a. Yes. This is 2005. I have a computer, a phone, a cell phone and a fax. I have all of the equipment I had in the Reid Building.
8. Do you still have your borough e mail address?
    a. Yes
9. Is this added expense to the borough?
    a. No. I pay my own phone bill and my own DSL connection.
10. If you come back, will the borough pay for that?
    a. The HR department has and has always had a travel budget.
11. Roy said you are working on union contracts. How many unions are there and who is represented.
    a. I told her APEA, IBEW, MM&P and IBU and who was represented by each;. I also told her that we had a signed contract with IBEW.
12. When do these contracts expire?
    a. The three contracts are already expired. There is language in their contracts that continues the contracts past the date of expiration unless one side or the other gives written notice of termination. Our bargaining units have not done that and neither has management..

She called back and wanted to know if my office was in my home. I told her it was not. She also wanted to know where I was in Oregon. I told her Wallowa.

After I talked to her, I called Dick Burton. I told him Ketchikan Daily News had just called me and I understood he had a problem with my working from Oregon. He said his problem was who was doing HR work because he had been told I had been fired. I told him I had not and if he had a concern, he could have called me rather than go to the newspaper and make a big deal out of nothing. He gave me unsolicited opinion of the borough assembly

EXHIBIT 7
Page 1 of 2

and then told me he and his wife were leaving Wednesday on the ferry for Bellingham and were going to purchase a condo and get the hell out of Ketchikan. He said it was enough to make him support consolidation so there would only be one inept body to deal with.

I told him I hoped they had a good trip.

Carolyn

---

Sign-up for Your Free E-mail Address @Wallowa.US -OR- @StamplessMail.com.
Visit http://www.wallowadesign.com for details.

EXHIBIT 7
Page 2 of 2

P00009

7/31/2005

# EXHIBIT 8

not a Native. He told the men that he didn't have a permit for the feathers in his home, but that his wife is a Native. The Manns said troopers confiscated the feathers, a skull and a set of wings given to Mary by her brother, also a Native. Mary Mann said she used the feathers for Native regalia, including a fan and a rattle she weaved.

"We had reports of a non-Native gentleman, who happened to be Mrs. Mann's husband, possessing eagle feathers and wings," said Steve Oberholtzer, assistant special agent in charge for the U.S. Fish and Wildlife Service in Alaska at the Juneau office. "Native Americans can possess eagle feathers for religious purposes. Non-Native Americans cannot."

Nearly a month after confiscating the eagle parts, the Fish and Wildlife Service returned them to the Manns on Monday, Mary Mann said. Oberholtzer said that technically, Natives who have eagle parts must have permits. But, if the parts weren't unlawfully taken, bought or sold, then the Fish and Wildlife Service won't pursue legal action for possession without a permit.

For more detail on this story, see Kelly Zientek's article in the July 16-17, 2005, edition of the Ketchikan Daily News.

### Boro HR director living in Oregon
KDN Staff

The Ketchikan Gateway Borough's human resources manager is telecommuting from Oregon.

Borough Manager Roy Eckert said Human Resources Manager Carolyn Thomas moved from Ketchikan to Wallowa, Ore., in early June to help her mother. She is working full-time for the borough, and is responsible for finishing union contract negotiations and updating borough job descriptions, he said.

The borough is negotiating with the Alaska Public Employees Association, which represents some airport employees and Planning Department staffers; the Inland Boatmen's Union of the Pacific, which represents the deckhands on the airport ferry; and Masters Mates and Pilots, which represents the ferry captains. Thomas said in an interview that the contracts have expired, but remain in place unless management or the bargaining unit gives notice of termination.

Eckert said the borough is "still evaluating where we want to go" with the human resources position, but things are working well. The move didn't result in a change in pay, he said. The pay is listed at $57,308 in this year's budget.

Thomas, too, said the arrangement is working well, and she's surprised that the change has generated interest.

"It's 2005 and people all over the United States do their job remotely," she said. "It wasn't a secret that I was doing it."

