EXHIBIT 14

# KETCHIKAN GATEW... BOROUGH

Human Resources Office • 344 Front Street • Ketchikan, Alaska 99901

Carolyn Thomas, Human Resources Manager
(907) 228-6625
Fax: (907) 247-6625

August 5, 2005

```
┌─────────────────────────┐
│ RECEIVED                │
│                         │
│ AUG 0 5 2005            │
│                         │
│ Borough Attorney's Office│
└─────────────────────────┘
```

Roy Eckert, Borough Manager
Ketchikan Gateway Borough
344 Front Street
Ketchikan, AK 99901

Dear Roy,

In February of this year, I had the first of a number of conversations with you regarding my mother's health and the fact that I might have to move to Oregon. I also discussed with you the fact that for the last two summers, Darrell had gone to Oregon for several months while I had stayed in Ketchikan, and that we didn't want to do that any more. I told you that eventually we would be moving to Oregon but that I needed to keep working for now. I do not remember exactly how it was presented, but some time in April while we were discussing my employment, you agreed to let me continue with my position as Human Resources Manager from Oregon. We agreed that with today's technology (phone, fax and computer) it was not necessary for me to be in Ketchikan all the time, but that I could commute back and forth when my presence was required in Ketchikan. I thanked you for the accommodation and told you how much I appreciated being allowed to continue with my job. You told me to let Greg Bjork know that I would need a laptop computer.

Over the course of the next couple of weeks, I let people know that I would be performing the duties of Human Resources Manager from Oregon, that I would have my same e mail address and my cell phone and that once I had my new phone number, I would notify them. I also spoke with some of our assembly members during that time, and let them know what I was doing. By the time I was ready to leave, it was common knowledge that I would be doing my job from Oregon.

On June 6, I worked until early afternoon and left for Seattle on a 5 o'clock jet.

On June 7, I was advised that in staff meeting that morning, you had announced I would be working on union contracts and job descriptions and my job would end the first of July. I was subsequently told that you informed people I had resigned. I was also told that you had told people you had discussed the occupation of my office with me and that I had recommended Lisa Machado occupy that office after I left, when, in fact, at the time I left town, Gisele Denton was the one who was going to be in that office. I was told you had informed supervisors that Lisa and Holly would be sharing Human Resources duties. I have been told that you offered my job to Eugene Martin. I have been told that you said I was working on special projects.

After being told all of these different things by several different employees, I called you. You assured me I had my job as long as I wanted it. I was absolutely shocked when you asked me if I had taken the personnel files. You told me that Mike Salazar was the one who had set the July 1 date for my resignation and that he was the one who had asked if I had taken the personnel files, so I called Mike. He told me he hadn't said anything of the kind. He also told me that he probably wouldn't have allowed me to keep my job indefinitely while I lived in Oregon because he didn't think it would work very well, but that he wasn't the borough manager, and it wasn't his call. You told me you hadn't told anyone I had resigned, that they had misunderstood, but several employees told me you had announced that I had resigned. I was also told that you had said I gave you a letter of resignation. I don't understand why you would have said that when you know that is just not true.

Toward the end of June, I was told that Eugene Martin had been directed by you to reopen negotiations with the bargaining units. Since negotiations had never been closed, I called Eugene to find out what was going on. He told me he was just doing what he was told to do. I told him I understood that. He asked me to bring him up to speed on negotiations and I told him it would not be necessary to do that because I was still Human Resources Manager and I would be completing negotiations.

Page 1

EXHIBIT 14
Page 1 of 4

KB 319

By this time, I had heard one rumor after another, yet when I asked you about them, you always told me it was a misunderstanding or you had not said it. You did, however, in one conversation, tell me that when I left, you had no idea how long I would be gone. I told you I would come back to Ketchikan any time my presence was needed. You said, "Well, when you left, I really wasn't sure what you were doing. I really wasn't." I replied to that absurdity by saying that we had certainly had enough conversations on the subject and how to make this arrangement satisfactory, that I knew you certainly did know what I was doing and that I was doing it with your approval. When you did not respond, I chalked your answer up to pre-occupation with your upcoming evaluation.

During all of this, I was receiving phone calls every day from employees who wanted to know if I was coming back to Ketchikan. I would explain the agreement to them and they would say, "Roy said you resigned." or "Roy said you are finished the end of June." Or "Roy said Lisa Machado is taking over Human Resources."

On June 29, 2005, I sent an e mail to all supervisors of the borough telling them I was still Human Resources Manager, that I was working out of Oregon and gave them my contact numbers. I told them that the purpose of the memo was to dispel the rumors that were circulating through the borough offices.

On July 1, 2005, I tried many times to contact you by phone to discuss union contracts with you. You either answered and said you were busy or you were not answering your phone, so I sent you an e mail.

