EXHIBIT 20



# KETCHIKAN GATEWAY BOROUGH

## Regular Assembly Meeting

### September 19, 2005

**Call to Order—Pledge of Allegiance—Roll Call**

The regular meeting of the Ketchikan Gateway Borough Assembly was called to order at 5:30 p.m., Monday, September 19, 2005, by Mayor Salazar in the City Council Chambers.

PRESENT:    THOMPSON, PAINTER, LYBRAND, LANDIS, SHAY [via teleconference], TIPTON [via teleconference]

ABSENT:    KIFFER

Staff present included Manager Eckert, Assistant Manager Corporon, Attorney Brandt-Erichsen, Finance Director Houts, Public Works Director Voetberg, Airport Manager Carney, Property Manager Machado, Assistant Planner Reeve, Associate Planner/LEPC Lappin, South Tongass Fire Chief Davis, and Clerk Edwards.

**Ceremonial Matters**––*Presentations, Proclamations, Awards, Guest Introductions*        *5:31:38 PM*

Proclamation—*Family Day – A Day to Eat Dinner with Your Children*—September 26, 2005

Mayor Salazar read the proclamation and gave it to the Clerk for mailing.

Proclamation—*National Disability Employment & Awareness Month*—October 2005

Mayor Salazar read the proclamation and presented it to Kara Lunde from Southeast Alaska Independent Living. Ms. Lunde accepted the proclamation and noted that in the 2000 census 41.5 percent of persons aged 21 through 64, in the Ketchikan Gateway Borough, were unemployed. Ms. Lunde said it was a large untapped labor pool and stated Disability Mentoring Day was observed locally. She said it allowed young people the opportunity to go out and sample their dream job by job shadowing. Ms. Lunde encouraged people, along with local businesses, to participate. Mayor Salazar suggested Ms. Lunde contact the Borough Manager. In response to Assemblymember Lybrand, Ms. Lunde said she would provide statistics regarding unemployment among disabled persons.

Proclamation—*Domestic Violence Awareness Month*—October 2005

The proclamation was postponed to the meeting of October 3, 2005, because the requester was not able to attend the meeting.

**Citizen Comments**—*Comments on any topic other than scheduled public hearings.*        *5:40:36 PM*

Terry Wanzer, Historic Ketchikan, reminded the Assembly it received a small sampling of information on September 13 regarding the progress of the White Cliff Development Group. He said a public meeting was scheduled at the Civic Center on September 22, 2005. He explained the full Phase I study results would be available and a panel discussion would be held.

Gregory Vickrey, a citizen of the Borough, said a number of community members had raised concerns about the openness of the negotiations with Ted Falconer and the Renaissance Development Group for the Wards Cove site, and the exact nature of the development. Mr. Vickrey said he had a list of questions about the issue and hoped the questions could be posed to the development group during the negotiations.

- ○ Generally speaking, how viable is the latest proposal by the Falconer/Renaissance Group, and what demonstrates this viability? He said it was unclear at the meeting on August 15 how viable the plan was.
- ○ Is there an adequate business plan that has not been discussed publicly, and if so, who had seen it and was any portion of it part of the public record for people to view.
- ○ What are the market projections for the proposal? Are they based upon reality?
- ○ How successful has Renaissance Group been with other projects in the past?
- ○ If they have been successful, where? Where can the public access that evidence if it does exist?
- ○ Has the negotiating group actually contacted people at those project locations to confirm Renaissance's participation?
- ○ Why is there an appearance of a real lack of transparency in regards to the proposal?
- ○ What changes have occurred that make this proposal viable as opposed to the Gateway Forest Products failure and the Timber Products withdrawal?
- ○ What role does AMHS play in these negotiations? He said he looked forward to the information that would be forthcoming in the meeting.

Mr. Vickrey said he would provide the questions to staff. He responded to questions from the Assembly.

Mike Sallee, a citizen of the Borough, agreed with Mr. Vickrey in the need for transparency in the Wards Cove negotiations. Mr. Sallee expressed concern about the proposed rezone on property owned by Alcan Timber. He emphasized the need for an updated Borough comprehensive plan and said one of his main areas of concern was Gravina Island. Mr. Sallee said the helicopter logging on Gravina created a large mess, although it was not visible.

**Public Hearings**—*Procedure: Citizens will sign up on a sheet and testify in the order that they sign up. Citizens may present arguments in favor or in opposition; staff report update, if any; close the public portion of the hearing and the assembly deliberates and renders a decision on the matter at hand.*

*5:49:38 PM*

Ordinance No. 1368 creating the Old Homestead Road Assessment District No. 1 for the purpose of paving roads

There was no public testimony.

M/S Landis/Thompson to adopt Ordinance No. 1368.

M/S Thompson/Landis to add Recital E to say that on September 12, 2005, the Assembly determined that the cost of improvements other than paving would benefit from the Fawn Mountain School and directed the Manager to include it in the contract for school construction, thus the special assessment is limited to paving in the amount of $88,000. He said that would also change subparagraph (4) to delete "installing sidewalks, installing storm drainage and guardrail". He said the amount in Item (6) would change to $88,000.

Assemblymember Thompson said he thought the intent was to delete the sidewalks, storm drainage and guardrail, but the cost of the paving would be split between the property owners. Manager Eckert said if the ordinance was substantially changed it would require another hearing.

Attorney Brandt-Erichsen said if there were changes in the assessment district he would recommend the process begin again at the notification to the property owners stage. In response to Assemblymember Thompson, Attorney Brandt-Erichsen said if the Assembly wished to postpone the ordinance it should be postponed at least 45 days.

EXHIBIT 20
Page 2 of 22

P00141

Assemblymember Thompson said he wished to modify his motion to have the ordinance postponed for 60 days. Assemblymember Landis agreed.

Assemblymember Lybrand expressed concern that a provision was not included to prohibit the adjacent property owner from cutting the pavement for five years.

Assemblymember Thompson stated he believed the pavement would benefit the undeveloped property and felt the property owner should share in the cost.

In response to Assemblymember Painter, Manager Eckert said if the change order was done for all the work, then the ordinance would not be needed.

Assemblymember Tipton pointed out that in the agenda statement staff had stated it was directed to have all the work done under a change order and the special assessment district was not needed. He said all that would be needed in the future was creation of a service area to take care of the maintenance costs.

Assemblymember Thompson said he remembered asking specifically for a separate accounting for the pavement so a special assessment district could be formed to cover the cost of the paving. He said he was trying to save the Borough $15,000 by assessing the other properties that sum for the pavement. Assemblymember Thompson said he did not see any major objections from Mr. Arnzten to that proposal. He said he did not object to having the Manager go ahead with the change order as directed, he just wanted to keep track of the road costs which would be included in a special assessment district.

Manager Eckert advised the change order had not been executed yet but the contractor was paving the upper portion around the school. He said the contractor felt he might be able to get the road paved this fall; the sidewalks and other work had to be done first.

In response to Assemblymember Thompson, Attorney Brandt-Erichsen explained an assessment district needed to be formed prior to installation of the improvements.

Assemblymember Tipton said in prior discussions he did not understand that the pavement was to be reimbursed by an assessment district. He said staff was given the direction to go ahead with a change order that included the paving.

