EXHIBIT 22

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.                    ROY ECKERT
7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

        Plaintiff,

        v.                          Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
        Defendants.
_____/


DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                        Terry Venneberg
                        1126 Highland Avenue, Suite 101
                        Bremerton, Washington  98337

FOR THE DEFENDANTS:

                        Mark A. Sandberg
                        Sandberg, Wuestenfeld & Corey
                        701 West 8th Avenue, Suite 1100
                        Anchorage, Alaska  99501

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

**Page 6**

1  one in her personnel file. As with most small towns, you
2  know, people have a way of stating things that aren't
3  correct, and I just did not want her to have the
4  perception that she had been fired, and she thought that
5  was a good idea.
6      Okay.  Did you ever see a written letter of
7  resignation from Ms. Thomas?
8  A   I -- I -- I could not definitely say that I have seen
9  one, but I know we did talk about it and I told her to put
10 it in her personnel file.
11 Q   Okay.  Okay.  Now, I had agreed with counsel here
12 prior to the deposition today, that we would be referring
13 to documents in the initial disclosures that we had
14 previously exchanged.  So, I would ask you to refer to the
15 binder that is in front of you that has the disclosures
16 from both the plaintiff and the defendants.  And I would
17 like you to turn to what is marked as KB062.  There are
18 numbers in the lower right hand corner.
19 A   I see them (word indiscernible).  Okay.
20 Q   Okay.  And do you recognize that letter?
21 A   I do.
22 Q   Okay.  And was this the -- the letter of termination
23 that you sent to Ms. Thomas?
24 A   Yes, I believe that -- yes it was.
25 Q   Okay.  And this letter is dated October 21, 2005?

**Page 7**

1      Yes, it is.
2  Q   Was that the date that you decided to terminate Ms.
3  Thomas' employment.?
4  A   This was the final date after giving her all the
5  chances to return.
6  Q   Okay.  Do you recall whether you actually made the
7  decision to terminate her employment on October 1, 2005?
8  A   Did you mean October 21?
9  Q   Yes, October, 21, yes.
10 A   I believe it is, because we had -- we had waited until
11 hearing from her and receiving, you know, her -- her final
12 answer.  And so, we -- I signed that -- was the letter --
13 wrote it after -- after receiving hers.  So, that was probably --
14 probably the 21st or maybe the day before.  I'm not too
15 sure, but within a day, probably.
16 Q   Okay.  And this letter states that the reason for her
17 termination was her failure to adhere to Ordinance 1369?
18 A   Yes, sir.
19     MR. SANDBERG:  What was Ordinance No. 1369?  Is there
20 a copy of it in here?  I'd like to refer to it.
21     MR. SANDBERG:  Yes.  I believe it is -- it starts at
22 KB66.  You can feel free to use that to.....
23     MR. SANDBERG:  Okay.
24     MR. VENNEBERG:  .....refresh your recollection.
25 A   Okay, this -- this ordinance was as a result of the

**Page 8**

1  Assembly wanting to clarify, you know, residence
2  requirements for employees with the Borough, especially
3  given the fact that we're an island community, requiring
4  people to work, you know, in Borough facilities and on
5  Borough property, and within the Borough.  So, it was --
6  it was a long time coming, but the Assembly had directed
7  that we have something like this in place.
8  Q   Okay.  And the ordinance goes from page KB66 to KB69,
9  is that right?
10 A   Yes, sir.  Technically 68, but 69 is a signature
11 page.
12 Q   Okay.  And this was adopted by the Borough Assembly
13 on September 19, 2005?
14 A   Yes, sir.
15 Q   And went into effect October 4, 2005?
16 A   I believe that's correct.
17 Q   Okay.  I know you touched on this earlier, but how
18 was it that Ordinance 1369 came about?
19 A   1369 came about as a result of a lot of discussion as
20 far as not just Ms. Thomas' employment, but whether or not
21 people should be allowed to work from home, or work from --
22 from other areas, even remote areas.  And it was decided
23 that we needed to tighten up our personnel policy and
24 in working area requirements.  We do have several places
25 in the Borough that -- our offices are -- are, you know,

**Page 9**

1  spread out and we don't have the best working conditions,
2  as far as office -- you know, all centrally located.  So,
3  they wanted to tightened that up and they decided this was
4  a good time to do that.  And so, it was for multiple
5  reasons, but basically to make sure people came to work,
6  showed up to work on Borough-owned property.  For
7  insurance and other reasons, but primarily just -- just to
8  have some control over -- over individuals.
9  Q   Did Ordinance 1369 come about as a result of Ms.
10 Thomas' employment situation?
11 A   It had a factor in it.  I'm not sure if it was -- it
12 was the overriding factor, but it was -- I'm sure it had a
13 factor in it.
14 Q   Okay.  I'd like you to turn to KG286, if you would.
15 A   286?
16 Q   Yes.
17 A   Okay.
18 Q   Okay.  And do you recognize that document that makes
19 up 286 and 287?
20 A   It's a standard agenda statement for the -- you know,
21 for what we were going to submit to the Assembly.  So, it
22 says consideration of Ordinance 1369, so.....
23 Q   And.....
24 A   .....so, right.
25 Q   .....that -- that states, submitted by Borough

EXHIBIT 22
Page 1 of 2

3 (Pages 6 to 9)

EXHIBIT 23

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

        Plaintiff,

        v.                               Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
        Defendants.
_____/


DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                        Terry Venneberg
                        1126 Highland Avenue, Suite 101
                        Bremerton, Washington  98337

FOR THE DEFENDANTS:

                        Mark A. Sandberg
                        Sandberg, Wuestenfeld & Corey
                        701 West 8th Avenue, Suite 1100
                        Anchorage, Alaska  99501

