UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

CAROLYN THOMAS,                      )
                                     )
          Plaintiff,                 )      5:06-cv-00001 JWS
                                     )
vs.                                  )      ORDER AND OPINION
                                     )
                                     )      [Re:   Motion at Docket 14]
KETCHIKAN GATEWAY BOROUGH,           )
and ROY ECKERT, in his individual    )
and professional capacity,           )
                                     )
          Defendants.                )
_____)

## I.  MOTION PRESENTED

At docket 14, defendants Ketchikan Gateway Borough and Roy Eckert move for

an order granting partial summary judgment pursuant to Federal Rule of Civil Procedure

56.  At docket 24, plaintiff Carolyn Thomas opposes the motion.  Defendants reply at

docket 26.  Oral argument was heard on February 6, 2007.

## II.  BACKGROUND

On March 29, 2004, Ketchikan Gateway Borough ("the Borough") employed

Carolyn Thomas as Human Resources Manager ("HR Manager").   Roy Eckert,

Borough Manager, was Thomas's direct supervisor.   In February 2005, Thomas

informed Eckert that she needed to move to Oregon to care for her mother and that she anticipated leaving in June 2005.[1]  During the next few months, Thomas and Eckert discussed the possibility of Thomas performing at least some work for the Borough from Oregon.  Thomas contends that Eckert authorized Thomas to perform her functions as HR Manager for the Borough from a remote location in Oregon.[2]  The Borough and Eckert contend that Eckert only agreed to allow Thomas to work from Oregon on completing negotiations for two union contracts.[3]  Thomas and Eckert did not reduce any agreement to writing.

On June 6, 2005, Thomas moved to Oregon.  After Thomas moved, Eckert told other Borough employees that Thomas voluntarily resigned and would only be finishing work on the union contract negotiations.[4] On June 29, 2005, Thomas sent an e-mail to Borough supervisors stating that she was still employed full-time as the Borough's HR Manager and was performing her duties from Oregon with Eckert's permission.  She also provided her contact numbers and stated that she was to be consulted on all disciplinary matters and personnel issues "just like when I was still in Ketchikan."[5]

In a memorandum dated August 5, 2005, Eckert notified Thomas that the Borough Assembly had decided to enact a policy requiring all Borough employees to reside in the Borough and to work in Borough facilities.  Eckert stated that if Thomas wanted to continue

---

[1]Doc. 20, exh. 4 at 5-6.

[2]Doc. 1 at 2.

[3]Doc. 4 at 2.

[4]Doc. 4 at 2.

[5]Doc. 20, exh. E at 1.

her employment with the Borough, she needed to report to work at the Borough offices by September 1, 2005.[6]  By letter dated August 5, 2005, Thomas responded that she would tender her resignation if the Borough agreed to pay her an amount equal to her current pay and benefits for four years.  Thomas stated that if her proposal was not accepted she would continue her employment as HR Manager while living in Oregon.[7]  By letter dated August 12, 2005, Thomas informed Eckert that she was not moving back to Ketchikan.[8]

On September 19, 2005, the Borough Assembly adopted Ordinance 1369, which amended the Borough Code to provide as follows:

> **30.20.016.  Residency**.  Residency within the borough shall not be a condition of initial appointment or selection as an employee.  However, all employees shall and as a condition of their continued employment, reside within the corporate boundaries of the Borough within three months after the later of October 1, 2005, or their date of hire.  The requirements of this section may be waived on the written recommendation of the Manager approved by motion or resolution of the Assembly based on a finding that such waiver is found to enhance the efficiency or effectiveness of the Borough workforce.  Such recommendation shall set forth the justification for the exception and any conditions which apply.
>
> **30.30.038 Work Location**.  Borough employees shall report to a regular work location designated by the Manager or designee.  All regular work locations to which Borough employees report for work shall be controlled by the Borough, whether as a Borough owned or Borough leased facility...The provisions of this section may be waived only to the extent and upon the terms authorized by the manager in writing and approved by the Assembly by motion or resolution.[9]

---

[6]Doc. 20, exh. F at 1.