For more detail on this story, see Joanna Markell's article in the July 16-17, 2005, edition of the Ketchikan Daily News.

### Board taps Lindemann for Houghtaling
KDN Staff

KETCHIKAN (KDN) — The Ketchikan School Board voted unanimously Wednesday to hire Kurt Lindemann as principal of Houghtaling Elementary School.

Lindemann replaces Les McCormick, whose contract the board declined

EXHIBIT 8
Page 1 of 1

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

    Plaintiff,

    v.                                    Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
    Defendants.
_____/

DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

        Terry Venneberg
        1126 Highland Avenue, Suite 101
        Bremerton, Washington 98337

FOR THE DEFENDANTS:

        Mark A. Sandberg
        Sandberg, Wuestenfeld & Corey
        701 West 8th Avenue, Suite 1100
        Anchorage, Alaska 99501

Page 58

1  as long as they knew that, you know, everything was going
2  to stop when the union contracts were ratified.
3  Q   Okay. The article says in the second paragraph, she
4  -- referring to Ms. Thomas -- is working full-time for the
5  Borough and is responsible for finishing union contract
6  negotiations and updating Borough job descriptions. Was
7  that something that you told the newspaper?
8  A   I don't (word indiscernible) telling them about
9  updating the Borough job descriptions. I know that we had
10 been talking about what we were doing here, doing --
11 updating Borough job descriptions. And again, I don't
12 believe everything I read in the papers, I learned that a
13 long time ago. But there may have been some
14 misunderstanding on, you know, on how they interpreted the
15 conversation, you know, with their notes. But I don't --
16 I don't believe that that was stated in the way they had
17 this stuff.
18 Q   Okay. So, is it the case that you recall that you
19 didn't tell the -- the reporter that she was updating
20 Borough job descriptions, or that you just don't recall
21 whether you did?
22 A   I don't think I did. I don't think I would have done
23 that, because that was not my understanding at the time.
24 Because we were doing that in-house, Mr. Corporon and
25 myself and several others had been in the process of

Page 59

1  updating job descriptions and -- and, you know, looking at
2  various ones that needed updating. So, that's why I think
3  that they might have had something --something a little
4  wrong here, because I just don't believe I would have said
5  -- you know, made that statement.
6  Q   Okay. And then it goes on, I think, in the fourth
7  paragraph to say, Eckert said the Borough is, quote, still
8  evaluating where we want to go with the Human Resources
9  position, but things are working well.
10 A   Right.
11 Q   Did you tell the reporter that?
12 A   Absolutely.
13 Q   Okay.
14 A   Absolutely. Because we were still evaluating whether
15 or not we wanted to do -- you know, hire someone, you
16 know, back, you know, to fill that position. But with
17 Steve working on the majority of things and Holly still
18 doing what she did daily, things were working well.
19 Q   Okay. So, when the article says that you -- you told
20 the reporter things were working well, that was an
21 accurate.....
22 A   Yes.
23 Q   .....statement?
24 A   Yes.
25 Q   We're going to turn to KB340. Okay. And do you

Page 60

1  recognize KB340 and then 341?
2  A   Let's see, this would be -- okay, yeah, agenda
3  statement, motion to recess to executive session to
4  discuss Carolyn's -- basically, I won't say Carolyn's,
5  Human Relations Manager position, yeah.
6  Q   Okay. And was this a document that you drafted?
7  A   Let's see, I know I did the summary statement, but on
8  the first page, let's see -- I got -- on the second page,
9  I think a lot of this is pretty much standard language.
10 Obviously, change the names for discussing executive --
11 you know, personnel matters. So, yeah, for the most part
12 I did it.
13 Q   Okay. And this agenda statement was a staff
14 recommendation to the Borough Assembly as to a motion they
15 should consider, is that right?
16 A   I think at the time -- I would have to go back and
17 see if I could find anything on this -- I think the
18 Assembly had asked for discussion on it, and most
19 personnel issues we really want to move into executive
20 session, because you never know what's going to happen
21 and, you know, what could be said. So, I don't believe
22 this was put forward by the staff. I -- it would probably
23 have been a request like -- my recollection would be it
24 would be a request either from the Mayor or an Assembly
25 member or two.