On July 5, I was finally able to make phone contact with you and I explained that I had two bargaining units ready to take a contract to their members and I thought they could be ready by the first assembly meeting in August if that was what you wanted me to do. You told me you did not want the contracts or the job descriptions I was working on completed until September 30, because that was right before your evaluation. (Last week, you asked Holly if she had any of the new job descriptions. She didn't, because you had told me not to complete them until September 30.) You also told me not to discuss your request for delay with anyone. I sent you an e mail confirming your request. Your reply to me was quite upsetting and offensive. You basically accused me of trying to go around you and the Borough Attorney and take language straight to the Assembly. I was shocked by your response, and when I replied to your e mail I communicated that to you. Your reply to my reply was anything but pleasant. You also criticized me for sending the e mail to the supervisors and told me that correcting e mails were your "period of pervue". That was the first time you had mentioned anything about the memo. I was very surprised by the unpleasant tone of your e mail. I replied to you and said that because I was writing the e mail about myself, I had certainly not considered it offensive. In your e mail to me, you said that my e mail to supervisors had raised the rumors to an annoying level.

On July 15, 2005, I called to discuss something with Holly and she told me that you wanted to talk to me because Joanna Markell had been in. I spoke with you and you told me you didn't think I should talk to her because you didn't know what she wanted, but it was up to me. I received a voice mail from Joanna and after giving it some thought, returned her call as I felt refusing to acknowledge her would lead her to believe that I had something to hide. I subsequently e mailed you the gist of our conversation when I could not reach you by phone. I also told you that I had called Dick Burton and asked him why he had gone to the newspaper, since he knew before I left Ketchikan what I was going to do. He told me it was because he had been told Lisa Machado was replacing me and he didn't want someone unqualified in that position. The article was published in the July 16-17 Ketchikan Daily News. That is when I learned that you had told her the borough was "... still evaluating where we want to go" with the Human Resources position. That was certainly news to me. In an e mail to me, you told me that because of the newspaper article, your whole day had "been in the toilet".

The morning of Tuesday, July 19, I received another call from Joanna Markell. That is when I learned that you had told the Assembly my job would be finished August 1. That is also when I learned that I had been discussed the night before at the Borough Assembly meeting and that there was going to be an executive session on the agenda for the August 1 assembly meeting to discuss my position. Because my first knowledge of this came from the newspaper reporter, I told her I really couldn't comment because it was news to me. She apologized for being the one to tell me and our conversation was concluded.

On July 20, I e mailed a travel authorization request to Holly Rosendin. Since my position was being discussed at an assembly meeting, I certainly felt I had the right to be there. You denied my request, but you never discussed it with me. I now realize you probably didn't want me at that meeting.

Page 2

EXHIBIT 14
Page 2 of 4

In the subsequent days, in the course of addressing a disciplinary matter with the Public Works Director, I discovered that you had told the supervisors not to discuss personnel issues with me. This was the same supervisor who, earlier, had e mailed me regarding a personnel issue. I had e mailed back (and discussed the issue by phone) and advised him of the correct course of action. He had responded with an alternate method that deviated greatly from our past practices. I had e mailed him again and explained why we needed to follow our usual procedures. Some time later, I learned that he had, in fact, handled the matter the way he wanted to and not the way we had always handled those kinds of problems. I now realize that he probably did that with your blessing, but you had not advised me you had removed those responsibilities from my job duties. That was somewhat of a shock. Personnel issues are an integral portion of my job duties.

Although you denied my travel request, I made my own arrangements and arrived in Ketchikan around 5:00 pm on August 1, and arrived at the Borough Assembly meeting during public comments. Because you had refused to even communicate with me regarding this issue, I had not informed anyone that I would be coming to town. During the first break, while I was visiting with some people, you walked back and said, "Are you in town for a few days?" I replied that I was. You then asked, "Are you coming in in the morning?" I replied that I was. That was the extent of our conversation.

On August 2, I spent approximately an hour and a half in your office talking with you. We discussed all kinds of borough issues, but nothing about my job. I finally asked you what the big hoorah was about my being in Oregon. You did not bring it up. You told me to think about coming back. I reminded you that I had moved with your permission and had I not had your permission to keep my job while living in Oregon, I would not have moved. You said, "You heard the Assembly. They are going to make you come back." I then read to you the responsibilities and authority of the Borough Manager. I told you that I worked for the Borough Manager, not the Borough Assembly and that my agreement had been with you. You told me everything had changed. Because it was lunch time, our conversation ended and to date, you have made no attempt to engage me in conversation again, although I have now spent three full days in the Reid Building. I have learned in those three days that I was discussed in staff meeting again, and that you allowed and participated in the discussion. I understand that at your direction, personnel matters are now to be handled by Steve Corporon. I have also learned that you told Steve Corporon you had given me two weeks to return to Ketchikan. That is simply not true.

I left Ketchikan with a clear understanding that I would continue as Human Resources Manager of Ketchikan Gateway Borough while living in Oregon until I resigned or was terminated for cause. Although I now realize I should not have taken your word for it and that I made a serious error in not requiring something in writing, I do believe any reasonable person would agree that, in fact, a verbal agreement is a contract, and as such cannot just be ignored, or in this case, be denied by you. If I did not have your permission to continue my employment, why would I move to Oregon without resigning? If I did not have your permission to continue my employment while living in Oregon, why would you tell Greg Bjork to order me a laptop computer and why would you approve the purchase? I would not need one unless I was traveling back and forth. If I did not have your permission to continue my employment while living in Oregon why would I tell other employees that I did?