Manager Eckert reiterated if the paving was to be covered under a special assessment district then the process had to begin again at the property owner notification stage; if the paving was to be paid by the Borough it could be done through a change order.

Attorney Brandt-Erichsen pointed out the staff's recommendation was that the ordinance be voted down primarily because the decisions made at the September 12 meeting were such that the ordinance was no longer a suitable vehicle. He said if the Assembly wished to allow the road construction to continue with curbs, gutters, sidewalks, and drainage done as a change order to the contract, including the pavement, but not including the street lights, then it could vote down the ordinance and leave staff with the direction given. He continued that if the Assembly wanted to remove the pavement, then it could vote down the ordinance and give staff direction to not proceed with the pavement under the change order, but to come back with a modified assessment district to pay for the pavement, which might result in the pavement not being done this fall, but would allow the pavement to be included in an assessment district. Attorney Brandt-Erichsen said if the Assembly chose to include street lighting in an assessment district with the paving, then that direction could be provided as well.

Assemblymember Painter noted the only legal way currently to maintain the road would be through the educational powers of the Borough. He said it would be difficult to maintain a gravel road and maintenance costs would be high.

EXHIBIT 20
Page 3 of 22

Upon roll call, the vote on the AMENDMENT was:

YES:        LYBRAND, THOMPSON

NO:         SHAY, LANDIS, PAINTER, TIPTON

ABSENT:     KIFFER

MOTION DECLARED FAILED.

Upon roll call, the vote on the MOTION was:

YES:        NONE

NO:         PAINTER, TIPTON, THOMPSON, SHAY, LANDIS, LYBRAND

ABSENT:     KIFFER

MOTION DECLARED FAILED.

*6:07:33 PM*

Ordinance No. 1369 amending portions of the KGB Code, Sections 30.10.011 and 30.20.016 regarding Borough employees' residency requirements; Section 30.30.036 regarding work scheduling; and Section 30.30.038 regarding work locations

There was no public testimony.

M/S Lybrand/Painter to adopt Ordinance No. 1369.

Upon roll call, the vote on the MOTION was:

YES:        LANDIS, LYBRAND, PAINTER, SHAY, THOMPSON, TIPTON

NO:         NONE

ABSENT:     KIFFER

MOTION DECLARED CARRIED.

*6:08:13 PM*

Ordinance No. 1373 Amended amending the FY 05/06 Borough Budget by making three loans from the Land Trust Fund to the Airport Enterprise Fund in the amount of $1,086,500 for capital projects as follows: HVAC System - $179,000; Generators - $250,000; Airport Road Construction - $657,500 with the intention that the loan for the generators will be repaid from AIP Funds; and making a supplemental appropriation from the General Fund in the amount of $1,950; a supplemental appropriation form the Airport Enterprise Fund in the amount of $1,086,500; a supplemental appropriation from the Old Homestead Special Assessment Fund in the amount of $442,856

There was no public testimony.

M/S Painter/Thompson to adopt Ordinance No. 1373 Amended.

EXHIBIT 20
Page 4 of 22

P00143

M/S Thompson/Shay to amend by deleting Section 2, Section 3c, and Section 4f.

In response to Assemblymember Tipton, Assemblymember Thompson said he was removing references to the $442,856 for the special assessment district.

Upon roll call, the vote on the AMENDMENT was:

YES:         LYBRAND, SHAY, TIPTON, LANDIS, PAINTER, THOMPSON

NO:          NONE

ABSENT:      KIFFER

MOTION DECLARED CARRIED.

Assemblymember Thompson said he wanted to make sure the ordinance clearly stated the $657,500 for the road construction would ultimately come from the Economic Development Fund. Assemblymember Thompson requested a division of the question. There was no objection.

Upon roll call, the vote on the $657,500 – ROAD CONSTRUCTION was:

YES:         THOMPSON, SHAY, TIPTON, LANDIS, LYBRAND, PAINTER

NO:          NONE

ABSENT:      KIFFER

MOTION DECLARED CARRIED.

Upon roll call, the vote on the $179,000 – HVAC SYSTEM was:

YES:         PAINTER, SHAY, TIPTON, LYBRAND, LANDIS

NO:          THOMPSON

ABSENT:      KIFFER

MOTION DECLARED CARRIED.

Upon roll call, the vote on the $250,000 – GENERATORS was:

YES:         TIPTON, PAINTER, LYBRAND, THOMPSON, LANDIS, SHAY

NO:          NONE

ABSENT:      KIFFER

MOTION DECLARED CARRIED.

Upon roll call, the vote on the $1,950 – CODE ENFORCEMENT VEHICLE was:

YES:         SHAY, LANDIS, PAINTER, LYBRAND, TIPTON

NO:        THOMPSON

ABSENT:    KIFFER

MOTION DECLARED CARRIED.

Upon roll call, the vote on the AMENDED MOTION was:

YES:        PAINTER, TIPTON, THOMPSON, SHAY, LANDIS, LYBRAND

NO:        NONE

ABSENT:    KIFFER

MOTION DECLARED CARRIED.

*6:14:21 PM*

Consideration of a request to rezone the unsubdivided remainder of USS 3802, Roosevelt Drive (upland and behind), Ketchikan Gateway Borough, from Future Development (FD) to Low Density Residential (RL)

There was no public testimony.

M/S Thompson/Painter to introduce Ordinance No. 1371, cause it to be published, and set a public hearing for October 3, 2005, in the City Council Chambers.

Assemblymember Tipton asked if the proposed rezone fit into the comprehensive plan. Planner Lappin responded yes.

Assemblymember Lybrand asked if there was more than one protest about the rezone and Planner Lappin responded no.

Upon roll call, the vote on the MOTION was:

YES:        LANDIS, LYBRAND, PAINTER, SHAY, THOMPSON, TIPTON

NO:        NONE

ABSENT:    KIFFER

MOTION DECLARED CARRIED.

*6:16:46 PM*

Consideration of a request to rezone ASLS 81-39, Block 2, Lot 1-A and USS 2804, Lot 8, Sublot C-2, 855 and 904 D-1 Loop, Ketchikan Gateway Borough, from Heavy Industrial (IH) and Suburban Residential (RS) to Light Industrial (IL)

There was no public testimony.

M/S Shay/Painter to introduce Ordinance No. 1372, cause it to be published, and set a public hearing for October 3, 2005, in the City Council Chambers.

Assemblymember Thompson said there was a letter on the table that indicated some residential property would be lost. He said he understood the rezone was from Heavy Industrial to Light Industrial. Planner Reeve explained the lands involved and said it would improve the area and there were a number of limitations that could be imposed on Light Industrial zoned lands. He said the current use of the land was of concern to the neighbors and the rezone should alleviate some of the problems.

Assemblymember Landis revealed he owned property across the highway from the subject property.

Planner Reeve responded to questions from the Assembly about the rezone and the potential improvement of the property. Assemblymember Thompson said he wanted to be sure a fence was not put around the entire property with a junkyard within it. Planner Reeve said staff would make sure that did not happen.