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 10

1  Manger. And that was yourself?
2  A  Right. It's submitted by myself, okay, reviewed or
3  submitted, so that's -- you know, when we're asked to do
4  something, you know, we have to make that. You know,
5  sometimes it will be the Attorney, sometimes myself or
6  department heads.
7  Q  Okay. Did you draft this agenda statement?
8  A  I know there was a lot of discussion on this. I
9  don't recall if I was the sole author of it, but -- but I
10  may have been. But it's -- may have been, may have been
11  just in, you know, relation with our Assistant Manager,
12  or, you know, some of the other employees that -- when
13  we're required to draft something and to give a good
14  background on what happens, we -- you know, several of us
15  work on it together. But it's got my signature on it.
16  Q  Okay. So, it's fair to say you reviewed and signed
17  this.....
18  A  Absolutely.
19  Q  .....before it -- And this is submitted to the
20  Borough Assembly, then?
21  A  Yes, it is. It goes to the Clerk and then she puts
22  it on the agenda, and then it goes to the Assembly.
23  Q  Okay. Now, the section entitled summary statement,
24  that starts by saying, at the Assembly meeting of August
25  1, 2005, some Assembly members expressed interest in

Page 11

1  considering an ordinance to set out a clear statement of
2  policy regarding residency of Borough employees. Do you
3  recall which Assembly member spoke to that issue on August
4  1, 2005?
5  A  I don't, but I could refer to the minutes, and I'm
6  sure that would have that in there.
7  Q  Okay.
8  A  Our Clerk keeps real good minutes.
9  Q  Okay. You might turn to page P91, which is in,
10  actually, the back section.
11  A  Okay. Okay.
12  Q  Okay. And P91 is the first page of the Assembly
13  meeting minutes of August 1, 2005, is that right?
14  A  Right.
15  Q  Okay. And if you turn to P94, there is a section
16  entitled request for executive session to discuss the
17  employment status of the Ketchikan Gateway Borough Human
18  Resource Human Relations Manager. Do you see that?
19  A  I do.
20  Q  And -- and that was Carolyn Thomas, at the time?
21  A  Yes, it was.
22  Q  Okay. So, would it be fair to say that it was --
23  this discussion that's noted in the minutes of August 1st,
24  2005, that led to the agenda statement that we referred to
25  earlier and the proposed Ordinance 1369?

Page 12

1  A  Again, like I said, it would have a factor in it.
2  There are some other items, I think, that were also
3  discussed later by Assembly members and even staff. But
4  it would have -- it would certainly have a factor, yes.
5  Q  Okay. So, it's -- it's your testimony that Ms.
6  Thomas' employment situation was a factor in the enactment
7  of Ordinance 1369?
8  A  Yes.
9  Q  What other factors went into the enactment of that
10  ordinance?
11  A  We had had some situations with the Borough Office,
12  for example, where we're at right now, with some
13  environmental concerns in the past and employees
14  requesting to work from their home, or in offices that are
15  not Borough-owned. You know, just a lot of people refer
16  to it as telecommuting, or whatever. And there was
17  concern about that with documents, with files, with
18  availability of employees and being able to make sure, to
19  monitor that they actually put in the time that they do.
20  So, that has been a -- it's kind of below the radar, but
21  it's been a continuing factor. And so that -- that was
22  considered when this was done, so -- but it was all part
23  of that.
24  Q  What other employees of the Borough were requesting
25  to perform their duties outside of the Borough offices,

Page 13

1  around the time of this Assembly meeting?
2  A  At this time I don't know that there were any.
3  Q  Okay. So, as of August 1, 2005, was it the case that
4  Ms. Thomas was the only Borough employee to be performing
5  her duties outside of the Borough offices?
6  A  At that time it was, yes.
7  Q  Okay. And would it be fair to say that the enactment
8  of Ordinance 1369 only had an impact on Ms. Thomas'
9  employment?
10  A  At that -- at that time it would. The -- again, the
11  situations had arisen before, and they did not want to
12  have, you know, situations arise again, where, you know,
13  people would be outside of the Borough control.
14  Q  It's fair to say that Ms. Thomas was the only one to
15  be disciplined as a result of the enactment of Ordinance
16  1369?
17  A  At that time, yes.
18  Q  Since that time, has anyone -- has any Borough
19  employee been disciplined as a result of failure to adhere
20  to Ordinance 1369?
21  A  No, because we don't allow it.
22  Q  Okay. We've got to turn to KB315. Do you recognize
23  KB315?
24  A  It's a request for legal services. I don't recognize
25  the handwriting on it.

EXHIBIT 23      4 (Pages 10 to 13)
Page 1 of 2

# EXHIBIT 24

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

    Plaintiff,

    v.                 Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
    Defendants.
_____/

DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                Terry Venneberg
                1126 Highland Avenue, Suite 101
                Bremerton, Washington  98337

FOR THE DEFENDANTS:

                Mark A. Sandberg
                Sandberg, Wuestenfeld & Corey
                701 West 8th Avenue, Suite 1100
                Anchorage, Alaska  99501

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 2

1    P R O C E E D I N G S
2    MR. COSSMAN: Okay, we're on the record at 9:38.
3    This is the video deposition of Roy Eckert, taken by the
4    plaintiff in the matter of Thomas v. Ketchikan Gateway
5    Borough, et al., Case No. 5:06-cv-00001-JWS, in the United
6    States District Court for the District of Alaska at
7    Ketchikan. This deposition is being held in the offices
8    of the Ketchikan Gateway Borough, located at 344 Front
9    Street, Ketchikan, Alaska, on July 19, 2006.
10    My name is Eric Cossman from Alaska Legal Video,
11    mailing address 645 G Street, No. 892, Anchorage, Alaska
12    99501, and I will be serving as both the videographer and
13    the court reporter for this deposition.
14    Will counsel please identify themselves for the
15    record?
16    MR. VENNEBERG: Terry Venneberg, representing the
17    plaintiff.
18    MR. SANDBERG: And Mark Sandberg, representing all
19    defendants.
20    MR. COSSMAN: Thank you. Would the witness please
21    raise your right hand and be sworn? Do you solemnly swear
22    or affirm that the testimony you are about to give in this
23    matter will be the truth, the whole truth, and nothing but
24    the truth?
25    MR. ECKERT: I do.