[7]Doc. 20, exh. G at 4.

[8]Doc. 20, exh. H at 2.

[9]Doc. 20, exh. I at 2-3.

The ordinance went into effect on October 4, 2005.[10]  Prior to the adoption of Ordinance 1369, § 30.20.016 provided as follows:

> **30.20.016.  Residency**.  Residency within the borough shall not be a condition of initial appointment or continued employment, except as otherwise required by state law, the Borough Code of Ordinances or resolution; provided, however, that an employee's residence location shall not interfere with the daily performance of an employee's duties and responsibilities.[11]

By letter dated September 26, 2005, Eckert let Thomas know that the assembly passed Ordinance 1369, "which requires all Borough personnel to live in and report to work in the Borough on or at Borough owned facilities."[12]  Eckert requested Thomas's  "final decision as to [her] intent to return to work here in Ketchikan by no later than Friday, October 7th."[13]  By letter dated October 7, 2005, Thomas indicated that she gave Eckert her final decision in August.  Thomas further suggested that Ordinance 1369 does not apply to her because it was adopted in September 2005, and she was hired in March 2004.[14]

Eckert responded by letter dated October 13, 2005, which states in pertinent part:

On September 19, 2005, the Assembly adopted Ordinance 1369.  This ordinance became effective October 4, 2005.  In accordance with this ordinance the Borough code now requires all Borough employees to reside in the Borough.  It also requires that the work location for Borough employees be in facilities owned or controlled by the Borough, unless authorized in writing by the manager and approved by the Assembly.

---

[10]Doc. 20, exh. L at 1.

[11]Doc. 24, exh. 17 at 2.

[12]Doc. 20, exh. J at 1.

[13]*Id.*

[14]Doc. 20, exh. K at 1, exh. H at 2.

Accordingly beginning October 4th, 2005, it will not be permissible under the code for you to perform your duties from Oregon. In your letter of October 7, 2005, you have communicated that you refuse to regularly report to a work location in Ketchikan. This position leaves me no choice but to terminate you for failure to comply with mandatory work rules set out in the Borough code.

Prior to actual termination, however, I want to offer you the opportunity to present any and all information you wish to explain why you should not be terminated for this cause. Please meet with me on October 19th at 1:00 p.m. Alaska time for this purpose.[15]

Thomas and Eckert met telephonically on October 19, 2005. By letter dated October 21, 2005, Eckert terminated Thomas's employment with the Borough effective November 1, 2005. As to the issue Thomas raised about whether Ordinance 1369 applies to her, Eckert's letter states in relevant part:

I believe that an elected body may change requirements for employees from time to time, and the action taken by the Assembly is not in conflict with any employment requirements that I am aware of. Your situation is no different from the AMHS employees who lived in Juneau, and when that facility was moved to Ketchikan, the employees could either report to work in Ketchikan or no longer work for AMHS. An employee does not obtain a vested right to a particular desk, chair, or work location. The employer has the right to require that employees work only in approved locations. Therefore, I find that the fact that you were employed prior to adoption of Ordinance 1369 and its requirement that employees work only in Borough owned or controlled facilities is not relevant, and will not preclude application of the ordinance to you.

Again, after reviewing our conversation of last Wednesday, I can find no compelling reason to not require that the ordinance be complied with. Therefore you are terminated effective November 1, 2005.[16]

On March 3, 2006, Thomas filed the underlying complaint alleging claims under

---

[15]Doc. 20, exh. L at 1.

[16]Doc. 20, exh. M at 1.

42 U.S.C. § 1983 and promissory estoppel claims against the Borough and Eckert. On October 30, 2006, the Borough and Eckert filed a motion for partial summary judgment.[17] The parties subsequently stipulated pursuant to Federal Rule of Civil Procedure 41(a) that all claims against Eckert be dismissed with prejudice.[18] The court has federal question jurisdiction under 28 U.S.C. § 1331 over plaintiff's Section 1983 claim, and supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiff's state law claim.