Page 61

1  Q   Okay. And you said you drafted the summary
2  statement?
3  A   Pretty much. The language -- most of the language on
4  the second page is kind of standard language we probably
5  used from other HR or personnel sessions that we would go
6  into executive session. And there might have been some
7  fine-tuning with myself and/or the Attorney, or someone,
8  but yeah, it was probably mostly me.
9  Q   Okay. And the summary statement starts at the
10 Assembly meeting of July 18, 2005, several Assembly
11 members asked questions regarding the employment status of
12 the Borough's Human Relations Manager, Carolyn Thomas, and
13 the Borough's plans for providing for Human Relations
14 functions in the future.
15 A   Right.
16 Q   Now, this reflects that as of August 1, 2005, Ms.
17 Thomas continued to hold the Human Relations Manager
18 position, is that right?
19 A   She had the title. And then she was -- that would
20 have been August 1 -- just about the time we were -- well,
21 we hadn't totally completed, I believe, the negotiations.
22 Hadn't ratified them, at that point.
23 Q   Okay. And the -- the recommended action -- I want to
24 go down to the recommended motion. Was this -- the
25 recommended motion, was that one that you recommended?

16 (Pages 58 to 61)

EXHIBIT 10

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.                                ROY ECKERT
                                                                          7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

    Plaintiff,

    v.                                    Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
    Defendants.
_____/

DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

        Terry Venneberg
        1126 Highland Avenue, Suite 101
        Bremerton, Washington  98337

FOR THE DEFENDANTS:

        Mark A. Sandberg
        Sandberg, Wuestenfeld & Corey
        701 West 8th Avenue, Suite 1100
        Anchorage, Alaska  99501

Page 54

1  she would -- she would be resigning?
2  A  I don't remember the exact date, but it was late
3  February or the first week or so of March.
4  Q  Okay.
5  A  I do remember it was quite -- quite traumatic,
6  because she was very concerned about her mother, who she
7  said was having eye troubles, going blind, and she was
8  going to have to move down and help take over their ranch
9  and she would be working full time, you know, taking care
10 of her mother, who was going to lose her eyesight. So,
11 that was -- that was what precipitated it. And I know she
12 was very concerned and very upset at the time.
13 Q  Was it this discussion where Ms. Thomas gave you the
14 date of July 1?
15 A  June 1.
16 Q  June 1?
17 A  Right.
18 Q  All right. After that discussion, did you have any
19 other discussion with Ms. Thomas about when she would be
20 leaving Borough employment?
21 A  Obviously, we discussed it off and on for the next,
22 you know, several months. I know I'd, you know, always
23 ask how her mother was doing, you know, because it's not -
24 - not a nice thing for somebody to, you know, have to go
25 blind. But discussed it -- she did say it was one of the

Page 55

1  hardest things she had ever done, because she had never
2  been, you know, unemployed and out of full-time
3  employment, but it was going to be an adjustment for her
4  and she kept --kept talking about the June 1 timeframe.
5  And one of the reasons, I think her husband had already
6  gone down. They were trying to make arrangements to get
7  their furniture and things moved, although they still have
8  their home here. Anyway, so, they were trying to make
9  that shift and so we discussed it off and on for the next
10 several months.
11 Q  Okay. But after that discussion in late February,
12 early March, did you have any discussion with Ms. Thomas
13 where she gave you a different date for her resignation?
14 A  No. No, in late April, early May is when, you know,
15 she asked about the union contracts because we could tell
16 they weren't going to be done in time for her to go on
17 June 1st. And she said if she could do that, it would
18 help the transition from full-time employment to part-time
19 -- or to no employment easier. And I did ask her, well,
20 would that interfere with her mother's -- trying to take
21 care of her? And she said, no, she would do it in the
22 same house. It was my understanding she was going to be
23 living in the house with her mother, because, you know,
24 when somebody loses their sight, it's hard to get around
25 for a while, and so she was going to be right there. So