Although I have given your change in attitude extensive thought, I fail to understand why you have said the things you have said and why you have denied agreeing to my continued employment while living in Oregon. I do not understand why you announced in staff meeting that I would be finished July 1. I do not understand why you announced to the Borough Assembly that I was concluding union negotiations and would be finished by August 1 when you had told me to "hold off" on the contracts until September 30. I do not understand why you have removed most of my job duties without ever discussing it with me, before or after you did it. I do not understand why, when I asked you about some of the things I was being told you had said, you denied having said them. I do not understand why you would not take my phone calls or call me back. In the two months I have been in Oregon, you have called me a couple of times and e mailed me a couple of times. (I have enclosed the e mails that I received from you.) That can hardly be considered communication.

You have made it impossible for me to do my job by assigning my job duties to other employees, most of whom are not qualified to handle human resources issues, and have yet to notify me that you were taking these actions. Because of the comments you made about me in public, my name has been on the front page

Page 3

EXHIBIT 14
Page 3 of 4

of the local newspaper not once, but twice, in less than a week's time. You have, with your statements, harmed my reputation and character. You have discussed me in public and you have discussed me in staff meetings, and you have done it all without notifying me you were going to do it or that you did it. In fact, on Tuesday, August 2, during staff meeting, the Public Works Director closed the door so you could all discuss me and my job duties. Did it ever occur to you to include me, since I was in the building?

It has become obvious to me that for some reason, you do not want my employment as Human Resources Manager to continue. However, not having just cause to terminate me you assumed that if you caused me enough embarrassment and humiliation, and took action that made it impossible for me to function effectively as the Human Resources Manager, I would quietly resign and you would have achieved your desired result. Or maybe you felt that eventually, you could take the position that you had just cause for discharge since I was no longer doing my job. Your actions constitute harassment and are discriminatory.

I have always taken great pride in my work, and I have always done my job well. That is also true of the work I have done for Ketchikan Gateway Borough. However, an ineffective Human Resources Manager is worse than no Human Resources Manager at all. Through your actions, you have rendered me ineffective. Although I have made you aware of a number of personnel problems, they have not been addressed by the people to whom you have assigned my job duties, and I cannot address them because of your actions. Therefore, I will tender my resignation under the following conditions. If my conditions are accepted, I will sign a legal document to be prepared by the Borough Attorney waiving my right to legal action against you and the borough.

It was always my intent to work to age 65. I am now 61. I am requesting payment equal to four years at my current rate. My current annual salary is $57,308.

$57,308 x 4 = $229,232.

Termination of my employment will prevent me from becoming vested in PERS, and will result in my insurance being terminated. I am requesting payment equal to four years at the cost of benefits currently being paid on my behalf. My current annual benefit total is $24,219.

$24,219 x 4 = $96,876.

Total:  $229,232 + $96,876 = $326,108

The amounts stated above represent the amount payable to me after taxes have been paid, and represent full and final settlement of this matter.

Because I am well aware that you put things off rather than make a decision, I will require a reply by 4:00 pm on Friday, August 5, 2005. I reserve the right to announce my resignation and strongly suggest that you not discuss this letter with other employees. Even under your new arrangement, confidentiality of personnel issues is still the law.

In the event that my proposal is not accepted, I will continue my employment as Human Resources Manager while living in Oregon. I will have no choice but to retain legal counsel and pursue my claim against you, personally, and against Ketchikan Gateway Borough.

Sincerely,

Carolyn L. Thomas

cc:  Scott Brandt-Erichsen, Borough Attorney
Encl:  e mails

Page 4

EXHIBIT 14
Page 4 of 4

KB 322

EXHIBIT 15

# KETCHIKAN GATEWAY BOROUGH
Office of the Borough Manager - 344 Front Street - Ketchikan, Alaska  99901

Roy Eckert
Borough Manager
(907) 228-6625
Fax: (907) 247-6625
mgr@borough.ketchikan.ak.us

# MEMORANDUM

DATE:       August 5, 2005

TO:          Carolyn Thomas

FROM:      Roy Eckert, Borough Manager

RE:          Work Location

On Tuesday, August 2nd, we discussed the confusion surrounding your working from your mother's home in Oregon. As we discussed, there are differences of opinion as to who said what and when, but that is not the subject of this memo.

During the Assembly Meeting on Monday, August 1, a statement was made by one Assembly member that there needs to be a policy or other form of official statement regarding work location requirements for all Borough employees, and it is in the manager's purview to make sure it happens. This is not the sole result of your working outside of the Borough - there have been other similar situations in the past that have been controversial, such as but not limited to, the former chief planner working from his home/office several blocks from the Borough offices. As we discussed on Tuesday, I told you that the policy is going to stand that all Borough employees will live in, reside in and work in the Borough, and will work in and on Borough property. I will also be drafting an amendment to the Personnel code that reflects this policy. This is standard policy in many Boroughs, Counties and Cities all across the United States.

When I first discussed this policy with you during our meeting, I told you that to continue employment with the Borough you would have to work here in Ketchikan, and you stated that this was not acceptable. After further discussion you said you would think it over and give me a reply as to what you would do.