Upon roll call, the vote on the MOTION was:

YES:        LYBRAND, SHAY, TIPTON, LANDIS, PAINTER, THOMPSON

NO:         NONE

ABSENT:     KIFFER

MOTION DECLARED CARRIED.

**Scheduled Informational Reports and/or Presentations**—*Reports on construction progress, financial status, presentations of budgets, audits, and reports or planning documents and related items.*

<u>Board of Education Report</u>              *6:24:43 PM*

Board President Schafer distributed a proposed truancy ordinance to the Assembly. She said the board chose to change the state-mandated maximum age of 16 for required attendance to 18. She said if the child had graduated from high school or obtained a GED he/she would not have to continue going to school. President Schafer said the recommended ordinance was passed at the last board meeting and requested the Assembly pass it so there would be a truancy law in Ketchikan.

Assemblymember Thompson wondered about the effect on the voluntary students by the students who were forced to attend school. President Schafer responded she had not considered that point of view and went on to say there were good things happening at the high school and alternative choices for schooling were available for students. She said she would rather strive to have the students in the system and work with them.

Assemblymember Painter asked if the district would have to hire a truancy officer and President Schafer said she did not believe it was within the district's budget and the district would be looking to do it in other ways. She mentioned a new grant the district received which was to help keep kids in school. She said it was a three-year grant and there would be a person under the grant, although not a truancy officer, but someone who would work with parents to keep the truancy issue under control. Assemblymember Painter expressed concern about forcing students to attend school. President Schafer reported last year the district had 89 twelfth graders drop out.

Assemblymember Landis said the proposed ordinance was an issue the board ought to be deciding. He did not believe it was up to the Assembly to re-decide the issue and he could see no reason to not have the Assembly consider it.

Assemblymember Tipton asked why the state had established the maximum age of 16. President Schafer said she did not know. Assemblymember Tipton suggested the reason be brought forward with any ordinance being presented the Assembly.

Assemblymember Lybrand spoke against the maximum of 18 and cited problems with dealing with some of the children.

President Schafer pointed out the graduation rate was one factor in the district's report to the public and in the No Child Left Behind reporting. She said the board was requesting the Assembly's help to make sure children stayed in school.

**Acceptance of Claims**          *6:34:18 PM*

M/S Landis/Shay to accept the Ketchikan Gateway Borough claims for the period of August 30 through September 9, 2005, in the amount of $1,344,248.46.

Staff responded to questions from the Assembly about the claims.

Upon roll call, the vote on the MOTION was:

YES:        THOMPSON, SHAY, TIPTON, LANDIS, LYBRAND, PAINTER

NO:         NONE

ABSENT:     KIFFER

MOTION DECLARED CARRIED.

*6:36:56 PM*

**Consent Calendar**—*Matters listed under the consent calendar are considered to be routine and will be enacted by one motion and one vote. There will be no separate discussion on these items. Platting or zoning items that are subject to court appeal may not be listed on the consent calendar. If the Mayor or an Assembly Member requests discussion, that item will be removed from the consent calendar and will be considered under <u>Unfinished Business.</u>*

Motion to approve the regular meeting minutes of September 6, 2005; the special meeting minutes of September 6, 2005; and the special meeting minutes of September 12, 2005, as presented

Motion to adopt Resolution No. 1916, appointing the judges and canvass board for the regular municipal election to be held October 4, 2005

M/S Landis/Thompson to accept the Consent Calendar as presented.

Upon roll call, the vote on the MOTION was:

YES:        THOMPSON, PAINTER, SHAY, TIPTON, LYBRAND, LANDIS

NO:         NONE

ABSENT:     KIFFER

MOTION DECLARED CARRIED.

EXHIBIT 20
Page 8 of 22

**Unfinished Business**          *6:37:23 PM*

Transferred Consent Calendar—NONE

**New Business**

*6:37:34 PM*

Consideration of Change Order No. 2 to Bicknell, Inc. for North Tongass Fire Station #8 Sitework

M/S Lybrand/Painter to authorize the Borough Manager to sign Change Order No. 2 to the Bicknell, Inc. contract in the amount of $12,450 for additional work at the North Tongass Fire Department Station 8 site.

Upon roll call, the vote on the MOTION was:

YES:          TIPTON, PAINTER, LYBRAND, THOMPSON, LANDIS, SHAY

NO:           NONE

ABSENT:       KIFFER

MOTION DECLARED CARRIED.

*6:38:10 PM*

Consideration of Resolution No. 1921 adopting the National Incident Management System (NIMS) Implementation Plan for the Ketchikan Gateway Borough

M/S Painter/Landis to adopt Resolution No. 1921.

Upon roll call, the vote on the MOTION was:

YES:          SHAY, LANDIS, PAINTER, LYBRAND, THOMPSON, TIPTON

NO:           NONE

ABSENT:       KIFFER

MOTION DECLARED CARRIED.

*6:38:57 PM*

Consideration of Resolution No. 1922 authorizing the Borough Manager to dispose by lease extension of Hangers 1 and 2 and the tank farm at the Ketchikan International Airport

M/S Landis/Lybrand to adopt Resolution No. 1922.

Assemblymember Lybrand asked Mayor Salazar if there was any reason to put the properties out for public lease and Mayor Salazar said he believed they just wanted to extend the leases for financing purposes.

In response to Assemblymember Painter, Manager Eckert explained the proposed action was just an extension of an existing lease. The company had been putting a lot of money in the property and planned to do more work.

He said no one had come forward expressing interest in the property. Mayor Salazar said the Borough had to comply with state law leasing requirements.

Mayor Salazar asked if the Borough was using the state charts and Manager Eckert responded yes.

Assemblymember Thompson asked if the lease was based on fair market value and if it had a CIP adjustor included for inflation. He asked about the terms of the lease and Manager Eckert said it was 35 years and he believed it contained the CIP adjustors. Mayor Salazar interjected the lease was reviewed every five years for the extensions.

Assemblymember Shay expressed concern because there was no information about the lease; the income derived from it and assurance that inflation adjustors were included. He asked if this extension was part of the big plan for fee re-structuring that had been discussed. Manager Eckert said there were going to have to be adjustments made to the overall plan because of adjustments with the tenants. He added all the terms were in the lease and the Borough was following state law.

Assemblymember Tipton commented that when the Assembly received requests such as the current one, it would be good to have the actual lease so the information was available.

M/S Tipton/Thompson to amend Section 1, Items 2 and 3 to change the ending date to 6/30/2037.

Assemblymember Thompson said he would like to see the lease document.

M/S Thompson/Lybrand to postpone to the next meeting [October 3, 2005].

In response to Assemblymember Landis, Manager Eckert said he could not see any harm in postponing the item to October 3.

Upon roll call, the vote on the MOTION TO POSTPONE TO OCTOBER 3, 2005 was

YES:       LANDIS, LYBRAND, PAINTER, SHAY, THOMPSON, TIPTON

NO:        NONE

ABSENT:    KIFFER

MOTION DECLARED CARRIED.

*6:46:15 PM*

Consideration of Ordinance No. 1370 amending KGB Code, Title 15, Airport, by amending Section 15.11.060 by deleting the landing fee for aircraft 6,000 lbs. and under; and by modifying the rates charged for bulk purchase of airport ferry passes

M/S Landis/Painter to introduce Ordinance No. 1370, cause it to be published and set it for a public hearing on October 3, 2005, in the City Council Chambers.