Page 3

1    MR. COSSMAN: Thank you.
2            ROY ECKERT
3    testified as follows on:
4         DIRECT EXAMINATION
5    BY MR. VENNEBERG:
6    Q    Thank you. Can you state your full name?
7    A    Yes, it's Roy Eckert, middle name Allen.
8    Q    All right. Now, what position of employment do you
9    have?
10    A    I'm the Borough Manager.
11    Q    The Borough Manager for the Ketchikan Gateway
12    Borough?
13    A    Yes, sir.
14    Q    How long have you been in that position?
15    A    It will be four years come October 1st.
16    Q    Okay. So, you started October 1st, 2002, is that
17    right?
18    A    Correct.
19    Q    Okay. And during your time as Borough Manager, have
20    you had occasion to supervise the employment of Carolyn
21    Thomas?
22    A    I have.
23    Q    Okay. And what position did she have?
24    A    She was our HR Director.
25    Q    Okay. And did you terminate the employment, or

Page 4

1    decide to terminate the employment of Ms. Thomas in
2    October 2005?
3    A    2005 -- I'm trying to remember the timeline, here.
4    The -- October 2005 would have been about the time that --
5    yes, I believe that was when the ordinances changed, yes.
6    Q    Okay. Why did you decide to terminate Ms. Thomas'
7    employment?
8    A    Originally she had stated she was going to resign and
9    move to Oregon, and then there was some disagreement as to
10    what her status was. But in the end we had offered her
11    several chances to, you know, come back to the community.
12    She chose not to do that, stated she would not come back,
13    so we had no choice but to -- you know, but to terminate
14    the employment.
15    Q    Okay. So, the reason for termination, then, was
16    what?
17    A    Just a refusal to come back.
18    Q    Okay. And was that pursuant to any law or policy of
19    the Borough?
20    A    Yes. Yes. The Borough had an ordinance to that
21    effect, that employees had to live inside the city -- I'm
22    sorry, inside the Borough.
23    Q    All right. And was that Ordinance 1369?
24    A    I believe that's right. If I saw it, I could -- I
25    could know the number, but --

Page 5

1    Q    Okay. And that was an ordinance that was enacted by
2    the Borough in September 2005, is that right?
3    A    I believe that's right, yes, sir.
4    Q    Okay. So, was her termination the result of her
5    failure to adhere to that ordinance?
6    A    Yes.
7    Q    Was there any other reason for her termination?
8    A    No. To the best of my knowledge, she had stated she
9    had resigned earlier. And then after the discrepancy
10    between our understandings -- you know, we gave her two
11    opportunities to come back, several opportunities, and she
12    chose not to.
13    Q    Okay. When had Ms. Thomas stated that she was going
14    to be resigning?
15    A    It was in late February or early March of -- I
16    believe it was 2005 -- she had come to my office and
17    stated that her mother was going blind and that she was
18    going to have to move to Oregon and take care of her full
19    time and she wanted to give me a chance to find a
20    replacement.
21    Q    Okay. Did Ms. Thomas indicate the effective date of
22    her resignation?
23    A    She said it would be around the 1st of June.
24    Q    Did Ms. Thomas ever give you a letter of resignation?
25    A    We had talked about one, and I had asked her to put

EXHIBIT 24
Page 2 of 3

2 (Pages 2 to 5)



# KETCHIKAN GATEWAY BOROUGH

344 FRONT STREET • KETCHIKAN, ALASKA 99901

Office of the Borough Manager, Manager Roy Eckert    • roy.eckert@borough.ketchikan.ak.us
• 907/228-6625 • Fax 907/247-6625

October 21, 2005

Carolyn Thomas
71735 Dourgherty Loop
Wallowa, Oregon 97885

```
┌─────────────────────────────┐
│  RECEIVED                   │
│     OCT 2 4 2005            │
│  Borough Attorney's Office  │
└─────────────────────────────┘
```

Dear Carolyn,

Thank you for meeting with me telephonically on October 19th to discuss your employment status. I have reviewed your comments and I can see no reason to not follow Ordinance 1369.

Many of your comments related to matters which are not relevant to the issue of whether you refuse to report to a work site in Ketchikan in a facility owned or controlled by the Borough which is central to this employment action. The only information relevant to the issues raised by the October 13, 2005 letter advising you of potential personnel action was the question of whether Ordinance 1369 would apply to you when you were hired prior to adoption of the ordinance.

I believe that an elected body may change requirements for employees from time to time, and the action taken by the Assembly is not in conflict with any employment requirements that I am aware of. Your situation is no different from the AMHS employees who lived in Juneau, and when that facility was moved to Ketchikan, the employees could either report to work in Ketchikan or no longer work for AMHS. An employee does not obtain a vested right to a particular desk, chair, or work location. The employer has the right to require that employees work only in approved locations. Therefore, I find that the fact that you were employed prior to adoption of Ordinance 1369 and its requirement that employees work only in Borough owned or controlled facilities is not relevant, and will not preclude application of that ordinance to you.

Again, after reviewing our conversation of last Wednesday, I can find no compelling reason to not require that the ordinance be complied with. Therefore you are terminated effective November 1, 2005. Please make arrangements to return any Borough equipment you may have as soon as possible.

This decision is a final decision. In accordance with KGB Code 30.30.041 you have the right to file a grievance regarding this action. Because this is a decision of the manager, any such grievance must be filed within 10 days, and will be at step III of the grievance process.

Sincerely,

Roy Eckert,
Borough Manager

c    Scott Brandt-Erichsen, Borough Attorney
     Personnel File

EXHIBIT 24
Page 3 of 3

KB 062

EXHIBIT 5
Page 1 of 1

http://www.borough.ketchikan.ak.us

EXHIBIT 25

In my 30-year Human Resources career I have been employed as the HR Manager of facilities and employees located far from my office for a total of seven years. My training, education, research - and those seven years of experience - have given me a thorough understanding and expertise in the issue of geographically-remote Human Resources Management.

I was retained in this case to render an expert opinion on an issue well within my expertise: Was there reason to think that Plaintiff could not have continued to satisfactorily perform her assigned duties for Ketchikan Gateway Borough (KGB) from the location in Oregon?