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. The moving party has the burden to show that material facts are not genuinely disputed.[19] To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[20] Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue of fact exists by presenting evidence indicating that certain facts are disputed so that a fact-finder must resolve the

---

[17]Doc. 14.

[18]Doc. 29.

[19]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[20]*Id.* at 325.

dispute at trial.[21]  The court views this evidence in the light most favorable to the nonmoving party and draws all justifiable inferences from it in favor of the nonmoving party.[22]

## IV.  DISCUSSION

Defendants move the court for an order granting partial summary judgment on the following grounds: 1) plaintiff does not have a valid claim against either the Borough or Eckert under 42 U.S.C. § 1983; 2) Eckert is immune from suit under § 1983; and 3) plaintiff does not have a valid promissory estoppel claim against the Borough under Alaska law. As the parties have stipulated to dismiss all of plaintiff's claims against Eckert, the court will consider defendant's motion only in relation to plaintiff's claims against the Borough.

**Claims under 42 U.S.C. § 1983**

Plaintiff's first cause of action alleges claims under 42 U.S.C. § 1983 against the Borough.  To state a claim under § 1983, plaintiff must allege facts showing a deprivation of rights secured by the Constitution or laws of the United States under color of state law.[23] Plaintiff's complaint alleges that the Borough violated her rights under both the Privileges and Immunities Clause and the Contracts Clause of the United States Constitution. Defendant argues that plaintiff does not have a valid claim against the Borough under § 1983 because plaintiff has failed to show a deprivation of her rights under either  clause.

The court first considers plaintiff's claim under the Privileges and Immunities Clause. Plaintiff contends that the Borough is liable for violating her rights under the Privileges and

---

[21]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[22]*Id.* at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

[23]*Giannini v. Real*, 911 F.2d 354, 359 (9th Cir. 1990).

Immunities Clause because her employment was terminated "based on [her] residency in Oregon, and non-resident status in Alaska" pursuant to the Borough's official policy.[24] Article IV, § 2 of the Constitution provides that "Citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several States." The Privileges and Immunities Clause "seeks to ensure the unity of the several states by protecting those interests of nonresidents which are 'fundamental to the promotion of interstate harmony.'"[25] To assess plaintiff's claim, the court first determines whether the residency requirement in § 30.20.016 burdens such fundamental rights.[26] If it does, the court determines "whether the state's reasons for discriminating between residents and nonresidents is 'substantial and 'whether the degree of discrimination bears a close relation to [that reason.]'"[27]

Defendant first argues that the Privileges and Immunities Clause is inapplicable here because plaintiff was terminated for refusing to comply with the work location requirement of § 30.30.038 of the Borough Code, not because of failing to comply with the residency requirement in § 30.20.016. In support, defendant notes that plaintiff was not in violation of the residency requirement in § 30.20.016 when she was terminated. Under the plain language of § 30.20.016, plaintiff was required as a condition of continued employment to reside within the corporate boundaries of the Borough within three months after October

---

[24]Doc. 1 at 4.

[25]*International Organization of Masters, Mates & Pilots v. Andrews*, 831 F.2d 843, 845 (9th Cir. 1987) (quoting *United Building and Construction Trades Council v. City of Camden*, 465 U.S. 208, 218 (1984)).

[26]*Id.* (quoting *Camden*, 465 U.S. at 218).

[27]*Id.* (quoting *Camden*, 465 U.S. at 222).

1, 2005, or by January 1, 2006.    Thus, when plaintiff's employment was terminated effective November 1, 2005, plaintiff was not yet in violation of the residency requirement set forth in § 30.20.016.