Page 56

1  she said, you know, there was not a lot of work left to
2  do, so she felt she could do it fine from there.
3  Q  Okay. I'd like you to turn to P10.
4  A  Okay.
5  Q  Okay. And P10- contains a reference to a newspaper
6  article in the Ketchikan Daily News.
7  A  Um-hmm.
8  Q  Were you interviewed for that article?
9  A  Oh, yes.
10 Q  Okay. What were the subjects that came up during the
11 interview?
12 A  Basically just -- just Ms. Thomas' employment.
13 Apparently someone had called the -- the newspaper, you
14 know, complaining about her working out of state and it
15 was -- it was a very interesting conversation with the
16 newspaper. As Ms. Thomas and I both know, neither one of
17 us like to -- like to work with the newspapers.
18 Q  Okay. And so, you were called by a reporter?
19 A  Yes.
20 Q  And what was the name of the reporter?
21 A  Let's see, probably Joanna Markell. Yeah, Joanna
22 Markell, I'm sure.
23 Q  Okay. What did the reporter tell you about the
24 reason for her call and the interview?
25 A  She just said that it had been reported to her that,

Page 57

1  you know, we were still paying a former HR Director, you
2  know, to do work, you know, and why was that allowed, you
3  know, to live out of state and to work away from the
4  office? And it was -- it was pretty specific, pretty
5  pointed.
6  Q  Okay.
7  A  I do have to say that this article caused me a lot of
8  grief, but that's okay.
9  Q  Why did the article cause you grief?
10 A  Oh, just -- just the concept in the community of
11 allowing somebody to work, you know, outside the area, and
12 to not -- not be at the office.
13 Q  Okay. Did the newspaper article generate some
14 political pressure on you?
15 A  I think that would be a fair assumption, yes.
16 Q  And what was the reason for the pressure, to your
17 understanding?
18 A  Well, just basically, that the public was getting,
19 you know, the heat, because the Assembly was already aware
20 that, you know, she was doing the -- doing the union
21 contracts, you know, from her -- you know, from down there
22 and finishing those up, but it had not been, you know,
23 widely publicized, you know, it was just -- it caused some
24 concern among the Assembly, you know, that we were even
25 doing that much. But I think they were all okay with it,

# EXHIBIT 11

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

    Plaintiff,

    v.                         Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
    Defendants.
_____/

DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                Terry Venneberg
                1126 Highland Avenue, Suite 101
                Bremerton, Washington  98337

FOR THE DEFENDANTS:

                Mark A. Sandberg
                Sandberg, Wuestenfeld & Corey
                701 West 8th Avenue, Suite 1100
                Anchorage, Alaska  99501

Page 58

1  long as they knew that, you know, everything was going
2  to stop when the union contracts were ratified.
3  Q  Okay. The article says in the second paragraph, she
4  -- referring to Ms. Thomas -- is working full-time for the
5  Borough and is responsible for finishing union contract
6  negotiations and updating Borough job descriptions. Was
7  that something that you told the newspaper?
8  A  I don't (word indiscernible) telling them about
9  updating the Borough job descriptions. I know that we had
10 been talking about what we were doing here, doing --
11 updating Borough job descriptions. And again, I don't
12 believe everything I read in the papers, I learned that a
13 long time ago. But there may have been some
14 misunderstanding on, you know, on how they interpreted the
15 conversation, you know, with their notes. But I don't --
16 I don't believe that that was stated in the way they had
17 this stuff.
18 Q  Okay. So, is it the case that you recall that you
19 didn't tell the -- the reporter that she was updating
20 Borough job descriptions, or that you just don't recall
21 whether you did?
22 A  I don't think I did. I don't think I would have done
23 that, because that was not my understanding at the time.
24 Because we were doing that in-house, Mr. Corporon and
25 myself and several others had been in the process of