I am not asking for your resignation and that is not the intention of this memo, but I need to know your decision as soon as possible, in any case by no later than Friday, August 12, 2005. If you decide to continue your employment with the Borough I need to have you available for work at the Borough offices on or before September 1st. If you elect to resign rather than return to work on September 1, 2005, you will be paid through that date as well as ant payments called for in the code. If there is a situation with your mother's health or other considerations that need to be addressed prior to your return to the Borough, please let me know what they are so they can be addressed. The September 1st time-line I feel gives adequate time to make arrangements to return to the office, and it will also allow me time

EXHIBIT 15
Page 1 of 2

KB 330

to determine adequate office space, for as you know office space is a constant problem here in the Borough.

I want you to know that I have repeatedly stated to staff and the Assembly that due to your efforts that we are in better shape with our union contracts than we have ever been, and have no grievances pending that I am aware of. That is a fact, and one that I will stand on. I feel that your efforts have been exemplary and we can be proud of your accomplishments here.

To avoid confusion, please acknowledge receipt of this memo, and keep a copy for your files.

*Roy Eckert*

Roy Eckert
Borough Manager

Received: _Aug 5, 2005     3:45P_

Date: _[signature]_

*reply delivered Aug 5, 2005*
*4:20 P*

EXHIBIT 15
Page 2 of 2

KB 331

EXHIBIT 16

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

    Plaintiff,

    v.                 Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
    Defendants.
_____/


DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

               Terry Venneberg
               1126 Highland Avenue, Suite 101
               Bremerton, Washington  98337

FOR THE DEFENDANTS:

               Mark A. Sandberg
               Sandberg, Wuestenfeld & Corey
               701 West 8th Avenue, Suite 1100
               Anchorage, Alaska  99501

EXHIBIT 16
Page 1 of 2

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 66

1  Q  And you don't know the date of the conversation?
2  A  No.  It probably would have been at least a week,
3  maybe a week and a half prior to the 1st.
4  Q  Okay.  Did you make any notes about that
5  conversation?
6  A  If I did, I would have given them to our Attorney and
7  he would probably have a copy of them.  But I do know that
8  -- that as a result of that, I did talk with our Attorney.
9  Q  Okay.
10  A  So, I don't know that I made any notes.
11  Q  So, as of the preparation of this agenda statement
12  for the meeting of August 1, 2005, you weren't
13  contemplating ending Ms. Thomas' employment with the
14  Borough.  Is that your testimony?
15  A  Well, again, it goes back to -- I've always said, my
16  understanding was she was -- she was done.  According to
17  her letter, you know, she says she wasn't.  And so, I
18  think at that point in time it was an okay, where are we?
19  But to answer -- the short answer to your question is, no.
20  Q  Now, the summary statement goes on, on KB341, in the
21  third paragraph on page.  It says, if, on the other
22  hand, the executive session is not to discuss Ms. Thomas'
23  actions or performance, but rather is to discuss potential
24  Borough liabilities in the event that the Borough were to
25  take an improper or unjustified adverse employment action

Page 67

1  against Ms. Thomas, then the appropriate basis for the
2  executive session would be KGB Code § 531.080(b)(2)(B) to
3  discuss potential or pending from litigation claims or
4  enforcement actions in which the Borough or service area
5  has an interest, or 531.080(b)(1)(A), the immediate
6  knowledge of which would clearly have an adverse affect
7  upon the finances of the Borough.  So, when the summary
8  statement refers to potential Borough liabilities, in the
9  event the Borough were to take an improper or unjustified
10  adverse employment action against Ms. Thomas, you don't
11  know what improper or unjustified adverse employment
12  action is being referred to, there?
13  A  No, I do not.
14  Q  And it's still your testimony that as of the drafting
15  of this agenda statement that you were in no way
16  contemplating terminating Ms. Thomas' services?
17  A  Right, because I was still -- still arguing with her,
18  the fact that she had resigned and she knew that when
19  those union contracts were finished, she was done, so
20  there would be no need for any termination.
21  Q  Okay.  If Ms. Thomas had already resigned, what
22  adverse employment action could that be referring to, in
23  your view?
24  A  In my view, the only thing that this could possibly
25  be referring to would be if, again, with her letter that

Page 68

1  she wanted to file a wrongful termination, or something
2  like that.  You know, just -- if we said, okay, we're
3  going to just fire you and, you know, just get it over
4  with, which again was not my position, because I'm -- I
5  will still say and I will always maintain, she resigned.
6  And so, should that action be taken, either by me or by,
7  you know, the Assembly, you know, saying you know, hey, do
8  this, although they don't have the authority to do it,
9  they'd have to order me to do it, that there would be some
10  -- some wrongful termination action.
11  Q  Okay.
12  A  And let me add there, whether it's justified or not.
13  Q  Okay.  Now, this -- the motion to recess to executive
14  session to discuss the employment status of the Ketchikan
15  Gateway Borough Human Relations Manager.....
16  A  Um-hmm.
17  Q  .....that motion didn't pass, did it?
18  A  I would -- you know, are the minutes there?  I don't-
19  Q  If you could turn to P94, and these are part of
20  the.....
21  A  Okay.
22  Q  .....minutes for August 1, 2005.  Does that reflect
23  that the motion to go into executive session to discuss
24  the employment status of the Ketchikan Gateway Borough
25  Human Relations Manager was rejected?