Assemblymember Painter requested a division of the question. There was no objection. He said he had a problem with removing the landing fee because there were commercial operators flying aircraft that fell under the 6,000 pound limit. He said if the ordinance reverted back to the previous way, those commercial operators would not be paying anything but fuel flowage fees. He added that anyone that landed at the airplane float was being charged. Assemblymember Painter said he was trying to equal the playing field. He said he was not trying

to penalize the transient pilots. He added aircraft landed at the dock that were in excess of 12,000 pounds and were only charged $3. If they had landed on the field they would have been charged more.

Assemblymember Thompson said he was not going to vote for the ordinance because when the Code was changed previously it was agreed there would be a top to bottom revenue fee analysis on the airport. He said that had not occurred and he was not going to vote for any more changes at the airport until the fee review was completed.

Assemblymember Tipton suggested the ordinance be introduced and allow staff time to do the fee analysis. He added it would also allow Assemblymember Painter time to come up with language for an amendment.

Upon roll call, the vote on the LANDING FEE was:

YES:      TIPTON, LANDIS

NO:       LYBRAND, SHAY, PAINTER, THOMPSON

ABSENT:   KIFFER

MOTION DECLARE FAILED.

Assemblymember Thompson said the bulk rates should be available to others rather than only being available to the rental car companies and the airporter. Manager Eckert advised the tickets had a statement printed on them that said they were not for resale. He said everyone was aware the tickets were not for resale.

Assemblymember Tipton commented there were a number of companies that purchased ferry tickets in bulk, whether for employees or for customers. He said it came down to the intent of the bulk purchase and he felt it was resolved because the tickets were stamped they were not for resale.

Assemblymember Lybrand commented the use of the pre-purchased tickets saved the Borough money because it allowed the traffic to move more quickly through the toll booth.

Assemblymember Thompson reiterated his objection to changing fees until the entire fee structure was reviewed.

In response to Assemblymember Painter, Attorney Brandt-Erichsen said a problem existed because some companies were buying the tickets and charging their customers the full fare and pocketing the difference. He said the companies were contacted and told they could not do that and the Borough was not successful in getting a response so he wrote a threatening letter which got a response. After review of the whole issue the policy direction from management was to propose sticking with the ten percent discount for the bulk tickets which was what it had been prior to the change in the fares. He said the policy to allow people to charge the full rate was not intended to be exclusive to the companies listed in the agenda statement; it was available to anyone who wanted to buy the tickets and charge whatever the market would bear to be able to do that. He suggested that if the companies were going to be doing that anyway, and the tickets said they were non-transferable, the Borough needed to have a clear legislative intent statement that it was okay with them doing that. He said it needed to be clearly stated for the public and businesses on how the system was going to work.

A brief discussion was held on the different tickets available.

Assemblymember Thompson said the bulk rates were for companies who had a need for a large number of tickets and it was assumed they would be transferred to someone, an employee or a customer. He felt the non-transferable applied to someone riding over with a ticket and giving it to someone else to ride back on the ferry.

Assemblymember Landis said when the fares were passed it was intended to give locals a discount on the tickets. He said he did not intend to vote for the motion.

Assemblymember Painter said his primary intent was to try to lower the deficit at the airport and mentioned that the cost of fuel was continuing to rise.

Director Carney said the ordinance was proposed because some parties were making 28 percent because a mistake was made in the changing the fares and not changing the bulk rate. He said it was evident what the rental car companies and the airporter were charging for passes; it would be difficult to determine what Southeast Stevedoring, Cruise West, or others were charging. He added the bulk rate pass fees were the only fees he had a problem with. He felt all the other fees were right. He said the change in fees for ferry passes was intended to pay for rising fuel and employee costs.

Upon roll call, the vote on the FERRY FARES was:

YES:       SHAY, TIPTON, LYBRAND, PAINTER

NO:        THOMPSON, LANDIS

ABSENT:    KIFFER

MOTION DECLARED CARRIED.

*7:08:15 PM*

Discussion of AMHS Development of Wards Cove Layup Facility—Assemblymembers Thompson and Painter

Assemblymember Thompson said at the last meeting the Manager was given direction by the Assembly to make sure AMHS was accommodated in any sale that might occur at Wards Cove. He understood that AMHS wished to lease an area for a lay-up facility and had provided a footprint of it. He asked Manager Eckert about the status of accommodating AMHS in getting a long-term lease with an option to purchase that area for a lay-up facility.

Manager Eckert said staff was still working out the terms on the lease, and AMHS did a good job of submitting the footprint of the area they were looking at. He said staff was working with the Renaissance Group to make sure everyone was compatible. He said Renaissance liked what they saw. He said they would be meeting with AMHS staff and getting it through.

Assemblymember Shay thanked Assemblymembers Thompson and Painter for bringing the issue to the Assembly's attention. He stressed the number of jobs provided by AMHS and the importance of making sure it would be in Ketchikan permanently.

Assemblymember Painter asked if upland Lots B-36, B-37, and B-38, along with the Admin Building had been removed from the sale. Manager Eckert explained the Admin Building was removed as agreed to in the offer to Mr. Jenkins. He said 36, 37 and 38 remained on the table as part of the purchase. The portion selected by AMHS for their lay-up facility was part of B-38 and some other areas. Assemblymember Thompson interjected it was part of B-36, 4 and 9 because a considerable portion of it was in the tidelands Lot 9. Assemblymember Painter then asked if it was the Manager's intent to remove the lay-up facility area from the offer to Mr. Jenkins.

Manager Eckert said the direction given by the Assembly was to sell the entire westside properties minus B-3, the Admin. Building, and AMHS and the Renaissance Group would then work out the details. He said staff was monitoring that and making sure that was going to happen. He said Mr. Jenkins had stated that he would work with AMHS, and staff was in meetings with Captain Falvey, and Mr. Jenkins was on the phone. He said it was in writing and they were working through the details of a lease to make sure it would happen. He said he was

EXHIBIT 20
Page 12 of 22

P00151

doing exactly as instructed. He said the terms would be a fair and equitable price. He said all parties would be satisfied.

Assemblymember Thompson asked why the Borough needed to wait to enter into a lease with AMHS for the property. Manager Eckert replied he was not saying it had to wait, the details of the cost had to be worked out; what was fair if the Borough retained it, whether Mr. Jenkins retained it or whether someone else retained it. Assemblymember Thompson stated AMHS wanted to ultimately purchase the property; they wanted a lease with an option. He said they had money now to purchase the property and if the Borough carved the property out and leased it to AMHS with a purchase option at fair market value then it would be done. Manager Eckert responded that he understood, but pointed out there was already an offer on the table to a party, and if the Borough started to change the parameters of that offer he could see some serious legal challenges. He contended the AMHS issue could be worked through.