As I will discuss below, a thorough and objective review of the evidence compels the conclusion that Plaintiff performed her duties competently throughout her stay in Oregon, and would have continued to do so if not discharged.

I closely reviewed Plaintiff's 2004 Job Description, her Performance Appraisals by Mr. Eckert, and the extensive correspondence generated after her mid-2005 departure for Oregon. Also important was Plaintiff's deposition, in which she testified in detail about her job duties and about her arrangements for doing all of those duties remotely from Oregon.

In my expert opinion, nothing in the 2004 Job Description is a duty a skilled, experienced and organized incumbent like Plaintiff could not perform remotely using the techniques available to Plaintiff.

Plaintiffs' Performance Appraisals establish that she was viewed by her superior, Mr. Eckert, as far above average in each element of performance and "Above Average Overall". Her Overall ratings for both periods were tenths-of-a-point short of the highest possible score: Outstanding. Her Overall ratings rose from one year to the next. Mr. Eckert's appraisal of Plaintiff confirms that she was substantially better than fully satisfactory to her employer KGB in all of her duties; duties she mastered in her first year. In my expert opinion, Plaintiff was just the kind of employee KGB could trust to work remotely, if that became necessary.

In her deposition testimony, Plaintiff explained how she prepared for working remotely, and how she accomplished her duties once in Oregon. In my expert opinion, her plans were thoughtful, confident, realistic, and flexible. She included provisions for returning to KGB at her own expense when face-to-face duties required, and she actually did so.

A review of the voluminous e-mail and letter correspondence was vital to arriving at my conclusions and expert opinions. First, because much of the correspondence itself is evidence that KGB's Human Resources work was getting done -- by Plaintiff working remotely. Second, because the correspondence confirms that Plaintiff was working just as she had planned: by phone, e-mail, fax, and occasional travel to KGB. Third, because exchanges between Plaintiff and the managers and employees she supported show that her "clients" were confident in her ability to support them remotely, and satisfied with her services. Fourth, because the correspondence gives no indication that Plaintiff's was performing her duties in a manner other than competently, thoroughly, and timely.

Finally, the most important finding I drew from the correspondence was that even after her relationship with Mr. Eckert became contentious and he began to demand her return to KGB, neither Mr.

EXHIBIT 25
Page 1 of 2

Eckert nor any other KGB official ever suggested that unsatisfactory performance – or even "Average" performance - was at all a factor in Plaintiff's treatment. KGB's non-negotiable demand was that she return to the Borough and <u>continue</u> her "Above Average" performance, not at all that she had <u>failed</u> at the remote support experiment.

In my expert opinion, the evidence allows only this conclusion: Plaintiff skillfully planned to succeed in providing remote HR support, her employer had good reason for confidence she would succeed, and she did succeed at performing her assigned duties competently right up to her discharge. Had she not been dismissed, I am convinced she would have continued to perform satisfactorily.

I reserve the right to amend and supplement my expert opinions if provided additional evidence or if posed additional questions.

EXHIBIT 25
Page 2 of 2

EXHIBIT 26

Leland C. Wilson
Dispute Resolution Services
2045 S. Parkwood Circle
Spokane, Washington 99223

Mark Sandberg
Sandberg, Wuestenfeld and Corey
701 West 8th Avenue, Suite 1100
Anchorage, Alaska 99501

Dear Mr. Sandberg:

This is my expert report, re <u>Carolyn Thomas vs. Ketchikan Gateway Borough and Roy Eckert</u>.

I.    QUALIFICATIONS

I hold a Master's degree in Labor Relations and Human Resource Management from Antioch University. During the period between July, 1983, and my retirement from the Anchorage School District in June, 2002, I held several positions of responsibility for employee discipline, recruitment of personnel, training of supervisors, and adjudication of disputes filed under negotiated grievance provisions contained within Collective Bargaining Agreements. At the time of my retirement, I supervised all human resource functions for the District, the 80th largest school district in the country, with more than 6,000 full and part-time employees. I also served, for three years, as Chair of the Anchorage Municipal Employee Relations Board.

During my tenure with Anchorage I was the primary author of the District's certificated and classified evaluation instruments; a Handbook for "How to Write a Plan of Improvement" for teachers which was distributed by the State Department of Education and Early Development; the School Report Card report, still in use, and numerous training materials for principals and supervisors. I also designed and taught short credit courses in "Standards-Based Supervision and Evaluation" of both teachers and principals, built upon the performance standards for both groups.

I have been employed in an adjunct and regular capacity with the University of Alaska/Anchorage, since 1997, offering courses in "Law and Ethics in Education" and "Politics of Education" for aspiring school administrators. These courses are required for completion of either a Masters degree in Educational Leadership or to establish eligibility for a Type B administrative Certificate.

I have held certificates in the State of Alaska for teacher, K-12 principal, and superintendent.

EXHIBIT 26
Page 1 of 6

II.    FILE MATERIALS AND OTHER INFORMATION CONSIDERED AND REVIEWED

See Attached letter from Mr. Sandberg, listing materials provided and reviewed.  I have also reviewed the expert witness report, submitted by Dr. Baxter, and the financial impact report prepared by Dr. Silberberg.

III.   COMPENSATION

I have been or will be compensated by the Defendants, through the attorney representing the borough's insurance carrier, at the rate of $150.00 per hour plus travel and miscellaneous expenses.

IV.   INSTANCES WHERE I HAVE TESTIFIED AS AN EXPERT WITNESS, AT TRIAL OR BY DEPOSITION, WITHIN THE PRECEDING FOUR YEARS.

I prepared a report and testified in the case of <u>Jane Doe v. Mark Woodward and Dillingham School District</u>.

V.    STATEMENT OF OPINIONS

A.    Scope and Purpose of the Report

I have been asked to render an opinion regarding assignment of human resource management responsibilities for the Ketchikan Gateway Borough (hereafter KGB) to someone residing and working outside of Ketchikan, in Oregon.  More specifically, I am to address (1) whether the job of Human Resource Manager/Safety Officer can be done remotely and (2) whether the practice of assigning human resource management functions to an employee in a remote location is common or reasonable, in the public sector.