Plaintiff argues that Eckert's deposition testimony "leave[s] no doubt that Thomas was fired based on her residency outside of the Ketchikan Gateway Borough, rather than rules established concerning 'Work Location.'"[28]    Eckert's testimony, however, suggests that plaintiff was terminated on two grounds - failure to reside inside the Borough and failure to work in a Borough controlled office:

> Q    Okay.  So, the reason for termination, then, was what?
> A    Just a refusal to come back.
> Q    Okay.  And was that pursuant to any law or policy of the Borough?
> A    Yes.  Yes.  The Borough had an ordinance to that effect, that employees had to live inside the city - I'm sorry inside the Borough.[29]
> ....
>
> Q    Okay.  And specifically, what part of Ordinance 1369 are we talking about, here, in your letter?
> A    Okay.  It was the part that - it stated that they have to work in the Borough, in the Borough Offices, control[led] offices.  If I can find that specific part in here.
> Q    Okay.  But I suppose when you live on an island in a remote location, they may, as a practical matter, be synonymous, but was she being fired because she lived in Oregon?
> A    She was being fired because she was not working here in Ketchikan and in a Borough-controlled office.  And that's - you know, we'd asked her to, given her several opportunities to do so, and she said no.[30]

The language in Eckert's letters leading up to plaintiff's termination suggests that plaintiff was terminated based on her refusal "to report to a work site in Ketchikan in a

---

[28]Doc. 24 at 11.

[29]Doc. 24, exh. 24 at 4.

[30]Doc. 18, exh. B at 25-26.

facility owned or controlled by the Borough."[31]  Eckert's deposition testimony, which was taken over eight months after plaintiff's termination, suggests that plaintiff was terminated based on both her refusal to reside in the Borough and to work in a Borough controlled facility.  On summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[32]  Because there are genuine issues of fact as to whether plaintiff was terminated based on her residency or her refusal to report to work at a Borough controlled facility, defendant is not entitled to summary judgment based on the theory that the Borough did not terminate plaintiff's employment based on residency.

Defendant next argues that even if the Borough had terminated plaintiff's employment based on her residency in Oregon, "it is not unconstitutional to require public employees to reside in the political subdivision that employs them."[33]  Therefore, "it would have been constitutionally permissible for [Ketchikan Gateway Borough] to terminate Thomas for refusal to comply with the residency requirement of KGB Code § 30.20.016."[34]

The court must first determine whether the residency requirement in § 30.20.016 burdens a fundamental right.  Plaintiff essentially claims a constitutional right to continued public employment in one state while she is living in another state.  "[W]hether public employment is a fundamental right within the Privileges and Immunities Clause remains

---

[31]Doc. 20, exh. M at 1.

[32]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[33]Doc. 14 at 17.

[34]Doc. 14 at 18.

unsettled."[35]  However, the court need not decide whether public employment is subject to the requirements of the Privileges and Immunities Clause because plaintiff has not shown that she has a constitutional right to be employed by the Ketchikan Gateway Borough while residing in another state.   Plaintiff has cited no cases, nor has the court's research produced, any cases supporting such a claim.  To the contrary, numerous courts, including the Supreme Court, have upheld   residency restrictions imposed upon municipal employees as a continuing condition of their public employment  on the grounds that such restrictions are  rationally related to legitimate governmental purposes.[36]

In *McCarthy v. Philadelphia Civil Service Commission*, the appellant's employment with the Philadelphia Fire Department was terminated after sixteen years of service "because he moved his permanent residence from Philadelphia to New Jersey in contravention of a municipal regulation requiring employees of the city of Philadelphia to be residents of the city."[37]  Similar to the case at bar, appellant claimed a "constitutional right to be employed by the city of Philadelphia *while* he is living elsewhere."  The Supreme Court ruled "[t]here is no support in our cases for such a claim."[38]  The Court upheld the residency requirement for municipal employment as a "bona fide continuing-residence requirement."   The Court pointed out that in previous cases it had "differentiated between

_____

[35]*Andrews*, 831 F.2d at 846 (citing *Camden*, 465 U.S. at 219-20).

[36]*See, e.g.*, *McCarthy v. Philadelphia's Civil Service Commission*, 424 U.S. 645 (1976); *Andre v. Board of Trustees of the Village of Maywood*, 561 F.2d 48 (7th Cir. 1977); *Mogel v. Sevier County School District*, 540 F.2d 478 (10th Cir. 1976); *Wardwell v. Board of Education of City School District*, 529 F.2d 625 (6th Cir. 1976); *Wright v. City of Jackson, Mississippi*, 506 F.2d 900 (5th Cir. 1975).