Page 59

1  updating job descriptions and -- and, you know, looking at
2  various ones that needed updating. So, that's why I think
3  that they might have had something --something a little
4  wrong here, because I just don't believe I would have said
5  -- you know, made that statement.
6  Q  Okay. And then it goes on, I think, in the fourth
7  paragraph to say, Eckert said the Borough is, quote, still
8  evaluating where we want to go with the Human Resources
9  position, but things are working well.
10 A  Right.
11 Q  Did you tell the reporter that?
12 A  Absolutely.
13 Q  Okay.
14 A  Absolutely. Because we were still evaluating whether
15 or not we wanted to do -- you know, hire someone, you
16 know, back, you know, to fill that position. But with
17 Steve working on the majority of things and Holly still
18 doing what she did daily, things were working well.
19 Q  Okay. So, when the article says that you -- you told
20 the reporter things were working well, that was an
21 accurate.....
22 A  Yes.
23 Q  .....statement?
24 A  Yes.
25 Q  We're going to turn to KB340. Okay. And do you

Page 60

1  recognize KB340 and then 341?
2  A  Let's see, this would be -- okay, yeah, agenda
3  statement, motion to recess to executive session to
4  discuss Carolyn's -- basically, I won't say Carolyn's,
5  Human Relations Manager position, yeah.
6  Q  Okay. And was this a document that you drafted?
7  A  Let's see, I know I did the summary statement, but on
8  the first page, let's see -- I got -- on the second page,
9  I think a lot of this is pretty much standard language.
10 Obviously, change the names for discussing executive --
11 you know, personnel matters. So, yeah, for the most part
12 I did it.
13 Q  Okay. And this agenda statement was a staff
14 recommendation to the Borough Assembly as to a motion they
15 should consider, is that right?
16 A  I think at the time -- I would have to go back and
17 see if I could find anything on this -- I think the
18 Assembly had asked for discussion on it, and most
19 personnel issues we really want to move into executive
20 session, because you never know what's going to happen
21 and, you know, what could be said. So, I don't believe
22 this was put forward by the staff. I -- it would probably
23 have been a request like -- my recollection would be it
24 would be a request either from the Mayor or an Assembly
25 member or two.

Page 61

1  Q  Okay. And you said you drafted the summary
2  statement?
3  A  Pretty much. The language -- most of the language on
4  the second page is kind of standard language we probably
5  used from other HR or personnel sessions that we would go
6  into executive session. And there might have been some
7  fine-tuning with myself and/or the Attorney, or someone,
8  but yeah, it was probably mostly me.
9  Q  Okay. And the summary statement starts at the
10 Assembly meeting of July 18, 2005, several Assembly
11 members asked questions regarding the employment status of
12 the Borough's Human Relations Manager, Carolyn Thomas, and
13 the Borough's plans for providing for Human Relations
14 functions in the future.
15 A  Right.
16 Q  Now, this reflects that as of August 1, 2005, Ms.
17 Thomas continued to hold the Human Relations Manager
18 position, is that right?
19 A  She had the title. And then she was -- this would
20 have been August 1 -- just about the time we were -- well,
21 we hadn't totally completed, I believe, the negotiations.
22 Hadn't ratified them, at that point.
23 Q  Okay. And the -- the recommended action -- I want to
24 go down to the recommended motion. Was this -- the
25 recommended motion, was that one that you recommended?