Page 69

1  It was rejected.  The motion failed.
2  Q  Okay.  And did you have an understanding as to why it
3  was rejected?
4  A  Let see -- no, I think the -- the Assembly a lot of
5  times -- the Assembly we currently have does not like to
6  go into executive session for very many reasons.  And
7  again, I think this is one issue that they were probably
8  wanting to pretty much stay away from.
9  Q  Okay.  Well, you have recommended that they go into
10  executive session to discuss this, is that right?
11  A  Right.  But I think that was at the direction of --
12  what was that document number?  That -- that agenda item?
13  Q  KB340.
14  A  Okay.  If I remember right, I think that was -- yeah,
15  several Assembly members had asked questions regarding the
16  employment status, and they wanted to discuss that.  And
17  any time a personnel issue, an HR issue comes up, we
18  always direct that to be, you know, an executive session.
19  We don't like to discuss an employee's status their --
20  you know, where they are with their position, their
21  employment.  So, that's pretty much standard.  If they
22  want to discus it, we want to give the employee all the --
23  all the option of having it into an executive session.
24  Q  Okay.  But, in fact, they didn't want to discuss it
25  that night?

EXHIBIT 16
Page 2 of 2

18 (Pages 66 to 69)

EXHIBIT 17

# TITLE 30
# PERSONNEL

## Chapter 30.20—Recruitment and Selection of Employees

**Sections:**

30.20.005    Recruitment, position vacancy announcements and applications.
30.20.015    Selection of employees.
30.20.016    Residency.
30.20.017    Nepotism.
30.20.018    Probationary period.

### 30.20.005. Recruitment, position vacancy announcements and applications.

(a)    The borough manager shall recruit qualified applicants for any position vacancies, which recruitment may include, but is not limited to, internal job postings, help-wanted advertisements, or employment agencies. The vacancy may be advertised to the public concurrently with in-house postings. When a qualified regular employee applies for any borough position they shall be afforded the opportunity to be interviewed for the opening. However, the borough will strive to fill any and all vacancies with the most qualified candidates.

(b)    Published announcements of position vacancies shall include the title of the position, the application deadline (if any), instructions for obtaining application forms, the place and manner of filing applications, other pertinent information, and any such information as may be required by law. All such announcements shall state that the borough is an "equal opportunity employer", and shall be published for a period of not less than seven (7) days prior to the application deadline.

(c)    When determined by the borough manager as advantageous to the borough, any position recruitment period may be authorized and advertised to be "open until filled". Further, when determined by the borough manager to be advantageous to the borough, an active registry may be developed to help keep frequently vacated positions filled.

(d)    All applications for positions shall be made on a form provided, or in the manner required, by the borough manager. Any information submitted on the form, or any other required documents, may be verified and investigated prior to appointment by the appointing authority to the extent necessary to determine the applicant's qualifications for appointment. The applicant shall authorize in writing, any investigation necessary to verify the information provided to by the applicant, including reference checks. The supplying of false or misleading information as part of an application or the omission of any material information from an application for employment may be grounds for rejection of the applicant or later removal of the employee.

(e)    In addition to the application requirements outlined in subsection (d) of this section all persons who have been offered positions with the borough shall be required to complete an immigration form and present evidence that they are eligible to be employed in the United States, in accordance with the requirements of federal immigration statutes and regulations. Failure to comply with these requirements, or ineligibility for employment under federal law, shall result in the withdrawal of the offer of employment, and in the case of a person who has become employed, constitutes independent and sufficient grounds for termination of employment.
(Ord. No. 956B, §1, 5-1-95; Ord. No. 1172, §1, 2-20-01)

### 30.20.015. Selection of employees.

(a)     The borough manager shall establish procedures for the initial selection or promotion of employees. All selection procedures and rules shall relate to the applicant's or employee's merit, fitness, and ability to perform the duties and responsibilities of the position to which the applicant or employee seeks appointment or promotion. Experience and training may be considered when evaluating an applicant's or employee's fitness for a particular position. Drug testing requirements set forth by any state or federal law will be followed if applicable.

(b)     Selection procedures may include examinations which measure the applicant's or employee's job-related ability, knowledge and skills. The appropriate form of each examination shall be determined by the borough manager and may include, but need not be limited to, oral, written, graded, pass-fail tests, resume analysis, employment references, reports of supervisors, performance evaluations and work sampling. Any setting of minimum qualifying scores or standards for any required examinations will be stated prior to announcing and recruiting. All selection procedures shall comply with section 30.30.015 of these policies and other applicable laws.