Assemblymember Thompson asked what agreement the Borough had with Jenkins and Falconer. Manager Eckert explained the Borough made an offer to Mr. Jenkins after the executive session for the sale of the entire westside of Wards Cove minus B-3 with the stipulation that they work with AMHS to make sure that AMHS was accommodated and provided for in Wards Cove. He said Mr. Jenkins agreed to that and put it in writing. Manager Eckert said that was done at the direction of the Assembly. He went on to explain that Mr. Jenkins had worked with AMHS, made accommodations in his plans, and talked with Borough staff. He said AMHS accommodated Mr. Jenkins by shifting a little to the east. He said things were working and no one was slowing down the process. Assemblymember Thompson expressed concern the deal with Mr. Jenkins could last six to eight months and Manager Eckert said in Mr. Jenkins' terms it stated he would have 90 days to close. Assemblymember Thompson contended there was nothing he could see that would prevent the Borough from entering into a lease with AMHS to preserve the lay-up facility and make the sale to Mr. Jenkins subject to that lease just like all the rest of the existing leases. Manager Eckert said that could be done but he was concerned that Mr. Jenkins would have to be agreeable to the lease terms because he would inherit that lease.

Assemblymember Lybrand asked if Manager Eckert was assured Renaissance Group was a real group with a lot of depth behind it. Manager Eckert said he had no problem with the people he was dealing with and then went on to discuss the issue of the difference of due diligence for making a loan and selling land to a willing buyer. He explained that if the Borough investigated one buyer it must investigate every buyer of Borough property.

Captain John F. Falvey, General Manager, AMHS, distributed a letter to the Assembly and read it. He said there was a timing problem; AMHS was ready to lease the land immediately.

Manager Eckert said he did not believe the timing issue was the problem. He said the Borough was right on step in negotiating price and was put in the middle to do this with Renaissance and AMHS. He said staff received clear direction from the Assembly on the offer and how it was to be negotiated. He said some in the state did not like that negotiation and asked for the Borough to intercede. He said the Borough had never received an offer by the state as to cost, either on the administration building or on the lay-up facility. Manager Eckert said Captain Falvey had been involved in meetings with Mr. Jenkins in which Mr. Jenkins had stated he not only wanted, but needed AMHS, to be in Wards Cove and he was willing to work with them. Manager Eckert said it would be resolved long before anything closed.

Assemblymember Landis noted the lack of transparency in the process has created some of the confusion. He said there was community interest in the sale, specifically the continued presence of AMHS in Ketchikan. He commented there needed to be more open discussion on the issue.

Assemblymember Tipton asked if it was possible to have the lease/purchase in place prior to finalizing the purchase of the property. He said Mr. Jenkins could assume the lease. He said within the lease/purchase there could be a fair market value included. Manager Eckert said it could be done but one of the directions given by the Assembly in executive session was that one of the terms of a sale to Mr. Jenkins would be that he would have to accommodate AMHS, which he was not only willing to do, but he had stated repeatedly that he would

do and had put in writing that he would do. Manager Eckert said he would oppose establishing a fair market value prior to the date of sale.

Assemblymember Tipton asked if AMHS had requested thirty-six months in one document and Manager Eckert responded yes. Assemblymember Tipton asked if protection could be included in the lease documents, whether AMHS was buying from Jenkins or the Borough. He expressed concern about the $9 million sale falling through. Manager Eckert said even if it was the Borough he would not agree to holding off on a sale for three years. He felt AMHS could expedite it. Manager Eckert reiterated that the direction he received from the Assembly was to sell the entire property on the westside of Wards Cove, with the exception of the admin building. He continued that AMHS and Mr. Jenkins would work together and make it happen. He said the process was working well.

Assemblymember Tipton asked if it would be to the Borough's advantage to have Manager Eckert state what was viable and the viability of the group. As to the transparency, he suggested the role of AMHS in the negotiations be the subject of a statement. He added the successes of the Jenkins' group be publicized. Assemblymember Tipton said by providing the information it would illustrate how the process was being done for the good of the community. Manager Eckert again expressed his concern about asking potential purchasers to provide business plans, background and financial information. Assemblymember Tipton repeated that the viability of the group and the past successes of the group should be explained. He said the question of transparency of the process should be addressed.

Assemblymember Thompson said the whole process pointed out the fact that unless there was an overriding reason to go into executive session, it should not be done. He stated if people read the record they would see there was an offer made and there was a counteroffer made. He noted the Assembly said it would accommodate AMHS, which did not mean it was going to be turned over to someone else. He said that currently he did not see the Borough accommodating AMHS. Assemblymember Thompson said AMHS wanted the Borough to negotiate a lease with them immediately to lease the lay-up facility property with an option to purchase and any sale done to a third party would be subject to that lease. He said he could not understand why the Borough could not accommodate that request and the reason it probably could not be answered was because the negotiations were secret.

Manager Eckert took exception to the word "secret" and said negotiations regarding financial deals were usually done in executive session; they were not done in the newspaper and not done out in the open. He expressed concern that if management started to deviate from the direction given by the Assembly the Borough could be in trouble. He said everyone was negotiating in good faith and the sale would be done. He again said there was nothing secretive about it and AMHS personnel had been included. Manager Eckert commented that for some reason the upper echelon of AMHS wanted to deal with the Borough rather than with a third party. He said either way it was the Borough's intention to make sure that AMHS was accommodated and it was in writing and it was part of the terms of the sale.

Assemblymember Thompson responded that if what Manager Eckert was saying was true, what was keeping the Borough from entering into a lease with AMHS and having the sale subject to the lease. Manager Eckert said negotiations were now down to discerning the price. Assemblymember Thompson stated if the whole deal fell apart and AMHS was going along and suddenly it was three months down the road then they would have to start from scratch. He said if the Borough started with AMHS and accommodated their needs, and the sale was subject to that, there would be no issue. Manager Eckert again repeated his instructions from the Assembly were that AMHS and Mr. Jenkins would be the ones to negotiate the terms of the lease. He added it was not going to take three months and the prices could probably be set in two weeks.

Assemblymember Thompson asked Captain Falvey when he last spoke with Mr. Jenkins and Captain Falvey said it was quite a few weeks ago on a teleconference. Assemblymember Thompson pointed out that Mr. Jenkins had not talked with Captain Falvey for six or eight weeks and asked how Manager Eckert could state that the negotiations were progressing just fine. Manager Eckert said he had been discussing it with Mr. Jenkins

on behalf of the Borough and also, at that meeting with Captain Falvey, Mr. Jenkins asked Robin Taylor to have his staff contact him and they would start negotiations. Mr. Jenkins heard nothing from AMHS. Manager Eckert said he was the go-between and was trying to get the sale done.

Assemblymember Painter said he voted for the executive session and the only reason he did was because Mr. Jenkins and Mr. Falconer requested it. He had no idea what was going to be said, but afterwards he felt there was nothing stated in the executive session that should have warranted an executive session. He said the Borough needed to accommodate AMHS because their proposal went hand-in-hand with the shipyard activities and he hoped the issue could move beyond who AMHS wanted to deal with and said he wanted the chance to review the minutes of the meeting.

M/S Thompson/Shay to direct the Manager to immediately negotiate a lease with option to purchase for fair market value within the first three years the lay-up facility with the Marine Highway System.