B.    General Information

The Ketchikan Gateway Borough is a public agency, a governmental unit, established under state law for the sole purpose of providing public services, at public expense.  The borough does not produce products or services to be sold in the private market, for profit.  The success of its operations cannot be measured by reference to revenue generated but by the satisfaction of the elected policy body, which represents the people of the borough.  The cultivation and maintenance of public support for government operations is as important to borough management as is the response of the private market to products and services produced and offered for sale by private businesses.  Managers in public sector organizations are important agents, whose conduct, performance, manner, even appearance, reflect upon the organization.  They are not simple technicians, whose tasks can be completed out of sight of the public.  They represent the organization to the various publics on which it must rely for support.

EXHIBIT 26
Page 2 of 6

2

C.    Relevant Considerations

Although private companies have grown more flexible in how they assign and supervise employees, including remote duty stations and arrangements for working at home, such companies are driven by a mission that is fundamentally different from that assigned to public sector organizations. Flexibility in how work is done and where it is done is much more limited in public sector, for a variety of reasons, not the least important of which is a concern for public perception and judgment. My experience with both the Municipality of Anchorage – governed by a Mayor, Manager, and Assembly – and the Anchorage School District (ASD) – governed by an elected school board and appointed superintendent – leaves no doubt that public managers are expected to be on the job where they can be seen by the public and other employees, every working day. There are certainly conditions under which it might be appropriate for a public sector duty station to be assigned, away from normal locations, for certain work to be done. In my experience, those conditions are very limited and almost always involve technical positions, with little authority or responsibility for public contact and organizational representation.

D.    First Question: Can the job of Human Resource Manager/Safety officer be done remotely?

The Human Resource Manager/Safety Officer is the Borough's primary Human Resource position, with clerical support provided. The job description for the position indicates numerous task, supervisory, and advisory responsibilities. It is a management position. Some duties of that position could be satisfied telephonically and via email or regular mail. Evidence that some duties were completed by Plaintiff, while in Oregon, was provided and reviewed. However, the full scope of duties typically carried by a position of this sort, in a public sector organization, could not be completed remotely, by Carolyn Thomas, or anyone else. The human resource manager is often the first point of contact between applicants for employment and the Borough. The job requires regular contact with job seekers; with members of the general public; with supervisors from other areas; with employees within and without the Borough office building; with members of the Assembly; with other governmental employees who might want to drop by for a chat or to receive help and advice; and, finally, with the supervisor, in this case the chief executive officer of the Borough. High visibility is a common expectation of public sector managers, especially in the human resource arena. A manager not routinely seen simply is not felt to be part of a working team, by other employees. Managers not routinely seen providing service *in person* are reasonably judged to be unnecessary. Within a public sector operation, often forced to function with inadequate financial support, the discovery that work can be performed without the presence of a full-time management leader may fairly result in a determination that the position is not needed, as is currently true in this case.

The duties typically assigned to a given position are simply picked up by others, when the employee assigned to that position works remotely. The changes may not occur immediately, assuming a good faith effort is made to "do the job," but it is common for people with questions, issues, problems, to want to talk directly to a manager. When the lead manager is not available, they go to another person, who might be able to help. In

EXHIBIT 26
Page 3 of 6

3

my experience, employees who are out of town – on professional trips – and try to "keep up" with telephone traffic and emails, may manage to do so. Nonetheless, when they return to their normal duty stations, they face work that has accumulated in their absence, work that could not be completed from a distance. I have had several employees on Family Medical Leave try to "keep up" with their work, in order to reduce the amount of leave they were charged. Sometimes their efforts were helpful but no one pretended that the full scope of responsibilities assigned to a given position could be accomplished as well from afar as when the person returned to regular duty, at the normal duty station. Often employees simply adjust to gaps in coverage caused by absent colleagues, whatever might be their status. That is normal and, in the short run, causes few problems. Long absences, whatever the effort to "keep up" by the absent employee, will normally result in formal assignment of responsibility to another person, present at the normal work location, or abandonment of the position and the services it was intended to provide.

E. Second Question: Is the practice of assigning human resource management functions to an employee in a remote location common or reasonable, in the public sector?

It sometimes happens that an administrator will arrange for completion of specific projects when the employee assigned to complete those projects gives notice of intent to leave, if completion can be arranged to meet required time lines and to satisfy organizational needs. This is especially likely in a case where a change in agent might have adverse consequences. For example, an arrangement between the Borough Manager and Ms. Thomas which would ensure completion of collective bargaining agreements, after she moved from Ketchikan, would be sensible, appropriate, and not particularly unusual. Completion of those agreements could be made separate and distinct from providing general human resource services to the Borough. However, it would be highly unusual – unprecedented, in my experience – for a chief executive officer in a public agency to attempt to satisfy human resource management needs of that agency by assigning responsibility to a manager, working out of state.

Plaintiff's expert clearly holds a different view and several of his opinions require comment. In general, he concluded that had Plaintiff not been terminated, she would have continued to "satisfactorily perform her assigned duties" from Oregon. The unanswered question, however, is to whose satisfaction were the duties required to be performed? The Plaintiff had a supervisor, the Borough Manager. If Plaintiff was to retain her responsibilities as Human Resource Manager, her supervisor required that she return to work in Ketchikan. Reasonably, the requirement to return may be construed to indicate her supervisor's dissatisfaction with the arrangement for remote work which Plaintiff claims she had. In any organization I have worked with or read about, that would be the end of the story.

Dr. Baxter's conclusion that Plaintiff could successfully complete all duties and responsibilities from Oregon stemmed, at least in part, from a review of the job description for Human Resource Manager/Safety Officer position and from a reading of email traffic generated by Plaintiff between June, 2005, and the effective date of her termination, in October, of the same year. I referenced the Job Description earlier, in concluding that the position under review was indeed managerial. On closer

EXHIBIT 26
Page 4 of 6

examination, it appears to follow a common format. It begins with an explanation of the purpose of the job description, as a management tool; it moves into a "Job Summary," and then lists essential job functions, and so forth. The duties listed "are intended only as illustrations of the various types of work that may be performed." The real job is captured in the "Job Summary," which reads: "Performs a variety of complex administrative, technical and professional work in administering the personnel systems of the organization including classification compensation, recruitment, selection, labor relations, and training.    Responsible for the organization, coordination, and administration of the day-to-day functions of the Borough's personnel management system, including recruitment, performance appraisals, pay adjustments, training, negotiation and administration of labor contracts, maintenance of personnel files, and the implementation of the Borough's procedures under federal and state laws such as FMLA, FLSA, ADA, PERA, and laws governing civil rights. Administer Family medical leave, workers compensation, Health Insurance and workplace safety programs."