[37]424 U.S. 645 (1976).

[38]*Id.* at 647.

a requirement of continuing residency and a requirement of prior residency of a given duration" and had upheld the "validity of appropriately defined and uniformly applied bona fide residence requirements."[39]  The Court further noted that the prior cases did not "involve a public agency's relationship with its own employees which, of course, may justify greater control than that over the citizenry at large."[40]

The Ninth Circuit also recognizes the distinction between durational requirements which "violate the constitutional right to travel by conditioning public benefits or political rights on a term of residency," and bona fide residence requirements which ensure that a state's services and benefits go to actual residents of the state.[41]  Here, the residency requirement in § 30.20.016 is not  a durational residency requirement, but rather a bona fide residence requirement which is appropriately defined and uniformly applied  to ensure that all Borough employees establish residency in the Borough within three months of their date of hire. Section 30.20.016 does not interfere with interstate harmony or with the freedom of nonresidents to seek employment with or residence in the Borough "for any person is free to move to [the Borough] and to establish residence there."[42]

In support of her claim that the Borough's residency requirement for continued employment implicates a fundamental right, plaintiff cites district court case *Walsh v. City*

---

[39]*McCarthy*, 424 U.S. at 647 (citing *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Dunn v. Blumstein*, 405 U.S. 330 (1972); *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974)).

[40]*Id.* at 647 n.6.

[41]*Andrews*, 831 F.2d at 846-47.

[42]*Id.* at 846.

*and County of Honolulu.*[43]  However, that case involved a pre-employment residency requirement. While the district court expressed concern that the pre-employment residency requirement would impinge on the fundamental right to travel, the court explicitly stated that, "[o]n the other hand, a requirement that a new hire obtain state residency within a reasonable period of time after hire appears to be a responsible requirement that would meet constitutional requirements, as dictated in prior decisions."[44]

Because the condition in § 30.20.016 is a bona fide residence requirement and does not burden a constitutional right, plaintiff's claim that the Borough violated her rights under the Privileges and Immunities Claim fails as a matter of law.

Plaintiff's complaint next alleges that the Borough violated her rights under the Contracts Clause of the Constitution in enacting Ordinance 1369 "by divesting plaintiff of her contractual right to perform her job duties outside of the Borough, so long as her remote location did 'not interfere with the daily performance' of those duties."[45]  Article I, § 10 of the Constitution provides: "No State shall ... pass any ... Law impairing the Obligation of Contracts."  Whether a regulation violates the Contracts Clause is governed by a sequential analysis.[46]  The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship."[47]  "This inquiry has

---

[43]423 F.Supp.2d 1094 (D. Hawaii 2006).

[44]*Walsh*, 423 F.Supp.2d at 1107.

[45]Doc. 1 at 4.

[46]*Rui One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004).

[47]*Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)).

-13-

three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."[48]

The first component to be addressed is whether a contractual relationship existed between plaintiff and the Borough.  At issue "is not whether any contractual relationship whatsoever exists between the parties, but whether there was a 'contractual agreement regarding the specific ... terms allegedly at issue.'"[49]  It is undisputed that the Borough hired plaintiff to serve as HR Manager in March 2004, and that the parties did not execute a written employment contract. The parties stipulate, however,  that Thomas "did enter into a contract concerning her employment as [HR Manager], the terms of which were set out in the applicable laws and policies adopted pursuant to the Borough Code and applicable state law."[50]

Accordingly, it is undisputed that the Borough Code is part of the contractual relationship between plaintiff and the Borough.  It is also undisputed that from the time of plaintiff's hire through October 4, 2005, the effective date of Ordinance 1369, § 30.20.016 provided:

> **30.20.016.  Residency**.  Residency within the borough shall not be a condition of initial appointment or continued employment, except as otherwise required by state law, the Borough Code of Ordinances or resolution; provided, however, that an employee's residence location shall not interfere with the daily performance of an employee's duties and responsibilities.[51]

---

[48]*General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992).

[49]*Rui,* 371 F.3d at 1147 (quoting *Romein*, 503 U.S. at 187).