# KETCHIKAN GATEWAY BOROUGH
## AGENDA STATEMENT

NO _____

MEETING OF **August 1, 2005**

| ITEM TITLE | REVIEWED BY |
|---|---|
| Motion to recess to executive session to discuss the employment status of the Ketchikan Gateway Borough Human Relations Manager.<br><br>SUBMITTED BY Borough Manager Roy Eckert<br>CONTACT PERSON/TELEPHONE<br><br>Roy Eckert   228-6625<br>NAME         PHONE | [ ] ____ PLANNING COMMISSION<br>[ ] ____ COMMITTEE - *<br>[X] ~~SEE~~ LEGAL<br>[ ] ____ FINANCE<br>[ ] ____ OTHER<br><br>REVIEWED FOR SUBMITTAL<br><br>_____<br>BOROUGH MANAGER |

**SUMMARY STATEMENT:**

At the Assembly meeting of July 18, 2005, several assemblymembers asked questions regarding the employment status of the Borough's Human Relations Manager, Carolyn Thomas, and the Borough's plans for providing for Human Relations functions in the future. The Borough Attorney suggested that this discussion be conducted in executive session rather than open session. The Assembly discontinued the discussion and the Mayor directed that an executive session be placed on the agenda for August 1, 2005, to discuss the topic.

Summary Statement Cont'd on page 2:

**RECOMMENDED ACTION:**

Staff recommends that if an executive session is convened on this topic it be convened under KGB Code Section 5.31.080(b)(1)(a), matters, the immediate knowledge of which would clearly have an adverse effect upon the finances of the Borough and (B)(2)(b), discussion of potential claims, specifically claims which could be asserted if the Borough were to take adverse employment action regarding Ms. Thomas's employment status and the likely outcome of those claims.

| FISCAL NOTES | | | |
|---|---|---|---|
| [ ] N/A | EXPENDITURE REQUIRED $ | AMOUNT BUDGETED $0 | APPROPRIATION REQUIRED $ |
| EXHIBITS ATTACHED | | | |
| [X] RESOLUTION<br>[ ] PLAN/MAP | [ ] ORDINANCE<br>[X] REPORT | [X] CONTRACT<br>[ ] LIST | [ ] MINUTES<br>[X] OTHER letters |

**RECOMMENDED MOTION:**

KB 340

"I move to recess into executive session for the purpose of discussing Human Resources function pursuant to KGB Code Section 5.31.080, matters the immediate knowledge of which may adversely effect the finances of the Borough and potential claims in the event that the Borough were to take adverse employment action regarding Ms. Thomas."

EXHIBIT 11
Page 3 of 4

**Summary Statement Cont'd:**

Executive sessions may be called for various purposes and the rules may vary slightly based upon the topics to be discussed in executive session. For example, if the purpose of the executive session is to discuss the performance of Ms. Thomas or any allegations of misconduct attributed to her, then the appropriate basis for an executive session would be under KGB Code Section 5.31.080(B)(1)(b), to discuss subjects that tend to prejudice the reputation and character of any person provided that the person may request a public discussion. If this is the basis for which an executive session would be held, Ms. Thomas would be entitled to notice of the potential executive session and the opportunity to require that the session be held in public.

As recently communicated in materials regarding executive session provided by the Borough Attorney's office, there are arguments that may be made that the rights of a person to attend an executive session at which there reputation or character may be discussed extend only to the requiring the session be held in the open and do not entitle the person to be present if waive the open discussion. The Borough's past practice has been to afford the individual an opportunity to attend the closed session. Staff recommends that if the purpose for the executive session is for character and reputation discussion, and Ms. Thomas does not insist upon an open session, that she be permitted to attend.

If on the other hand the executive session is not to discuss Ms. Thomas's actions or performance, but rather is to discuss potential Borough liabilities in the event that the Borough were to take an improper or unjustified adverse employment action against Ms. Thomas, then the appropriate basis for the executive session would be KGB Code Section 5.31.080(B)(2)(b), to discuss potential or pending litigation, claims, or enforcement actions in which the Borough or service area has an interest or 5.31.080 (b)(1)(a), matters, the immediate knowledge of which would clearly have an adverse effect upon the finances of the Borough. Under either of these basis Ms. Thomas would not be entitled to be present, nor would there be a separate obligation to provide her with notice of the scheduled executive session.

The specific basis for convening the executive session will be dictated by the nature of the discussion which is desired.

KB 341

EXHIBIT 11
Page 4 of 4