(c)     Depending upon the particular job offered, a physical examination may be required after offer of employment is made. Any physical examination so required must be completed by a qualified health care provider before an applicant is appointed or an employee is promoted to a particular position. Any minimum medical and physical standards which relate to the essential duties and responsibilities of a particular position will be defined in the job description. The standards may differ based on the essential duties and/or responsibilities of each position. No appointment or promotion shall be effective until the applicant or employee demonstrates satisfaction of any required minimum medical or physical standards. Failure to meet the required minimum standards shall result in disqualification for appointment or promotion to the position.
(Ord No. 956B, §1, 5-1-95)

### 30.20.016. Residency.
Residency within the borough shall not be a condition of initial appointment or continued employment, except as otherwise required by state law, the borough Code of Ordinances or resolution; provided, however, that an employee's residence location shall not interfere with the daily performance of an employee's duties and responsibilities. (Ord. No. 956B, §1, 5-1-95)

### 30.20.017. Nepotism.
No person shall be employed who is under the direct or indirect authority of a supervisor, director or manager who is the spouse of or is related by blood or marriage within and including the second degree of kindred, or is a member of the immediate family of the supervisor, director or manager as defined in section 5.37.020(a)(8). No spouse of or relation by blood within and including the second degree of kindred, or is a member of the immediate family as defined in section 5.37.020(a)(8), of the borough manager or assistant borough manager may be employed without prior approval of the borough assembly. (Ord. No. 956B, §1, 5-1-95; Ord. No. 970, §4, 5-20-96)

### 30.20.018. Probationary period.

(a)     The probationary period shall be considered an integral part of the employee selection and examination process. During the probationary period, the employee's supervisor shall review, examine and monitor the conduct, capacity, efficiency, skill, responsibility, integrity, and effectiveness of the employee to determine whether the employee is fully qualified for employment in the classification and position to which the employee has been appointed.

(b)     All employees, except the borough attorney, the borough clerk, and the borough manager appointed to regular positions with the borough, are on probation.

Chapter 30.20
3/2002

Page 2 of 3
EXHIBIT 17
Page 2 of 3

Ketchikan Gateway Borough
Code of Ordinances

P00180

(c)    If at any time during the probationary period the probationary employee does not satisfactorily meet the requirements of the job for any reason, the probationary employee may be terminated from that position. At management's option, the supervisor may propose the use of section 30.20.018(h). If retained after six (6) months in the same position, such employees shall thereafter be considered a regular employee.

(d)    During the probationary period described in section 30.20.18, the employee is not covered by section 30.30.040 or 30.30.041 of these personnel policies and has no right to appeal a suspension without pay, demotion or removal.

(e)    Any employee who is promoted shall be given a reasonable trial period, not to exceed sixty-five (65) days, to become acquainted with the job and to demonstrate ability to fill the job satisfactorily. If, during this trial period, the employee demonstrates unsatisfactory ability for the job or at the employee's request, the employee shall be returned to the employee's former job without loss of benefits. If an employee accepts a position vacated by an employee who has been promoted or transferred, the appointment shall be conditioned upon the successful completion of the promoted or transferred employee's trial period.

(f)    A probationary employee is not and shall not be considered to be a temporary employee. Temporary employees are not eligible for group insurance, paid annual leave, paid sick leave, holiday pay, personal days, or pay increases. Up to three (3) months of time served as a temporary employee may be counted toward the employee's six-month probationary period.

(g)    Hours of work shall be specified by job title. The number of hours of work may vary for different positions, but shall be uniform for all employees within the same job title.

(h)    After written evaluation and upon written mutual agreement among the employee, the employee's supervisor and the manager, the probationary period of a new employee may be extended for up to one additional period not to exceed ninety (90) work days. Upon successful completion of the extended probationary period, the employee shall thereafter be considered a regular employee.
(Ord. No. 956B, §1, 5-1-95; Ord. No. 1095, §§1--3, 4-5-99)

Chapter 30.20
3/2002

Page 3 of 3
EXHIBIT 17
Page 3 of 3

Ketchikan Gateway Borough
Code of Ordinances

P00181

# EXHIBIT 18

KETCHIKAN   GATEWAY   BOROUGH
AGENDA STATEMENT

NO _*9h*_

MEETING OF September 6, 2005

| ITEM TITLE | REVIEWED BY |
|---|---|
| AN ORDINANCE OF THE ASSEMBLY OF THE KETCHIKAN GATEWAY BOROUGH, ALASKA, AMENDING PORTIONS OF KETCHIKAN GATEWAY BOROUGH CODE 30.10.011; 30.20.016 REGARDING BOROUGH EMPLOYEES RESIDENCY REQUIREMENTS; 30.30.036 REGARDING WORK SCHEDULING, AND 30.30.038 REGARDING WORK LOCATIONS; AND PROVIDING FOR AN EFFECTIVE DATE. | [ ] ____ PLANNING COMMISSION<br>[ ] ____ COMMITTEE - *<br>[X] ____ LEGAL<br>[X] ____ FINANCE<br>[ ] ____ OTHER _____ |
| SUBMITTED BY Assistant Borough Manager<br>CONTACT PERSON/TELEPHONE<br><br>Steve Corporon  228-6625<br>NAME          PHONE | REVIEWED FOR SUBMITTAL<br><br>_____<br>BOROUGH MANAGER |

SUMMARY STATEMENT

At the assembly meeting of August 1st, 2005, some assembly members expressed interest in considering an ordinance to set out a clear statement of policy regarding residency of Borough employees . Ordinances requiring employees to be residents of the political jurisdiction in which they work are not uncommon, and may be found in a number of communities around the country. Generally the equal protection clause will require that a restriction on the right of employees to live where they wish be justified by a policy which serves a public interest and which is important enough to justify the restriction on the private right. The public interest in this instance must be shown to have a rational relationship to a legitimate governmental purpose.