Assemblymember Landis expressed concern the motion may create a legal problem if it conflicted with what the Assembly already decided. Manager Eckert said he also was concerned about changing the terms of the Borough's offer to the buyer. He added he would strongly oppose having a three-year deal with anyone.

Assemblymember Tipton asked that the motion be repeated and Assemblymember Thompson said: I move to direct the Manager to immediately negotiate a lease with option to purchase for 25 years with an option to purchase at fair market value within the first three years the lay-up facility as described on the footprint currently on the agenda item. Assemblymember Tipton suggested Manager Eckert ask the Jenkins group if the Borough could remove the cut-out of the parcel as designated in the survey. He added he felt it was workable to have a lease put in place by the Borough prior to the sale to Jenkins. He said he understood the Borough and Mr. Jenkins were just trying to finalize the numbers and having AMHS agree to them. He pointed out the Assembly gave direction once and now it was changing. He said it sounded like parties had been talking outside the realm of letting the Manager do his job. He stated he wanted to do his best to accommodate AMHS and did not feel it was insurmountable. He suggested the head of AMHS come to a meeting and explain why he was creating a conflict for the Borough and putting a $9 million sale at risk.

Assemblymember Shay said Hurricane Katrina and a pending new hurricane would push the price of veneer up and up. He said he did not feel that passage of the motion would be a big handicap to the prospective purchasers of Wards Cove.

Assemblymember Lybrand commented he thought Mr. Jenkins had a three-month period to come back to the Borough and one month was gone already. Manager Eckert said they had 30 days to accept the proposal for a sale at $9 million for the entire parcel except B-3, which they did. He said from that date they had 30 days to execute and bring forward the non-refundable deposit and the promissory note. He advised that time period would be up September 27. He said after that time the buyer would have 90 days to close. Assemblymember Lybrand asked if it would be a done deal on September 27 and Manager Eckert said the Assembly would have to approve the contract.

Assemblymember Landis stated he was uncomfortable with the issue because he did not have the entire picture. He said he could understand the frustration of the public about it. He said at one time he had suggested a negotiation team be formed composed of the Manager, Mayor and some Assemblymembers, but the idea was not accepted. He suggested a work session which included Mr. Jenkins, Mr. Taylor, and Captain Falvey would be a good way for the Assembly to come to a little better understanding of the implications of the Assembly's actions. He was concerned that the current dissention would cause some component of the project to go away.

RECESS:

The meeting recessed at 7:54 p.m. and reconvened at 8:04 p.m.

Assemblymember Thompson commented that part of the problem was the executive sessions and everyone's memory of what transpired in them. He said if the meetings were held in public then the public and newspapers would keep the Assembly on its toes as to what was said and the intent. He said the current situation was a question of whether the Borough was to take the lead in taking care of the needs of AMHS or if Mr. Jenkins and his group were to take care of them. He said he believed it was the Borough's responsibility to look out for AMHS. He spoke of the benefit of having AMHS in the community on a permanent basis. He said AMHS needed a commitment from the Borough to assist in development of that permanent facility.

Attorney Brandt-Erichsen said there was an agreement signed by the Manager on August 24 and Jerry Jenkins on August 27. He said the terms say in respect to Alaska Marine Highway, Renaissance Ketchikan Group (RKG) agrees to the term of the Borough's requirement to negotiate in good faith with the Alaska Marine Highway System for ship storage and lay-up in parcel B-9 and adjacent uplands. He said that was the extent of the agreement on that point. He continued that in the course of the discussions the interests he had heard expressed had been to lease but not sell on the part of RKG. He stated the other provision of the agreement was for the final purchase and sales agreement to be negotiated within 30 days of execution of the shorter agreement. He said there were a number of terms left open that would need to be finalized in the final purchase and sale agreement. He said the 30 days would run out September 27. Attorney Brandt-Erichsen said there was a teleconference about eight or nine days ago and on September 8 staff e-mailed to Mr. Jenkins a draft agreement. He said Mr. Jenkins sent back comments which were received about the end of last week. Attorney Brandt-Erichsen said he had been going through and incorporating those comments. He said the current status of Alaska Marine Highways remained that Renaissance Group would negotiate in good faith for the use of a portion of Wards Cove for lay-up facilities.

Mayor Salazar asked if that was for a lease, but not a sale. Attorney Brandt-Erichsen said in oral discussions in the teleconference that was held Mr. Jenkins indicated that they did not want to sell, but were willing to lease. He continued that one of the other relevant terms in the proposed real estate sales agreement was that the Borough would not enter into any leases during the course of negotiations or prior to closing without Renaissance's consent. Any leases that the Borough did enter into the Borough would represent that they were terminable upon 120 days notice. Assemblymember Thompson asked if that was in the agreement and Attorney Brandt-Erichsen responded it was in the draft sales agreement. Attorney Brandt-Erichsen said his impressions from the discussions was that RKG's interest would be obtaining the property and then leasing to AMHS at what they deemed to be a commercially reasonable rate.

Assemblymember Thompson said he believed the proposal would cause a problem for AMHS. Captain Falvey said AMHS would have a problem leasing the land because the federal government would not spend their $6.7 million to build a facility on leased land, so the facility would not get built.

In response to Assemblymember Landis, Captain Falvey said the proposal had always been a lease with an option to buy. He said there was never an option to lease that land with state funds forever. Assemblymember Landis asked Captain Falvey if Mr. Jenkins understood the restrictions and Captain Falvey responded apparently not. Assemblymember Landis said it appeared very clear. Manager Eckert said he believed the understanding Mr. Jenkins had was to lease, which was easy to do. He thought the purchase was unclear, even as to the amount or terms. Manager Eckert said the terms were received later from Mr. Taylor and he stated he wanted to lease three years and to exercise a possible option to purchase. Manager Eckert said Mr. Jenkins may have had a problem with waiting three years for a purchase. Manager Eckert noted that Mr. Taylor had refused three or four times to even talk with Mr. Jenkins until he was on the telephone at the Borough's insistence. Manager Eckert said the reluctance to get together had been at the higher level of AMHS. He believed that once Mr. Jenkins understood the needs of AMHS, that there was some serious money there and there was a serious intent to purchase, that he probably would re-think the issue.

Captain Falvey said AMHS had $6.7 million on the STIP and a portion of it would be released October 1, and the problem with Federal Highways was they needed to see language leasing with an option to purchase for

them to move forward on the construction of the facility. Manager Eckert said he believed it was doable and that Mr. Jenkins would understand that.

Assemblymember Tipton said he could not understand what Captain Falvey was saying; would it be a lease or would it be a purchase. Captain Falvey responded the Federal Highways Administration would not invest funds in property that was not owned or language present stating lease with an option to purchase. He said the language needed to be present indicating they could use the money to buy the land. Assemblymember Tipton asked if that language was put in the lease, with Jenkins as the prospective purchaser, if that would solve the problem. Captain Falvey said that would allow the facility to be built. Assemblymember Tipton then asked if that would allow the land to be purchased at that time or some future time. Captain Falvey responded yes.