This summary does not describe an easy job; it describes a leadership position of considerable significance. Although the job description of the Assistant Borough Manager is said to include some responsibilities in the human resource area, testimony indicates that while Plaintiff worked at the Borough office, she handled all human resource work. She could not continue to do so, following her departure; consequently, her duties were picked up by others, either by assignment or necessity. Plaintiff asserted that work was taken from her by the Borough Manager, implying that had he assigned full and exclusive responsibility for the manager position to her, she would have been able to do the complete job. It is my opinion she could not.

The failure would not have stemmed from incompetence. Clearly, Plaintiff was viewed as a competent performer and a valued member of the management team, up until her departure, in June, 2005. Had circumstances allowed Plaintiff to remain able to provide service from her assigned office in Ketchikan, she would have been welcome. This dispute really is not about competence or job performance, prior to June 6.

There is reference in Dr. Baxter's report to "voluminous email and letter correspondence" prepared by the Plaintiff, from Oregon. That material was "vital to arriving at (his) conclusions and expert opinions." The problem is, of course, the term "voluminous" is not defined, although the implication is that the number of items reviewed was sufficiently large to warrant the conclusion that the job of Human Resource Manager was being "satisfactorily" performed. In my experience, it is not uncommon for a public sector human resource manager – a lead position – to receive and respond to dozens of emails and telephone calls each working day. Assuming about 90 work days between June 6 and the October termination date, it would be normal to expect the full record of emails alone to approach three hundred, if full duties were performed. The record provided includes nowhere near that number let alone a number large enough to support the declaration that the correspondence was "voluminous."

Finally, on the last page of Dr. Baxter's report, he declares that "neither Mr. Eckert nor any other KGB official ever suggested that unsatisfactory performance – or even "Average" performance – was at all a factor in Plaintiff's treatment." The best information in the provided record regarding the quality of Plaintiff's performance is

found in evaluation documents completed by the Borough Manager before June, 2005. She was a good and valued employee. However, that fact has no relevance to the actual dispute.

F.    Conclusion

While it is clear, from a review of the record, that Ms. Thomas undertook and did complete some amount of work of the sort previously done at her normal work station, at the Borough offices, it is unreasonable to conclude that she was providing the same level of service for which she was credited, prior to June, 2005. Asserting that full service in the human resource arena could be provided by a remotely located manager seriously understates the importance of direct personal contact, ready availability, team interaction, and public visibility. The position under review was not exclusively technical, it was managerial, charged with "a variety of complex administrative, technical and professional work in administering the personnel systems of the organization…" Certainly, many tasks could be completed remotely, but the full scope of responsibilities for the position could not reasonably be satisfied. Any attempt by a public entity to assign Human Resource Manager responsibilities to an employee working, not simply off the regular work site but out of state, would be unprecedented, in my experience, and operationally untenable.

I understand that I may receive additional materials to review. This report is based on material available at the time it was prepared.

Sincerely,

Leland C. Wilson
Dispute Resolution Services

Submitted: October 5, 2006

EXHIBIT 26
Page 6 of 6

6

EXHIBIT 27

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT KETCHIKAN

CAROLYN L. THOMAS,

    Plaintiff,

    v.                    Case No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH,
and ROY ECKERT, in his
individual and official
capacity,
    Defendants.
_____/

DEPOSITION OF ROY ECKERT

JULY 19, 2006

APPEARANCES:

FOR THE PLAINTIFF:

                Terry Venneberg
                1126 Highland Avenue, Suite 101
                Bremerton, Washington  98337

FOR THE DEFENDANTS:

                Mark A. Sandberg
                Sandberg, Wuestenfeld & Corey
                701 West 8th Avenue, Suite 1100
                Anchorage, Alaska  99501

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 18

1  state of the law prior to October 4, 2005?
2  A   Yes, yes it was.
3  E   Okay.  And could you read that?
4  A   Okay.  Residency within the Borough shall not be a
5  condition of initial employment -- or appointment, sorry -
6  - or continued employment, except as otherwise required by
7  state law, the Borough Code of Ordinances, or resolution.
8  Provided, however, that an employee's residence location
9  shall not interfere with the daily performance of an
10  employee's duties and responsibilities.
11  Q   Okay.  And Ordinance 1369 served to amend that
12  paragraph.....
13  A   Yes, it did.
14  Q   .....to add the language that is underlined.....
15  A   Yes.
16  Q   .....on page KB289?
17  A   Absolutely correct.
18     MR. SANDBERG:  Among other things.
19     MR. VENNEBERG:  Right, among other things.  But as to
20  that particular paragraph, that's --that's what it did to
21  that paragraph?
22  A   Yes, sir.
23  Q   So, the code, prior to the amendment that was in
24  Ordinance 1369, provided that residence within the Borough
25  was not a condition of employment for Borough employees.

Page 19

1  Would that be fair to say?
2  A   I believe it says initial employment, if I read that
3  right.  Of initial employment......
4  Q   Initial employment or continued employment.
5  A   .....or continued employment.  Right.
6  Q   Okay.  So, I'll ask the question again, then.  Would
7  it be fair to say that the Code, prior to the amendment
8  that was Ordinance 1369, provided that residency within
9  the Borough was not a condition of employment for Borough
10  employees?
11  A   Of initial employment, no.  But -- and I understand
12  the continued employment.
13  Q   Or continued employment, right.  Okay.  And it also
14  provided that residence location shall not interfere with
15  the daily performance of an employee's duties and
16  responsibilities, right?
17  A   (No audible response.)
18  Q   Okay.  Would it be fair to say, then, that under the
19  Code prior to amendment that an employee could not be
20  disciplined for residency location, unless the residency
21  location interfered with the daily performance of their
22  duties?
23     MR. SANDBERG:  I object to calling for a legal
24  conclusion, but if he has an understanding, I'll let him
25  answer it.