[50]Doc. 30 at 2.

[51]Doc. 24, exh. 17 at 2.

-14-

Plaintiff argues that based on the above language, she had a contractual right to perform her job duties outside of the Borough, so long as her remote location did not interfere with the daily performance of those duties.   Defendant argues that "nothing in KGB Code § 30.20.016, as it existed when Thomas was hired, [] remotely suggested she had a contractual right to select a work location in Oregon."[52]

"Since the contract here relied upon is one between a political subdivision of a state and private individuals, settled principles of construction require that the obligation alleged to have been impaired be clearly and unequivocally expressed."[53]  That requirement is not met here.   While the Code in effect at the time of plaintiff's hire did not require residency in the Borough as a condition of continuing employment, the plain language of § 30.20.016 did not create an absolute unconditional contractual right in plaintiff to live outside the Ketchikan Gateway Borough.  It also did not create a contractual right to reside in another state while working for the Borough.  Even if § 30.20.016 created some interest in plaintiff, that interest would have been subject to the Borough Manager's discretion[54] and contingent upon the anticipated continuance of the Code.[55]

---

[52]Doc. 26 at 5.

[53]*Keefe v. Clark*, 322 U.S. 393, 396-97 (1944).

[54]Ketchikan Gateway Borough Code § 5.20.

[55]*See, e.g., Andre v. Board of Trustees of the Village of Maywood*, 561 F.2d 48, 51 (7th Cir. 1977).

It is well established that the "power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power."[56] It is also settled that the government may not contract away its right to exercise its police power in the future.[57] Moreover, the Code in effect when plaintiff was hired expressly stated that residency within the borough "shall not be a condition of initial appointment or continued employment, except as otherwise required by state law, the Borough Code of Ordinances or resolution." Courts have interpreted such provisions to mean that a party to a contract will comply with existing law as well as future law.[58]  A such, the Code in effect when plaintiff was hired expressly contemplates that plaintiff as a Borough employee will be subject to statutes, regulations, and ordinances that may change over time.[59]

In her response brief, plaintiff acknowledges that "by enacting Ordinance No. 1369, the Borough did not breach its contract with [] Thomas; the Borough owed Thomas no contractual obligation to keep its Personnel Code intact. [60]  However, citing *University of Hawaii Professional Assembly v. Cayetano*,[61] plaintiff argues that by adopting Ordinance 1369 and modifying § 30.20.016, the Borough substantially impaired its contractual relationship with plaintiff by "creat[ing] a defense to a claim of breach of contract by using

[56]*Rui*, 371 F.3d at 1150.

[57]*Id.* at 1149.

[58]*Id.* at 1150.

[59]*Id.* (concluding that "contrary to RUI's suggestion, the lease agreement provides that RUI will be subject to regulation that may change with time, not that it is immune from such regulation").

[60]Doc. 24 at 17.

[61]183 F.3d 1096 (9th Cir. 1999).

-16-

its law-making powers to change the law."[62]  In *Cateyano*, the Ninth Circuit ruled that the "second component of the substantial impairment test turns on whether the State has used its law-making powers not merely to breach its contractual obligations, but to create a defense to the breach that prevents the recovery of damages."[63]  *Cateyano* is inapplicable here because, as set out above, plaintiff has failed to establish the breach of a contractual obligation.

Because plaintiff has failed to establish the existence of a contractual obligation on the part of the Borough regarding the specific term allegedly at issue, the court need not reach the issue of impairment.  "Before we can find impairment of a contract, we must find an obligation of the contract which has been impaired."[64]

For the reasons set out above, plaintiff has failed to establish a violation of her rights under either the Privileges and Immunities Clause or the Contracts Clause, and defendant is entitled to summary judgment on plaintiff's claim under 42 U.S.C. § 1983 as a matter of law.

**Promissory Estoppel Claim**

The court next considers plaintiff's claim of promissory estoppel against the Borough.  Plaintiff's second cause of action alleges that Eckert, on behalf of the Borough, promised plaintiff that she could continue her employment as HR Manager if she moved her residence to Oregon, and that in justifiable reliance on the promise made by

---

[62]Doc. 24 at 17.