**Summary Statement Cont'd on Page 2:**

**RECOMMENDED ACTION:**

**Staff recommends introduction of Ordinance 1369.**

| FISCAL NOTES | | | |
|---|---|---|---|
| [ ] N/A       EXPENDITURE | | AMOUNT | APPROPRIATION |
| REQUIRED  $* | | BUDGETED  $* | REQUIRED  $* |
| EXHIBITS ATTACHED | | | |
| [ ] RESOLUTION | [ ] ORDINANCE | [ ] CONTRACT | [ ] MINUTES |
| [ ] PLAN/MAP | [ ] REPORT | [ ] LIST | [ ] OTHER * |

**RECOMMENDED MOTION:**

"I move to introduce Ordinance 1369, cause it to be published and set it for public hearing on September 19th, in City Council Chambers."

EXHIBIT 18
Page 1 of 2

## SUMMARY STATEMENT CONT'D:

Here, the Borough has several public policies served by such a requirement. First there is a public safety and health concern that employees who work in connection with fire, sewer, water or airport operations, must be able to respond within a reasonable time if called in the event of an emergency relating to public health. The Ketchikan Gateway Borough is geographically located such that an individual residing outside of the Borough would not be able to respond rapidly. Unlike communities which have contiguous road connections with other communities, the Ketchikan Gateway Borough is isolated to the extent that travel from any other community may take several hours.

Separately, unless the very nature of the work, such as lobbying in the state capital, requires absence from the Borough, efficiency of the Borough's operations requires that employees be available in the Borough offices or their normal assigned work places when on duty unless they are in another location on a temporary assignment basis. Again, the isolation of Ketchikan makes commuting from a residence outside of the Borough impractical. Third, the Borough's economic development interests include promotion of employment within the Borough. Borough employees are paid by public dollars, whether generated from the local tax payers or from grants. Expenditure of these public dollars within the Borough promotes local employment.

The proposed ordinance would allow non-residents to be hired, but would require them to establish a residence within the Borough within 3 months. It allows for a waiver based on written justification approved by the Assembly. This will allow accommodations of situations where the Borough may employ a lobbyist whose work calls for residence in Juneau or Washington D.C., or similar specialized situations.

The ordinance would also codify a policy that the routine work location of all Borough employees be in a Borough controlled (i.e. Borough owned or leased) facility. For employees who, like animal protection officers or public works employees who report to a central location each day but then travel to numerous sites, the routine work location would be that Borough facility to which they report at the beginning of a shift. By insisting upon Borough control of the site we can better maintain workplace safety. It also allows the Borough to provide better accountability to the taxpayers regarding employee attendance and work schedules.

The ordinance also adds a clarification to the work schedules in Section 30.30.036 to clearly require a written documentation of any work schedule established for an employee which differs from one of the two standard schedules. This change will assist in accountability and tracking of proper payroll calculations for employees who are assigned to a non-standard work schedule.

EXHIBIT 18
Page 2 of 2

P00109



# EXHIBIT 19

KETCHIKAN   GATEWAY   BOROUGH

ORDINANCE NO. 1369

AN ORDINANCE OF THE ASSEMBLY OF THE KETCHIKAN GATEWAY
BOROUGH, ALASKA, AMENDING PORTIONS OF KETCHIKAN GATEWAY
BOROUGH CODE 30.10.011; 30.20.016 REGARDING BOROUGH EMPLOYEES
RESIDENCY REQUIREMENTS; 30.30.036 REGARDING WORK SCHEDULING,
AND 30.30.038 REGARDING WORK LOCATIONS; AND PROVIDING FOR AN
EFFECTIVE DATE.

## R E C I T A L S

A.    WHEREAS the Assembly finds that efficient operations of the Borough workforce,
adequate supervision and worker safety concerns require that Borough employees have their
regular work places in Borough authorized facilities.


B.    WHEREAS the Assembly finds that the Borough's economic development objectives
in promoting employment in the Borough justify a requirement that Borough employees paid with
public funds reside in the Borough.

NOW, THEREFORE, IN CONSIDERATION OF THE ABOVE FACTS, IT IS ORDAINED
BY THE ASSEMBLY OF THE KETCHIKAN GATEWAY BOROUGH, ALASKA as follows:

Section I: Amendment to the Ketchikan Gateway Borough Code 30.10.011, entitled **Scope
and Applicability**, to read as follows:


**30.10.011. Scope and applicability**.

(a)    The personnel policies shall apply to all borough employees who are not subject to a
collective bargaining agreement to the extent that such coverage is not otherwise limited expressly
in these personnel policies, the Ketchikan Gateway Borough Code of Ordinances, and
employment agreements negotiated for assembly appointed employees. These personnel policies
shall apply to borough employees in a collective bargaining unit only to the extent that the section
is listed in subsection (b) of this section or the relevant code section expressly provides for
application to collective bargaining units. Sections 30.20.018, 30.30.040; and 30.30.041 of these
personnel policies shall not apply to executive level employees who serve at the pleasure of the
manager.

(b)    The following sections of this title apply to all borough employees, including those subject
to a collective bargaining unit: Sections 30.20.016; 30.20.017; 30.30.005; 30.30.021; 30.30.022;
30.30.026; 30.30.027; 30.30.028; 30.30.029; 30.30.030; 30.30.031; 30.30.032; 30.30.033;
30.30.036; 30.30.037; 30.30.038; and Chapter 30.70.