Assemblymember Lybrand asked Captain Falvey if the minimum lease AMHS wanted, with an option to purchase, was three years. He asked if a one-year lease with option would be acceptable. Captain Falvey said AMHS would like to do it as soon as possible. He said he understood Mr. Taylor's letter had indicated three years. Assemblymember Thompson interjected that his motion was for a 25-year lease with an option to purchase in the first three years. Assemblymember Lybrand commented that was a long time. Assemblymember Thompson said if they were going to build a lay-up facility they would want it for a long time. Assemblymember Lybrand asked if a one year lease with an option would work and Captain Falvey replied it should.

Assemblymember Painter asked if the state had purchased the barge and Captain Falvey responded they were still negotiating with the owner. He added the transfer bridge was in place on the property. Assemblymember Painter said at the prior Assembly meeting that Captain Falvey attended he stressed the purchase of the admin building was the top priority and very little was mentioned about the lay-up facility. He said that was why the Assembly gave the Manager direction to exclude the building from the offer. Captain Falvey said he did mention to the Assembly that AMHS wanted to purchase the building and wanted a lease with an option to buy. Assemblymember Painter reiterated little was said about the lay-up facility.

Assemblymember Lybrand attempted to amend the motion to a one-year lease with an option to purchase for one year. There was no second.

Mayor Salazar stated the Manager was already given direction to negotiate and what he wanted to see the Manager, AMHS and Mr. Jenkins get together and get the deal done.

Assemblymember Thompson responded to previous comments by Assemblymember Painter by stating at the meeting that contained the executive session the offer on the table, for the most part, excluded properties that were related to the lay-up facility so it was not quite as big an issue as the admin building that was part of the purchase. He said he did not believe that a requirement to negotiate in good faith rose to the level of protection that the Borough needed to protect AMHS' interest in the sale. He noted Mr. Jenkins had already said he did not want to sell the land, he wanted to lease it. He emphasized AMHS needed to purchase the facility and the Borough needed to carve it out or get a lease in place with an option to purchase that would work for AMHS. He added that when the option was exercised it would be for fair market value. He said the current agreement between Mr. Jenkins and the Borough only required good faith negotiations; it did not assure an agreement. He said that was not the intent of the direction to the Manager.

Manager Eckert pointed out that Assemblymember Thompson left out an important part. The agreement said the Borough's offer to RKG was for $9 million excluding B-3 known as the AMHS Administration Building subject to approval of the final sales agreement. He said everything was subject to that final approval. Manager Eckert said Mr. Jenkins was well aware of the caveat and he knew there would be no approval of the sales agreement unless something was worked out.

Assemblymember Landis noted the three-way negotiations had made things more difficult. He stated at the prior meeting everything was clear in everyone's mind but now there was some log jamming going on. He stressed the importance to the community of the sale of land along with retention of the AMHS operation. He said there

needed to be more discussion and pointed out the key players, Mr. Jenkins and Mr. Taylor, were not present. He urged that a full and open discussion be held among all the parties.

Assemblymember Thompson said the Borough needed to take the lead on taking care of AMHS, put the lease in place, and let Mr. Jenkins know about it. He stated it did not need to wait for the sale of the property.

Assemblymember Landis pointed out the Borough did not know what Mr. Jenkins would do and again urged that a meeting be held to clear up the issue. He also noted the direction to the Manager did not include the lease with AMHS. Assemblymember Thompson disagreed and said the Assembly directed the Manager to look out for the interest of AMHS and that did not mean turning the negotiations over to the Jenkins group.

Assemblymember Tipton suggested Manager Eckert talk with Mr. Jenkins to see if the land could be carved out of the sale. He contended the Borough was not turning its back on AMHS, as the current discussion proved. He said Mr. Jenkins may be reluctant because of the length of the option and it appeared from Mr. Falvey's comments the money would be available sooner. Assemblymember Tipton said he could not see any problem with doing the lease prior to the sale. He stressed the willingness of the Borough to resolve the problems and commented on the events that lead up to the apparent issue. He reiterated the Manager could be directed to continue negotiations and propose the land for the lay-up facility be carved out of the land for sale with the purpose price adjusted accordingly. He said it could be subject to the amount the Borough agreed to sell for less the amount the Borough received from AMHS on the sale of the carved out parcel.

Manager Eckert said however it was done AMHS would be there because Mr. Jenkins had a specific reason for wanting AMHS at the Cove. He pointed out Mr. Jenkins was a developer and he was in the project to make some money and he was going to bring in a whole lot more than 40 jobs because he was going to invest a considerable sum of money. He urged the Assembly to let staff do its job.

Assemblymember Painter asked if it would present any problems to schedule a special meeting to deal with the issue and include all the parties. Manager Eckert said he did not believe there was a problem; the only thing would be to extend Mr. Jenkins' 30-day deadline.

M/S Painter/Landis to postpone action on the agenda and schedule a special meeting subject to the Clerk's calendar and the availability of the two other parties, at least by teleconference.

Assemblymember Painter expressed reluctance to vote on Assemblymember Thompson's motion.

Upon roll call, the vote on the MOTION TO POSTPONE was:

YES:        THOMPSON, PAINTER, TIPTON, LYBRAND, LANDIS

NO:         SHAY

ABSENT:     KIFFER

MOTION DECLARED CARRIED.

After discussion a special meeting was scheduled for Saturday, September 24, 2005, at noon in the City Council Chambers.

*8:36:52 PM*

Report on Borough staff review of the April 29, 2003, agreement for fill between the Ketchikan Gateway Borough and Coalaska dba Secon

Regular Assembly Meeting
September 19, 2005 – Page 18

EXHIBIT 20
Page 18 of 22

M/S Lybrand/Thompson to direct staff to continue negotiations with Secon in order to reach satisfactory terms for an amendment to the agreement for fill regarding a final completion date and capping material.

Assemblymember Lybrand said when land was going to be used it had come through a resolution process and he felt the agreement for fill should have come before the Assembly. He felt the Borough should continue to pursue compensation for use of the land.

Assemblymember Thompson said he believed the contractor needed to complete the job in accordance with the agreement or give the Borough a little bit better credit.

Upon roll call, the vote on the MOTION was:

YES:        TIPTON, PAINTER, LYBRAND, THOMPSON, LANDIS, SHAY

NO:         NONE

ABSENT:     KIFFER

MOTION DECLARED CARRIED.

**Reports of Committees, Executive, Administrators**

Manager's Report              *8:39:36 PM*

Manager Eckert reported that Fawn Mountain School was coming along very well and provided construction details. Assemblymember Landis asked if there had been organized tours of the facility and Manager Eckert said not yet because construction was still going on.

Assemblymember Tipton requested a report on: $190,000 for equipment; $150,000 for technology; and $95,650 for art. Manager Eckert said he would get with the district about a report.

Manager Eckert said he understood that the certificate of substantial completion on Schoenbar School was being sent to his office for action. He said staff was going to review it. He added he understood the city building official was going to issue a temporary certificate of occupancy on September 20. He was unsure if it meant the district could move in because it had a few exceptions.