Page 20

1     MR. VENNEBERG:  Right.
2  Q   I'm just asking for your understanding.
3  A   Okay.  My understanding is that within the Borough,
4  absolutely correct.  But again, out of state, I don't
5  think was ever contemplated.
6  Q   Okay.  But the -- the Code prior to 1369 didn't refer
7  to out-of-state or in state?
8  A   Right.
9  Q   It says, basically, that residency location is not a
10  condition of employment, unless it interferes with an
11  employee's daily performance?
12  A   Right.
13  Q   Right.  Okay.  Was there any time during the
14  employment of Carolyn Thomas where her residency location
15  interfered with the daily performance of her duties?
16  A   Prior to her moving?  Absolutely not.
17  Q   At all.  At any time during her employment.
18  A   It's hard to say.  When she left, the understanding
19  we had was that she was working on union contracts,
20  finishing those up alone, and that was all, and that's --
21  and she was able to do that, you know, by phone and fax
22  and emails.  So, in that respect, no.
23  Q   Okay.  So, the answer to the question I posed was no,
24  then?
25  A   No --

Page 21

1     MR. SANDBERG:  I -- I object to that.....
2     MR. VENNEBERG:  Sure.
3     MR. SANDBERG:  .....because that, I believe
4  mischaracterizes his testimony.
5     MR. VENNEBERG:  Okay.  Well, let me ask the question
6  again, because I think it's -- I think it's a yes or no
7  question.  Was there anytime during the employment of
8  Carolyn Thomas, where her residency location, in your
9  view, interfered with the daily performance of her duties?
10  A   As HR Director?
11  Q   As a -- right.  That was her position, right?
12  A   Yes.  Yes.  And I would have to say yes to that.
13  Q   Okay.  And at what point during her employment did
14  her residency location interfere with the daily
15  performance of her duties?
16  A   Okay.  We would have numerous things under her job
17  description that were to be fulfilled by the HR person in
18  charge, handling safety issues, training meetings,
19  complaints, very technical personnel files and issues,
20  such as injuries, accidents, things that would come up on
21  a daily nature, garnishments, things like that, that I
22  would, quite frankly, have no business seeing, or anyone
23  else, for that matter.  We take our personnel issues very,
24  very seriously.  And that -- that cannot be done long
25  distance.  It's just impossible.

EXHIBIT 27
Page 2 of 3

6 (Pages 18 to 21)

THOMAS v. KETCHIKAN GATEWAY BOROUGH, ET AL.

ROY ECKERT
7/19/2006

Page 22

1  Q  Okay.  Was there any point prior to October 4, 2005,
2  where Ms. Thomas' residency location interfered with the
3  daily performance of her duties?
4  A  Again, after her leaving June 1st, other than the --
5  other than the union issues, union contract issues, which
6  were almost done, you know, there was no way to perform
7  other HR functions, you know, on a daily basis, you know,
8  via long distance.
9  Q  Okay.  So, the answer to the question was yes, then,
10 that at some point before October 4, 2005, that her
11 residency location interfered with the daily performance
12 of.....
13 A  Yes.
14 Q  .....her duties?
15 A  Yes.
16 Q  Okay.  And at what point did that come?
17 A  Well, it would have been any time after she left,
18 which was somewhere around the first of June, 1st or 5th,
19 I can't remember exactly what dates she was gone, but --
20 Q  Okay.  And I believe the testimony was June 6th.
21 Does that sound right?
22 A  Yes, it sounds right.
23 Q  Okay.  So, as of June 6, 2005, it's your view that
24 her residency location interfered with the daily
25 performance of her duties?

Page 24

1  believe that he testified she left her position on June
2  6th, when she got on an airplane and that they had an
3  understanding that she would be doing some continuing
4  work, but would not be doing the -- the entire HR job
5  remotely.  And therefore, when you -- each of your
6  questions assumes that he thinks she's still the HR
7  Director in Oregon, and that's my objection.....
8     MR. VENNEBERG:  Okay.
9     MR. SANDBERG:  .....to the form.
10    MR. VENNEBERG:  Well, I'll accept that as a daily
11 objection, but it does -- it does open up a line of
12 questioning, then.
13 Q  So, is it your view that Ms. Thomas left her position
14 as HR Manager, effective June 6th, 2005?
15 A  Yes.
16 Q  Okay.
17    MR. SANDBERG:  And that was the basis of my
18 objection.
19    MR. VENNEBERG:  Okay.
20 Q  And did -- did Ms. Thomas -- so, it's your view that
21 Ms. Thomas resigned, effective June 6, 2005?
22 A  Yes, sir.
23 Q  Was there a written letter or notice that reflected
24 that?
25 A  I know we had discussed it at length.  She had been

Page 23

1  A  Yes.
2  Q  Okay.  Did you ever discipline Ms. Thomas under the
3  previous ordinance that provided that -- that residency
4  was not a condition of employment unless it interfered
5  with the daily performance of her duties?  Did you ever
6  discipline her under that ordinance?
7  A  You're talking prior to -- I mean, after June 6th?
8  Q  Yes, after -- yes.
9  Q  No.  Because it was our understanding that she had --
10 had resigned and she was strictly working on HR -- or
11 union contract functions, period.  There was no need for
12 this.
13 Q  Okay.  So, the answer is no?
14 A  No.
15 Q  As of June 6, 2005, when did you expect that Ms.
16 Thomas would be leaving her position?
17 A  We had discussed that the union contracts would
18 probably be finished -- we were shooting for early to mid-
19 June, but August 1st, at the latest, was what we had
20 contemplated.
21 Q  Okay.  So, was there a date in there, then?  Was that
22 -- was it July 1?
23    MR. SANDBERG:  Terry, may I have a continuing
24 objection?  I don't want to keep interrupting you, but,
25 simply, my objection is to form.  And only because I