[63]*Cateyano*, 183 F.3d at 1102.

[64]*Keefe*, 322 U.S. at 396.

defendants, plaintiff moved to Oregon and began to perform her duties as HR Manager from that location.

"Under Alaska law, a promise that induces action will bind the promisor only if it satisfies all four elements of promissory estoppel:

'1) The action induced amounts to a substantial change of position;  2) it was either actually foreseen or reasonably foreseeable by the promisor;  3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and 4) enforcement is necessary in the interest of justice.'"[65]

Defendant argues that plaintiff's promissory estoppel claim fails as a matter of law because plaintiff cannot satisfy any of the requirements imposed by Alaska law.

"With respect to the first prong of the promissory estoppel test, '[w]hether particular actions represent substantial changes is a question of all the circumstances and is not determinable by reference to a set formula.'"[66]  "Courts look for evidence of actual and substantial economic loss."[67]  Defendant argues that plaintiff cannot establish the first element because she was moving to Oregon anyway.  Defendant further argues that Eckert did not ask plaintiff to move to Oregon.  Rather, the "discussion began when Thomas advised Eckert that family problems required her to leave Ketchikan."[68]  Plaintiff argues she

---

[65]*Valdez Fisheries Development Association, Inc., v. Alyeska Pipeline Service Company*, 45 P.3d 657, 668 (Alaska 2002) (quoting *Zeman v. Lutfhansa German Airlines*, 699 P.2d 1274, 1284 (Alaska 1985)).

[66]*Simpson v. Murkowski*, 129 P.3d 435, 440 (Alaska 2006).

[67]*Zeman*, 699 P.2d at 1284.

[68]Doc. 15 at 24.

moved to Oregon and set up a workplace based on Eckert's promise and that had he not made that promise, she "would probably have stayed in Ketchikan longer."[69]

It is undisputed that when plaintiff first told Eckert in February 2005 that she needed to move to Oregon, she said that she anticipated leaving in June 2005. It is also undisputed that neither party discussed the possibility of plaintiff working from Oregon at that time. In her June 2006 deposition, however, plaintiff testified that she would have stayed in Ketchikan longer than June 2005 and might still be in Ketchikan if Eckert had not authorized her to work remotely.[70] Viewing the evidence in the light most favorable to plaintiff, plaintiff raises a material question of fact as to whether she might have stayed another year in Ketchikan had Eckert not authorized her to work remotely, which represents the economic loss of one year's salary and benefits. Such economic losses could conceivably constitute a substantial change for purposes of promissory estoppel.

The second element requires detrimental reliance on the alleged promise to be either foreseen or foreseeable. Defendant argues that there was no detrimental reliance at all. Rather, "Thomas approached Eckert because she already intended to move to Oregon."[71] Plaintiff argues that "[t]here can be no question that Thomas' reliance on the promise that she could work from a remote location was actually foreseen by Eckert" because Eckert proposed the idea of plaintiff performing her position from Oregon.[72] In support, plaintiff cites her deposition testimony, which states:

---

[69]Doc. 24 at 21.

[70]Doc. 15, exh. A at 17.

[71]Doc. 15 at 24.

[72]Doc. 24 at 21.

> And I told him that I would really like to stay with the union contracts until they were signed...And he said...something to the effect that I wish you would just do –stay with your whole job.  And I said, but I really need to be in Oregon.  And he said, I know.  And we discussed doing it remotely and what would work and what would not work.  And we talked about it two or three or four times, and then it was determined that that was what I would do.[73]

Plaintiff also cites a Ketchikan newspaper article which reported that the Borough's HR Manager was telecommuting from Oregon and working full-time for the Borough.  The article also quoted Eckert as saying the Borough is "still evaluating where we want to go" with the HR position but that the arrangement is working well.[74]  Construing the evidence in the light most favorable to plaintiff, plaintiff has raised material questions of fact as to whether plaintiff's reliance on the alleged promise was foreseeable.