(c)    Those responsibilities which are assigned to the borough manager in this title shall be
exercised by the borough clerk for employees in the borough clerk's office and by the borough
attorney for employees in the borough attorney's office.

EXHIBIT 19
Page 1 of 4

P00110

Section 2. Amendment to the Ketchikan Gateway Borough Code 30.20.016, entitled Residency, to read as follows:

**30.20.016. Residency.** Residency within the borough shall not be a condition of initial appointment <u>or selection as an employee. However, all employees shall and as a condition of their continued employment, reside within the corporate boundaries of the Borough within three months after the later of October 1, 2005, or their date of hire. The requirements of this section may be waived on the written recommendation of the Manager approved by motion or resolution of the Assembly based on a finding that such waiver is found to enhance the efficiency or effectiveness of the Borough work force . Such recommendation shall set forth the justification for the exception and any conditions which apply.</u>[OR CONTINUED EMPLOYMENT, EXCEPT AS OTHERWISE REQUIRED BY STATE LAW, THE BOROUGH CODE OF ORDINANCES OR RESOLUTION; PROVIDED, HOWEVER, THAT AN EMPLOYEE'S RESIDENCE LOCATION SHALL NOT INTERFERE WITH THE DAILY PERFORMANCE OF AN EMPLOYEE'S DUTIES AND RESPONSIBILITIES.]

Section 3. Amendment to the Ketchikan Gateway Borough Code **30.30.036**, entitled , **Work scheduling** to read as follows:

**30.30.036. Work scheduling.**

(a)    Unless otherwise specified by job description, the borough manager may establish work hours and schedules for employees based upon the best interests of the borough and the particular needs of each department.

(b)    The job descriptions shall assign employees to one (1) of two (2) general work schedules set forth below:

(1)    Schedule A. The normal workweek shall be forty (40) hours, Monday through Friday, 8:00 a.m. to 5:00 p.m., with a one-hour lunch period. To meet the needs of the public, an emergency or other unusual circumstances, the borough manager, or a department head with the approval of the borough manager, may designate other hours of work.

When an employee is required to work in excess of forty (40) hours in any one (1) week, such time shall be paid for at the rate of time and one-half (1-1/2). All claims by employees for overtime shall be submitted to the department head. Overtime work done by employees should be performed only with prior written authorization of the department head or borough manager. Records of overtime work and payments shall be kept and maintained by the finance department and shall be public records. Unauthorized overtime will be paid, but, if determined by the department head or the borough manager to be unnecessary, may be subject to disciplinary action. Compensation time is not available and all hours of work in excess of forty (40) hours will be paid at a rate of time and one-half (1-1/2).

Regular department of transportation services employees shall work the same number of hours per subject month as other schedule A employees. Their work schedule may, however, differ from the other schedule A employees, and said work

EXHIBIT 19
Page 2 of 4                    P00111

schedules shall be determined by the director of transportation services or his designee, and the borough manager.

(2)    Schedule B. Professional or supervisory employees, or those who are assigned a work program which cannot be restricted to a schedule of specific hours, shall work the hours necessary to perform their duties without overtime compensation or compensatory leave.

[(3)](c)    A department may experiment with innovative or variable workweeks in order to meet the varying needs of the department. However, any variance from one of the two work schedules authorized by this section shall be only upon the written approval of the department head and the borough manager.

(d)[(4) ]    Each department head shall ensure that his/her department maintains proper attendance, records and that the finance department and the borough manager are notified of all pertinent leave, pay and all such other personnel actions.

Section 4. Addition to Ketchikan Gateway Borough Code. A new section of the Ketchikan Gateway Borough Code is enacted to read as follows:  Section **30.30.038** Work Location.

**30.30.038 Work Location**

Borough employees shall report to a regular work location designated by the Manager or designee. All regular work locations to which Borough employees report for work shall be controlled by the Borough, whether as a Borough owned or Borough leased facility. Where a Borough employee performs services which require movement from location to location, the regular work location shall be that designated site to which the employee routinely reports at the beginning of a shift. The provisions of this section may be waived only to the extent and upon the terms authorized by the manager in writing and approved by the Assembly by motion or resolution.

Section 5. This ordinance is effective as provided in Section 5.41.020 of the KGB Code of Ordinances.

ADOPTED this _____ day of _____, 2005.

EXHIBIT 19
Page 3 of 4



ORDINANCE NO. 1369                                                  PAGE 4

_____
BOROUGH MAYOR

ATTEST:

_____
BOROUGH CLERK

Approved as to form:

_____
BOROUGH ATTORNEY

PUBLIC HEARING DATE:_____
EFFECTIVE DATE:_____

| ROLL CALL | YES | NO | ABSENT |
|---|---|---|---|
| THOMPSON | | | |
| KIFFER | | | |
| LYBRAND | | | |
| LANDIS | | | |
| SHAY | | | |
| PAINTER | | | |
| TIPTON | | | |
| MAYOR (Tie Vote Only) | | | N/A |
| 4 AFFIRMATIVE VOTES REQUIRED FOR PASSAGE | | | |

EXHIBIT 19
Page 4 of 4

P00113