Assemblymember Thompson referred to Manager Eckert's comments at a recent Assembly/School Board Liaison Committee meeting and asked if he knew what Mr. Dearden's issues were. Manager Eckert said he believed some of them were so minor that Mr. Dearden would allow them to be done within 14 days. Assemblymember Thompson asked if Mr. Dearden had any comments on the "rolling beam" and Manager Eckert said he did not and had talked to the structural engineer on it, but until the shop drawings were found he could not comment. Manager Eckert said he was going to get something in writing. Manager Eckert and Assemblymembers briefly discussed the beam and why the engineer would not comment on it. Assemblymember Lybrand said when the architect issued the substantial completion it was certifying the building. Manager Eckert said there were some issues that were unresolved and he and Assemblymember Lybrand discussed the temporary occupancy certificate and other items regarding Schoenbar. In response to Assemblymember Painter, Manager Eckert said he and Attorney Brandt-Erichsen developed a scope of work for the consulting attorney on Schoenbar. The questions continued about the certificate of occupancy and the punchlist items.

Manager Eckert advised the City of Ketchikan had already sent their legislative list to Juneau, the City of Saxman said to include their projects from last year, and the school district provided a list. Assemblymember

EXHIBIT 20<br>
Page 19 of 22

Regular Assembly Meeting<br>
September 19, 2005 -- Page 19

Thompson requested a copy of the list and asked if Manager Eckert had received a copy of the City of Ketchikan's list. Manager Eckert said no but he was sure they would provide one.

Manager Eckert invited the Assembly to meet the new people in the Planning Department.

Mayor Salazar stated that last year the Borough provided free bus service for voters on Election Day. He said it would be effective this year if there were no objections. No objections were stated.

Staff Reports [Airport—first meeting of month; Public Works—second meeting of month]

Assemblymember Thompson requested an update of the financial figures for FY 04–05. He expressed concern about some expenses that were ahead of schedule on the airport fund, the Ward Cove Economic Development Fund, and the Wastewater Fund. He questioned the $125,000 encumbrance on the wastewater. Manager Eckert said he believed that it was for mechanical and said it happened a lot when budgets were spent upfront. Assemblymember Thompson asked if that would take care of the stockpiles of sludge and Manager Eckert responded yes. Assemblymember Thompson asked about the $430,000 encumbrances on the Airport Fund and said he assumed that it had to do with the HVAC and generators. He then asked about the revenue from the property purchases at Wards Cove and Manager Eckert said the sales had not closed. Assemblymember Thompson asked if more bids were received on the properties that had been unsold and Manager Eckert said he believed people were waiting until the last minute. Assemblymember Thompson asked about the cost of the annual inspection for Connell Lake Dam and Assistant Manager Corporon explained the work being done. Assemblymember Thompson continued to question staff about other costs.

Assemblymember Thompson requested four hands to direct that before a check was actually sent out to McGraw Construction that it would come before the Assembly. Assemblymember Lybrand cautioned the Assemblymembers there were several change orders pending. Attorney Brandt-Erichsen said it involved Change Order Nos. 5 and 6 which totaled about $600,000 which the contractor was due some time ago. He suggested those two change orders be allowed to go through. Assemblymember Thompson agreed.

AT LEAST FOUR ASSEMBLYMEMBERS AGREED.

A brief discussion was held on the repairs to the Connell Lake Dam gates. Assemblymember Painter asked about transport of the sludge and Assistant Manager Corporon said they were still loading sludge for shipment.

Mayor Salazar asked if the NIMS training was being coordinated with the city and Assistant Manager Corporon said the city, South Tongass, North Tongass, and the airport were all working together. He briefly described the process.

Mayor's Report          9:17.04 PM

Mayor Salazar announced that absentee voting started today and people could vote in the City Clerk's Office or the Borough Clerk's Office up to October 3, 2005.

Committee Reports

There were no committee reports.

Assemblymembers' Comments          9:18:05 PM

Assemblymember Tipton said he appreciated the work staff had done on many different projects. He said he also appreciated the work session on the AMHS and the Wards Cove property sale. He said it was disconcerting to have 35 days go by after the Manager was given direction and all of a sudden it became a big issue. He said there was discussion on some agenda items about the intent being misconstrued. He stated if an

EXHIBIT 20
Page 20 of 22

Assemblymember wanted a motion to be clear it should be written down. Assemblymember Tipton said he hoped the school district had been moving along for the technology and art for Fawn Mountain. He reminded voters to vote for the $1.1 million bond proposition. He suggested the list of the projects that would be funded by the bonds should be published in the newspaper so voters would know.

Assemblymember Tipton requested four hands to expend funds to publish a list in the newspaper showing what projects would be funded by the $1.1 million.

AT LEAST FOUR ASSEMBLYMEMBERS AGREED.

Assemblymember Tipton said he appreciated the report by Terry Wanzer and he was glad to hear the endeavor was moving forward.

Assemblymember Tipton suggested Manager Eckert provide some information about the Jenkins Group so the public could become familiar with it. He said it could contain their successes and contacts about their work.

Assemblymember Shay thanked the Assembly for all the work it did on the legislative list. He expressed concern about the recent illness of Representative Elkins. He gave a report on his progress after his operation. He also thanked everyone for the support for naming the airport after Congressman Don Young.

Assemblymember Thompson said the tendency of the Assembly to go into executive session exacerbates the problem of misconceptions. He said his memory of the executive session may not mirror the memory of others. He said it was not fair to the public, the Assembly, and the process. He said he looked forward to the Saturday meeting in order to get some public debate going on what was happening in Wards Cove. Assemblymember Thompson said it sounded like Schoenbar was close to being opened but he would not vote to put any kids in there if there was any danger involved. He expressed concern about the "rolling I-beam."

Assemblymember Landis said he was distressed to hear about Representative Elkins. He noted the Manager's task tracking list was growing and encouraged Assemblymembers to review it.

Assemblymember Painter urged voters to get informed about the candidates and to vote.

Assemblymember Lybrand said he wanted to add an executive session on the next meeting to evaluate the Manager. Manager Eckert advised he would not be at that meeting. The issue was briefly discussed as to a possible date and Assemblymember Lybrand's intent. Assemblymember Lybrand said he felt the Manager should be evaluated prior to the election because of questions raised at the last evaluation. Mayor Salazar said he wanted the forms distributed. A discussion was held on possible dates for a meeting. Assemblymember Lybrand said it would be pointless to do it after October 3. The Clerk listed off possible meeting dates and there were no responses. Mayor Salazar asked if it could be placed on the agenda for the meeting of September 24. Assemblymember Lybrand said if a majority of the Assembly would not be available to do an evaluation it would be pointless.

**Executive Session**—*Procedure: Motion is made and voted upon. If adopted, executive session is held. If necessary, action is taken in public session following the executive session. If there is more than one executive session topic, each topic will be handled completely separate from the other.*

There were no executive sessions.

**Adjournment**—*The meeting must adjourn by 10:00 p.m. unless that deadline is extended to 10:30 p.m. by a motion approved by a majority of the assembly members present. Any extension beyond 10:30 p.m. requires a unanimous vote of all assembly members present. If the meeting is not adjourned or extended prior to 10:00 p.m., or such extended time as has been set, the meeting shall automatically recess at that time and shall be reconvened at 5:30 p.m. the following day.*

The meeting adjourned at 9:32 p.m.

ATTEST:

_Borough Mayor_

_Borough Clerk_

**APPROVED: October 3, 2005**