Page 25

1  in my office in late February, early March, stating that
2  she would be resigning effective and maintained that all
3  the way down through June -- or through May, rather.  I
4  had asked her to put something in her personnel file,
5  stating she had resigned, because I didn't want people in
6  town saying that she had been fired, because that was not
7  the case.  And I had reported to the Assembly that she
8  would be leaving, effective, you know, June 1, or shortly
9  thereafter.  But as far as anything else, I'm not aware of
10 it.
11 Q  I'd like you to turn to KB34.  Okay.  What -- do you
12 have that in front of you?
13 A  I do.
14 Q  What is KB34?
15 A  KB34 is a personnel action file, PAF they call them.
16 It's a -- we do this for every employee that has a change
17 in status of employment, whether it be a you know, raise
18 or, you know, being -- resigning, being terminated,
19 whatever.  So.....
20 Q  Okay.
21 A  .....it's just a record of what was done.
22 Q  Okay.  And KB34 was a personnel action that concerned
23 Carolyn Thomas, is that right?
24 A  Yes, sir.
25 Q  Okay.  And this reflects her dismissal from

EXHIBIT 27
Page 3 of 3

7 (Pages 22 to 25)

EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT KETCHIKAN

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

CAROLYN L. THOMAS,

        Plaintiff,

    vs.                                  No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH

and ROY ECKERT, an individual

and official capacity,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION UPON ORAL EXAMINATION OF

CAROLYN THOMAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -


9:05 a.m.

June 20, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington


Zel D. Gonce, CCR          1601 Fifth Avenue, Suite 860

(CCR No. 2458)             Seattle, WA  98101


Moburg & Associates - Seattle, WA (206) 622-3110

Thomas v. Ketchikan Gateway Borough                6/20/06                                    Carolyn Thomas

Page 73

1          I called Mike.  Mike said he hadn't said

2    anything of the kind.  He also told me that he probably

3    wouldn't have allowed me to keep my job indefinitely.

4    But he wasn't the Borough manager and it wasn't his

5    call.  And that is in this letter.

6          Roy denied having told anyone I had

7    resigned.  But practically everybody in the staff

8    meeting told me he had said that.  And Roy also told

9    Scott Brandt-Ericksen, who is the Borough attorney,

10   that I had given him a letter of resignation.  But when

11   Scott asked him for copy of it, Roy couldn't produce

12   it.

13          Q.    And I take it no such letter ever existed?

14          A.    And I have never given Roy a letter of

15   resignation.  I mean, it's just -- what was your

16   question?  When's the last time I talked to him?  You

17   know, I honestly cannot tell you that, sir.

18          Q.    Actually, the question was related to your

19   conversation with Mr. Salazar, but let me ask a

20   different one.  Go to the fourth page of this, page 18.

21          A.    Okay.

22          Q.    In the one, two, third paragraph down are

23   the words "I will tender my resignation under the

24   following conditions.  If the conditions are accepted I

25   will sign a document to be prepared by the Borough

# EXHIBIT 29

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT KETCHIKAN

- - - - - - - - - - - - - - - - - - - - - - - - - - -

CAROLYN L. THOMAS,

         Plaintiff,

     vs.               No. 5:06-cv-00001-JWS

KETCHIKAN GATEWAY BOROUGH

and ROY ECKERT, an individual

and official capacity,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION UPON ORAL EXAMINATION OF

CAROLYN THOMAS

- - - - - - - - - - - - - - - - - - - - - - - - - - -

9:05 a.m.

June 20, 2006

1601 Fifth Avenue, Suite 860

Seattle, Washington

Zel D. Gonce, CCR      1601 Fifth Avenue, Suite 860

(CCR No. 2458)        Seattle, WA  98101

Moburg & Associates - Seattle, WA (206) 622-3110

Thomas v. Ketchikan Gateway Borough                6/20/06                                Carolyn Thomas

Page 62

1          Q.    Does that mean you would have left or you

2     expected to leave during 2005 --

3          A.    Probably.

4          Q.    -- otherwise?

5                So if Mr. Eckert hadn't authorized you to

6     work remotely, your expectation was you were going to

7     quit sometime during the year 2005?

8          A.    Possibly.

9          Q.    How about probably?  Do you know?

10         A.    No, I said possibly.

11         Q.    What's this mean then, "Otherwise, I would

12    not have left until at least December"?

13         A.    Well, I wouldn't have.  I would not have

14    left until in June.

15         Q.    Maybe I'm wrong, but I thought earlier this

16    morning you told me your mother's situation required

17    you to be down in Oregon by the summer of 2005?

18         A.    My husband has spent the last three summers

19    in Oregon taking care of Mother and we would have

20    continued that.

21         Q.    So if Mr. Eckert hasn't authorized you to

22    work remotely what would you have done?

23         A.    I would probably have stayed in Ketchikan

24    longer.

25         Q.    If Mr. Eckert had not authorized you to

Thomas v. Ketchikan Gateway Borough                6/20/06                                    Carolyn Thomas

Page 63

```
 1   work remotely would you still be working in Ketchikan
 2   today?
 3           A.   I can't answer that question.  I truly
 4   can't.  I can't give you a definitive answer on that.
 5   I probably would still be in Ketchikan using my PTO,
 6   going back and forth.
 7           Q.   I thought that earlier this morning when we
 8   were discussing how this all came up it had come up
 9   because you had gone to Mr. Eckert and told him that
10   you had to leave?
11           A.   I did.  The word I used was "needed."
12           Q.   Right.
13           A.   But you're asking me to speculate on "what
14   ifs," and I can't do that.
15           Q.   Well, in February of 2005, you went to
16   Mr. Eckert and told him that you needed to leave your
17   employment --
18           A.   Yes.
19           Q.   -- to go to Oregon?
20                 MR. VENNEBERG:  Wait until he finishes
21   his question.
22                 THE WITNESS:  Sorry.
23           Q.   (By Mr. Sandberg)  That's how this all got
24   started, right?
25           A.   Yes.
```