To satisfy the third element, plaintiff must first "show that 'an actual promise was made.'"[75]  The Alaska Supreme Court's prior promissory estoppel decisions illustrate that an actual promise must be very clear and definitive in order to fulfill the "actual promise" prong of the promissory estoppel test.[76]  It is undisputed that there was no written agreement between Eckert and Thomas defining the terms of their agreement.  It is also undisputed that Eckert and Thomas did not discuss how long Thomas would work remotely, nor how Thomas would fulfill her all of duties as HR Manager from Oregon.[77]  While the Alaska Supreme Court has ruled that promissory estoppel can bind a promisor to an oral

---

[73]Doc. 24, exh. 4 at 4-5.

[74]Doc. 24, exh. 11 at 1.

[75]*Eufemio v. Kodiak Island Hospital*, 837 P.2d 95, 103 (Alaska 1992).

[76]*Simpson*, 129 P.3d at 443 (citations omitted).

[77]Doc. 15, exh. A at 16.

employment contract notwithstanding the statute of frauds, the court did so in part based on the "extent to which the main terms of an employment contract are generally well understood."[78]  The case at bar  is distinguishable because the duration and terms of the alleged promise are indiscernible.[79]   In her deposition, plaintiff testified that Eckert "said...something to the effect that I wish you would just do –stay with your whole job" and that they  "discussed doing it remotely and what would work and what would not work... and then it was determined that that was what I would do."[80]  Construing all the evidence in the light most favorable to plaintiff, Eckert's statements are not sufficiently definite to qualify as "an actual promise."[81]

Plaintiff also cannot establish that reliance on defendant's alleged promise actually induced her  move to Oregon.  It is undisputed that plaintiff told Eckert in February 2005 that she needed to move to Oregon to care for her mother and that she anticipated moving in June 2005.  It is also undisputed that neither party discussed the possibility of plaintiff working from Oregon at that time.  Based on the undisputed evidence, plaintiff cannot now argue that her move was induced by Eckert's alleged representation that she could continue working as the Borough's HR Manager from Oregon.[82]

---

[78] *Valdez Fisheries*, 45 P.3d at 669  (citing *Alaska Democratic Party v. Rice*, 934 P.2d 1313, 1316-17 (Alaska 1997)).

[79] *Id.*

[80] Doc. 24, exh. 4 at 4-5.

[81] *Simpson*, 129 P.3d at 443.

[82] *Eufemio*, 837 P.2d at 103 ("Eufemio, who was already planning on obtaining the additional training, cannot argue that his attendance was induced by the hearing committee's recommendation.")

Because plaintiff failed to establish that "an actual promise was made and itself induced the action or forbearance in reliance thereon," the court need not address "whether enforcement of the purported promise would be necessary in the interests of justice."[83]  For the reasons set out above, defendant is entitled to summary judgment on plaintiff's promissory estoppel claim as a matter of law.

In her opposition brief, plaintiff for the first time argues that she also has an equitable estoppel claim and/or a claim based on quasi-estoppel.  The court declines to address plaintiff's newly raised claims as they were not presented in plaintiff's complaint.  Moreover, the Alaska Supreme Court has concluded "the 'primary difference between promissory and equitable estoppel is that the former is offensive, and can be used for affirmative enforcement of a promise, whereas the latter is defensive, and can be used only for preventing the opposing party from raising a particular claim or defense.'"[84] Because plaintiff seeks to enforce an alleged promise, the four-part test for promissory estoppel is the appropriate test.

## V.  CONCLUSION

For the reasons set out above, defendants' motion for partial summary judgment at docket 14 is **GRANTED.**  Because all claims against defendant Eckert were previously dismissed, no claims remain and this matter is **DISMISSED**.

---

[83]*Simpson*, 129 P.3d at 444.

[84]*Id.* at 440 n.18 (quoting *Mortvedt v. State, Department of Natural Resources*, 858 P.2d 1140 1143, n.7 (Alaska 1993) (internal citations omitted)).

DATED at Anchorage, Alaska, this 7th day of February, 2007.

_____
/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE
